NOS. 21-50259 & 21-50261

_____

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

## UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

## JUAN CARLOS CABRERA,

Defendant-Appellant

_____

Appeal from the
United States District Court
for the Southern District of California
Honorable Larry Alan Burns, District Judge Presiding

_____

## APPELLANT'S EXCERPTS OF RECORD VOLUME 1

_____

KARA L. HARTZLER
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Attorneys for Defendant-Appellant

# ER-1

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5         Plaintiff,                   ) No. 20-CR-435-LAB
                                        )
 6             v.                       )
                                        ) June 7, 2021
 7   JUAN CARLOS CABRERA,               )
                                        ) 3:48 p.m.
 8         Defendant.                   )
     _____ ) San Diego, California
 9

10               TRANSCRIPT OF MOTIONS IN LIMINE HEARING
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                              By:  COLIN MCDONALD, ESQ.
14                                 AMANDA MUSKAT, ESQ.
                              880 Front Street
15                            San Diego, California  92101

16   For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
                              By:  BENJAMIN P. DAVIS, ESQ.
17                                 SALIL DUDANI, ESQ.
                              225 Broadway
18                            San Diego, California  92101

19

20   Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
21                            333 West Broadway, Suite 420
                              San Diego, California, 92101
22                            cynthia_ott@casd.uscourts.gov

23

24
     Reported by Stenotype, Transcribed by Computer
25
```

1    THE COURT:  Okay.

2    MR. DAVIS:  And the government said they weren't going

3  to introduce anything after that.  So --

4    THE COURT:  Okay.  So that had to do with, what, a

5  post-arrest statement?

6    MR. DAVIS:  Yes, Your Honor, he invoked and then --

7    THE COURT:  Okay.  And now -- now you're challenging

8  whether Miranda rights should have been given upon the

9  encounter with him near the fence?

10    MR. DAVIS:  Yes, and Mr. Dudani is prepared to argue

11 that motion today.

12    THE COURT:  All right.  I'm happy to hear from you.

13 I've read the papers.

14    MR. DUDANI:  Thank you, Your Honor.

15    THE COURT:  Uh-huh.

16    MR. DUDANI:  Your Honor, let me just start by

17 contrasting this case to most field statements.  I submitted a

18 video that maybe the Court had a chance to review, and this

19 incident was captured on video.

20    THE COURT:  Uh-huh.

21    MR. DUDANI:  Most of the time, field statements don't

22 raise the, you know --

23    THE COURT:  Custody.

24    MR. DUDANI:  Don't support a finding of custody

25 because it's in the field, it's public, it's in the desert

```
1    or --
2              THE COURT:  Custody issue.
3              MR. DUDANI:  -- or it's in a vehicle.
4              THE COURT:  Right.
5              MR. DUDANI:  It's a roadside stop.  Those are easy
6    cases.  This case is very different on the facts as they
7    pertain to custody.  The Court has seen the video.  Mr. Cabrera
8    was hemmed in-between the secondary fence, the Border Patrol
9    vehicle, and the Border Patrol agent, all right there within
10   feet of him on -- on those three sides.  That's one point.
11             Another point is that he is in a restricted area.  He
12   is in-between the border fence and the secondary fence.  And so
13   this is not the ordinary situation when it comes to field
14   statements, and these facts strongly support a finding of
15   custody.
16             I think there's some other important differences that
17   follow from those facts.  One is in these other roadside cases
18   or in -- kind of in the desert cases, you know, there are some
19   special Fourth Amendment rules governing these border
20   interactions and part of that is motivated by the need --
21   obviously the need for the agent to determine is this an
22   immigration interaction, is this person an alien, do I have
23   probable cause to take this person into custody for that
24   reason?
25             This case is different because he's in a restricted
```

ER-4

1   area.  That alone generates probable cause to take him into

2   custody.  It's not the -- it's not the typical kind of

3   immigration interaction out into the field.

4         THE COURT:  Wait.  You're saying anybody in proximity

5   to the fence can be arrested regardless of their citizenship?

6         MR. DUDANI:  Let me rephrase that.  You know, under 19

7   USC 1459, any person regardless of citizenship is prohibited

8   from entering not at a port of entry.

9         And so I do think when a person is in no man's land

10   in-between the two fences just inside the United States, it's

11   not the ordinary -- the ordinary justification is that, hey,

12   you need to do an immigration --

13         THE COURT:  I agree with you.  I agree.  It's unusual.

14         I think once or twice I've had people walking around

15   down in these areas that it turned out to be lawfully in the

16   United States or citizens, but -- it doesn't happen all of the

17   time, but it's another thing to say just by virtue of being

18   there, without any questioning at all, that the Border Patrol

19   have authority to arrest them.

20         MR. DUDANI:  Fair enough.  I think another point to be

21   made about the unusual -- kind of how this is different than

22   the typical border case is that that line of cases that talks

23   about border interactions, you know, Terry stops at the border

24   being okay, those are Fourth Amendment cases, they're special

25   Fourth Amendment principles, and so most of the time it's an

ER-5

1  easy case.  It's clearly a Terry stop under the Fourth

2  Amendment.  It's clearly not custody under Miranda.

3       There's no special exemption for the general custody

4  principles of the Fifth Amendment, even if near the border.

5  And so --

6       THE COURT:  Yeah, I -- I agree with that.  I agree

7  with that.

8       MR. DUDANI:  And ultimately -- yeah.

9       THE COURT:  But there's also likewise no prohibition

10 that prevents Border Patrol from approaching someone and asking

11 them questions if they're in the proximity of the border.

12      MR. DUDANI:  I agree with that.

13      THE COURT:  Without Miranda warnings.  They don't have

14 to give Miranda warnings just because somebody's close to the

15 fence.

16      MR. DUDANI:  I think one factor is being in no man's

17 land, but another factor is being hemmed in by a Border

18 Patrol -- by the vehicle and by the agent.

19      THE COURT:  Yeah.

20      MR. DUDANI:  It would not have been reasonable for

21 Mr. Cabrera to feel free to leave in the restricted area.

22 That's not reasonable to believe.  And so in combination with

23 being surrounded, being in no man's land strongly supports a

24 finding of custody.

25      And I think -- I think that on these facts, the

ER-6

1  custody argument is strong.  And I think the closer question

2  has to do with the booking exception.  And if the Court likes,

3  I can proceed to that, the booking exception, which --

4  which would -- well, let me just back up.  Our position is that

5  this was interrogation and the booking exception does not apply

6  because these are questions about elements of the offense.

7          But I want to highlight for the Court that if the

8  Court does not accept that position, some of these questions

9  clearly fall outside the booking exception and also clearly

10 fall outside what an ordinary immigration inspection kind of

11 incident to a Terry stop would include.

12         There are four statements here.  The first one is a

13 statement about citizenship, that he's a citizen of El

14 Salvador.  Again, our position is that the booking exception

15 doesn't apply, but if the Court disagreed, that one would be

16 the kind of question substantively that's included there.

17         He doesn't have documents, and then the third -- the

18 third statement is that he climbed over the primary fence.

19 That is not necessary for an immigration inspection.  That's

20 not an ordinary part of a border Terry stop, just establishing

21 alienage, lack of permission.  And that's certainly not a

22 booking question.

23         The fourth statement is even clearer.  The fourth

24 statement is in response to a question about the purpose for

25 coming.  Why -- what's your motivation?  Of course, that

ER-7

1  wouldn't be supported by --

2          THE COURT:  In sequence, is that the fourth question

3  that was asked after they ascertained the answers to the first

4  three?

5          MR. DUDANI:  Exactly.

6          THE COURT:  Okay.  And what -- I'm sorry.  Remind me

7  what was his answer when he was asked that?

8          MR. DUDANI:  To come to work.

9          THE COURT:  Okay.  All right.

10          MR. DUDANI:  Unless the Court has questions, those are

11  the arguments in favor of suppressing the statements.

12          THE COURT:  All right.  Mr. McDonald?

13          MR. MCDONALD:  Your Honor, this was an excellent field

14  immigration inspection asking exactly the questions that a good

15  Border Patrol agent should ask in this circumstance.

16          THE COURT:  The third one -- or the fourth one seems

17  to me problematic.  By the time they've ascertained that he's a

18  citizen of El Salvador, he has no documents or permission to be

19  in the United States, he just climbed over the fence, the

20  fourth one actually goes to an element of the crime.  It goes

21  to proof.  It doesn't go to them convincing themselves that he

22  should be arrested.  They know that after they've ascertained

23  the first three, right?

24          MR. MCDONALD:  Well, not quite, because when someone

25  jumps over the fence, if they're coming to go into custody, if

1  they're coming in to go into Border Patrol custody, that's

2  something that the Border Patrol has to ascertain.  There are

3  give-ups, for instance, where if they say I was coming to go

4  into custody, then they know that they're not going to

5  prosecute that case.

6          In this case, he asked him what was your purpose for

7  coming?  And he said that my purpose was coming to go to work.

8          But more generally, Your Honor, there's no, you know,

9  three questions only rule for Border Patrol agents when they

10  encounter someone in the field.  Berkemer v. McCarty, way back

11  from 1984, says that an officer may ask a detainee a moderate

12  number of questions to determine his identity and to try to

13  obtain information confirming or dispelling the officer's

14  suspicions.  This was just basically four questions, Your

15  Honor.

16          Otherwise, the encounter itself is a traditional

17  standard Terry stop.  And I'll just quote the Ninth Circuit

18  from Gutierrez-Salinas, 640 Fed. Appendix 690:  "The Ninth

19  Circuit has repeatedly held that brief questioning near the

20  border is a noncustodial Terry stop that does not trigger

21  Miranda."  And there's nothing about this stuff that makes it

22  any different.

23          The Court has seen the video.  The agent comes up on

24  an individual up against the secondary fence and asks some

25  simple questions.  He does not handcuff him, as was suggested

ER-9

1    in the defendant's motion.  You can see the defendant, for

2    instance, once he gets into the Border Patrol vehicle, putting

3    out his arms in a way that would not be possible to be

4    handcuffed.  So this is a standard Terry stop, and all four

5    questions were -- were reasonable and appropriate within the

6    Terry stop exception.

7              MR. DUDANI:  Your Honor, may I respond?

8              THE COURT:  Yeah, sure.

9              MR. DUDANI:  First on whether there might have been a

10   defense available about specific intent and so he had to ask

11   that fourth question, that -- even -- there was probable cause

12   to take him into immigration custody at that point.

13             So we're talking about Border Patrol at the border and

14   there's --

15             THE COURT:  But this -- this Miranda warning applies

16   to criminal custody, right, not immigration custody?  There's

17   no requirement to give Miranda warnings before taking somebody

18   into immigration custody.

19             And the point the government makes is, look, this

20   under Ninth Circuit law and it's kind of a crazy quilt here

21   about, you know, who has to be given warnings under what

22   circumstances -- I take that back.  Not who has to be given a

23   warning.  Under what circumstances a person physically present

24   without permission in the United States can be prosecuted or

25   has committed the offense implicates this official restraint

1  doctrine.  And I don't disagree with Mr. McDonald that, you

2  know, to make sure that he's got probable cause to arrest, he's

3  got to assure himself that the defendant's intent -- the Ninth

4  Circuit has said this -- subjective intent was to go at large.

5      It's not just physical presence here.  It's not just

6  objective.  You have to ascertain the subjective intent of the

7  person.  And without that, it's a complete defense to the

8  charge and it's probably -- if you know otherwise or he says

9  I'm coming to be arrested, that may cut against the efficacy of

10 the arrest.

11     That's the problem I'm having with it.  It's -- it's a

12 difficult standard to deal with because, as I said, you know,

13 it's hard to get -- for lay people to get their mind around the

14 fact that, wait a minute, he jumped over the fence, his feet

15 are here in the United States, what part of enter hasn't he

16 done?

17     But we have this legal fiction that, well, if you're

18 under continuous restraint, you know, you're not in, and if

19 your intention is to turn yourself in, then you're not coming

20 in with the required intent, which is to go about at large in

21 the population, not just to turn yourself in.

22     I think under the cases, the Border Patrol -- it's

23 wise to, you know, ask that follow-up question before they

24 place somebody under arrest.

25     MR. DUDANI:  Your Honor, and maybe it's wise and in

1    some broader sense appropriate for --

2         THE COURT:  Well, it goes to probable cause, in other

3    words.

4         MR. DUDANI:  Well, so, Your Honor, what we're talking

5    about is whether it's admissible in the criminal case.

6         THE COURT:  Right.

7         MR. DUDANI:  And so, you know --

8         THE COURT:  Actually what we're talking about is

9    whether it's inadmissible because they didn't advise Miranda

10   warnings.

11        But you're asking me to suppress, which is at its base

12   a deterrent to the -- to the police.  It punishes the police

13   and says don't do this again, we're going to deter you by

14   suppressing the statement here.

15        That's the real context of this, right?

16        MR. DUDANI:  Border Patrol had probable cause to

17   arrest him, if only for an immigration purpose and -- even if

18   only for an immigration purpose, and --

19        THE COURT:  Then -- then we're not -- why are we

20   talking about Miranda if it's just for an immigration purpose?

21        MR. DUDANI:  Because we're talking about its

22   admissibility or inadmissibility in the criminal trial.  So

23   it's not contradictory to say that, well, he had probable cause

24   as an immigration officer and didn't need to ask that fourth

25   question.

# ER-12

1    THE COURT:  I don't know.  I mean I don't -- I don't

2  know that to be true.  Does -- do they have the right to arrest

3  if they believe that the person's subjective intent was just to

4  be arrested or if he's being chased by people that are going to

5  do harm to him -- can they arrest him for an immigration

6  offense?  I mean if they can, that's a clear difference between

7  what's required for a criminal offense and what's required for

8  an immigration offense.  So I don't understand the point.

9    MR. DUDANI:  Well, I -- I think it happens all the

10  time that people are taken into immigration custody, and from

11  there, their claim that they're there in order to get arrested

12  is --  is evaluated in immigration court.

13    I -- it's not even clear to me that there wasn't

14  probable cause.  I -- let me step back and address the

15  contention that the Ninth Circuit case law is clear on these

16  kinds of interactions.  I don't agree and the unpublished case

17  -- the published cases that the unpublished case that the

18  government cited relies on, the published cases have exactly

19  those facts that I started contrasting this case to.  Those are

20  car cases and those are kind of in the public, in the

21  wilderness, in the desert type cases.

22    And in those situations -- you know, in those

23  situations, there's a clear rationale for immigration

24  inspections that doesn't apply here, and those are akin to

25  roadside stops like in Berkemer where there is publicity and

ER-13

1   you're not in a restricted area where obviously you're not free

2   to leave.

3           And -- and so -- I mean I think that also relates to

4   the point that we're talking about that that fourth question

5   was clearly unnecessary in this context, you know, in this

6   context where he's already in the no man's land where clearly

7   there's authority and probable cause to arrest him and clearly

8   the officer went outside the limited immigration inspection.

9   Maybe questions like that need to be asked in some

10  circumstances, but not -- not in this one.

11          THE COURT:  All right.  In the context of the -- this

12  is charged as an attempt, isn't it?

13          MR. MCDONALD:  Yes.

14          THE COURT:  Yeah, in the context of attempted entry

15  into the United States after being deported, the government

16  bears the burden of establishing lack of official restraint.

17  The government doesn't have to disprove speculative unsupported

18  evidence, but it otherwise does have to prove that the

19  defendant had the intention to come in and go free among the

20  populace, not some purpose just to turn himself over to Border

21  Patrol at the time.

22          And in the absence of that, the jury must find the

23  defendant not guilty where that's the issue.  It's relevant not

24  just to the commission of the crime.  It's relevant to probable

25  cause to arrest a person on that.  So to begin with, I don't

ER-14

1  find that the fourth question put to him, what was your

2  purpose, is out of bounds.  I find that that is a question that

3  goes to probable cause.

4       Going back for just a second to the question of

5  whether the defendant was in custody.  Miranda requires three

6  things, custody, focus, and interrogation.  There's no question

7  that there was interrogation.  There's no question there was

8  focus.  When you find somebody close to the border like that,

9  you're homing in on a particular offense, immigration offense.

10  The question here is whether the defendant was in custody.

11       The Supreme Court has said that's a significant

12  deprivation of personal freedom.  The Ninth Circuit has defined

13  it more broadly.  But the Ninth Circuit has recognized that

14  these encounters to ascertain whether we're dealing with

15  somebody who has crossed in illegally or one of the weird

16  situations where some U.S. citizen or legal resident is down

17  wandering around down by the border fence makes it appropriate

18  to make inquiry.  And the fact that they make inquiry under

19  those circumstances doesn't convert it into custodial

20  interrogation.

21       I've looked at the -- the video.  You say, well, he's

22  hemmed in.  He's no more hemmed in than when a person is

23  apprehended by two Border Patrol agents that stand on either

24  side of his egress into the United States.  So the Court,

25  having reviewed the evidence here, does not find that the

1    defendant was in custody for Miranda purposes.  I don't find

2    that this was custodial interrogation.

3         I find this is akin, as is -- as are most of the

4    cases, to a Terry stop where this is an encounter and the

5    Border Patrol are trying to ascertain what they have.  You can

6    say, well, it looks pretty evident what you have here, but

7    until they ask the question -- and, as I said, the Ninth

8    Circuit has inserted this evidence on attempt cases that the

9    subjective intent of the defendant is part of this, and in the

10   absence of an intent to come in and go free and about in the

11   United States, the person is not guilty because they're under

12   official restraint being caught under these circumstances, very

13   close, being watched the whole time.  So I think the need for

14   the Border Patrol to ascertain that his intent was to go at

15   large in the United States or go to work here is relevant.

16        So to sum up, he wasn't in custody for Miranda

17   purposes, in my judgment.  And all four components of what he

18   was asked in the field statements were relevant to the

19   assessment of whether probable cause existed.  The motion to

20   suppress is denied.

21        Okay.  I think that's it then, right?

22        MR. DUDANI:  Your Honor, I understand the Court's

23   ruling.  Just very briefly, I just want to say what I should

24   have said earlier, which is that after the third question when

25   Mr. Cabrera allegedly said that he climbed over the fence,

ER-16

```
 1   there was probable cause for a violation of 19 --
 2           THE COURT:  I would have thought that too.  But
 3   subsequent case law, including case law in my own cases, have
 4   said oh, no, no, it's the subjective intent that forms the
 5   attempt and it has to be proved --
 6           MR. DUDANI:  Right.
 7           THE COURT:  -- and that has to be an element.  And I
 8   remember Judge Bybee is saying, look, we're in this unusual
 9   situation now where, you know, people -- people cannot be asked
10   in some circumstances, but they must be asked, you know, if
11   they're planning to turn themselves in.
12           And I think it's incumbent on the Border Patrol to
13   distinguish, you know, those situations and to say the
14   defendant's subjective intent was to go -- be free to go about
15   in the United States as was his determination.
16           So I have your point on that.
17           MR. DUDANI:  Right.
18           THE COURT:  Respectfully, I disagree with you.
19           MR. DUDANI:  Understood, and just to complete the
20   record, my -- my point is that there was ample probable cause
21   for a violation of 19 USC 1459 whose elements relate to failing
22   to report your arrival.  Climbing over the fence itself
23   violates that statute, and so the position is that there's
24   probable cause in that --
25           THE COURT:  Okay.  Got you.
```

ER-17

1      MR. DUDANI:  -- and even if a Terry stop had exceeded

2  the scope.

3      THE COURT:  All right.  The record is complete on

4  that.  The motion is denied.  The statements may come in.

5      Is there anything else to resolve prior to trial now?

6      MR. DAVIS:  Yes, Your Honor.  I want to -- I just want

7  to front for the Court an issue that may come up tomorrow --

8      THE COURT:  Uh-huh.

9      MR. DAVIS:  -- about a defense witness that we intend

10 to call.

11     We don't believe that this witness is an expert, but

12 we've provided expert notice to the government in an abundance

13 of caution.

14     THE COURT:  Okay.

15     MR. DAVIS:  And I just want to give the -- you know,

16 give the opportunity now to tell the Court.

17     THE COURT:  Yeah.  No, I'd rather do it now than hold

18 the jury out.

19     MR. DAVIS:  And the other reason that we may do this,

20 Your Honor, is that she -- our witness, we don't know exactly

21 when she's going to be called because we don't know how long

22 the court -- case is going to take.  I know 1326 trials in this

23 courtroom often take less than a day, but --

24     THE COURT:  3:00 in the afternoon, they'll probably be

25 done.

ER-18

```
 1            MR. DAVIS:  We're having her come tomorrow afternoon.
 2    The question that we're going to have is if the government is
 3    not done with their case tomorrow afternoon, if we could call
 4    her out of order.  I know --
 5            THE COURT:  Sure.  Yeah, you can.
 6            MR. DAVIS:  So this witness, Your Honor, her name is
 7    Erica Pinheiro.  She's a legal director of an organization
 8    called Al Otro Lado in Mexico.
 9            THE COURT:  What's the name of it?
10            MR. DAVIS:  Al Otro Lado.  It means the other side in
11    Spanish.
12            THE COURT:  All right.
13            MR. DAVIS:  Al Otro Lado.  She's a -- she's an
14    American attorney who works in Mexico, lives and works in
15    Tijuana.  And what we intend to call her to testify, we believe
16    that her testimony is lay testimony, fact testimony, not expert
17    testimony.
18            THE COURT:  All right.
19            MR. DAVIS:  To front that for you.  So what we -- so,
20    big picture, Your Honor, we haven't been shy about what our
21    defense is going to be in this case.  We do intend to argue
22    that Mr. Cabrera did not have a specific intent to enter the
23    United States free from official restraint.
24            THE COURT:  All right.
25            MR. DAVIS:  And there's evidence in the record to
```

ER-19

1    support that.  For example, you know, we're going to rely on

2    the fact that he -- I don't know if the Court has reviewed the

3    footage of him, but he comes over the fence, walks straight up

4    to the border fence, sits down and waits for about seven

5    minutes before the Border Patrol come -- you know, he's waiting

6    for the Border Patrol to come get him.

7             THE COURT:  Uh-huh.

8             MR. DAVIS:  And he has also applied for asylum before

9    in the past, Mr. Cabrera has.  In 2018 he applied for asylum.

10            THE COURT:  Has that been acted on?

11            MR. DAVIS:  Yes, he was found credible, but it was

12   denied because of a -- you know, he hadn't met the evidentiary

13   burden.

14            THE COURT:  Okay.

15            MR. DAVIS:  But we believe that those two facts, the

16   fact that he, you know, in his most recent time in the United

17   States had sought asylum and the fact that when he crosses the

18   border and walks straight up the hill and sits down and waits

19   for the Border Patrol to come get him, allow us to argue the

20   inference that that's what he was doing --

21            THE COURT:  Yeah, I have no disagreement with that.

22            MR. DAVIS:  Okay.  So the -- the witness that we

23   intend to call, we are going to ask her -- she's going to --

24   prepared to testify about the factual situation in Tijuana in

25   November of 2019, specifically that as a result of the migrant

1   surge that was well attested to and in the news at that time

2   and the government's policies including the remain in Mexico

3   policy and the metering policies, that there was an enormous

4   backlog of Central American migrants seeking asylum.  Thousands

5   of people were waiting, long line, you know, basically no hope

6   to come in through the port of entry.  And that -- this is from

7   personal experience, not from, you know, reports.  This is what

8   she has seen and interacted with.  And for that reason, that --

9   that many people were -- the word was that you could climb over

10  the fence and try to get your asylum application that way.

11          So we intend to offer her to put those facts before

12  the jury.  They can, you know, dispute the facts --

13          THE COURT:  She -- she doesn't know the defendant,

14  knows nothing of his personal circumstances?

15          MR. DAVIS:  No.  This is -- this is simply to describe

16  the situation at the border.  We think it's probative and

17  relevant because it certainly corroborates the idea that -- you

18  know, the evidence is going to come in that Mr. Cabrera is a

19  citizen of El Salvador.  The evidence is going to come in --

20          THE COURT:  Right.

21          MR. DAVIS:  -- that he has applied for asylum before

22  and that he walked straight up and sat down at the fence.

23          THE COURT:  Right.  Right.  I have no problem with

24  that.  I just --

25          MR. DAVIS:  And so we think this corroborates --

```
1              THE COURT:  Go ahead.

2              MR. DAVIS:  I'm going to limit it.  I'm not -- here's

3    the thing:  I know the Court's likely concerned.  I'm not going

4    to be talking about the travails and how difficult it was --

5              THE COURT:  Yeah.

6              MR. DAVIS:  -- and all this other stuff, and I'm not

7    going to put a sob story in front of the jury about --

8              THE COURT:  Yeah.

9              MR. DAVIS:  You know, I'm not trying to get into

10   politics.  I'm not trying to --

11             THE COURT:  Right.

12             MR. DAVIS:  -- get into anything that would distract

13   the jury away from what this is.  We're going to target the

14   conversation to, really, a few bullet points, which is that

15   there was a backlog of people, the line to get in through the

16   port of entry was very -- thousands of people long.

17             THE COURT:  Right.

18             MR. DAVIS:  And I think that corroborates the idea

19   that someone who wants to apply for asylum might try to go get

20   into custody and put their application that way.  It supports

21   that inference, and that we argue the inference from those

22   facts.

23             So that's what we propose to do.

24             THE COURT:  The concern I have is something else you

25   said earlier, which was the word was that you could climb over
```

1  the fence.  Word according to who?

2       MR. DAVIS:  I think that she would say she was aware

3  from -- you know, she'll lay a foundation that she -- she lives

4  in Tijuana, works in Tijuana with these populations and is

5  aware of --

6       THE COURT:  That there's a rumor circulating among

7  people that the way to do this is jump over the fence, how is

8  that probative of anything?

9       MR. DAVIS:  I guess what she would say is that -- that

10  she is aware that people -- that many migrants were electing to

11  try to cross the fence rather than to go through the port of

12  entry.

13       THE COURT:  Well --

14       MR. DAVIS:  Now, if the Court, you know --

15       THE COURT:  I wouldn't want her to say what the word

16  was.

17       MR. DAVIS:  Fair enough.

18       THE COURT:  It's collective hearsay, but, you know, if

19  she wants to say I'm personally aware there were a number of

20  people that were unhappy with the speed at which asylum was

21  being -- but I don't know what that gets us.  I mean it's not

22  like that's a legal defense.

23       Is your argument going to be that he was crossing over

24  to get his asylum claim reviewed again?

25       MR. DAVIS:  To go into custody so he could apply for

ER-23

1   asylum.

2           THE COURT:  Okay.  I mean that kind of flies in the

3   face of what he said if the proffer of the government is true

4   that he said, no, I'm coming over to work.

5           Did he mention anything about asylum?

6           MR. MCDONALD:  He did not.

7           MR. DAVIS:  That'll be our obstacle, Your Honor.

8           THE COURT:  All right.

9           MR. DAVIS:  But I think that the evidence is

10  relevant --

11          THE COURT:  I think circumscribed by that, you know --

12  I don't know, I mean I'm --

13          MR. MCDONALD:  Your Honor, I do have some arguments in

14  response.

15          THE COURT:  Sure.

16          MR. MCDONALD:  I don't think that this is appropriate

17  evidence and I think it is a tricky issue --

18          THE REPORTER:  Please slow down.  Please slow down.

19          MR. MCDONALD:  Yes.  It is -- it is a tricky issue,

20  probably better in a written motion, I think, to really flesh

21  this out, Your Honor.

22          We just were given this notice on June 2nd just a

23  couple days ago.

24          THE COURT:  Yeah.

25          MR. MCDONALD:  This expert notice.

1    THE COURT:  Yeah.  It's easy enough to conceive,

2 though.  I mean either it's relevant or it's not and, you know,

3 if relevant, is there any probative danger to it?

4    Sounds pretty harmless.  I don't know that it, you

5 know, backs up anything, the fact that people are jumping over

6 the fence because the lines are long, okay.

7    MR. DAVIS:  Your Honor --

8    THE COURT:  I mean your answer to that is not this

9 guy.  Not this guy because he never said word one about asylum.

10 He said he was coming to work.  So what's that have to do with

11 anything?

12    MR. MCDONALD:  I think, step number one, we're missing

13 a critical link to the defendant.  Unless the defendant

14 testifies that he was, in fact, coming for that particular

15 purpose, having someone come and tell the jury that some

16 unknown, unnumbered number of migrants crossed over the fence

17 in this particular area during this particular time, that opens

18 up a whole can of worms from a 403 prejudice perspective.

19    The United States then -- this -- this simple

20 immigration case would be expanded to really be a discussion

21 about the asylum procedures.

22    THE COURT:  Is there a relevancy issue to begin with?

23 Is there a 402 issue?

24    MR. MCDONALD:  There -- there is a relevancy issue I

25 think, unless -- unless there's a link to the defendant.

# ER-25

1   Unless he testifies that that's my --

2          THE COURT:  That's the problem I'm having, Mr. Davis.

3   You know, if he's going to say, look, my purpose -- I know what

4   I said to the agent or I didn't say it to the agent, whatever

5   he wants to say, but my purpose was to get asylum, then I can

6   see this as corroborative evidence.  But in the absence of

7   that, you're saying, well, because other people did it, that

8   must have been his purpose, and that doesn't follow.

9          MR. DAVIS:  No, Your Honor, I disagree.  First of all,

10  the defendant doesn't have to testify for us to -- to argue

11  inferences.  This is the case United States versus Rahm.  It's

12  993 F.2d 14 --

13         THE COURT:  Yeah, but where -- you're pulling this,

14  the concept of asylum, out of the sky.  Without some historical

15  underpinning that the defendant was trying to get asylum this

16  time, which is contrary to what they say he said, then, you

17  know, we're just pulling some concept out of -- out of the sky

18  and trying to impute it in this case.

19         MR. DAVIS:  I disagree, Your Honor.  He applied for

20  asylum in 2018.

21         THE COURT:  But it was denied.

22         MR. DAVIS:  Right.  But he can still apply again.

23         THE COURT:  Well, he can, but that doesn't -- that

24  doesn't prove that was the reason he came across.

25         MR. DAVIS:  It's an inference, Your Honor.

ER-26

1    THE COURT:  Yeah.

2    MR. DAVIS:  We're allowed to argue inferences from

3  evidence --

4    THE COURT:  I don't --

5    MR. DAVIS:  And this case says that we -- the

6  government's allowed to do -- to argue inferences from

7  circumstantial evidence.  The case of Rahm says --

8    THE COURT:  But there's no question --

9    MR. DAVIS:  -- that the defendant does not have to

10  testify --

11    THE COURT:  Mr. Davis, there's no question that you

12  can allow inferences from circumstantial evidence.

13    The question is whether this is relevant evidence.

14    MR. DAVIS:  Right.

15    THE COURT:  And in the absence of -- of some proof

16  that his purpose -- you know, from him or otherwise, that his

17  purpose was to reapply for asylum, then her testimony doesn't

18  make any difference.  She's -- she doesn't know him.  She's

19  saying that a lot of people cross over to apply for asylum.

20  Well, that doesn't mean it's him.

21    MR. DAVIS:  I disagree, Your Honor.  I think it's

22  relevant because we are able to argue an inference from his

23  prior -- the Court has already agreed with this, that we can

24  argue an inference from his prior application --

25    THE COURT:  No, no, I haven't agreed with that.  I

ER-27

1    haven't agreed with that.  What I've agreed with is that you

2    can argue an inference that arises from circumstantial

3    evidence, but the fact that he crosses over doesn't raise a --

4    does not amount to circumstantial evidence of what his purpose

5    was.

6              MR. DAVIS:  That plus the prior asylum application.

7              THE COURT:  It was denied, though.  It was denied.

8              MR. DAVIS:  That doesn't matter, Your Honor.  The

9    question is not whether he has a likelihood of being granted.

10   The question is whether we can argue -- the jury could believe

11   that one reason -- the reason that he came across and sat down

12   and waited for the Border Patrol to come get him was because he

13   didn't want to wait for a line for six months in Tijuana with

14   thousands of other people.

15             THE COURT:  Now you're imputing to him something that

16   she cannot possibly say.

17             MR. DAVIS:  I'm not --

18             THE COURT:  He hasn't said that.  It would be entirely

19   speculation to argue that was his motive without his testimony

20   that was my motive.

21             MR. DAVIS:  I disagree, Your Honor.  I think the Ninth

22   Circuit case law is very clear on this, that we do not --

23             THE COURT:  All right.  I don't think it is.  I find

24   it's not relevant.  I'm not going to allow it.  Absent him

25   testifying that his purpose was to apply for asylum, then

ER-28

1   that's corroborative evidence, but in the absence of that, just

2   to grab something out of the sky and say, well, a lot of people

3   cross for this reason, that must be his reason and the fact

4   that he'd applied for asylum before and been denied, I don't

5   think that that necessarily is evidence of what his reason was

6   on this occasion.  And then you're up against the fact that he

7   said, according to them -- didn't mention word one about

8   asylum -- said I came here to work.

9         MR. DAVIS:  That's their case, Your Honor.  That's the

10  government's burden that they're going to try to prove.  Our

11  argument --

12        THE COURT:  I -- I understand.  I'm just saying

13  there's not a link between her testimony and this defendant or

14  anything that happened in this case.  The motion to exclude her

15  is granted.

16        You have your objection to it.  You've made your

17  record.

18        MR. MCDONALD:  Your Honor, with regard to the

19  defendant's prior asylum application, that is also not relevant

20  for purposes of this case.

21        THE COURT:  No, I -- I agree.  I don't think we're

22  going to get into that at all.  I mean I just don't see it.  So

23  I agree.

24        MR. DAVIS:  I'm sorry, I missed that.  What was the

25  point that --

ER-29

1          THE COURT:  He says he doesn't think the prior asylum

2    application and what happened on that is relevant.  I agree

3    with him.

4          MR. DAVIS:  Your Honor, the Court is excluding our

5    entire defense.  All right.  We --

6          THE COURT:  No, no.  You can -- you can argue that,

7    look, given his proximity to the fence, the fact he sat down

8    for seven minutes, the fact that he wasn't running away, that

9    his purpose was to turn himself -- turn himself in.

10         MR. DAVIS:  Right.  But we have to be able to tell the

11   jury why he might do that, right?  And we don't have to tell

12   them -- he doesn't have to testify and say I did this.  I'm

13   allowed to argue inferences from the evidence, so I can say,

14   look, the fact that he's from El Salvador, has applied for

15   asylum before, walked straight up and sat down, and thousands

16   of people were waiting to get in through the port of entry and

17   coming over the fence, that -- you can infer from that evidence

18   that this is what he did in this case.

19         THE COURT:  Yeah, I -- I just don't --

20         MR. DAVIS:  Now, is it a strong inference?  Can the

21   government rebut it?  Sure, they can.  They can try to with

22   their evidence.  But the Court -- this is -- Your Honor, if the

23   Court is going to exclude this, this is violating our right to

24   a defense under the Constitution.  I mean the Constitution --

25         THE COURT:  No, I don't agree with you, Mr. Davis.

ER-30

1   Look, I'm very mindful of that, and -- and I usually bend over
2   backwards if there's some basis for it, but this is entirely
3   speculative.  It has nothing to do with showing what this
4   fellow's intent was.
5           The fact that other people are climbing over because
6   the word out according to this lawyer is that you can get
7   asylum that way or get -- that has nothing to do with this
8   fellow.  You know, nothing at all.
9           I mean, if it was true and inexorable that everybody
10  coming over the fence was applying for asylum, maybe.  But
11  that's not what she's going to say.
12          MR. DAVIS:  That's not what we're arguing, Your Honor.
13  And if the Court's concerned about --
14          (Discussion off the record.)
15          THE COURT:  Go ahead, Mr. Davis.
16          MR. DAVIS:  I understand what the Court is saying.
17  What I'm -- the point that I'm trying to make, Your Honor, is
18  that if the Court's concerned about this thing about the word
19  out and what other people are doing, then that's fine.  I don't
20  have to put that in.  But I think the facts on the ground that
21  there was a line of people trying to get in through the front
22  door and that line was several thousand people long and that
23  the wait in Mexico was taking forever to come in is admissible,
24  relevant evidence that I can raise -- that I can argue to the
25  jury you can infer from this evidence that that may be a reason

ER-31

1  that he was coming in, and that coupled with the fact of his

2  prior asylum application, it gives a motive for why he would

3  come in and turn himself in to the police.

4        Because otherwise, what's the motive, right?  Why does

5  he come and sit down and wait for seven minutes sitting on a

6  road in plain view of everybody as they drive up and come to

7  him?  We're going to point that out and we're going to say he

8  came in with intent to enter free from official restraint.

9        THE COURT:  How are you going to --

10       MR. DAVIS:  You can't tell --

11       THE COURT:  How are you going to prove that one can

12  reapply for asylum?

13       MR. DAVIS:  I'm going to get it from the A-file

14  custodian.

15       THE COURT:  Okay.

16       MR. MCDONALD:  And, Your Honor, I think that would be

17  beyond the scope of the examination of the A-file custodian.

18       THE COURT:  Well, then he can call him as his own

19  witness.  I mean the A-file custodian will say somebody can

20  reapply for asylum?

21       MR. MCDONALD:  I don't -- I don't know exactly what he

22  will say, but, Your Honor, I think --

23       THE COURT:  I'll -- I'm going to change the ruling.

24  I'll permit you to prove that he applied previously for asylum

25  and it was turned down, and I'll permit you to prove through

ER-32

1  the A-file custodian that one can reapply for asylum.  And you

2  can argue the circumstances, the physical circumstances, in

3  evidence pertaining to this defendant, that he came in, sat

4  down by the fence, and waited.  And you can argue that.

5  　　　　I'm not going to allow the woman to testify about what

6  others have done or what the condition on the ground was.  So

7  that's the ruling.

8  　　　　MR. DAVIS:  I've given up on what others have done,

9  Your Honor.  You know --

10  　　　　THE COURT:  Yeah.  Otherwise --

11  　　　　MR. DAVIS:  I'm not going to --

12  　　　　THE COURT:  Otherwise, she doesn't provide anything

13  that's relevant, as far as I'm concerned, to this.  So that's

14  my ruling.  I don't want to belabor it.

15  　　　　She may not testify.  I will permit you to prove that

16  he had previously applied for asylum and that one can reapply.

17  And, you know, maybe that's relevant to the -- the physical

18  circumstances of him sitting down by the fence and remaining

19  there.

20  　　　　MR. DAVIS:  Is the Court precluding all testimony

21  about the situation in Tijuana in November of 2019, about the

22  thousands of people waiting to come in and the long line at the

23  border?  Because I can inquire that of the A-file custodian as

24  well.

25  　　　　THE COURT:  Yeah, okay, I'll let you do that way.

ER-33

```
 1          MR. MCDONALD:  Your Honor, I have an additional issue

 2   with the asylum claim from previously, and it is this:  That

 3   when he made that asylum application, it was actually after he

 4   had illegally entered the United States, and he pled guilty to

 5   illegally entering the United States and was in custody at the

 6   time that those credible fear claims --

 7          THE COURT:  I assume all of this can be elicited from

 8   the A-file custodian, right?

 9          MR. DAVIS:  I think that all goes to weight, Your

10   Honor.

11          THE COURT:  I do too.

12          You can -- I'm not foreclosing you from proving any of

13   that.  But I think there is a -- you know, there's a thread of

14   relevancy to the fact that one can reapply, this fellow has

15   applied before, and then you look at his conduct, you can say,

16   well, that might have been his motive, and even though, you

17   know, he disclaimed that, he didn't say anything about it at

18   the time.  But that's how it shapes up.

19          The -- the lawyer, with all respect to her, I don't

20   find has any relevant testimony to this case.  And as you say,

21   Mr. Davis, you can inquire of the agent what the circumstances

22   on the ground were at the time that he entered and that there

23   was a big pileup of people trying to get asylum.

24          I'll let you do that.

25          MR. DAVIS:  Thank you, Your Honor.  And as to the
```

ER-34

```
 1   asylum application, just to let the Court know, I'm not going
 2   to inquire about any of the merits or the facts of what he was
 3   claiming or anything like that.
 4            THE COURT:  Right.  Okay.  That's fine.
 5            MR. DAVIS:  I'm just going to go the fact that he
 6   applied --
 7            THE COURT:  So those -- those are the parameters then.
 8   You can call her off.
 9            Okay.  Anything else?
10            MR. MCDONALD:  Your Honor, with regard to the asylum
11   application, would the United States be permitted to get into
12   the substance of it to show that --
13            THE COURT:  Why?  I mean the only relevance is he's
14   saying that this fellow applied before and one is not
15   foreclosed from reapplying, and if you look at this guy's
16   behavior, it looks like that's what he wanted to do because he
17   sat down.  He didn't try to make a run for it.  He didn't try
18   to get over the second fence.  Those are fair inferences, and I
19   don't want to completely deprive him of a defense.
20            He's -- he's right, you know, there's some relevance
21   to that.  The woman, no, she doesn't have any historical
22   connection.  She knows -- doesn't know this fellow, doesn't
23   know what his motives were.  So I'm not going to allow
24   testimony that the word was that if you jump over the fence --
25   the word from whom?
```

ER-35

```
 1           MR. MCDONALD:  Your Honor, my -- my concern is that
 2  the jury will hear El Salvador and asylum request and really
 3  run away with their own imagination in terms of what that looks
 4  like.
 5           THE COURT:  You're going to be able to prove that his
 6  -- whatever his claims were, without regard to specificity,
 7  that he presented them and an immigration judge said, no, and
 8  he was legally put out.
 9           That's all we need to know.  We don't need to get into
10  the weeds on this.  Look, that's it.  We've thrashed this
11  around.  Those are my rulings on this.
12           Tomorrow at 9:00 I'll see you downstairs.
13           MR. DAVIS:  So -- okay.  So tomorrow we're meeting
14  downstairs in the jury lounge.
15           THE COURT:  In the jury assembly room.
16           MR. DAVIS:  At 9?
17           THE COURT:  Yeah, at 9.  Be ready to go.  We'll pick a
18  jury.  And how many witnesses do you have?
19           MR. MCDONALD:  Four.
20           THE COURT:  Okay.  So your evidence, if you intend to
21  present affirmative evidence, I don't know, maybe Mr. McDonald
22  will let you handle this asylum thing while the witness is on.
23  Otherwise, you can recall him, put him on as your
24  case-in-chief.  But be ready to go in the afternoon.
25           MR. DAVIS:  We will.
```

ER-36

```
  1                  UNITED STATES DISTRICT COURT

  2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

  3

  4   UNITED STATES OF AMERICA,           )
                                          )
  5        Plaintiff,                     ) No. 20-CR-435-LAB
                                          )
  6            v.                         )
                                          ) June 8, 2021
  7   JUAN CARLOS CABRERA,                )
                                          ) 11:29 a.m.
  8        Defendant.                     )
      _____ ) San Diego, California
  9

 10         TRANSCRIPT OF JURY TRIAL - DAY 1 (No Voir Dire)
                 BEFORE THE HONORABLE LARRY ALAN BURNS
 11                  UNITED STATES DISTRICT JUDGE

 12   APPEARANCES:

 13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                              By:  COLIN MCDONALD, ESQ.
 14                                AMANDA MUSKAT, ESQ.
                              880 Front Street
 15                           San Diego, California  92101

 16   For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                              By:  BENJAMIN P. DAVIS, ESQ.
 17                                SALIL DUDANI, ESQ.
                              225 Broadway
 18                           San Diego, California  92101

 19

 20   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
 21                           West Broadway, Suite 420
                              San Diego, California, 92101
 22                           cynthia_ott@casd.uscourts.gov

 23

 24
      Reported by Stenotype, Transcribed by Computer
 25
```

ER-37

1          He was sitting down.  He wasn't sneaking in.  And

2   that's why, at the end of this trial, I'm going to come back

3   before you and I'm going to ask you to find him not guilty.

4          THE COURT:  All right.  Thank you, Mr. Dudani.

5          Folks, at this time, we'll call it 12:05, we'll break

6   for lunch.  Please be back in your seats at 1:05.  You'll be

7   escorted to the La Jolla conference room.

8          And the lunches are ready, Tish?

9          THE CLERK:  Yes, Your Honor.

10          THE COURT:  Remember the Court's admonitions.  Don't

11  form or express an opinion about the case.  Don't discuss it,

12  enjoy your lunch.  We'll begin testimony at 1:05.  Have a nice

13  lunch.  A nice recess.

14          You're free to leave anything that you feel

15  comfortable leaving in the chair, on one is going to disturb

16  it.  We lock the court up and have people here during the

17  break.  So if you want to leave things there, you don't have to

18  take them with you.

19       (At 12:06 p.m., the jury was excused, and the following

20  proceedings were held:)

21          THE COURT:  Is there anything we need to discuss

22  before we take the noon recess?

23          MR. DAVIS:  The only thing, Your Honor, is I just

24  wanted to complete my record from the argument yesterday, if

25  the Court will indulge it, the argument about our witness.  I'm

# ER-38

1  not seeking to revisit the ruling, I just want to make sure the

2  record was complete.

3        THE COURT:  Of course, Mr. Davis.

4        MR. DAVIS:  The only thing I want to do is make sure

5  that my proffer was complete about what the testimony would

6  have been so the record is complete on it.

7        THE COURT:  Okay.  This is the lawyer from Mexico, the

8  U.S. lawyer who lives in Mexico and has interaction with people

9  trying to get asylum?

10       MR. DAVIS:  Yes.  Our proffer, Your Honor, would be

11  that had she been called to testify, Ms. Pinheiro would have

12  testified that she is intimately familiar with the process of

13  applying for asylum from Mexico in the United States or other

14  forms of relief, that she has specific firsthand knowledge of

15  the facts on the ground at the San Ysidro port of entry and the

16  situation in Tijuana, Mexico generally in November of 2019 and

17  that her specific, personal firsthand experience, she was aware

18  that there was a backlog of several thousand -- I think between

19  8- and 10,000 -- migrants who were waiting in Tijuana for their

20  opportunity to present their claims for asylum or other forms

21  of humanitarian relief in the United States.

22        And as a result of two policies, one called metering

23  and the other called the Migrant Protection Protocols, commonly

24  known as the Remain in Mexico Policy, that backlog was growing

25  and that there was increasing -- drastically increasing wait

ER-39

1  times for migrants, especially from Central America, to be able

2  to come into the ports of entry and press their claims in the

3  United States.

4      THE COURT:  Okay.  You acknowledged in response to a

5  question that I had that she has no knowledge of Mr. Cabrera.

6  She doesn't know him.  She never spoke to him.  She has no idea

7  of what his specific motives were when he came across, true?

8      MR. DAVIS:  Correct.

9      THE COURT:  And you did say the word -- the word on

10  the street that she had picked up on was, what, that people

11  were jumping the fence to try to get a shot at asylum?

12      MR. DAVIS:  I disclaimed reliance on that testimony.

13  I think we said that if the Court objected to that, that we

14  would withdraw that.

15      THE COURT:  All right.

16      MR. DAVIS:  But we intended to present her for those

17  other specific facts.

18      THE COURT:  Do you have any objection, Mr. McDonald,

19  now that the defense has pared down their proffer regarding --

20  I'm sorry, what's the witness' name, Mr. Davis?

21      MR. DAVIS:  Erika Pinheiro.

22      THE COURT:  -- Ms. Pinheiro's testimony?

23      MR. MCDONALD:  Your Honor, I do for the same reasons

24  as stated yesterday but also to reiterate this type of

25  testimony enlarges the scope of this case from the specifics

1  pertaining to Mr. Cabrera to bring in categories of evidence

2  that are highly controversial and are highly inflammable and

3  prejudicial under Rule 403.

4         Without a link specifically to Mr. Cabrera's

5  situation, without him, for instance, testifying that I was

6  coming to seek, you know, some sort of protection or asylum,

7  without that link to his particular circumstances, this witness

8  would solely be talking about the experiences of unknown,

9  unnamed, unnumbered individuals and their plight at the border

10  in some, you know, date range.

11         That is evidence that is highly prejudicial.  We're

12  already carrying, as we heard in the opening statement, the

13  baggage of the El Salvador situation and his prior request for

14  protection in that.  And I think that in and of itself is -- is

15  unduly prejudicial under 403 --

16         THE COURT:  All right.

17         MR. MCDONALD:  -- but certainly this further proposed

18  testimony is --

19         THE COURT:  Here's the problem I'm having, Mr. Davis,

20  with the testimony.  I just think it's very attenuated.  The

21  government has to prove that this defendant, not people in

22  general, but this defendant had the state of mind that he

23  wanted to come in in order to go free among the populace.

24         In other words, that he did not want to be arrested,

25  that his purpose was to get in olly olly oxen free.  The

1   witness, Ms. Pinheiro can't offer any testimony about that.

2   She has no idea.  Until -- I dare say until you or Mr. Dudani

3   told her what was at stake here, she didn't have any context

4   for understanding anything about this case.

5           And I'm a little concerned here because if the

6   defendant testifies, that's one thing, he can testify to his

7   state of mind and what his purposes were, but if he doesn't, I

8   think it's very, very tricky for you to say, here's what he was

9   thinking in the absence of his testimony and I expect the

10  government will object if you cross that line, and it's

11  a -- it's a difficult thing to press this.

12          I have no problem with you suggesting, as you've said,

13  that, you know, a possible motive for somebody coming over is

14  to reapply for asylum, but I don't think it can go any farther

15  than that absent his testimony, I really don't.

16          There's no other evidence that that was his purpose

17  that you've proffered, none.  And so I -- the fear I have and

18  the concern I have is that without subjecting him to cross

19  examination, someone is going to say, here's what he was

20  thinking, here's what was on his state of mind and I won't

21  permit that.

22          And that's why I think the testimony of --

23  Ms. Quintera?

24          MR. DAVIS:  Pinheiro.

25          THE COURT:  That's why I think Ms. Pinheiro's

1    testimony is not particularly relevant here and it raises all

2    kinds of probative dangers.  It raises the danger that I'm

3    going to have to instruct the jury that, look, the decision

4    here you have to make is what the defendant's subjective intent

5    was.  Attempt crimes or specific intent crimes, you know, his

6    intent had to be to turn himself in for the purpose of applying

7    for asylum, if that's what you say, but that has to come from

8    him or some other form of competent evidence that shows that

9    and I just find Ms. Pinheiro doesn't -- can't do that.  She has

10   no competent evidence of that.

11         The fact that other people were held up at the border

12   doesn't inform what his frame of mind was on the day and time

13   that he crossed the first fence.  Doesn't do that at all.

14         MR. DAVIS:  I disagree with that last point, Your

15   Honor.  Obviously she would never have testified about his

16   mental state.  She's not competent to do that.  We frankly --

17   she doesn't know Mr. Cabrera and we haven't talked to her about

18   the facts of his case.

19         THE COURT:  Right.

20         MR. DAVIS:  What she would testify to are facts from

21   which the jury can infer that a person who crosses in this

22   situation --

23         THE COURT:  Are they facts or are they hearsay

24   accounts that she's gotten from other people?  I mean, that's

25   one of the problems too.  You've disclaimed that the word was,

ER-43

```
 1   but how does she know?  Was she there interviewing people?

 2            MR. DAVIS:  Yes.

 3            THE COURT:  Was she looking at documentation saying

 4   this is this person's purpose in jumping over the fence at a

 5   particular time?

 6            MR. DAVIS:  Your Honor, I want to be clear about this.

 7   The facts that we were going to proffer her for are about the

 8   long wait, the reasons for the wait and the fact that there

 9   were thousands of people waiting.

10            THE COURT:  Why can't you establish that, as you

11   indicated you're going to be able to establish, that a person

12   can seek asylum again through the government's witness?

13            MR. DAVIS:  Well, I may be able to, Your Honor, but

14   these facts are going to be specific to November 2019 at the

15   San Ysidro port of entry.

16            THE COURT:  Well, again, I'm not even sure she's

17   competent to state facts.  Does she have some kind of empirical

18   basis for knowing what the numbers were?

19            MR. DAVIS:  Yes, Your Honor.

20            THE COURT:  How does she have access to government

21   records as to what the numbers were?

22            MR. DAVIS:  She doesn't have access to government

23   records.  She works in Tijuana and works with the populations.

24            THE COURT:  Really, so she can give us a definitive

25   number of how many people were waiting?
```

ER-44

1        MR. DAVIS:  A range.

2        THE COURT:  Yeah, again, I think it's trying to prove,

3  well this is what the phenomena was and so this guy, he must

4  have had, you know, a similar motive, similar subjective

5  intent.

6        And I just -- I don't think that's competent evidence.

7  So the Court -- the Court finds first that there's very little

8  relevance to this, if any; and second, that the probative

9  danger of getting into things that are going to delay the trial

10  or cause the government to have to, you know, call counter

11  witnesses to say, well, no, actually we were processing, you

12  know, at a steady pace just fine.

13        The case isn't about that.  The case is about what was

14  on Mr. Cabrera's mind when he came over, whether he had the

15  intent to go at large in the population without being

16  apprehended or whether he intended to turn himself in for the

17  purpose of seeking asylum for a second time.

18        He can answer that question.  Maybe there's other

19  competent evidence, but I find Ms. Pinheiro can't offer

20  competent evidence on that so the objection is sustained, both

21  under 402 and 403.

22        I have weighed the evidence.  I find that it does not

23  substantially -- that it is substantially outweighed by the

24  probative dangers of consumption of time, distracting the jury

25  from what the important issue is on the case and the likelihood

1   of -- of prejudice, that is, the suggestion that, well, because

2   other people were doing it, that that must have been the

3   defendant's motive too.

4           So for all those reasons, you've got your record but I

5   reiterate that the objection is sustained.

6           MR. DAVIS:  Thank you, Your Honor.

7           THE COURT:  Mr. Dudani, you mentioned something that I

8   was not aware of.  I just want to check with you.  I thought

9   people could -- could apply for asylum from outside the United

10  States, that they did not have to be in the United States to

11  apply for it.

12          I don't know what the status of the law is now, but I

13  thought that that was the whole purpose of the so-called Remain

14  in Mexico Policy, is make your application for asylum.  We'll

15  consider it.

16          I have a vague recollection of people saying you could

17  go to a U.S. embassy in these countries.  Now, again, I'm

18  unsure of that so I heard you say, no, you have to be in the

19  United States to apply for asylum, physically present in the

20  United States.

21          Is that your understanding of what the situation was

22  and what the law was in 2019?

23          MR. DUDANI:  Yes, Your Honor, and even in the -- the

24  Remain in Mexico program, the application is made inside the

25  United States.

ER-46

1          THE COURT:  But does the person have to be physically

2   present?  I thought somebody else could make the application

3   for the person.

4          MR. DUDANI:  My best understanding is that to make the

5   application, the person needs to be physically present and

6   these are facts that the witnesses will hopefully be able to

7   speak to.

8          THE COURT:  Okay.  Okay.  Again, I'm only inquiring

9   because I don't know and my understanding was different from

10  what you said.  Is that your understanding also, Mr. McDonald?

11  You have to be physically present in the United States to

12  pursue an asylum application?

13         MR. MCDONALD:  I'm not a hundred percent sure.

14         THE COURT:  Okay.  Yeah, I'm not either.

15         MR. MCDONALD:  It hasn't come up in a case previously.

16  I was a little bit surprised by it as well.

17         MR. DAVIS:  I believe that's the case, Your Honor.  In

18  the Remain in Mexico Policy, they would come in, put their

19  application in, and while it was pending, normally you're

20  allowed to stay in the United States while it's pending.

21         In Remain in Mexico, they would have them go back to

22  Mexico, wait there while it was pending.  But they have to be

23  in the United States.

24         THE COURT:  So where would they present it?  At the

25  port of entry and then go back?

```
 1          MR. DAVIS:  Yes, but basically -- any situation where
 2   they were -- made an asylum application --
 3          THE COURT:  But you're going to offer some testimony
 4   on that?
 5          MR. DAVIS:  We're going try -- elicit it.
 6          THE COURT:  Okay.  All right.  And it's a question
 7   because I was unsure about that.
 8          MR. DAVIS:  Can I spell the witness' -- the
 9   prospective witness' name for the court reporter to make sure
10   the record is clear?
11          THE COURT:  Ms. Pinheiro?
12          MR. DAVIS:  Her first name is Erika with a K, and the
13   last name is Pinheiro, P-I-N-H-E-I-R-O.
14          THE COURT:  All right.  Will you -- the last thing
15   before I let you go for lunch, both of you do me a favor.  I've
16   had problems and I tried to contact Ms. Nestor and
17   Mr. Grossman, before that, Mr. Brewer about this.
18          It's not uncommon for people from both respective
19   offices to come and watch the closing arguments, and then
20   there's this mass exodus right in-between jury instructions,
21   and I've had to tell people, sit down, please sit down, let me
22   finish the instructions, don't get up because it 's
23   distracting, right?  I'm trying to finish the concluding
24   instructions and there's this mass exodus.
25          So please remind those who want to come and watch the
```

ER-48

1   arguments that they have to stay until the jury has been sent

2   to begin its deliberations or we recess so that they can do so.

3          In other words, they have to sit through the last five

4   instructions on deliberations.

5          MR. DAVIS:  We'll tell them, Your Honor.

6          THE COURT:  Same thing with the government, of course,

7   Mr. McDonald.

8          MR. MCDONALD:  Yes, Your Honor.

9          THE COURT:  Both sides have done that before.  I want

10  everybody seated until all the instructions are given and we

11  recess to allow the jury to begin deliberations.

12         Have a nice lunch.  See you back a little bit before

13  1:05.

14     (A recess was taken from 12:19 p.m. to 1:06 p.m.)

15         THE COURT:  Counsel's present.  The defendant is

16  present.  The jury is not present.  I looked at this, thought

17  about the proffer a little bit more.

18         I wanted to, from my perspective, complete the record

19  of my thoughts.  It may not be clear.

20         Ordinarily, propensity evidence is not admissible, in

21  other words, showing that somebody did something on this

22  occasion because they'd done it many times on other occasions.

23         The problem I'm having with the proffer with respect

24  to Erika Pinheiro is that I view this as a form of propensity

25  evidence.  It's even more attenuated.  It's not because the

ER-49

1  defendant had done this several times before, necessarily he

2  did it this time.  The suggestion is that, because other people

3  are doing this, the defendant must have done it.  So it's even

4  another step away and I find that that really erodes the

5  relevancy of the evidence.

6       The other thing is, I've also sustained the objection

7  under 403 after considering it.  To the extent it has some

8  relevancy at all, I find it grossly outweighed by the probative

9  dangers under 403, particularly the danger that we'll have a

10 trial within a trial.

11      For example, counsel has conceded that Ms. Pinheiro

12 doesn't have any kind of empirical figures on how many people

13 were trying to come over illegally in order to press an asylum

14 claim.

15      And even if she did, to what extent have those people

16 who are trying to press an asylum claim had one denied already?

17 Those are all relevant things.  What sample can she give us?

18 How many people are actually over there?

19      I don't think she has any basis for saying any of that

20 and logical follow-up questions of a witness who had offered

21 the testimony that's been proffered would lead to those

22 questions and then we're off on a chase about, you know -- a

23 chase of white rabbits that have nothing do with the issues in

24 this case.  So I find under 403 that there's a significant

25 danger of diverting the jury's attention from the important

1    issue in this case.

2         This is an attempt case.  The government has to prove

3    that the defendant had the intent not to go at large but rather

4    to turn himself in.  They must prove beyond a reasonable

5    doubt -- actually, just the opposite, that he had the specific

6    intent to go at large, not some other intent.

7         All of that focuses on the defendant.  And it's not

8    focused on the motives of other people or how many other people

9    were trying to come over to press an asylum claim.  I'm not

10   foreclosing that theory of defense, not at all.  I'm just

11   saying that this witness, number one, I don't think offers

12   anything relevant on that issue and to the extent there's

13   marginal relevance to what she would say, it's greatly

14   outweighed by the risk of a trial within a trial having to do

15   with the motives of other unknown people and whether the sample

16   of people she spoke to is representative and many other

17   differences that exist.

18        The motives of other people don't inform what the

19   defendant's motives were on that day.  Again, not trying to

20   foreclose and will not foreclose you from arguing inferences.

21        For example, Mr. Dudani mentioned in opening statement

22   the defendant came in and sat down and one can logically argue

23   from that, no, he didn't have any intent to go any farther in

24   the United States.  Look what he did.  He sat there for seven

25   minutes and waited for Border Patrol to get there.  Fine.

ER-51

1        You want to argue the circumstantial evidence from

2  that, that that shows that he had no motive to go at large

3  within the United States, that's fine.  That's an inference

4  that directly derives from the defendant's conduct.

5        But I think when we get away from that and we start

6  talking about somebody who doesn't know the defendant, had no

7  contact with him, has no idea what his motives are, but is

8  going to testify to the motives of other people, that we,

9  number one, run into a relevancy problem, but more than that,

10  run into a 403 problem with the evidence outweighing whatever

11  marginal relevancy they may be.

12        So those are my concluding remarks on that.

13        Tish, you can call the jury.  You can call the jury

14  in.

15    (The following proceedings were held in open court in the

16  presence of the jury:)

17        THE COURT:  Your witnesses are here.  Go ahead and

18  summon your first witness and have him ready to go,

19  Mr. McDonald.

20        (Jury entered the courtroom.)

21        THE COURT:  All right.  All jurors are present.

22  Counsel and the defendant are present.

23        Welcome back.  How was the filet mignon?  Oh, it

24  wasn't filet mignon, huh?

25    DANIEL CABRAL ALEXANDER, GOVERNMENT'S WITNESS, SWORN

1  far as the mens rea.

2       MR. DAVIS:  I'm satisfied with the 1325 and I'm just

3  reviewing the 1326 to make sure.

4       Yes, Your Honor, maintaining the objection, but other

5  than that, no other objections.

6       THE COURT:  So the Court notes as to both

7  instructions, the defense is asking me to give the last line

8  that they've proposed, which, as I pointed out, I think tends

9  to focus on the physical location rather than the mens rea.

10      For the reasons I've stated from Castillo Mendez, the

11 Court declines to do that.

12      The next and last is a separate crime as charged, I

13 assume you want that, right, that they should consider it

14 separately?

15      MR. DAVIS:  Yes, Your Honor, thank you.

16      MR. MCDONALD:  Your Honor, we have some -- we would

17 request that some additional language be included in the

18 instructions for the specific intent --

19      THE COURT:  Okay.

20      MR. MCDONALD:  -- element.

21      THE COURT:  Back to both instructions then?

22      MR. MCDONALD:  Yes.

23      THE COURT:  Which additional language?

24      MR. MCDONALD:  So we included this in our proposed

25 instructions for Your Honor and it is that -- and it is

ER-53

1  directly from Ninth Circuit case law, it's directly from the

2  Argueta Rosales case, and it is that the government does not

3  need to prove that entry free from official restraint was the

4  defendant's sole intent.  Rather, the United States must prove

5  only that the defendant had a specific intent to enter the

6  United States free from official restraint, not that that was

7  his only purpose.

8          That's directly from Argueta Rosales.  It's about the

9  only good case law in the Ninth Circuit on official restraint

10  and it directly engages with the facts of this case, which is

11  the jury needs to know that it's law that he's only not guilty

12  if his sole intent was to go into custody.

13          If he was okay, for instance, with possibly getting

14  through or possibly getting caught, he's guilty.  That element

15  is satisfied.  This is directly from Argueta Rosales.  I have a

16  copy of the case.

17          THE COURT:  If you'll hand it up for just a second,

18  please.

19          Do you have a copy of this too, Mr. Davis?

20          MR. DAVIS:  I don't have a copy of it, Your Honor.

21  I'm familiar with it.

22          MR. MCDONALD:  I've handed off a copy.

23          And this appears on page 1157 of this opinion, which

24  is page six of the Westlaw printout, Your Honor, on the left --

25  the left column, towards the bottom of that left column.

ER-54

1    THE COURT:  So which line do you want me to use?  The

2    one that says the government must prove only that the defendant

3    had a specific intent to enter the United States free from

4    official restraint, not that this was his only purpose?

5    MR. MCDONALD:  What I would propose is starting midway

6    through the sentence before that, "the government or the United

7    States need not prove that entry free from official restraint

8    was the defendant's sole intent.  The government must prove

9    only that the defendant had a specific intent to enter the

10   United States free from official restraint, not that this was

11   his only purpose."

12   THE COURT:  Mr. Davis?

13   MR. DAVIS:  Your Honor, first of all, Your Honor,

14   Argueta came out in 2016.  The last time that the Ninth Circuit

15   model instruction on official restraint was updated was in

16   2019, several years later.

17   So the Ninth Circuit has had lots of opportunities to

18   update its model instruction and hasn't felt the need to do so.

19   So I don't think the Court should amend it when the Ninth

20   Circuit hasn't done so.

21   THE COURT:  Isn't this -- I mean -- I don't know if

22   it's really necessary here.  Do you, Mr. McDonald?  Because it

23   seems like a binary choice.  I mean, I understand the evidence

24   shows that this fellow, Mr. Cabrera, had applied for asylum

25   before.  It had been denied.

ER-55

1          I think the defense is going to argue, look, after he

2  got to the fence, he just sat there and was submissive and so,

3  you know, you can infer from that that really all he wanted to

4  do was get back to the United States and you heard testimony

5  that a person can reapply for asylum.

6          I mean, I think that those are fair inferences for

7  them to argue.  They can't stand in the shoes of Mr. Cabrera

8  and tell him what he was thinking.  Again, it's a fine line.

9          But it's either that or he was coming here to work and

10  he picked that little crooked spot in the fence because he was

11  hiding and waiting to get over.

12          Maybe he was fatigued from climbing up that hill.  I

13  don't know what the reasons were that there was a delay but it

14  seems like a binary choice here.

15          You're not going to say, well, he was coming to work

16  and to reapply for asylum, right?  You're not going to argue

17  that.

18          MR. MCDONALD:  Your Honor, that is exactly what

19  these -- this case law stands for, which is that if the

20  defendant had multiple intent, so, for instance, let's say he

21  crossed with the intent to go free, but then he changed his

22  mind after he came across, he changed his mind and said I'll

23  just go into custody, that would satisfy this element, because

24  he had the specific intent to enter free from official

25  restraint.

ER-56

1          He made a substantial step and then maybe he changed

2   his mind afterwards.

3          THE COURT:  Is that what you're going to say?  I mean,

4   is that what you think happened?  Or do you think he was coming

5   across to work?

6          MR. MCDONALD:  No, I think he certainly was coming

7   across to work, but the argument, the defense is going to, you

8   know, raise doubt as to whether he was coming to seek asylum.

9   The argument that I intend to make is that he was coming for

10  the purpose of being free from official restraint, period.

11         But it's even easier than that because the law only

12  requires that a purpose of his be to enter free from official

13  restraint.

14         So, for instance, if he had one purpose of trying to

15  come in for work and another was -- you know, he was okay with

16  going into custody.  If he has those dual purposes, Your Honor,

17  this element is satisfied based on this clear Ninth Circuit

18  law.  But I can't argue the law unless it's instructed to the

19  jury.

20         This -- and this case is very clear, there's also a

21  string cite there, Lombera-Valdovinos where it says noting the

22  defendant crossed the border with the intent only to be

23  imprisoned.  That's what negates guilt is if his only intent is

24  to go into custody.

25         If there's dual intent, then he's guilty of that

ER-57

1  element.

2  THE COURT:  Mr. Davis, you point out that the

3  instruction, notwithstanding the age of this case, which is

4  now, what, four years old, yeah, almost five years old,

5  notwithstanding the age of the case, I'm unaware this has been

6  overruled, right?

7  That principle appears to be an abiding principle that

8  string cite cases that go back to 612 -- 429 F.3d.  So it looks

9  like it's a legal principle that has been cited and withstood

10  the test of time so far.

11  MR. DAVIS:  I'm not aware of its being overruled, Your

12  Honor, but I agree with the Court and this is what I argued in

13  our briefing was that the proposition is binary.  He either had

14  the intent to enter free from official restraint or he didn't,

15  right?

16  So when he crosses the border, he intended with the

17  intent to enter -- I'm sorry, if he crosses the border --

18  THE COURT:  Right.

19  MR. DAVIS:  -- with intent to enter free from official

20  restraint --

21  THE COURT:  Right.

22  MR. DAVIS:  -- and then changes his mind and says I

23  want to go into custody, then he's guilty, because he entered,

24  he --

25  THE COURT:  So Mr. McDonald, what's wrong with that?

ER-58

1   Why isn't it a binary proposition?  There's this principle in
2   the law that there has to be a unity between act and intent so
3   I think Mr. Davis is correct to say that the intent has to be
4   formed at the time of the crossing.
5           It can't be that he crossed and then changed his mind
6   and that somehow absolves you.  You have to show that the time
7   he crossed the first fence, his intention was to go at large
8   within the United States.  That's the element here.
9           Not that -- not that he crossed and then changed his
10  mind when he got in the midway point.
11          MR. MCDONALD:  Well, that's actually exactly
12  what -- that's actually exactly what the case law stands for,
13  Your Honor.  Not that it is his only intent to be free from
14  official restraint.  That flips it.
15          The requirement directly here from Argueta Rosales is
16  that the defendant need not prove that -- that the government
17  need not prove that entry free from official restraint was the
18  defendant's sole intent.
19          THE COURT:  We're begging the question, though.  The
20  question is:  At what point does the intent have to
21  crystallize, and I think it has to crystallize at the point
22  that he enters.
23          There has to be a union of act and intent at that
24  point seems to me.  So when he crosses the first fence and
25  comes into the United States, you have to be able to prove

1    beyond a reasonable doubt that his intention was to go at

2    large, not to turn himself in.

3          So a concentration on what may have happened after he

4    got in seems -- seems to me to be beside the point.  I mean, if

5    he changes his mind after he's crossed, he's already entered,

6    physically he's entered.

7          MR. DAVIS:  Right.  It's like if I go to rob a bank

8    with the intent and I do the substantial step but then I see

9    the cop and I run away, as long as I've completed the

10   substantial step with the intent --

11         THE COURT:  I think that's right.  If you want to

12   concentrate at the point of entry, you know, and have me give

13   language similar to this by saying, when he first crossed over,

14   but I think it's wrong to say, well, he may have changed his

15   mind once he got over the first fence because he's in the

16   United States at that point.

17         The entry has occurred and if his intent, you know,

18   wasn't to go at large at that point, I don't think it does it

19   to say, well, he later formed the intent to go at large or he

20   later ascribed, you know, some other reason.

21         MR. MCDONALD:  Well, Your Honor, on Argueta Rosales,

22   it actually answers this exact question.

23         THE COURT:  All right.

24         MR. MCDONALD:  On the right hand column on that same

25   page we were on, page six, there's further analysis of this.

ER-60

1  At the end of that paragraph, it says exactly what may apply

2  here similarly if Argueta, "actually intended to sneak into the

3  country, and changed his plans only when he was spotted by the

4  border patrol, he again would be guilty."

5       MR. DAVIS:  And I said, Your Honor, I think that is a

6  correct statement of law, obviously, because the Ninth Circuit

7  said it, but I think that correctly identifies the union of

8  intent and action that the Court has described.

9       And I think the instruction, Your Honor, is correct

10  and has not been modified and if the government wants to say

11  that -- if they want to argue that that's what Mr. Cabrera did

12  and, therefore, he's still guilty, we won't object to the legal

13  point.

14       We'd say, yes, if he entered with his intent formed

15  and committed this actus reus at that time, then he would be

16  guilty and our contention, obviously, is that's -- you know,

17  that they can infer that that's not what he did, that he was

18  doing something else instead.

19       So, I think that the only question is when he

20  committed the action and substantial step, did he or did he not

21  have this intent to enter to go at large.

22       MR. MCDONALD:  Did he have an intent, an intent.

23       MR. DAVIS:  Yes, had, I think the intent does in this

24  not mean sole, it just means, it's a common way of describing

25  it, you had the intent to do something.

ER-61

1    MR. MCDONALD:  But, Your Honor, again, this case makes

2  that distinction and it's a legal distinction and that's why

3  the United States needs it to be in the instructions to the

4  jury that -- that the United States does not need to prove that

5  entry free from official restraint was the sole intent and then

6  also that final paragraph that if someone intends to sneak in

7  and then when they see that border patrol is coming up on them

8  and they think I'll just go into custody now.

9    THE COURT:  No, no, I think we're saying the same

10  thing.  We're concentrating on the point in time that he

11  entered and the burden of proof on the government is to prove

12  at that point in time, was his intent to go at large within the

13  United States.  Even if he had an alternative plan, you have to

14  establish that that was his intent at the point he crossed.

15    How about this, if I add to the second to last

16  sentence in the second paragraph this, starting with capital T,

17  and this would be the third sentence:  "The government need not

18  prove that entry free from official restraint was the

19  defendant's sole intent," and I won't italicize sole.

20    "However, the government must prove that at the point

21  the defendant first entered the United States, he had a

22  specific intent to enter free from official restraint, not that

23  that was his only purpose."

24    MR. DAVIS:  I maintain my objection to that, Your

25  Honor.  And part of the reason is that Mr. McDonald has been

ER-62

1    repeatedly confusing the question about whether someone has the

2    intent when they enter versus after they enter.

3             THE COURT:  Doesn't this -- doesn't this instruction

4    that I've just proposed clarify that by saying --

5             MR. DAVIS:  No, I think the two sentences together are

6    confusing.  Right?  The only question is, did he have the

7    intent or not when he tried to enter.  It's binary.

8             So this question about other intents, you can't

9    simultaneously have the intent to go free but also have the

10   intent not to go free.

11            THE COURT:  Wait a minute.  Sure you can.  I mean,

12   he's hypothesized a situation where a guy says, okay, I'm going

13   to try to get in, but if something happens and I get caught,

14   then I'm going to give myself up and tell them I'm giving

15   myself up.

16            MR. DAVIS:  Right.  But you don't have the intent to

17   get caught.  You have the intent to not get caught and then if

18   you get caught you're okay with it.  And those are different

19   things.  That's not the intent to not get caught.

20            What I'm concerned about, Your Honor, is that

21   Mr. McDonald is going to conflate them again as he's been doing

22   in this argument in front of the jury and the jury is going to

23   be confused about it.

24            MR. MCDONALD:  Your Honor, I haven't been conflating

25   anything and I would just say that if this isn't a thing, these

ER-63

1  dual intents, then why would the Ninth Circuit in a published

2  opinion say that it is -- that it is, in fact, a thing, which

3  is that there's this -- that there's the possibility of dual

4  intents.

5           MR. DAVIS:  Your Honor, I think it goes to, for

6  example, the sufficiency of the evidence challenge, which

7  appears to be what they were ruling on.  The Ninth Circuit

8  instruction remains unchanged.

9           So how the Ninth Circuit wants district courts to

10 instruct juries on this issue has not changed at all.  If the

11 Ninth Circuit is going to review this case for sufficiency of

12 the evidence and I argue on appeal, it was insufficient because

13 they didn't prove it was his sole intent, that's how they're

14 going to rule.  They're going to follow Argueta.

15          But in terms of how the Ninth Circuit wants courts to

16 instruct juries, they haven't changed it, and I think that the

17 instruction that the Court has proffered -- the original

18 instruction without the added elements, is sufficient.

19          THE COURT:  If I were in the prosecutor's shoes, I

20 wouldn't want to get mouse trapped by saying, well, okay, I'll

21 give up on that only to have you say, oh, well, look, you know,

22 when he came over, you know, maybe he had that, but he had

23 obviously changed his mind.

24          Then I understand why he would want this in here.  If

25 you're going to proffer to me that your argument is going to be

ER-64

1    at the point he crossed the fence, the first fence, his purpose

2    was to give himself up and that's the only argument you're

3    going to make, maybe I'm swayed that this is unnecessary.

4            MR. DAVIS:  That's going to be our argument.  We're

5    going to argue it inferentially obviously because we don't have

6    direct evidence.  So we're going to argue that inference.

7    We're not going to argue that he had other intents or that the

8    government needs to prove other intents.

9            We're going to say -- need to say that they can infer

10   that he didn't have that intent, the government needs to prove

11   that he did have that intent.

12           MR. MCDONALD:  Your Honor, this is the most important

13   instruction in this case.

14           THE COURT:  Well, you'd think if that was the case,

15   Mr. McDonald, that the Ninth Circuit instructions committee

16   would have changed it between now and five years ago when

17   Argueta first said this.

18           It obviously doesn't come up that much, you know,

19   there's yearly revisions in those instructions and there's been

20   none here, right?

21           MR. MCDONALD:  Well, I think the issue, number one, is

22   that as Your Honor knows, these instructions based on a

23   case-by-case analysis of the particular facts, the importance

24   to tailor the instructions to the particular case that's at

25   hand, that's perfectly appropriate and common in all cases.

ER-65

1          And so the model instruction is just that it's a

2    model.  But the Court's instruction should be tailored to

3    engage with the actual facts of the case and so -- and in

4    official restraint cases, sometimes no definition of official

5    restraint is even given at all where it's not an issue.

6          In this case, we actually -- I think we are differing

7    already from the model instruction, the second sentence, a

8    person has the intent to enter the United States free from

9    official restraint only if he has the intent to enter, et

10   cetera.  That's not in the model instruction.

11         THE COURT:  Well, you're right.  That comes from

12   Castillo Mendez.  Okay.  Here's what I'm going to do.  Over the

13   defendant's objection, I'm going to add a third and fourth

14   sentence and I'll give you a copy of this so you can look at it

15   and -- look at it in context.

16         The sentence will read as follows, this will follow

17   the mixing with the population last sentence in the current

18   version.  "The government need not prove that entry free from

19   official restraint was the defendant's sole intent," no

20   italics.  "However, the government must prove," strike the word

21   only, "that at the point the defendant first entered the United

22   States, he had a specific intent to enter free from official

23   restraint, not that this was his only purpose."

24         So I will incorporate those two sentences and we'll

25   give you a copy of that first thing tomorrow morning.

ER-66

1     And I note that the defendant objects to that, but in

2  the end, I don't think it's going to make a difference and I

3  agree with the government that I did modify the second

4  paragraph to capture this language.

5     I mean, the other problem is that this language that

6  we know to be the law of the case hasn't been picked up either

7  about concentrating on the mens rea rather than the physical

8  location where the defendant is apprehended.

9     MR. DAVIS:  Right, Your Honor, but that's because

10  Castillo Mendez is a case about jury instructions and Argueta

11  is about sufficiency of the evidence.

12     THE COURT:  I have your position on it.  It still

13  states what the black letter law is.  They have a concern about

14  it.  Frankly, I don't think it's going to come up.  I mean, I

15  honestly don't think it's going to be implicated if you do what

16  you say which is to say, look, his whole purpose from the

17  get-go was to come in to turn himself in and they have a

18  reasonable doubt about that, he's acquitted.

19     So whether it was his sole or an ancillary purpose,

20  if, you know, if that was his intent and they believe that,

21  then he'll be acquitted.

22     Okay.  So I'll make that change.  It'll be made to

23  both instructions to that element in both instructions.

24     MR. MCDONALD:  Your Honor, I see a stray quotation

25  mark.

ER-67

1          THE COURT:  Sure, tell me where.

2          MR. MCDONALD:  Yeah, 1325 elements, the second page,

3    the last sentence, a place other than as designated refers to,

4    and then I think we can just take out that quotation mark, any

5    place other than immigration facilities at designated ports of

6    entry."

7          THE COURT:  Okay.  All right.

8          MR. DAVIS:  Your Honor, I'm not going to reargue it

9    because I know the Court has ruled on it, but my concern is

10   that the government is going to argue in closing this confusion

11   between having the intent and being okay with being caught.

12   And so I'm going to object if the government does that.

13         THE COURT:  I'm sorry, I'm not following it.  You're

14   worried that they're going to say what?

15         MR. DAVIS:  The government is continually confusing

16   whether someone has the intent to enter free from specific --

17   excuse me, has a specific intent to enter free from official

18   restraint with after they come in being okay with being caught.

19   That's what Mr. McDonald is continually saying is that those

20   are really simultaneous intents where they're not in fact

21   simultaneous intents.  If the government argues that to the

22   jury, I'm going to object strenuously.

23         THE COURT:  And I'll sustain the objection.  I'm not

24   going to permit that.

25         The proof here, as I've said several times, there has

ER-68

1  to be a union of act and intent.  The government's

2  responsibility here is to prove at the point he crossed the

3  first fence, entered the United States from Mexico, he had the

4  intent to go at large.

5        If he had an alternative plan, that's one thing, but

6  they have to prove beyond a reasonable doubt that was his

7  intent.

8        Not his only intent.  Maybe they had a backup plan,

9  but they have to show that was his really his conscious purpose

10  at that point.  So don't argue contrary to that.  You can't

11  say, well, he got over and then he changed his mind and he used

12  this as some kind of subterfuge.

13        Your responsibility, Mr. McDonald, as I read the case

14  law, is to prove at the point of entry, he had the intent to go

15  at large in the United States.

16        MR. MCDONALD:  And I just want to clarify this, I plan

17  to hew my argument to what was said in Argueta Rosales

18  including the last sentence of page six on the right-hand

19  column, similarly if Argueta actually intended to sneak into

20  the country and changed his plans only when he was spotted by

21  the border patrol, he again would be guilty.

22        THE COURT:  I think that's fine.  But, again, the

23  concentration is on your burden of proving that at the point of

24  entry, his specific intent was to go at large.

25        So I'll listen carefully.  But don't suggest something

ER-69

1   contrary to that.  That's what you have to prove here.

2          Okay, let's see.  Separate crime as charged.  Oh, oh.

3   I don't know, this was thrown in, this LIO.

4          Does anybody want this, The lesser included offense?

5          MR. DAVIS:  Yes, Your Honor, we'd ask for that for

6   count one, the 1325 misdemeanor -- I'm sorry, felony, in the

7   event the jury finds that they haven't proven the prior

8   conviction.

9          THE COURT:  Here's what I'll modify this and I'll give

10  it because you asked for it, Mr. Davis, but instead of the

11  crime of, I'll start it out, a lesser included offense of count

12  one is attempted improper entry by an alien and then go on from

13  there.

14          And I propose that we insert it right after count one

15  rather than leave it before we go -- give it before we go to

16  count two.

17          MR. DAVIS:  Agree with all of that.

18          THE COURT:  Okay.

19          I don't think I'm going to -- is there any reason for

20  me to repeat this three times, mere preparation is not a

21  substantial step?  And alien is a person designated and all

22  that stuff?

23          MR. DAVIS:  I think the Court could say that these

24  definitions apply to both counts in the lesser included and

25  state them once.

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  ) No. 20-CR-435-LAB
                                      )
 6            v.                      )
                                      ) June 9, 2021
 7   JUAN CARLOS CABRERA,             )
                                      ) 9:00 a.m.
 8        Defendant.                  )
     _____) San Diego, California

 9

10               TRANSCRIPT OF JURY TRIAL - DAY 2
                BEFORE THE HONORABLE LARRY ALAN BURNS
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  COLIN MCDONALD, ESQ.
14                                AMANDA MUSKAT, ESQ.
                             880 Front Street
15                           San Diego, California  92101

16   For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                             By:  BENJAMIN P. DAVIS, ESQ.
17                                SALIL DUDANI, ESQ.
                             225 Broadway
18                           San Diego, California  92101

19

20   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
21                           West Broadway, Suite 420
                             San Diego, California, 92101
22                           cynthia_ott@casd.uscourts.gov

23

24
     Reported by Stenotype, Transcribed by Computer
25
```

1   the side of the cake box, remember that?  That's what this is.

2   This is going to tell you what the elements are that must be

3   proved as to each of the counts.

4       In count one, the defendant is charged with being an

5   alien who attempted to enter the United States at a time or

6   place other than designated by immigration officers.  To be

7   found guilty of that charge, the government has to prove the

8   following things beyond a reasonable doubt:

9       First, they have to prove that on the date of the

10  alleged entry, November 4th, 2019, that the defendant was an

11  alien.  An alien is a person who's not a natural born or

12  naturalized citizen of the United States.  That's the legal

13  definition of alien, a person who is not naturally born or

14  naturalized citizen of the United States, so that's the first

15  element.  They have to prove on the date that this happened,

16  the defendant was an alien.

17      Second, they must prove that the defendant had the

18  specific intent to enter the United States free from official

19  restraint.  A person has the intent to enter the United States

20  free from official restraint only if he has the intent to enter

21  the U.S. without being detected or apprehended or prevented

22  from going at large within the United States and mixing with

23  our population.

24      The government need not prove that entry free from

25  official restraint was the defendant's sole intent.  However,

ER-72

1    the government must prove that at the point the defendant first

2    entered the United States, he had the specific intent to enter

3    free from official restraint, not that that was his only

4    purpose but that that was part of his purpose, that he had the

5    specific intent to enter and go at large among the population,

6    so that's the second element.

7        Third, the government has to prove that the defendant

8    attempted to enter the United States at a time or place other

9    than a place designated by immigration officers, in other

10    words, someplace other than at a port of entry where you're

11    subject to inspection.

12        Fourth, that the defendant did something.  He took

13    some action that was a substantial step toward committing the

14    crime of illegally entering the United States.  Remember, this

15    is charged as an attempt.  They're charging the defendant with

16    attempting to come into the United States.

17        So the fourth element, you must find that the

18    defendant did something that was a substantial step toward

19    committing the completed crime of actually entering the United

20    States and that strongly corroborated the defendant's intent to

21    commit the crime.

22        Let me say a word about substantial step.  Preparing

23    to commit a crime, getting ready to commit a crime, is not a

24    substantial step so mere preparation doesn't cut it as a

25    substantial step to committing a crime.

1          To be a substantial step, a defendant's act or actions

2     must unequivocally show, must unequivocally demonstrate, that

3     the crime will be committed, the crime will take place, unless

4     it's somehow interrupted by independent circumstances, so

5     that's what's meant by this term substantial step.

6          Jurors don't need to agree unanimously on which

7     particular act or actions of the defendant amounted to the

8     substantial step provided all of you agree that the defendant

9     took some action that was a substantial step toward committing

10    the completed crime of actually entering the United States.

11         And then finally, the fifth element here is that the

12    defendant committed the offense after being convicted of a

13    prior offense of illegally entering the United States.  In

14    other words, that sometime prior to November 4th of 2019 when

15    the defendant's alleged to have committed this offense, he had

16    previously been convicted of illegally entering the United

17    States.

18         So those are the five elements.  They're spelled out

19    in this instruction as to count one.

20         Let me turn to count two.  There's some similarities,

21    there's some differences.  In count two, the defendant is

22    charged with being an alien who, after being excluded or

23    deported or removed from the United States, attempted to come

24    back in, attempted reentry.

25         To be found guilty of this charge in count two, the

1  government has to prove the following things to you beyond a

2  reasonable doubt:

3           First, they have to prove that sometime before the

4  date of the alleged entry, which was November 4th, 2019, the

5  defendant had been excluded, deported or removed from the

6  United States.  That's the first element.

7           The second element is the same as it was for the first

8  crime that's alleged, that is that the defendant -- it must be

9  shown beyond a reasonable doubt the defendant had the specific

10 intent at the time he entered the United States to be free from

11 official restraint.

12          And, again, the same definition applies.  That means

13 that you're coming in with the intention to go at large among

14 the population, not to be apprehended, not to turn yourself in,

15 but to go at large without being detected by authorities.

16          And, again, the same qualifications apply to this

17 definition.  The government doesn't have to prove that the

18 defendant's sole intent was to go at large, but they must prove

19 that at the point that he first entered into the United States,

20 he specifically intended to enter free from official restraint

21 or at least that that was part of his intention and motivation

22 and that he specifically planned that, not that it was his only

23 purpose, but at least it was part of his purpose.

24          The third element is that the defendant was an alien

25 at the time that he attempted reentry.  Again, I remind you an

1    room for you to begin your deliberations.

2         Jury is not present.  Counsel and the defendant are

3    present.

4         Both sides agree that the jury instructions, subject

5    to the objections that were made, were read as agreed upon?

6         MR. DUDANI:  Your Honor, there is one point on that.

7         THE COURT:  Uh-huh.

8         MR. DUDANI:  The Court extemporaneously said regarding

9    the dual intent doctrine, so I know our objections were made

10   and overruled.

11        THE COURT:  Yeah.

12        MR. DUDANI:  That's fine.  But the Court said as to

13   each count that it suffices for guilt if part of his purpose

14   was the mens rea, but I would object to that because it needs

15   to be -- there needs to be a fully formed intent.

16        Now we lost the argument --

17        THE COURT:  I didn't say anything about fully formed,

18   I just said if he had a dual intent, that was still sufficient

19   as long as the government proved at the time that he entered

20   that his purpose was, his specific intent, I even used that

21   word, was to -- was to come in and go at large among the

22   public, so there was no deviation, extemporaneous or not, from

23   what the law is and what I found that the instruction should

24   say.

25        MR. DUDANI:  Your Honor, can I clarify?

ER-76

```
1              THE COURT:  Yeah, sure.

2              MR. DUDANI:  What the Court just said, I completely

3    agree, it's in conformity with the written instructions and we

4    had the argument yesterday.  The Court did say twice as to each

5    count part of his purpose, if part of his purpose was the

6    illicit purpose.

7              THE COURT:  Right.

8              MR. DUDANI:  But that's -- and I would object because

9    there needs to be a full-fledged intent.  It can't be part --

10             THE COURT:  You're conflating things, though.

11             I mean, part of his purpose doesn't mean that it

12   wasn't full-fledged.  What you're doing is saying, no, it has

13   to be his exclusive purpose to come.  That's not what the law

14   is.  We went over that yesterday.

15             If he has dual motives, if he says I want to come in,

16   that's one of my purposes, but if I get caught, I'm going to

17   resort to saying, well, I want asylum.  That suffices as long

18   as the government proves that he had the specific intent at the

19   moment of entry to come in.

20             I didn't say anything different from that.  Your

21   objection is noted and overruled.

22             Anything else then?

23             MR. DAVIS:  Your Honor, I would like -- if the

24   government has anything?

25             MR. MCDONALD:  Go ahead.
```

ER-77

```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5        Plaintiff,                    ) No. 20-CR-435-LAB
                                        )     15-CR-353-LAB
 6           v.                         )
                                        ) November 15, 2021
 7   JUAN CARLOS CABRERA,               )
                                        ) 6:56 p.m.
 8        Defendant.                    )
     _____ ) San Diego, California

 9

10    TRANSCRIPT OF SENTENCING AND REVOCATION OF SUPERVISED RELEASE
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                              By:  COLIN MCDONALD, ESQ.
14                            880 Front Street
                              San Diego, California  92101
15
     For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
16                            By:  BENJAMIN P. DAVIS, ESQ.
                              225 Broadway
17                            San Diego, California  92101

18   Court Interpreter:       DEBORAH BERRY

19   Court Reporter:          CYNTHIA R. OTT, RDR, CRR
                              District Court Clerk's Office
20                            333 West Broadway, Suite 420
                              San Diego, California, 92101
21                            cynthia_ott@casd.uscourts.gov

22

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1          Let's see, I think I also got -- did I get a

2     sentencing chart from you, Mr. McDonald?

3          MR. MCDONALD:  Yes, Your Honor, at ECF No. 84.

4          THE COURT:  I have it now I just came on it, so I got

5     that.

6          So those are the things that I reviewed, did I neglect

7     to mention anything that was filed by you, Mr. Davis?

8          MR. DAVIS:  No, Your Honor, that's everything.

9          THE COURT:  And you Mr. McDonald?

10         MR. MCDONALD:  That's it, Your Honor.

11         THE COURT:  I'm happy to hear from you on the

12    objections.

13         MR. DAVIS:  Thank you, Your Honor.  I think I've laid

14    it out fairly well in my papers.  I think that the government

15    and I just dispute about what the phrase "time served" means.

16         My contention is that when -- the government's correct

17    that you look at the sentence that's imposed, not the amount of

18    time spent in custody.  So if someone is sentenced to 24 months

19    and they only do 21 because of good time, obviously what counts

20    is the 24 months.

21         But here what happened is the sentencing court imposed

22    a sentence of time served and I think the way that you look to

23    the content of how much time you served on the case is how --

24    how the time has been counted by the accounting authority which

25    is the BOP.

1    And so I think the sequence of events here lays out

2  pretty clearly, federal law says you don't count a pretrial

3  detention towards two sentences.

4    So he was arrested, he pled guilty and was sentenced

5  to time served on January 25th, so all of the time that he

6  spent in custody at that point was credited towards the 17-CR

7  case and then four days later supervised release was revoked on

8  the 15-CR case.  And he was sentenced to time served.  The

9  Court didn't say, I'm sentencing you to six months or I'm

10  sentencing you to 133 days.

11    It said time served.  And at that point the time

12  that -- what counts as the time he had served at that point was

13  four days.  And so for that reason even when you add the two

14  times together it comes under the 13-month requirement for a

15  three point conviction.  And as I point out this does matter,

16  sometimes it's academic, one point here in the criminal history

17  one point there, but it does change them from category III to

18  category IV.  Or I should say it the other way, he should be in

19  category III and it lowers the guidelines by a few months.

20    So as I laid out, what my argument is, does the Court

21  have any questions for me about it?

22    THE COURT:  All of this applies to 15-CR-00353?

23    MR. DAVIS:  Well, there's two cases, Your Honor.  He

24  was -- in the 15-CR case he was sentenced to 12 months and plus

25  supervised release.  And then he came back in 2017 and he got a

1   misdemeanor that time.  And so he was sentenced to time served

2   on the misdemeanor.

3          THE COURT:  How much time had he done at that point?

4          MR. DAVIS:  It was 100 and about four months something

5   like that.

6          THE COURT:  Okay.

7          MR. DAVIS:  I have it here somewhere.  But it was a

8   133 days, somewhere around that time.  And then his supervised

9   release was revoked a few days later based on the -- on the

10  misdemeanor, on the misdemeanor allegation.  And Judge Lorenz

11  at that time sentenced him to time served.

12         And what my contention is, is that the four months

13  that he'd done in custody counted towards the new illegal entry

14  sentence and not toward the revocation sentence.

15         So if you called BOP right now and say, BOP, how much

16  time did Mr. Cabrera serve on his revocation sentence in the

17  15-CR case, BOP will say it was four days long.  That's how

18  long that sentence was.

19         So that's how much time he had served.

20         THE COURT:  All right.  Mr. McDonald.

21         MR. MCDONALD:  Your Honor, this isn't a matter of what

22  the BOP says, this is a matter of a guidelines calculation of

23  the criminal history points.

24         The question is whether for his 2015 1326 conviction,

25  whether he served more than 12 months or more than 13 months

ER-81

1 and a day. The original sentence was 12 months, then the

2 revocation sentence several years later was 134 days which was

3 the time served at the time that the judgment was entered in

4 the revocation proceeding.

5 　　　　　THE COURT: Okay.

6 　　　　　MR. MCDONALD: That's over 13 months and a day and

7 thus the --

8 　　　　　THE COURT: That's the only issue here, right?

9 　　　　　MR. MCDONALD: That's the issue that they've raised.

10 They've also raised a factual objection or really a legal

11 objection to the inclusion of hearsay in the PSR. But the

12 issue is whether the 2015 conviction scores two points or

13 scores three points. It scores three points because he served

14 more than 13 months.

15 　　　　　THE COURT: Right. You take the original sentence you

16 add any time spent on a supervised release or probationary

17 revocation and add that and that becomes the total amount of

18 time that one considers in determining whether the sentence is

19 more than 13 months?

20 　　　　　MR. MCDONALD: Correct.

21 　　　　　THE COURT: That's always been my understanding,

22 Mr. Davis.

23 　　　　　MR. DAVIS: I completely agree with that, Your Honor.

24 　　　　　THE COURT: Okay.

25 　　　　　MR. DAVIS: The question is when Judge Lorenz said

1    time served on the OSC sentence, what does time served mean?

2            THE COURT:  He says it's 133 days, he's been in on the

3    misdemeanor for a while, then as I understand it there's a

4    four-day gap between his sentence on the misdemeanor and him

5    appearing before Judge Lorenz.

6            MR. DAVIS:  Right.

7            THE COURT:  The total time is 133 days, but when you

8    add that to 12 months it comes out to more than 13 months.

9            MR. DAVIS:  I understand that's what the government's

10   argument is, but what I'm saying is that when Judge Lorenz

11   sentenced him to time served, the only time that was counted in

12   that sentence was the four days between the misdemeanor

13   sentence and the revocation sentence.

14           THE COURT:  I'm not sure that's true.  When was the

15   petition filed alleging that he was in violation of the

16   original grant of supervised release that Judge Lorenz imposed

17   by coming back in?

18           MR. DAVIS:  I don't have the date in front of me, but

19   it was about a month after his arrest.

20           MR. MCDONALD:  Your Honor, I do have those dates.  The

21   revocation docket shows he was arrested on the revocation

22   petition on September 18th of 2017.  Two days later he appeared

23   for his initial appearance on the revocation petition and was

24   ordered detained.  That's ECF number 40 of 15-CR-353.

25           THE COURT:  If this were original sentencing and I

1    said time served, it would subsume all of that time.  You

2    wouldn't say that, well, that doesn't count.  He was detained

3    on that case.  He was in custody, perhaps on both.  Perhaps on

4    the new case and that one.

5              MR. DAVIS:  Right.

6              THE COURT:  But the judgment makes it clear that part

7    of the custody time is attributable to the revocation.  So --

8              MR. DAVIS:  I don't know if that's right, Your Honor.

9    He's sentenced on January 25th to time served for the

10   misdemeanor, right?

11             THE COURT:  Right.  But before January, in September

12   there's a petition filed.

13             MR. DAVIS:  Right.

14             THE COURT:  And he's arraigned on the petition.

15             MR. DAVIS:  Correct.

16             THE COURT:  Said, hey, it's alleged you're in

17   violation of supervised release.  Apparently he denies that at

18   that point, but he's detained on that case.

19             MR. DAVIS:  Right.

20             THE COURT:  Time starts accruing on that case as well.

21             MR. DAVIS:  But it can't be counted towards two cases

22   at the same --

23             THE COURT:  My, goodness, Tish.

24             THE CLERK:  It automatically shuts down at 7 I think.

25             THE COURT:  Okay.  There we go.  I'm sorry for that.

ER-84

```
 1              Okay.  I think I have in mind the argument.  Look,
 2   we're talking about a period of, what, 31 days beyond the 12
 3   months?  It's 12 months, regardless of good time, the
 4   pronounced sentence on the original was 12 months, and so if
 5   the government convinces me that he did an additional 31 months
 6   attributable to that case -- I'm sorry, 31 days, then we're --
 7              MR. DAVIS:  More than that.
 8              MR. MCDONALD:  About 134 days.
 9              THE COURT:  NO, I know it's more than that, but I'm
10   saying what we're talking about is a period of 31 days that
11   puts him over the 13 months, right?
12              MR. MCDONALD:  Correct.
13              THE COURT:  You used to ask for 13 months and a day on
14   some of those cases and I think it was because of that.  I
15   overrule the objection.  I agree with the government.  I find
16   that the judgment here is really dispositive, and the other
17   court documents that I can judicially notice, including the
18   date that he was arraigned on the petition, that allege that he
19   violated supervised release that well preceded the date that
20   Judge Lorenz pronounced sentence and then the magistrate
21   judge's detention order that emanated from that appearance on
22   the petition and the denial, none of that was resolved and he
23   remained in custody, ordered detained by the magistrate judge
24   up until Judge Lorenz sentenced him to time served.
25              It's not unusual that a person can be doing time on
```

ER-85

1   two things, it's the reason we have concurrent and consecutive

2   sentences.  And here Judge Loren could have sentenced him to

3   consecutive time.  He could have done that.  He didn't have to

4   give him credit, because he was getting credit already on the

5   misdemeanor, and he chose not to do that.  But I don't have any

6   reason to believe that time served meant the four day interval

7   between when he was sentenced on the misdemeanor and when Judge

8   Lorenz sentenced him.

9          As I said what's operative here is the date that he

10  was detained for the allegations of violation of supervised

11  release and the fact that a magistrate judge ordered him

12  detained separately on that matter.  So the objection is

13  overruled.

14         MR. DAVIS:  Understood, your Honor.  I think I've made

15  my record on it.

16         THE COURT:  You have.

17         MR. DAVIS:  As to the other objection, the government

18  mischaracterized it as a legal objection.  It's not.  It's a

19  factual objection.  He's denied the facts that were alleged in

20  the offense conduct and so forth.

21         THE COURT:  Okay.  Well, I rely on the jury's

22  resolution of the case and I find -- it's paragraph, what, 5,

23  is that what it pertains to?

24         MR. DAVIS:  No, Your Honor.  I was referring to the

25  summaries where the -- it's in the criminal history section

ER-86

1    defendant's fourth immigration conviction and this is a

2    graduated increase from what he previously has received.

3            I do note, I do think the COVID issue is one that Your

4    Honor should take into account, and I know that Mr. Cabrera has

5    had somewhat of a roundabout with COVID and being at the MCC.

6    And I do think that that's appropriate for Your Honor to take

7    into account.

8            We are, and in light of that, in light of the equities

9    presented, we're recommending 33 months and 24 months on the

10   1325 felony count.

11           THE COURT:  All right.  Thank you, Mr. McDonald.

12           The Court finds as follows:  First, as to the

13   guidelines, I find the base offense level is eight.  The

14   defendant has a prior illegal reentry offense, that adds four.

15   The adjusted offense level upward is 12.

16           No one's contending that he's accepted responsibility

17   and I find that he has not.  There was no demonstration of

18   acceptance at any point and that's notwithstanding that he went

19   to trial, but the guidelines do advise that it's a rare case

20   where a defendant can claim that he's innocent of the charge,

21   be convicted by a jury and still be entitled to acceptance and

22   I don't find this is one of the rare cases.  So it remains at

23   12.

24           The defendant is in criminal history category V.  The

25   Court has made a finding regarding that, and as mentioned by

ER-87

1  Mr. McDonald the guidelines applicable to him are 27 to 33

2  months.

3         I'll keep that range in mind as I turn to the 3553

4  factors.  First, let me note that on count two, count two, the

5  defendant's exposure is up to 20 years imprisonment.  As to

6  count one, his exposure is just two years imprisonment.  So I

7  have the statutory maximums in mind as well.

8         MR. DAVIS:  Excuse me, Your Honor, I think the

9  statutory maximum is 10 years.  He does not have an aggravated

10  felony.

11         THE COURT:  The probation officer said it's 20.  And I

12  think -- are you contesting that, for example, the assault with

13  a dangerous weapon is a felony is not an aggravated felony.

14         MR. DAVIS:  Yes, for a crime of violence, Your Honor,

15  it requires more than a year in custody, more than a yearlong

16  sentence under 1101843(f).

17         THE COURT:  Okay.  So you're saying by virtue of the

18  sentence imposed, it won't qualify?

19         MR. DAVIS:  As an aggravated felony.

20         THE COURT:  What about the assault and battery with a

21  dangerous weapon, are we in the same situation, did he get less

22  than a year?

23         MR. DAVIS:  Yes.

24         THE COURT:  Okay.  All right.  I assume, Mr. McDonald,

25  you agree with that by virtue of the sentences and