NOS. 21-50259 & 21-50261

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JUAN CARLOS CABRERA,**

Defendant-Appellant

_____

Appeal from the
United States District Court
for the Southern District of California
Honorable Larry Alan Burns, District Judge Presiding

_____

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 2**

_____

KARA L. HARTZLER
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Attorneys for Defendant-Appellant

# ER-89

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **V.** | (For Offenses Committed On or After November 1, 1987) |
| JUAN CARLOS CABRERA (1) | |

Case Number:   3:20-CR-00435-LAB

Benjamin P. Davis
Defendant's Attorney

**USM Number**   26618-038

☐  –

THE DEFENDANT:

☐  pleaded guilty to count(s)   -

☒  was found guilty on count(s)   1 and 2 of the Indictment

after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offense(s):

| **Title and Section / Nature of Offense** | **Count** |
|---|---|
| 8:1325(a)(1) - Attempted Unlawful Entry by an Alien (Felony) | 1 |
| 8:1326(a),(b) - Attempted Reentry of Removed Alien | 2 |

The defendant is sentenced as provided in pages 2 through   **3**   of this judgment.
The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s)

☐  Count(s)                                    is            dismissed on the motion of the United States.

☒  Assessment:  $200.00 - waived

–

☐  JVTA Assessment*: $

-

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

☒  No fine            ☐  Forfeiture pursuant to order filed                                    , included herein.

IT IS ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in the defendant's economic circumstances.

November 15, 2021
Date of Imposition of Sentence

HON. LARRY ALAN BURNS
UNITED STATES DISTRICT JUDGE

# ER-90

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | JUAN CARLOS CABRERA (1) | Judgment - Page **2** of **3** |
| CASE NUMBER: | 3:20-CR-00435-LAB | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Count 1: 24 months; Count 2: 51 months; All counts to run concurrently.

☐    Sentence imposed pursuant to Title 8 USC Section 1326(b).

☐    The court makes the following recommendations to the Bureau of Prisons:

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant must surrender to the United States Marshal for this district:

    ☐    at _____ A.M.      on _____

    ☐    as notified by the United States Marshal.

☐    The defendant must surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    on or before

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# ER-91

3:20-CR-00435-LAB

AO 245B (CASD Rev. 1/19) Judgment in a Criminal Case

| | | |
|---|---|---|
| DEFENDANT: | JUAN CARLOS CABRERA (1) | Judgment - Page **3** of **3** |
| CASE NUMBER: | 3:20-CR-00435-LAB | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant will be on supervised release for a term of:
3 years as to count 2

### SPECIAL CONDITIONS OF SUPERVISION

- Do not enter the United States illegally.

- The defendant must not commit another federal, state, or local crime.

//

# ER-92

3:20-CR-00435-LAB

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5        Plaintiff,                    ) No. 20-CR-435-LAB
                                        )     15-CR-353-LAB
 6            v.                        )
                                        ) November 15, 2021
 7   JUAN CARLOS CABRERA,               )
                                        ) 6:56 p.m.
 8        Defendant.                    )
     _____   ) San Diego, California
 9

10    TRANSCRIPT OF SENTENCING AND REVOCATION OF SUPERVISED RELEASE
                  BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  COLIN MCDONALD, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
     For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
16                           By:  BENJAMIN P. DAVIS, ESQ.
                             225 Broadway
17                           San Diego, California  92101

18   Court Interpreter:      DEBORAH BERRY

19   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
20                           333 West Broadway, Suite 420
                             San Diego, California, 92101
21                           cynthia_ott@casd.uscourts.gov

22

23

24

25   Reported by Stenotype, Transcribed by Computer
```

ER-93

1          SAN DIEGO, CALIFORNIA, NOVEMBER 15, 2021, 6:56 P.M.

2                              * * * *

3          THE CLERK:  Calling number 20 and 21, 15-CR-353,

4    United States of America versus Juan Carlos Cabrera on for

5    revocation of supervised release, and 20-CR-435 for sentencing.

6          THE COURT:  Slowly I turn to Mr. Davis and

7    Mr. McDonald.  Thank you for being patient both of you.  Sorry

8    this took so long.

9          MR. MCDONALD:  No problem, Your Honor.

10         MR. DAVIS:  No worries, Your Honor.  Someone had to be

11   last.

12         Good evening, Your Honor, Ben Davis, Federal

13   Defenders.  I'm appearing for Mr. Cabrera on both cases.

14         THE COURT:  Good afternoon, Mr. Davis.

15         MR. MCDONALD:  And good afternoon, Your Honor, Colin

16   McDonald for the United States.

17         THE COURT:  All right, good afternoon -- good evening,

18   good evening.

19              (Discussion off the record.)

20         MR. DAVIS:  Your Honor, Mr. Cabrera is present.  He's

21   in custody.  He's being assisted by the Spanish language

22   interpreter.

23         THE COURT:  All right.  Mr. Cabrera, good evening.

24   Good evening.

25         Thank you for being patient.  We've had a long

ER-94

1  calendar today and unfortunately yours was the last case to be

2  called, but I appreciate that you've been waiting and you've

3  been patient.

4      Mr. Cabrera is here on two cases.  The first is his

5  convictions for two offenses, attempted unlawful entry and

6  attempted reentry by a removed alien.

7      These resulted from a jury trial.  And I can't

8  remember what date the verdict was entered.

9      MR. DAVIS:  It was in June, Your Honor.  I think it

10 was the 7th or the 8th.

11     THE COURT:  Okay.

12     MR. DAVIS:  Something like that.

13     THE COURT:  So I'll take that first.  The other case

14 is a revocation of supervised release and that's based on the

15 defendant's commission of the two offenses for which he was

16 convicted.

17     In this case I have received and reviewed a

18 presentence report.  I assume you've gone over that with the

19 defendant.

20     MR. DAVIS:  I have, Your Honor.

21     THE COURT:  Okay.  I've also looked at the following:

22 Defendant filed objections to the presentence report and the

23 government responded to those.

24     In addition on behalf of Mr. Cabrera, Mr. Davis filed

25 a sentencing memo.  And I have reviewed that memo.

```
 1            Let's see, I think I also got -- did I get a
 2   sentencing chart from you, Mr. McDonald?
 3            MR. MCDONALD:  Yes, Your Honor, at ECF No. 84.
 4            THE COURT:  I have it now I just came on it, so I got
 5   that.
 6            So those are the things that I reviewed, did I neglect
 7   to mention anything that was filed by you, Mr. Davis?
 8            MR. DAVIS:  No, Your Honor, that's everything.
 9            THE COURT:  And you Mr. McDonald?
10            MR. MCDONALD:  That's it, Your Honor.
11            THE COURT:  I'm happy to hear from you on the
12   objections.
13            MR. DAVIS:  Thank you, Your Honor.  I think I've laid
14   it out fairly well in my papers.  I think that the government
15   and I just dispute about what the phrase "time served" means.
16            My contention is that when -- the government's correct
17   that you look at the sentence that's imposed, not the amount of
18   time spent in custody.  So if someone is sentenced to 24 months
19   and they only do 21 because of good time, obviously what counts
20   is the 24 months.
21            But here what happened is the sentencing court imposed
22   a sentence of time served and I think the way that you look to
23   the content of how much time you served on the case is how --
24   how the time has been counted by the accounting authority which
25   is the BOP.
```

ER-96

1        And so I think the sequence of events here lays out

2   pretty clearly, federal law says you don't count a pretrial

3   detention towards two sentences.

4        So he was arrested, he pled guilty and was sentenced

5   to time served on January 25th, so all of the time that he

6   spent in custody at that point was credited towards the 17-CR

7   case and then four days later supervised release was revoked on

8   the 15-CR case.  And he was sentenced to time served.  The

9   Court didn't say, I'm sentencing you to six months or I'm

10  sentencing you to 133 days.

11       It said time served.  And at that point the time

12  that -- what counts as the time he had served at that point was

13  four days.  And so for that reason even when you add the two

14  times together it comes under the 13-month requirement for a

15  three point conviction.  And as I point out this does matter,

16  sometimes it's academic, one point here in the criminal history

17  one point there, but it does change them from category III to

18  category IV.  Or I should say it the other way, he should be in

19  category III and it lowers the guidelines by a few months.

20       So as I laid out, what my argument is, does the Court

21  have any questions for me about it?

22       THE COURT:  All of this applies to 15-CR-00353?

23       MR. DAVIS:  Well, there's two cases, Your Honor.  He

24  was -- in the 15-CR case he was sentenced to 12 months and plus

25  supervised release.  And then he came back in 2017 and he got a

ER-97

1    misdemeanor that time.  And so he was sentenced to time served

2    on the misdemeanor.

3            THE COURT:  How much time had he done at that point?

4            MR. DAVIS:  It was 100 and about four months something

5    like that.

6            THE COURT:  Okay.

7            MR. DAVIS:  I have it here somewhere.  But it was a

8    133 days, somewhere around that time.  And then his supervised

9    release was revoked a few days later based on the -- on the

10   misdemeanor, on the misdemeanor allegation.  And Judge Lorenz

11   at that time sentenced him to time served.

12           And what my contention is, is that the four months

13   that he'd done in custody counted towards the new illegal entry

14   sentence and not toward the revocation sentence.

15           So if you called BOP right now and say, BOP, how much

16   time did Mr. Cabrera serve on his revocation sentence in the

17   15-CR case, BOP will say it was four days long.  That's how

18   long that sentence was.

19           So that's how much time he had served.

20           THE COURT:  All right.  Mr. McDonald.

21           MR. MCDONALD:  Your Honor, this isn't a matter of what

22   the BOP says, this is a matter of a guidelines calculation of

23   the criminal history points.

24           The question is whether for his 2015 1326 conviction,

25   whether he served more than 12 months or more than 13 months

ER-98

1   and a day.  The original sentence was 12 months, then the

2   revocation sentence several years later was 134 days which was

3   the time served at the time that the judgment was entered in

4   the revocation proceeding.

5           THE COURT:  Okay.

6           MR. MCDONALD:  That's over 13 months and a day and

7   thus the --

8           THE COURT:  That's the only issue here, right?

9           MR. MCDONALD:  That's the issue that they've raised.

10  They've also raised a factual objection or really a legal

11  objection to the inclusion of hearsay in the PSR.  But the

12  issue is whether the 2015 conviction scores two points or

13  scores three points.  It scores three points because he served

14  more than 13 months.

15          THE COURT:  Right.  You take the original sentence you

16  add any time spent on a supervised release or probationary

17  revocation and add that and that becomes the total amount of

18  time that one considers in determining whether the sentence is

19  more than 13 months?

20          MR. MCDONALD:  Correct.

21          THE COURT:  That's always been my understanding,

22  Mr. Davis.

23          MR. DAVIS:  I completely agree with that, Your Honor.

24          THE COURT:  Okay.

25          MR. DAVIS:  The question is when Judge Lorenz said

1   time served on the OSC sentence, what does time served mean?

2        THE COURT:  He says it's 133 days, he's been in on the

3   misdemeanor for a while, then as I understand it there's a

4   four-day gap between his sentence on the misdemeanor and him

5   appearing before Judge Lorenz.

6        MR. DAVIS:  Right.

7        THE COURT:  The total time is 133 days, but when you

8   add that to 12 months it comes out to more than 13 months.

9        MR. DAVIS:  I understand that's what the government's

10  argument is, but what I'm saying is that when Judge Lorenz

11  sentenced him to time served, the only time that was counted in

12  that sentence was the four days between the misdemeanor

13  sentence and the revocation sentence.

14       THE COURT:  I'm not sure that's true.  When was the

15  petition filed alleging that he was in violation of the

16  original grant of supervised release that Judge Lorenz imposed

17  by coming back in?

18       MR. DAVIS:  I don't have the date in front of me, but

19  it was about a month after his arrest.

20       MR. MCDONALD:  Your Honor, I do have those dates.  The

21  revocation docket shows he was arrested on the revocation

22  petition on September 18th of 2017.  Two days later he appeared

23  for his initial appearance on the revocation petition and was

24  ordered detained.  That's ECF number 40 of 15-CR-353.

25       THE COURT:  If this were original sentencing and I

ER-100

1    said time served, it would subsume all of that time.  You

2    wouldn't say that, well, that doesn't count.  He was detained

3    on that case.  He was in custody, perhaps on both.  Perhaps on

4    the new case and that one.

5            MR. DAVIS:  Right.

6            THE COURT:  But the judgment makes it clear that part

7    of the custody time is attributable to the revocation.  So --

8            MR. DAVIS:  I don't know if that's right, Your Honor.

9    He's sentenced on January 25th to time served for the

10   misdemeanor, right?

11           THE COURT:  Right.  But before January, in September

12   there's a petition filed.

13           MR. DAVIS:  Right.

14           THE COURT:  And he's arraigned on the petition.

15           MR. DAVIS:  Correct.

16           THE COURT:  Said, hey, it's alleged you're in

17   violation of supervised release.  Apparently he denies that at

18   that point, but he's detained on that case.

19           MR. DAVIS:  Right.

20           THE COURT:  Time starts accruing on that case as well.

21           MR. DAVIS:  But it can't be counted towards two cases

22   at the same --

23           THE COURT:  My, goodness, Tish.

24           THE CLERK:  It automatically shuts down at 7 I think.

25           THE COURT:  Okay.  There we go.  I'm sorry for that.

 1          Okay.  I think I have in mind the argument.  Look,

 2   we're talking about a period of, what, 31 days beyond the 12

 3   months?  It's 12 months, regardless of good time, the

 4   pronounced sentence on the original was 12 months, and so if

 5   the government convinces me that he did an additional 31 months

 6   attributable to that case -- I'm sorry, 31 days, then we're --

 7          MR. DAVIS:  More than that.

 8          MR. MCDONALD:  About 134 days.

 9          THE COURT:  NO, I know it's more than that, but I'm

10   saying what we're talking about is a period of 31 days that

11   puts him over the 13 months, right?

12          MR. MCDONALD:  Correct.

13          THE COURT:  You used to ask for 13 months and a day on

14   some of those cases and I think it was because of that.  I

15   overrule the objection.  I agree with the government.  I find

16   that the judgment here is really dispositive, and the other

17   court documents that I can judicially notice, including the

18   date that he was arraigned on the petition, that allege that he

19   violated supervised release that well preceded the date that

20   Judge Lorenz pronounced sentence and then the magistrate

21   judge's detention order that emanated from that appearance on

22   the petition and the denial, none of that was resolved and he

23   remained in custody, ordered detained by the magistrate judge

24   up until Judge Lorenz sentenced him to time served.

25          It's not unusual that a person can be doing time on

1  two things, it's the reason we have concurrent and consecutive

2  sentences.  And here Judge Loren could have sentenced him to

3  consecutive time.  He could have done that.  He didn't have to

4  give him credit, because he was getting credit already on the

5  misdemeanor, and he chose not to do that.  But I don't have any

6  reason to believe that time served meant the four day interval

7  between when he was sentenced on the misdemeanor and when Judge

8  Lorenz sentenced him.

9          As I said what's operative here is the date that he

10  was detained for the allegations of violation of supervised

11  release and the fact that a magistrate judge ordered him

12  detained separately on that matter.  So the objection is

13  overruled.

14          MR. DAVIS:  Understood, your Honor.  I think I've made

15  my record on it.

16          THE COURT:  You have.

17          MR. DAVIS:  As to the other objection, the government

18  mischaracterized it as a legal objection.  It's not.  It's a

19  factual objection.  He's denied the facts that were alleged in

20  the offense conduct and so forth.

21          THE COURT:  Okay.  Well, I rely on the jury's

22  resolution of the case and I find -- it's paragraph, what, 5,

23  is that what it pertains to?

24          MR. DAVIS:  No, Your Honor.  I was referring to the

25  summaries where the -- it's in the criminal history section

ER-103

1  where the probation officer repeats what the police report

2  said.

3          THE COURT:  Oh, okay.  All right.

4          MR. DAVIS:  It includes a number of facts that when I

5  was reviewing it with Mr. Cabrera, he said, no, I didn't say

6  that, I didn't do that.

7          THE COURT:  Okay.

8          MR. DAVIS:  And it's my practice often to just say,

9  look, these are from 20 years ago and he denies the facts that

10 he didn't admit at the time.

11         THE COURT:  Okay.  I'll accept the objection and not

12 rely on any of the narrative portions.  You don't deny that he

13 suffered the convictions that are set forth, okay.  I'm happy

14 to hear from you generally on behalf of the defendant.

15         MR. DAVIS:  Thank you, Your Honor.  I'm sure the Court

16 remembers this trial.  This was the trial where Mr. Cabrera was

17 arrested between the fences sitting with his back, walked up

18 the hill sat down and waited for the border patrol agent to

19 come up to him.

20         THE COURT:  Right.

21         MR. DAVIS:  I can tell you when we were preparing for

22 sentencing Mr. Cabrera reiterated to me that his intention is

23 to apply for relief from -- to avoid being removed to El

24 Salvador.

25         Things are extremely difficult and violent in that

1    city and he just feels unable to live there.  I've told him

2    that, frankly, I don't think that he has a particularly good

3    case.  He's not eligible for asylum, and it's likely the

4    standards for the other forms of relief that he would face,

5    such as withholding under the convention against torture,

6    they're very, very high standards.

7             THE COURT:  Right.

8             MR. DAVIS:  And I just don't think it's likely that

9    he's going to make them.  But he's told me that he just -- he

10   fears returning there and he's going to exhaust whatever

11   ability he has --

12            THE COURT:  Mr. Davis, isn't it the case -- I don't

13   know this to be true but I've read this that Mexico, for

14   example, has offered amnesty or at least, you know, safe harbor

15   to anybody traveling from the Central American countries which

16   used to be an impediment to getting amnesty here in the United,

17   States, right?  If some other country between the country that

18   is oppressing you and the United States will offer you safe

19   harbor you can stay there and my understanding is Mexico has

20   made that blanket offer to all of these people that are

21   currently coming across and presumably it would extend to

22   Mr. Cabrera.

23            MR. DAVIS:  I don't know that factually, Your Honor.

24   That may well be the case.

25            THE COURT:  I don't either.  But I've read that's the

ER-105

1  case.

2        There's a heated debate going on about immigration now

3  and the proponents of keeping the border tightly sealed say,

4  hey, wait a minute, they don't need to come here, Mexicans

5  speak their language, Spanish, people coming from Central

6  America for the most part and the Mexican president has said,

7  oh, you're olly olly oxen free here.

8        MR. DAVIS:  Well, I hope that's the case, Your Honor,

9  that he can find somewhere between his home country where he's

10  not able to stay and the United States where he's also not able

11  to stay.

12        THE COURT:  That's really a matter for immigration

13  courts, right?

14        MR. DAVIS:  I agree.  I'm just talking generally about

15  what he's going to do with himself because, you know, I know

16  the Court may view this differently but I view this as a really

17  sad situation for him.

18        You know, I'll tell you, Your Honor, we sometimes have

19  this experience when I review someone's A-file where you go

20  backwards through time, you know how they're stacked so the

21  most recent documents are at the top and the old documents are

22  at the bottom.  And when you go through the A-file, you

23  sometimes see the photographs that are appended as they go

24  backwards in time.  And you see the defendant, my client,

25  someone I'm getting to know well over the two years that I

1   represented him getting younger and younger.  And then you go

2   back to often the first photograph.

3        And he had some photographs attached -- I didn't

4   include them in my sentencing memorandum, but they're from his

5   wife's petition to legalize him back in the late '90s or mid

6   '90s.  And they're pictures from his wedding day, and they were

7   in the basement of a church in Boston.  And Mr. Cabrera looked

8   young and hopeful and like he had, you know, a lot going for

9   him that perhaps he was going to get married to his wife who's

10   a United States citizen, that maybe he could work hard, that

11   maybe he could have a future here.

12        And what happened obviously is that he had a strong --

13   a really problematic relationship with alcohol and drugs, that

14   his wife and daughter have attested to in the presentence

15   report.

16        He had this five-year run of really troubling crimes

17   where he's being drunk and getting arrested for cocaine

18   possession and marijuana possession and assaults and things

19   like that, and he just couldn't get a handle on it and because

20   of that, he lost every chance that he's had to live in this

21   country.  And the criminal record since the early 2000s is

22   really just the reentries of him trying to find a way back.

23        THE COURT:  I think the evidence at trial was that

24   he'd never had legal status in this country, right?

25        MR. DAVIS:  He never received legal status.  His wife,

1  he had an approved I-130 petition, this is part of the 1326(d)

2  motion, why I thought that he had a very plausible chance of

3  going through departure.

4         THE COURT:  Right.

5         MR. DAVIS:  Because his petition had been approved, so

6  the next step would be to file the application for legal

7  permanent residence but he was deported in the meantime.

8         You know, and he also had the criminal record, so

9  maybe he wouldn't have been granted it.  I don't know.  But he

10  definitely, there was a moment there where he had his shot at

11  getting it and he fumbled it away.  And I find that a very sad

12  fact and I know that he does too.

13         And it's really sad to look at someone who looking at

14  these pictures from when he's getting married is sort of on the

15  cusp of one kind of life and then the paths fork really

16  divergently.  And since he was removed, I think it was 2002 or

17  2003 he's tried many times to return to his family and to

18  escape El Salvador.  And I've certainly given him the advice

19  that I don't think he's ever going to be able to legalize his

20  status in this country and, you know, I encouraged him to seek

21  whatever form of withholding or asylum that he's able to.

22         I know that he intends to ask for a reasonable fear

23  interview and try to convince the immigration authorities that

24  he fears returning to El Salvador.

25         I think it's going to be a hard row for him to hoe

ER-108

1  though just given the criminal record and the fact that he's

2  had it denied before, because the sad truth is that sometimes

3  people can be in untenable situations that they cannot stand

4  and cannot tolerate and that are unbelievably dangerous but

5  that that doesn't form a legal basis to come to this country

6  and seek refuge.  And that's the truth.

7          And Mr. Cabrera is going to have to learn that.  I can

8  tell Your Honor, I've worked with him a lot.  He's one of the

9  re-entry client I think I know the best.  He's been my client

10 for two years now in this case.  I also represented him in the

11 17-CR case.

12          He's a very pleasant and respectful person.  I really

13 have a hard time connecting him with the drunk and violent

14 person that's represented in the criminal record from the '90s

15 and the early 2000s.

16          He speaks about faith a lot.  He speaks about music.

17 He speaks about his family members.  He's talked -- told me a

18 lot about the journey.  I know the Court's aware of the journey

19 that folks take from El Salvador and the trains and the danger.

20          THE COURT:  Right.  It's arduous.  A lot of walking

21 too.

22          MR. DAVIS:  Yeah, and there's extortion and fear.  And

23 I think the Court can appreciate the desperate extremes that

24 one finds yourself in to willingly take that trip over and over

25 again.

ER-109

1        And I think he has this -- this dream that -- of, you

2   know, that if things are so bad for him in El Salvador that

3   that maybe means that that's a basis for seeking refuge here.

4   And I think the fact is that we have good and strong and

5   appropriate asylum and refugee laws but they just

6   don't -- they're not going to operate to his benefit.

7        That's my opinion, I'm not an immigration attorney.

8   But I've tried to convey that message to him that I think that

9   it seems to me that the outcome of these long and painful and

10  dangerous journeys is really just going to be time in custody.

11       And I sort of want to use that to pivot to talk a

12  little bit about his time in custody in this case.  I know the

13  Court has been skeptical of variances because of COVID in lots

14  of cases and I certainly understand why and certainly,

15  especially when there are defendants who were arrested after

16  COVID began when sort of the idea was you knew well that jail

17  is a dangerous place.

18       THE COURT:  Sure.  Yeah, no, it doesn't make a lot of

19  sense when a person picks time, place and manner that's right

20  in the middle of a pandemic to say I'm going to give you time

21  off because you chose to do this then.

22       MR. DAVIS:  Right.

23       THE COURT:  I get it, this is November 4th, 2019,

24  right, before the pandemic was upon us or we appreciated that

25  it was upon us.

ER-110

1        MR. DAVIS:  Right.  And I think that he caught the

2   brunt of all the disruptions that it had.  We continued the

3   trial I think about a year.  It was initially supposed to be

4   set in the summer of 2020 and it was tried in summer of --

5        THE COURT:  Did he get COVID?

6        MR. DAVIS:  He did.  We had a trial date in April or

7   May of this year that we continued because he was hospitalized

8   on a respirator with COVID.  He was in the hospital for about a

9   week we had to continue it a couple of times.

10       So he's really, of all the sufferings the Court's

11  heard about for the COVID, how it's affecting the jails, he's

12  received all of them.  I mean, he's dealt with the isolations,

13  the lockdowns, the inability to have commissary, or exercise,

14  phones, things like that.  But then also getting COVID himself,

15  being hospitalized with a respirator is to me strikes a very

16  serious case, not simply some of the easier symptoms that we've

17  heard about but much more serious symptoms.

18       And then just the anxiety of two years in pretrial

19  detention where there's no programming and there's no outdoors.

20       He's been inside at the MCC, Your Honor, for two years

21  now.  If we tried the case in 2020 and he'd been convicted and

22  sentenced to time, you know, he could have spent the last year

23  at least with a yard to walk around.

24       So I think that to the extent that the Court has ever

25  viewed COVID as, you know, time spent in COVID custody as

ER-111

1    qualitatively different from time spent in ordinary custody,

2    I'd urge the Court to take that into consideration in this

3    case.  Because I think that Mr. Cabrera has well and truly been

4    punished during the two years that he's been in custody on this

5    case.

6            So I think the Court has my recommendations well in

7    hand.  I'm asking for -- obviously I've asked for a total

8    sentence between the two cases of 27 months.  I split that with

9    21 on the first case, which was the low end of the guidelines

10   as I calculated them.  I'm going to stand by that

11   recommendation.

12           I think it takes into consideration

13   Mr. Cabrera's -- how his criminal history has aged out over

14   time and that, you know, the Court, I don't know what the

15   Court's personal view was on the trial testimony -- or trial

16   evidence, but I certainly think that the case that was put

17   forward was consistent with Mr. Cabrera's trying to seek asylum

18   again, with him sitting down and waiting for the agents to

19   arrest him.

20           Obviously the jury didn't find it that way and the

21   Court may not have as well, but this is not someone who is

22   jumping -- or running through the wilderness and hiding from

23   the officers and making them climb up the mountains and things

24   like that.  He sat down between the fences and he waited for

25   them to come.

ER-112

1    THE COURT:  There's no evidence that Mr. Cabrera was
2  aware of this, but my own recollection is that the stay in
3  Mexico policy that was in place at the time, that was later
4  rescinded when we had a change of administrations, I understand
5  it's been reinstated now because a federal judge found that the
6  executive order terminating the stay in Mexico policy didn't
7  comply with the Administrative Procedures Act.
8         The United States challenged that ruling, but no
9  court, including the Supreme Court, stayed the ruling so it
10  went into effect.  And the last I read, the Biden
11  administration was attempting to negotiate with Mexico and get
12  it reinstated.
13         But the point is, forget about what happened after
14  2020, in November of 2019, that program was in place.
15         MR. DAVIS:  Correct.
16         THE COURT:  He had to stay in Mexico in order to file
17  his asylum claim, right?
18         MR. DAVIS:  Correct.
19         THE COURT:  That would have been the case?  As I said
20  I don't know that he's aware of it but it kind of underscores
21  the fact that he should not have come back.
22         This amounts to now, what, his -- certainly his fourth
23  immigration conviction overall?
24         MR. DAVIS:  Correct.
25         THE COURT:  Three of which have been felonies.

ER-113

```
 1              MR. DAVIS:  Yes.

 2              THE COURT:  And one misdemeanor.

 3              MR. DAVIS:  Yes.

 4              THE COURT:  And two of the felonies and one of the

 5    misdemeanors have occurred in the last six years?

 6              MR. DAVIS:  Yes.

 7              THE COURT:  And at one point, Mr. Davis, he got 56

 8    months, right?  That was back in '07.

 9              MR. DAVIS:  Yes.

10              THE COURT:  Then he was in front of me the next time

11    on a felony, was that right?

12              MR. DAVIS:  No, Your Honor, it was originally Judge

13    Lorenz's case.

14              THE COURT:  Oh, I thought I imposed a 12-month case.

15              MR. DAVIS:  It has your initials on it now, Your

16    Honor, but it was in front of Judge Lorenz.

17              THE COURT:  So he imposed 12 months?

18              MR. DAVIS:  He imposed 12 months.

19              THE COURT:  Okay.  And that was, let's see the first

20    one was '07 and that was 2015?

21              MR. DAVIS:  Yes.

22              THE COURT:  So that's the case that's in front of me

23    on the supervised release violation?

24              MR. DAVIS:  Correct.

25              THE COURT:  His sentence was the result of a departure
```

ER-114

1    or a variance.  I note on the judgment, original judgment, and

2    Judge Lorenz embellished on it under part D justifying the

3    sentence underneath the -- below the guidelines, but it's

4    checked here that it was a defense motion for a sentence

5    outside the guidelines, and he certainly faced more than 12

6    months at the time, right, on guidelines?

7            MR. DAVIS:  It sounds like it, Your Honor.

8            THE COURT:  Yeah.

9            MR. DAVIS:  I don't have the calculations in front of

10   me.

11           THE COURT:  So here's the concern I have.  I think he

12   faces up to 24 months as a sanction on the 15 case because the

13   first sentence was the result of a variance or departure.

14           I know the guidelines applicable are less than that.

15   But, you know, I have a very different concern here.  I'm

16   concerned about the background.  I take your point that the

17   violent offenses and, you know, let's be specific about what he

18   did, they're very violent defenses -- or offenses that make me

19   believe that at least at one point, you know, he was a very

20   violent guy.

21           And I'm talking in particular about the assault with a

22   knife that's recorded at paragraph 25, breaking and entering in

23   the daytime.  Let's see, oh, he pled guilty to all counts, that

24   included an assault with battery with a dangerous weapon?

25           MR. DAVIS:  Yes, Your Honor.

1          THE COURT:  And a threat to commit crimes which was a

2    misdemeanor.

3          Now, you know, it's true as you say those were 20

4    years ago, but they formed the basis for why it would have been

5    really unreasonable, irrational for him to think that he could

6    come back to the United States, notwithstanding the

7    circumstances in El Salvador.  I can't imagine with a record of

8    serious violence like that -- put aside the other stuff,

9    destruction of property and drug possession and all that.

10         Obviously the Court that sentenced him in

11   Massachusetts recognized the danger that he posed because that

12   Court imposed a 56-month sentence.

13         By '07, the guidelines were advisory.  So the Court

14   wasn't compelled to impose that sentence.  That was an exercise

15   of discretion.

16         MR. DAVIS:  Yes, but I think he probably would have

17   had at least one plus 16 under the old guidelines.

18         THE COURT:  Yeah, yeah, he probably would have.  Now

19   why Judge Lorenz downgraded it to 12 months in custody after 56

20   months, I don't know I haven't spoken to him.

21         It may have been the passage of time.  When, lets's

22   see, he was released -- he was released in 2011, so it was just

23   four years earlier that he'd been released and he's back

24   already.

25         I don't know why he imposed the sentence that he did,

ER-116

1    but I have a different view on this, Mr. Davis, and it's that

2    56 months didn't deter this fellow.  He's back.  He gets 12

3    months, which I think was probably the wrong message, that's my

4    view.

5            I don't -- again, I don't mean any criticism of Judge

6    Lorenz.  Each judge sentences according to different

7    priorities, but I would look at this and say, boy, this guy is

8    really violent.  And 56 months didn't keep him out, he's back

9    and gets 12 months.

10           And I don't think this is on any judicial officer, but

11   he comes back again in '17 and the government decides, well,

12   two felonies and a sentence of 56 months, 12 months didn't

13   work, let's try a misdemeanor.  And they let him plead to a

14   misdemeanor.

15           MR. DAVIS:  That's because we filed a 1326(d) motion,

16   Your Honor, and I think they felt they had vulnerability --

17           THE COURT:  Did you represent him on that one?

18           MR. DAVIS:  I did.

19           THE COURT:  Whatever the reasons, but what occurs to

20   me is that he has not been deterred by long sentences.

21           He keeps coming back.  And to tell you the truth, I

22   have on my notes that a variance for deterrence is in order,

23   that the guidelines prepared here.  And I hope you believe me

24   and trust me on this, this has nothing to do with his election

25   to go to trial.

1    I never ever, I never ever punish people for going to

2   trial.  That's his right.  They charge him, he's got a right to

3   say you prove it.  I don't care whether he's guilty or not

4   guilty and I don't punish people for that.

5    But if this was a matter of original sentencing and he

6   pled guilty I would feel the same way.  These sentences have

7   not been sufficient to deter him and now I'm being asked to

8   impose a sentence of 33 months by the government.  I don't

9   think -- frankly, I'm inclined to vary upward and here's my

10  thinking on this:  I think the reason the government brings

11  these charges is to try to dissuade people from doing this

12  again.

13    That's the only point.  Because they do time here.

14  Used to be they get deported.  Maybe he won't be deported now.

15  I shared an experience -- I don't think you were here in court

16  at the time, 10 times a month now I'm getting petitions from

17  probation to change supervised release conditions because we

18  all assumed that, you know, somebody convicted of 1326 with a

19  serious criminal record would be deported when they finished

20  the sentence for that.

21    I'm getting these petitions that say, oh, we're being

22  told by Department of Homeland Security or ICE or whoever does

23  the deportations that these don't qualify under the guidelines

24  anymore.

25    And I'm thinking how peculiar this must be to these

1   people.  They've just done a long sentence for this.  They've

2   done it many, many times, they've been told by the judge, don't

3   come back and then they're told, oh, you can stay here.

4          Another judge called me a week ago or so and said,

5   look, I've had a similar experience.  I had a defense attorney

6   call me.  This guy did his time and the defense attorney called

7   me and said what do I do, Judge, my client called me, he's at a

8   bus stop.  He's been released on to the street.  There's

9   nowhere to go.

10          It's crazy and it's zany, but my sense of things is

11  they bring these charges primarily with the objective of

12  deterring people from coming back.

13          MR. DAVIS:  I agree.

14          THE COURT:  But my point here, Mr. Davis, is it hasn't

15  worked with this fellow.

16          I mean, you know, I get it.  I get the time lapse and

17  the different sentences and all but, you know, it just doesn't

18  seem to me that 33 months is going to do the trick.

19          56 months didn't do it and two subsequent prosecutions

20  and impositions of sentences and revocations didn't do it.

21          MR. DAVIS:  Yeah, I guess, Your Honor.  I think that

22  maybe we have an empirical difference about whether the length

23  of sentence deters people in cases like this.

24          THE COURT:  Yeah, I've seen the arguments, I don't

25  know if you've offered them, but your office argues that, says,

ER-119

1   oh, there's not a relationship between the two things, well.

2         MR. DAVIS:  I don't think there's not a relationship,

3   I just think there's a subtle one and it's multifaceted.  For

4   example in a border bust, Your Honor, I think length of

5   sentences does do some work to deterring people.

6         I think the Court and I would disagree about the

7   length of sentence necessary to deter people, but I think you

8   go back on the street and you say, hey, look don't go down

9   there and drive a car for somebody because you're going to go

10  to prison for two, four, six, whatever many years, and I think

11  that does some work.

12        THE COURT:  Right.

13        MR. DAVIS:  But -- and there are I think reentry

14  clients for which it also does some work.  But I think there

15  is -- these circumstances, Your Honor, I don't know if they're

16  fixable by courts, right.

17        I don't think that, whatever it is, think about what

18  Mr. Cabrera has undergone to be here in this courtroom, you

19  know, and the suffering that he's undergone.  And I don't know,

20  and I'm careful about this kind of argument because I don't

21  want to suggest to the Court that, you know, you need to go up

22  higher, you need to go higher than 56 months or something like

23  that.

24        THE COURT:  No.  Yeah, I know that's not your

25  position.

ER-120

1    MR. DAVIS:  I'm just saying I think there comes a

2  point, Your Honor, where there is a desperation that I don't

3  know if the length of sentence, to like Mr. Cabrera the seven

4  additional months is going to tell him when he gets back to San

5  Salvador and he's crossing the gang line to get to his factory

6  job and they're holding guns to his head and taking the five

7  dollars that he's earned that week out of his pocket --

8    THE COURT:  But he doesn't have to go back there.  I

9  presume he'd be unmolested in Mexico.  No one molested him on

10  his way up here in Mexico, right?

11    MR. DAVIS:  I don't know that, Your Honor.  I would

12  find it hard to believe that he didn't have --

13    THE COURT:  You say you've got a relationship with

14  him, I'm sure he would have told you, no, I couldn't stay in

15  Mexico if that were the case and tell you why.

16    MR. DAVIS:  I thought you meant on the voyage.  Well,

17  I can tell you --

18    THE COURT:  I'm not -- Mr. Davis, I'm not talking

19  about, I'm not talking about the -- you know, the reason he

20  came across or what happened there.

21    But what I put to you earlier about the President

22  offering amnesty, asylum to all the people that have come

23  across.  I'm just saying on this particular trip before he got

24  to where the fence was and across the fence, had anybody said

25  you can't stay here, you can't settle here?

1         MR. DAVIS:  I don't know if the authorities had done

2    that, but certainly the armed gangs that terrorize the Tijuana

3    refugee camps had done that.

4         THE COURT:  Well, go some place else.

5         It's not like there's no safe place in Mexico.  And I

6    get it, it's more dangerous than here.  But he can't come here.

7    He's got a disqualifying record.  That's the frustration I

8    have.

9         And, honestly, I agree with you, but I think the

10   obverse is also true that these sentences of 12 months and then

11   a misdemeanor prosecution, whatever the reasons were, send the

12   wrong message to him.

13        It's dialing it down.  You know, if the purpose is to

14   try to deter him by imposing a sentence, it doesn't help when

15   the sentence for doing the same thing twice before successively

16   becomes less 12 months and then whatever he got.

17        MR. DAVIS:  I don't know about the 12-month sentence

18   because I didn't represent him and I don't know what the facts

19   were there.  I can tell the Court that the misdemeanor was, you

20   know, we filed a 1326(d) motion and the government felt it was

21   a strong one and elected not to pursue it.  And at that point

22   he didn't have a misdemeanor, so.

23        THE COURT:  Did he get deported again after that

24   misdemeanor conviction?

25        MR. DAVIS:  Yes.

ER-122

```
1             THE COURT:  Was that the deportation they relied on at

2    the trial?

3             MR. DAVIS:  I don't know, I don't remember.

4             THE COURT:  It was?

5             MR. MCDONALD:  We did rely on that one, April 4th of

6    2018.

7             THE COURT:  Was there a (d) motion filed in this case?

8             MR. MCDONALD:  Yes, the Court denied it.

9             THE COURT:  Did the deportation after the misdemeanor,

10   was it one of those that just incorporated prior deportations?

11   the reinstatement?

12            MR. MCDONALD:  Yes, it was.

13            THE COURT:  But apparently you saw the merits

14   differently on the (d) motion?

15            MR. MCDONALD:  I did, Your Honor.

16            THE COURT:  Okay.  All right.  All right.  Mr. Davis,

17   anything else?

18            MR. DAVIS:  No, Your Honor, I just --

19            THE COURT:  I guess I should give you a chance, you

20   know, on a departure I have to give notice of it, I don't know

21   why you don't have to do it on a variance but you don't.  But

22   I'm telling you I'm considering a departure here because I

23   frankly think 33 months is insufficient to achieve the

24   objectives of sentencing under 3553, particularly two strong

25   ones, protecting the public and deterrence.
```

ER-123

1    And you say, you know, what are we to do. Look, if it

2 takes incapacitating him just to prevent him from doing this

3 again then I think that's a valid objective too. I'm not

4 talking about giving him a life sentence or anything like that,

5 but if he's bent on coming back -- and it seems to be he is,

6 and there's nothing I can do, well, you know, if he's going to

7 come back, he's going to be in jail.

8    MR. DAVIS: Yeah, I don't think that there's nothing

9 you can do, Your Honor and I think the gist of the scholarship

10 that my office often cites to the Court is that it's the

11 certainty of being caught and prosecuted and that he's not

12 going to get through that will drive the message.

13    THE COURT: Maybe he got the wrong message when they

14 capitulated on the 1326(d) motion back in '17. Maybe, he

15 thought, well, I can invoke a legal technicality and at least

16 come in. But he was still caught and prosecuted. It was still

17 a misdemeanor.

18    MR. DAVIS: That's true. But I'll tell you this, Your

19 Honor, since the first reentry case in '07, he's never

20 successfully made it into the country. And I think, you know,

21 what I hope and what I am telling him today and what I've told

22 him in preparation for the sentencing is that I don't think

23 he's ever going to make it into the country because the odds

24 are against it and they're not going to catch and release him

25 because of his record.

1    They're always going to prosecute him.  And so what I

2  hope that that gives the message to him is that before he sets

3  out on the journey north he says, this is hopeless.  I'm not

4  going to be able to reach my family, and I'm not going to get

5  asylum, and that I think is more of a deterrence than maybe

6  I'll get through and if I don't it's another couple years or

7  three years, or 33 months or whatever the Court is thinking

8  about imposing in a federal jail which is better than the

9  streets of Metapan, El Salvador.

10    And so I think sending the message that coming here is

11  hopeless is stronger medicine than sending the message of maybe

12  he'll get through, maybe he won't, and if we happen to catch

13  you, you know, it's like playing the lottery, right, or doing

14  Russian roulette as opposed to saying you're just not going to

15  come through, you're not going to make it and I think that's

16  what --

17    Look, I understand, Your Honor, it's the fourth one,

18  so a lot of these claims that I have the Court can say, well,

19  wasn't that true the last time.  Wasn't that true the time

20  before that, and I understand that.

21    I can just tell the Court that as he gets older I

22  think he is going to learn that he is not simply not going to

23  be able to come into this country again and that he's going to

24  have to find a place for himself somewhere else.  And that's

25  very, very difficult for people to accept sometimes and it's

1  something that he has to accept.

2        I also just reiterate, Your Honor, I know time to sum

3  up because we're getting into it, but I do think that the Court

4  should -- I do urge the Court to take into consideration the

5  time that he spent in custody and --

6        THE COURT:  Okay.

7        MR. DAVIS:  And how it's qualitatively different from

8  other times.

9        THE COURT:  Right.  You make a good point on that.

10  The objection I have to it is that typically the offenses

11  committed during COVID when everybody is aware including the

12  offender that that's not the case here.  He committed his

13  offense preCOVID.  I'm more inclined to credit that even though

14  the government is not asking for it here, but it'll moderate my

15  desire to impose a sentence that's longer than what he served

16  before.

17        Mr. Cabrera, I'm happy to hear from you, whatever you

18  want to say.  This is on the case that the jury convicted you.

19  You'll have a right to speak again because you face a

20  revocation on an older case where you were convicted of the

21  same thing, told not to come back and by coming back illegal ly

22  you violated those conditions.

23        But we'll get to that in a minute.  For now, I'm happy

24  to hear whatever you have to say regarding the case that you

25  stood trial for before a jury and were convicted of both counts

1  by the jury.

2         THE DEFENDANT:  Well, first of all, good afternoon to

3  everyone.  I would like to offer an apology for having entered

4  the United States illegally once again, knowing that I

5  shouldn't have done it.

6         But my childhood was so hard.  And I did not have the

7  opportunity to go to school and I think that I have mental

8  problems because as my attorney said and I thank the attorney

9  because of the way he explains things so well.

10        And so when I came here I enrolled in Bankers Hill

11  Community College to learn English as a second language because

12  I wanted to be a productive person and I did not want to become

13  a burden for the government.

14        And so my teacher, Angie, one day called me over and

15  she said to me, Mr. Cabrera, you are not prepared to learn

16  English because you don't know Spanish grammar.

17        So she said to me you have to go back to the Hispanic

18  center so that you can learn calligraphy and then you can learn

19  English and you can be the guitar player that you've always

20  wanted to be because I've always liked music and I wanted to be

21  a guitar player.

22        So all of my classmates at Bankers Hill Community

23  College were able to graduate, and I was very sad because I

24  wasn't able to go to school and be a different person and I

25  didn't have a mother or a father.

1          THE COURT:  So, Mr. Cabrera, if you could sum up here,

2    I am familiar with your history.  I have read the presentence

3    report.  I've even looked back over the old presentence report.

4          THE DEFENDANT:  So I was very sad and I started to

5    drink alcohol and I wasn't able to stop and sometimes I guess

6    people would offer me cocaine, but I'm not a drug addict, so I

7    don't do hard drugs like crack or anything.

8          And I do have a problem with alcohol and perhaps once

9    I was drunk, well, I made mistakes under the influence of

10   alcohol because it destroyed my mind.

11          So I would like to offer an apology for what I've

12   done, and I'm not going to come back to the United States

13   anymore because I have suffered very much.

14          And I am an older person now and I am going to make my

15   life anew.  And so that's why I beg Your Honor to consider my

16   age, and I will no longer insist in coming to the United

17   States.  I will forever stay out of the United States.

18          Please excuse me, and I would like to ask the United

19   States to excuse me for everything that I have caused here

20   thinking that I could come back.

21          THE COURT:  Okay.  Thank you, Mr. Cabrera, I

22   appreciate your statement.  Mr. McDonald.

23          MR. MCDONALD:  Your Honor, just a few brief points,

24   number one, when the defendant was before the district of

25   Massachusetts in 2007 being sentenced, he said virtually the

1  same thing that he was sorry and said he would come back no

2  more.  That's quoted in our response to the (d) motion at ECF

3  number 23 on page seven.

4         With respect to El Salvador that, Your Honor, is a

5  false dichotomy that the defense props up that he only has two

6  choices, which is to either be in El Salvador or to be in the

7  United States.  And the reason we best know, you know, that is

8  the very words of the defendant.

9         In paragraph 56 of the PSR, for instance, he says that

10  he plans to reside in Puebla Mexico and seek available

11  employment.  That's his future plans, not to be in El Salvador

12  but to be in Mexico.

13         Can also look at PSR paragraph 51 where he said that

14  he lived in Metapan until the age of 16 when he moved to Belize

15  for three years.  He then moved to Villahermosa, Mexico for

16  three year.  He then, for instance, lived he says in Mexicali

17  from 2007 onward, and we know that for a -- a large part of

18  that time he was in federal custody.

19         But the point is that it appears as though he has been

20  in Mexico for a large part of his life and indeed has said that

21  he plans to return there.

22         The guideline range, the properly calculated guideline

23  range is 27 to 33 months, and Your Honor has noted the facts

24  that the United States also was focusing on in recommending

25  that high end sentence, which is the fact that this is the

ER-129

1　defendant's fourth immigration conviction and this is a

2　graduated increase from what he previously has received.

3　　　　　I do note, I do think the COVID issue is one that Your

4　Honor should take into account, and I know that Mr. Cabrera has

5　had somewhat of a roundabout with COVID and being at the MCC.

6　And I do think that that's appropriate for Your Honor to take

7　into account.

8　　　　　We are, and in light of that, in light of the equities

9　presented, we're recommending 33 months and 24 months on the

10　1325 felony count.

11　　　　　THE COURT:  All right.  Thank you, Mr. McDonald.

12　　　　　The Court finds as follows:  First, as to the

13　guidelines, I find the base offense level is eight.  The

14　defendant has a prior illegal reentry offense, that adds four.

15　The adjusted offense level upward is 12.

16　　　　　No one's contending that he's accepted responsibility

17　and I find that he has not.  There was no demonstration of

18　acceptance at any point and that's notwithstanding that he went

19　to trial, but the guidelines do advise that it's a rare case

20　where a defendant can claim that he's innocent of the charge,

21　be convicted by a jury and still be entitled to acceptance and

22　I don't find this is one of the rare cases.  So it remains at

23　12.

24　　　　　The defendant is in criminal history category V.  The

25　Court has made a finding regarding that, and as mentioned by

ER-130

1    Mr. McDonald the guidelines applicable to him are 27 to 33

2    months.

3          I'll keep that range in mind as I turn to the 3553

4    factors.  First, let me note that on count two, count two, the

5    defendant's exposure is up to 20 years imprisonment.  As to

6    count one, his exposure is just two years imprisonment.  So I

7    have the statutory maximums in mind as well.

8          MR. DAVIS:  Excuse me, Your Honor, I think the

9    statutory maximum is 10 years.  He does not have an aggravated

10   felony.

11         THE COURT:  The probation officer said it's 20.  And I

12   think -- are you contesting that, for example, the assault with

13   a dangerous weapon is a felony is not an aggravated felony.

14         MR. DAVIS:  Yes, for a crime of violence, Your Honor,

15   it requires more than a year in custody, more than a yearlong

16   sentence under 1101843(f).

17         THE COURT:  Okay.  So you're saying by virtue of the

18   sentence imposed, it won't qualify?

19         MR. DAVIS:  As an aggravated felony.

20         THE COURT:  What about the assault and battery with a

21   dangerous weapon, are we in the same situation, did he get less

22   than a year?

23         MR. DAVIS:  Yes.

24         THE COURT:  Okay.  All right.  I assume, Mr. McDonald,

25   you agree with that by virtue of the sentences and

1   notwithstanding the title or elements of the charges, these are

2   not violent felonies or crimes of violence that would subject

3   the defendant to a 20-year exposure?

4         MR. MCDONALD:  Your Honor, I haven't thought through

5   this issue with this specific issue in mind, but I think it

6   would be prudent for Your Honor to just consider it as a ten

7   year cap.

8         THE COURT:  I will.  I'm not going to impose anywhere

9   near 10 years, so I'll accept that argument and impose -- and

10  assume that on the 1326, count 2, his exposure is up to 10

11  years.

12        3553 factors, look, the manner in which the offense

13  was committed here is not aggravated.  There was not any

14  resistance or anything like that.  But the real problem is when

15  I get to the history and characteristics.

16        And it dovetails with another 3553 factor that I've

17  discussed with Mr. Davis which has to do with deterrence.  This

18  fellow just has not been deterred.  And I -- you know, it's

19  kind of a perverse thing that he goes from 56 months for this

20  offense, commits the very same offense and gets 12 months.

21  Again, I'm not casting shade on any other judge or the

22  sentence, and I don't know what the circumstances are.  But,

23  you know, the concentration here is on how much time a person

24  has done and it controls the issue, for example, of whether a

25  felony is a violent felony or considered by one.

ER-132

1        But I wonder what the message is when a guy gets 56

2  months, commits the same crime, gets convicted of it and then

3  gets 12 months.  I'd be very confused if I was the offender.

4  And then, on top of it, he comes back and suddenly the offense

5  is down to 172 days, because we've downgraded the charge to a

6  misdemeanor.  Now, again, I understand the background.  Some

7  Assistant U.S. attorney didn't think that he could prevail on

8  the (d) motion or was too lazy to write up a response.  I don't

9  know which it was, but for whatever reason.

10        And so if I'm in Mr. Cabrera's position, I'm really

11  confused.  I'm being told by judges don't come back, but then

12  when I do come back the punishment kind of oddly is way less

13  than what I got for the former offenses, 56 months as I said

14  morphs down to 12 months, of, what, 44 month reduction.

15        And then 12 months morphs down to 172 days which is

16  less than -- which is less than half of what I got before.  My

17  goodness, notwithstanding what a judge said, if I was in his

18  position I'd say, you know, I know they're saying this but that

19  hasn't been my experience.

20        Now, look, I want to emphasize something.  I'm

21  inclined to vary in this case, but less than I was inclined to,

22  to begin with.  And I want to say as a preface to the variance

23  that I intend to impose, this has nothing to do with the

24  defendant going to trial.  And I think -- I can't speak for

25  Mr. Davis, he acknowledged I think by nodding his head, maybe

1    even agreed with me, that my reputation as a judge is one that

2    people get to try their cases and I don't punish people for

3    going to trial.

4         I'm not doing that here.  He had a right to say prove

5    this.  Prove it.  Prove every aspect of it.  Prove my

6    deportation was legal.  Prove in front of the jury that I

7    wasn't just trying to give myself up, that I, you know, and all

8    of that was at the fore, the jury decided against him.

9         That's fine.  I have no heartburn at all.  This was a

10   short trial anyway.  What was it a day, day and a half

11   something like that?

12        MR. DAVIS:  Day and a half.

13        THE COURT:  There's nothing for anybody, particularly

14   somebody that wants to be a trial judge to be mad about, the

15   guy asserts his right to go to trial.  So, Mr. Davis, I hope I

16   have you convinced of that, but I say these things for the

17   record, because if you go up from a guideline sentence after a

18   guy's gone to trial, I would immediately suspect, oh, this guy

19   is being punished.  It's a so-called trial penalty.  That is

20   not my intention at all.

21        As I mentioned to you, if I were looking at this as a

22   matter of first impression with Mr. Cabrera having pled guilty

23   to this charge I would feel the same way.  I would feel that

24   the prior sentence is 12 months and 172 days, and, you know,

25   the charge bargain that was entered into had this perverse

ER-134

1  effect of giving him a mixed message that maybe if he keeps

2  coming at some point we'll give up and he can stay.

3         He can't stay.  And I don't want to hit this hard

4  because I'm not relying on it very hard and I'm relying only on

5  the nature of the convictions here.

6         Again, I've sustained the objection or told Mr. Davis

7  I wouldn't consider the underlying -- the alleged facts that

8  underlie these cases, but these are serious offenses on the

9  face of them, breaking and entering into a place, assault and

10 battery with a dangerous weapon, a threat to commit a crime.

11        At another time, assault with a dangerous weapon.  I

12 mention this to you, Mr. Cabrera, because it's the reason

13 you're disqualified from coming into the United States.  You've

14 never had permission to be here.  You were here illegally from

15 the beginning and any chance you had at least during those

16 years, around 2000, of staying went out the window when you got

17 convicted of those serious offenses.

18        Look, we're the most generous country in the world in

19 terms of allowing people to come in legally.  We admit more

20 people legally into this country as immigrants than any other

21 country in the world, including Germany with the rash of people

22 that they've let in.  But we can't continue to let people in,

23 you know, in a responsible way, exercise our discretion as to

24 who comes in through the front door if people are breaking down

25 the back door and ignoring our rules and coming in.  And I have

ER-135

1    to say with all respect to you, you've done that.  You've

2    totally ignored these rules.

3          The prosecutor says as far as back as 2007 you made

4    the same pledge to the judge that you've made to me today that

5    this is it, I'm not coming back anymore.

6          And then, you know, the idea that you have to escape

7    oppression in your home country, you know, it's belied by the

8    references the prosecutor called to my attention in paragraphs

9    51 and 56.

10          You lived in Mexico before for substantial periods of

11    time, and I've heard no complaint that anybody in Mexico

12    accosted you or bothered you or that you can't live there.  You

13    speak that language there.  So even what you told me in your

14    allocution about not being able to speak Spanish grammar, well,

15    you speak enough Spanish that you can get by in a Spanish

16    speaking country.

17          The point is this is not your only out if you want to

18    really get out of El Salvador because you're being harassed or

19    oppressed there.  You have plenty of other places you can go.

20          You heard me ask your lawyer, and I think this is

21    true, you can look it up when you get the chance to consult the

22    internet again or publications, I think the president of Mexico

23    has recently said, I'm going to give asylum to all these folks

24    crossing from Central American countries.  But, as I said, with

25    or without asylum, you have lived in Mexico peacefully and

ER-136

1  without oppression, so it's not true that you have to be in the

2  United States in order to be safe.

3          In my notes, Mr. Davis, before anything was said here

4  I was contemplating a variance of 24 months in this case, that

5  would have taken the sentence up to 60 months.  I'm mindful now

6  of a nonfrivolous argument you've made having to do with COVID.

7          The defendant committed this in November of '19.  We

8  hadn't heard about COVID yet or maybe if we had it was nascent

9  stages of something happening in China.  So this isn't a guy

10  that picked a time during COVID to come in and the variance

11  that you recommend has legs to it where I think if somebody

12  commits an offense, you know, well into the period of the

13  pandemic has been upon us, it doesn't have legs.

14          And you also mentioned that the defendant's actually

15  suffered from the effects of being in custody, closed

16  population, big population, and he contracted COVID while in

17  jail.  I take that into consideration, and I'm moderating the

18  variance that I think is warranted because of that, because of

19  the conditions of confinement.  And the fact that he was in for

20  a long time.  And as you say, even though, you know, it -- I

21  don't think he'd succeed on saying his speedy trial rights were

22  violated, the Olson case pretty much forecloses that, we

23  couldn't try him.  We tried him as quickly as we could and I

24  kept promising him I'd get him a trial date as soon as I could.

25  That's for the trial court to judge.  But it's a factor that I

1    think should be given some weight now that he didn't get to

2    trial right away.

3         I don't know if it would change the ultimate sentence.

4    He's getting credit for all the time he's been in, but I do

5    have those things in mind and I'm going to moderate the -- the

6    variance that I intended to apply in this case.

7         Let me be clear about the basis for the variance, I

8    can take into consideration just punishment here, this is

9    original sentencing, that's one of the 3553 factors.  It's

10   permissible.  In fact, I'm directed to take that into

11   consideration expressly by 3553.

12        I can certainly take into consideration promoting

13   respect for the law.  That's still a permissible factor here.

14   I mentioned those two because they're not permissible factors

15   in -- for a court to consider in imposing any sanction for

16   violation of supervised release.  And I'm mindful that the

17   defendant has additional exposure on that, but I can consider

18   them here.

19        Both of those factors I think support a variance in

20   this case, particularly the deterrence factor.  What's clear to

21   me is the defendant has not been deterred by successive

22   prosecutions, this is now the fourth.  This is now his fourth

23   immigration conviction.  Three felonies, the last three within

24   a matter of, what, six years, five years?  I mean between 2015,

25   2020, he hasn't been deterred.  And, as I said, maybe it's not

ER-138

1    all his fault.  I think if I was in his position the reduced

2    sentence after 56 months would have given me a mixed message

3    too.

4          I don't want to be cynical about what he says about

5    not coming back anymore, but I have to recognize that he said

6    it before.  I have to recognize that it's not oppression that

7    he's fleeing because he's got other alternatives besides coming

8    into the United States.  That's not the reason he's coming in.

9          But here I find that an 18 month variance from the

10   high end, the high end of 33 months is warranted and I impose a

11   variance upward of 18 months.

12         I find that that's necessary here to achieve the

13   objectives of sentencing under 3553 in this case, given his

14   criminal history, particularly the rash of immigration offenses

15   that have happened in the last five years.

16         So the Court imposes in this case a 51 month sentence.

17   I note that it's lower than the highest sentence he's gotten

18   before, but as I said I was inclined to give him 54 months --

19   I'm sorry, I was inclined to give him 57 months which would

20   have been one month higher than the 56 month, but I have taken

21   into consideration and reevaluated in light of the variance

22   argument made by Mr. Davis.

23         So I find that the 18-month variance to 51 months as I

24   said is warranted for the purpose of deterrence, what I find to

25   be just punishment given this fellow's total criminal history.

1    As I said, I haven't dwelled on the older violent convictions.

2    He says I'm older now, I'm not a violent man.

3          I note that one of the convictions is with a knife and

4    it's the great equalizer, whether you're 50 or 30, you've got a

5    knife in your hand you're very, very dangerous with it as long

6    as you're ambulatory and he certainly is.

7          So I find that 51 months is a reasonable sentence, not

8    longer than necessary, but long enough to achieve the

9    objectives of sentencing for this particular offense.

10         I am aware of the guidance of the sentencing

11   commission that ordinarily a person who is not a citizen of the

12   United States, I can't say anymore likely to be deported, I

13   really can't.

14         There was one point I had confidence that he would

15   certainly be deported.  I don't have that confidence anymore.

16   And that I think adds impetus to my decision to impose a term

17   of supervised release, but I impose it as an additional measure

18   of deterrence.

19         One thing Mr. Cabrera is aware of now is that it's not

20   just the new offense for which he's going to have to answer.

21         Today he's going to have to answer not only for the

22   offense he committed in November of 2019, but for an old

23   offense because he was on release for that offense.  And I

24   wanted him to know that he's on supervised release for three

25   years on this offense.

ER-140

1    All the ordinary conditions, Tish, are waived.  I'm
2    going to set two specific conditions applicable to this case
3    and to Mr. Cabrera.  One, Mr. Cabrera, don't come back into the
4    United States illegally.  Don't do that.  You want to apply for
5    asylum, you do it from outside the United States, which you can
6    do.  You can go to an embassy.

7    I think there's now provisions being made for you to
8    do so in a place like Tijuana, if that's what your desire is.
9    So don't come back in illegally.

10    Number two, don't violate any United States law.  The
11    Court doesn't impose a fine.  If you move to remit the penalty
12    assessment, Mr. McDonald, I would not impose it here.

13    MR. MCDONALD:  So moved, Your Honor.

14    THE COURT:  No penalty assessment either.

15    Mr. Cabrera, you have a right to appeal your trial and
16    any ruling I made prior to trial and any ruling I made during
17    trial.  You also have a right to appeal your sentence.  If you
18    choose to appeal, you have to exercise your right within the
19    next 14 days.  Mr. Davis is an expert on that and he can tell
20    you exactly what you need to do.

21    Essentially, you just need to tell him you want to
22    appeal and he'll file the notice.  And the grounds for appeal
23    can be determined or perfected later, but 14 days from today
24    you have to make up your mind and tell him if you want to
25    appeal, trial, pretrial motions, sentencing.  Do you

ER-141

1  understand?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Mr. Davis, anything else on this matter?

4           MR. DAVIS:  Yes, Your Honor, just to lay some

5  objections for the record.

6           First, there's two counts, count two --

7           THE COURT:  Oh, yeah, I'm sorry, I should have

8  mentioned the other one.  I apologize.  Thank you for bringing

9  that to my attention.  I ignored count one.  Yeah, count one

10 was the 1325, punishable by up to two years in custody.

11          The Court imposes 24 months, that sentence to run

12 concurrent.  No point in imposing an additional term of

13 supervised release on that.  I think it -- because it's

14 concurrent, it remains concurrent.  So 24 months concurrent on

15 that count though.  Thank you for reminding me.

16          MR. DAVIS:  And no fine --

17          THE COURT:  Yeah, on that the government moves to

18 remit the penalty assessment?

19          MR. MCDONALD:  Yes, Your Honor.

20          THE COURT:  Yeah.  No fine is imposed on count one and

21 no penalty assessment.

22          MR. DAVIS:  Thank you, Your Honor.

23          THE COURT:  Go ahead.

24          MR. DAVIS:  And just for my objections, Your Honor,

25 procedurally.  I object procedurally to the -- I don't think

ER-142

1    the Court adequately explained the reason for the extent of the

2    18-month variance as opposed to a lesser term under the

3    parsimony principle.

4           THE COURT:  Let me see if I, I mean, the reason for

5    lodging procedural objections and the requirement to do so at

6    the time of sentencing is to allow me to fix any procedural

7    error.

8           I tried to make it clear that I'm very concerned about

9    deterrence, and it's evident to me that the defendant who was

10    sentenced to 56 months in 2007 was not deterred by that.  I was

11    moved also by the allocution of the defendant in that case

12    where he promised not to come back anymore.  And it's made me

13    insecure about trusting a promise that he makes here.  I'm not

14    always so insecure.  Sometimes people tell me that and I place

15    them on probation or I, you know, give them a limited term and

16    I have every confidence that they won't come back and I have to

17    say many times they don't.

18           But here, I just don't have that confidence, and the

19    defendant's subsequent track record after '07 kind of

20    underscores that.

21           So I really think there's the need for deterrence.  I

22    have -- I don't say this to attack the credibility of

23    Mr. Cabrera, but he just hasn't been good at keeping his

24    promises and you're right, there's no empirical evidence, but

25    common sense tells me that when the consequence is greater, the

ER-143

1   inclination to engage in the same conduct that results in the

2   consequence lessens.

3        So that's why I -- that's why I've done that in

4   supporting deterrence.

5        MR. DAVIS:  Thank you.

6        THE COURT:  The other reason is, as I said, I'm not

7   accusing him of being violent now, but at least one of the

8   offenses, two of the offenses involved use of a -- of a weapon.

9        One case it was a knife, and as I said, you know, in

10   the hands of an assailant, whether the assailant is 30 or

11   Mr. Cabrera's age, older, a knife is a very dangerous thing and

12   the person is just about as dangerous, maybe not as much but,

13   you know, it would be a nuanced difference to say that a

14   30-year-old with a knife is less dangerous than a 50-year-old

15   with a knife.

16        So those things are also of concern to me and of

17   particular concern is protecting the public.  Do I need to say

18   more or do you think that that's adequate to explain the reason

19   for the 18 month variance?

20        MR. DAVIS:  I'm not going to agree that it's adequate,

21   Your Honor, but I don't have anything else to add on that.

22        THE COURT:  Okay.

23        MR. DAVIS:  And I think I preserved my objection to

24   the Court's calculation of the criminal history which is in

25   my written --

ER-144

1        THE COURT:  You preserved both of those, so I have

2   those things in mind.

3        Let me turn now to 15-CR-0353.  I think I made a

4   finding -- correct me if I'm wrong when the jury went out that

5   the defendant was in violation.

6        MR. DAVIS:  I don't know if the Court did.  I know

7   that's been the Court's practice sometimes.  But I don't --

8        THE COURT:  Do you remember, Mr. McDonald?  I know I

9   kept saying that while we were postponing both cases that I

10  would make the finding after the jury went out and after giving

11  Mr. Davis and Mr. Cabrera a chance to present anything that

12  might cut against finding him in violation.

13       MR. MCDONALD:  Your Honor, I don't have that at my

14  fingertips, I'm not a hundred percent sure.

15       MR. DAVIS:  I think the Court did not make the

16  finding.  I don't object to the Court taking judicial notice.

17       THE COURT:  Let me make a belt and suspenders approach

18  here.  If I did not, I now find based on the conviction of

19  Mr. Cabrera by the jury, that he was -- he's in violation of

20  the conditions that were set by Judge Lorenz in that he was

21  told not to commit a new violation.  He has committed two new

22  violations, and he was told not to illegally reenter the United

23  States and, of course, that was the charge against him and his

24  conduct amounted to an illegal reentry in my judgment.  So

25  I find that he violated both conditions.

ER-145

1      I think he faces a sentence of up to 24 months.  His

2  original sentence as I mentioned to you preliminarily,

3  Mr. Davis, was the result of a departure or a variance down to

4  12 months and so now he faces up to 24 months.  The guidelines

5  on this are 6 to 12 months.  I'm happy to hear from you and him

6  on what if any sanction is appropriate.

7      MR. DAVIS:  Your Honor, it's not my practice typically

8  to recommend completely concurrent sentences because I believe

9  that most courts think that some additional punishment is

10  necessary and so I rarely ask for.

11      THE COURT:  Not punishment here.  Remember the

12  nomenclature.

13      MR. DAVIS:  Of course.  Sanction is necessary.  But

14  given the Court's upwards variance from the guidelines in the

15  previous case, the Court sentenced him to four and a half years

16  in prison, I don't -- I think that's enough time for even to

17  sanction him for the supervised release violation.  So my

18  request, obviously I'm asking the Court for the most mitigated

19  sentence that the Court could impose.  I'd ask for a concurrent

20  sentence.

21      THE COURT:  Okay.

22      MR. DAVIS:  And if the Court is not going to do a

23  concurrent, then a minimal amount that will, you know, send him

24  a message that when he's finishing this, you know, four and a

25  half to five years in prison that maybe he'll think, oh, these

1    last few months, these are because of the supervised release

2    violation, but.

3           THE COURT:  All right.

4           MR. DAVIS:  So I'm asking for a concurrent sentence.

5           THE COURT:  Thank you, Mr. Davis.

6           Mr. Cabrera, anything more on this issue of violation

7    of the conditions of supervised release that were imposed in

8    2015 when you were convicted of the same offense?

9           THE DEFENDANT:  No.

10          THE COURT:  Mr. McDonald?

11          MR. MCDONALD:  Your Honor, we submit to the Court.

12          THE COURT:  All right.  As I mentioned, the Court has

13   the discretion to go outside the guidelines on this because the

14   Defendant's original sentence was the result of a departure or

15   a variance.  I don't intend to do that.

16          I did take deterrence into account.  The Court does

17   not take punishment or promoting respect into account.  I

18   realize that those are not applicable factors on this, but

19   there was a breach of trust and it came from a fellow who's

20   pledged trust before, not necessarily in front of Judge Lorenz,

21   but again, did you represent him there in that?

22          MR. DAVIS:  Not in the 15-CR case.

23          THE COURT:  Judge Lorenz's notes make clear that he

24   had granted a downward variance or adjustment.  And he says

25   this in the notes:  The defendant had no serious state

ER-147

1   conviction for over 15 years, although he did have two federal

2   illegal entries.  He does possess job skills and came from El

3   Salvador where his father was killed, and the defendant had

4   been threatened due to extreme violence in his country.  He

5   plans to live in Mexico.  I assume that that representation

6   came from the defendant or his counsel, he plans to live in

7   Mexico upon his release.

8          The Court considered his lack of criminal history for

9   state violations and ability to be gainfully employed in Mexico

10  and sentenced him to 12 months in custody with two years

11  supervised release as sufficient but not greater than

12  necessary.

13         I glean from that that the defendant did promise that

14  he would live in Mexico.  The Court contemplated that he would

15  stay in Mexico.  So once again there's this idea that this

16  fellow who's been in Mexico, had resided in Mexico before would

17  go back there, thereby averting the perceived threat in El

18  Salvador.  And I think implicit in this was a representation by

19  the defendant that that would work.  It certainly formed a

20  basis for the Court imposing a sentence less than what the

21  advisory guidelines recommended.

22         So I do find there's a breach of trust here and,

23  again, it's kind of consistent with the fact that the defendant

24  had promised in 2007 he wouldn't come back and yet did three

25  more times.  So I think some sanction for the breach of trust

ER-148

 1  is in order.  Again, the Court is entitled to consider

 2  deterrence here.

 3          I was going to give six additional months before to

 4  promote deterrence.  I think that's the correct measure now, it

 5  falls within the guideline for the revocation that the -- that

 6  the defendant faces, six to 12 months, it's the low end of that

 7  guideline.

 8          The Court imposes an additional six months in this

 9  case to account for the breach of trust on behalf -- or on the

10  part of the defendant.

11          He faces a term of up to 30 months supervised release

12  on this case.  The Court deducts the six months that just was

13  imposed.

14          I don't think -- did I previously impose any sentence

15  on this that needs to be deducted from the remaining supervised

16  release term?  I think this is --

17          MR. DAVIS:  The previously imposed sentence was time

18  served which --

19          THE COURT:  Oh, a hundred and something days?  All

20  right.  I reimpose two years, that subsumes the six months and

21  the 133 days that he previously got for violation.

22          And it's to run concurrent with the term of three

23  years on the new case.  And the two conditions are the same,

24  Mr. Cabrera, listen again, don't come back illegally into the

25  United States, that is without permission of the United States

1   Government and don't violate any United States law.  You'll

2   face a new charge plus two cases if you do that.  Please don't

3   do that.

4         This six month sentence is imposed consecutively to

5   the 51 month sentence I previously imposed, so the total

6   sentence here is 57 months.  I note it's one month longer than

7   the previous length of a sentence for 1326 that the defendant

8   was given.

9         Okay.  Anything --

10        MR. DAVIS:  Yes, Your Honor, can I just make a record

11  as to this case as well?

12        THE COURT:  Yeah.

13        MR. DAVIS:  The document that the Court was reading

14  from with Judge Lorenz's notes, that's not the judgment,

15  correct?

16        THE COURT:  It's a statement of reasons.

17        MR. DAVIS:  Okay.

18        THE COURT:  If you want to look at it, I see no reason

19  why you can't, but the statement of reasons has checked defense

20  motion for sentence outside the advisory and government does

21  not object.

22        Then he checks also nature and circumstances, afford

23  deterrence, protect public.  And then he annotates that with

24  what I read to you.

25        MR. DAVIS:  And the statement of reasons is not

1    publicly filed, correct?

2         THE COURT:  No.  I'm happy to make this statement of

3    reasons part of the record if you prefer.

4         MR. DAVIS:  I guess, my procedural objection is to

5    having the Court rely on it without the parties having reviewed

6    it beforehand.

7         THE COURT:  I'll let you review it right now and we

8    can go over this again.  I read it to you verbatim.  And it's

9    here.  It's a judicially noticeable document and it's available

10   to me.  Would you like to see it?

11        MR. DAVIS:  Sure.

12        THE COURT:  Having reviewed it, Mr. Davis, do you

13   agree that I read it verbatim?

14        MR. DAVIS:  Yes, Your Honor, it appears the Court read

15   it verbatim.

16        THE COURT:  Okay.  You said you wanted to make an

17   additional record on the supervised release?

18        MR. DAVIS:  I think I've made that record, Your Honor.

19   And I don't think I need to object to the substantive

20   reasonableness so.

21        THE COURT:  No, that's preserved on every sentence,

22   substantive reasonableness is.

23        MR. DAVIS:  Right.  May I just say goodbye to

24   Mr. Cabrera?

25        THE COURT:  Of course.  Of course.  Thank you again,

1  both of you, for indulging me.  I'm sorry you missed dinner

2  with your wife.  Thank you too.  I want to thank the probation

3  officer and the two marshals and the interpreter.

4    (The proceedings concluded at 8:14 p.m., November 15, 2021.)

1           COURT REPORTER'S CERTIFICATE

2

3      I, CYNTHIA R. OTT, Official Court Reporter, United States

4  District Court, Southern District of California, do hereby

5  certify that pursuant to 28 U.S.C. §753 the foregoing is a

6  true, complete and correct transcript of the stenographically

7  reported proceedings had in connection with the above-entitled

8  matter and that the transcript page format is in conformance

9  with the regulations of the Judicial Conference of the United

10  States.

11
         DATED December 30, 2021.
12

13

14                    _/s/ CYNTHIA R. OTT_
                   CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25

1  RANDY S. GROSSMAN
   Acting United States Attorney
2  COLIN M. MCDONALD
   Assistant U.S. Attorney
3  California Bar No. 286561
   Office of the U.S. Attorney
4  880 Front Street, Room 6293
   San Diego, CA 92101-8893
5  (619) 546-9144
   Colin.McDonald@usdoj.gov
6
7  Attorneys for the Plaintiff
   UNITED STATES OF AMERICA
8
9                    **UNITED STATES DISTRICT COURT**

                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  UNITED STATES OF AMERICA,          Case No.: 20-CR-00435-LAB

12              Plaintiff,             **UNITED STATES' RESPONSE IN**
                                       **OPPOSITION TO DEFENDANT'S**
13          v.                         **OBJECTIONS TO THE PRESENTENCE**
                                       **REPORT**
14  JUAN CARLOS CABRERA,

15              Defendant.             Date:   November 15, 2021
                                       Time:   3:00 p.m.

16      The United States, through its counsel, hereby responds to Defendant's objections

17  to the presentence report, filed in Defendant's sentencing memorandum on November 9,

18  2021. In the event the Court reaches the objections,[1] they are meritless and should be

19  overruled.

20      First, Defendant objects to the "characterizations of each factual allegation appended

21  to the descriptions of his convictions." ECF No. 87 at 5. He does not claim that the

22  information in the PSR is factually inaccurate. Instead, he objects on the ground that the

23  factual allegations are "taken from police reports reflecting the hearsay of alleged witnesses

24  and police officers." *Id.*[2] The Ninth Circuit has rejected this exact type of broad objection.

25  ─────────────────────

26  [1] Local Rule 32.1(a)(5) requires PSR objections to be filed fourteen days before sentencing. When a party
    shows good cause for its failure to timely object, it is within the discretion of the court to consider the
27  objection. *See* Fed. R. Crim. P. 32(i)(1)(D) ("At sentencing, the court may, for good cause, allow a party
    to make a new objection at any time before sentence is imposed."). As of now, the defense has not
    attempted to establish good cause for the late filing.
28  [2] Of course, it is well-established that sentencing courts may rely on reliable hearsay at sentencing. "Only
    when the hearsay is so inadequately supported that the factual basis for believing it is almost nil can it be

ER-154

In *United States v. Staterau*, 524 F.3d 988 (9th Cir. 2008), the defendant "challenged several paragraphs of his PSR on the ground that the information gathered from police reports contained multiple levels of hearsay." *Id.* at 1012. The defendant "did not deny that the police reports contained the information alleged in the PSR or that the information was factually inaccurate." *Id.* Instead, defendant argued that "law enforcement reports are not generally a reliable source of information." *Id.* Given that, the Ninth Circuit found that the defendant's challenge to the PSR was "not a specific factual dispute about issues affecting the temporal term of sentence but rather a general evidentiary legal challenge to the inclusion of information in the PSR drawn from sources other than the plea agreement." *Id.* Under those circumstances, the district court was not even required to rule on the PSR objections, as ordinarily required for factual objections under Rule 32(i)(3)(B). *Id.*

The same analysis applies here: Defendant does not claim facts in the PSR are inaccurate; rather, he lodges a general evidentiary challenge to the inclusion of hearsay facts in the PSR, without any argument as to why those facts are unreliable or untrue. Notably, nearly identical narratives accompanying Defendant's prior crimes and other criminal conduct were included in his 2015 PSR. *See* Case No. 15-CR-00353-LAB, ECF No. 25. Defendant did not object to the facts in that PSR; rather, he admitted he had "dealt with substance abuse issues involving alcohol and drugs for much of his adult life, which has often fueled the behavior leading to the criminal history detailed in the PSR." *Id.* at ECF No. 33 at 2-3. Defendant's objection should be overruled.

Second, Defendant claims his 2015 illegal reentry conviction in Case No. 15-cr-00353-LAB scores two points, not three. He is wrong. Under Guidelines section 4A1.1, three points are added for any prior sentence exceeding 13 months. U.S.S.G. § 4A1.1. And when assigning points, section 4A1.2(k) instructs courts to combine the term of imprisonment for a revocation of probation with the original term of imprisonment.

---

argued that the evidence should not have been considered." *United States v. Fernandez-Vidana*, 857 F.2d 673, 675 (9th Cir. 1988). The Guidelines explain that this is a low burden: so long as "the information has sufficient indicia of reliability to support its probable accuracy," it may be used to support "any factor important to the sentencing determination." U.S.S.G. § 6A1.3(a).

ER-155

1        Here, two terms of imprisonment were imposed in Defendant's 2015 § 1326 case:

2   the original 12-month sentence, and a revocation sentence of approximately 134 days, for

3   a total of over 16 months. *See* PSR ¶ 29; Case No. 15CR00353-LAB, ECF Nos. 34, 47.

4   The BOP's calculation of custody time—which Defendant points the Court to—is

5   irrelevant for Guidelines purposes. *See* USSG § 4A1.2, cmt. n. 2 ("That is, criminal history

6   points are based on the sentence pronounced, not the length of time actually served.").

7   And—contrary to Defendant's assertion—Defendant was "in custody" for 134 days in the

8   revocation proceeding before the time-served sentence was imposed. Indeed, the

9   revocation docket (Case No. 15CR00353-LAB) shows he was arrested on the revocation

10  petition on September 18, 2017; two days later he appeared for his initial appearance on

11  the petition and was ordered detained, *see* ECF No. 40. He remained in custody on the

12  revocation petition until January 29, 2018, at which time a time-served sentence was

13  imposed, *see* ECF No. 47. That same day, the abstract of order releasing Defendant from

14  custody in 15-CR-353-LAB was issued, *see* ECF No. 48. In other words, "time-served" for

15  Defendant meant 134 days, bringing him comfortably over 13 months in total.

16        Defendant's objections should be overruled.

17        DATED: November 10, 2021       Respectfully submitted,

18

19                                 RANDY S. GROSSMAN
                                    Acting United States Attorney

20

21                               */s/ Colin M. McDonald*
                                    COLIN M. MCDONALD

22                                    Assistant U.S. Attorney

23

24

25

26

27

28

**Benjamin P. Davis**
California Bar No. 275918
**Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Benjamin_Davis@fd.org

Attorneys for Juan Carlos Cabrera

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

### (HONORABLE LARRY A. BURNS)

| United States of America, | ) | <u>Case No:</u>  20cr-0435-LAB |
|---|---|---|
| | ) | 15cr-0353-LAB |
| Plaintiff, | ) | |
| | ) | **Mr. Cabrera's Sentencing** |
| vs. | ) | **Memorandum** |
| | ) | |
| **Juan Carlos Cabrera,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**To:   Randy Grossman,** Acting United States Attorney,
   **Colin M. McDonald,** Assistant United States Attorney, and
   **Amanda T. Muskat,** Assistant United States Attorney:

The defendant Juan Carlos Cabrera, by and through his counsel, Benjamin P. Davis and Federal Defenders of San Diego, Inc., hereby files his Sentencing Memorandum respectfully requesting that the Court impose a **total sentence of <u>27 months in prison.</u>**

//

//

*UNITED STATES V. CABRERA*, 20CR-0435-LAB – DEF. SENTENCING MEMORANDUM - 1

# ER-157

# I.

## Procedural Background

Mr. Cabrera was arrested on November 3, 2019, between the border fences near the ocean. A jury convicted him on June 9, 2021, of two counts: felony attempted illegal entry under 8 U.S.C. § 1325, and attempted illegal re-entry after removal under 8 U.S.C. § 1326(a) and (b). A Pre-Sentence Report was filed on August 23, 2021.

In case no. 15cr-0353-LAB, Probation has filed a petition alleging that Mr. Cabrera has violated the conditions of supervised release. That case is set for an admission and sentencing on November 15, 2021. This memorandum analyzes the cases together, and will recommend a total sentence of 27 months in prison. Mr. Cabrera proposes that this Court sentence him to 21 months on the new case, to be followed by a consecutive sentence of six months on the supervised release case.

As of November 15, 2021, Mr. Cabrera will have been in custody for 744 days – just about two years and two weeks.

# II.

## Juan Carlos Cabrera

Juan Carlos Cabrera is a sad-eyed, somewhat mournful man who is afraid to return to El Salvador. His childhood in that country was traumatic – just a child when the brutal civil war ravaged the countryside and left millions dead, he saw his father murdered in front of his eyes by a government-backed death squad. He explains that the squads used to roam the countryside looking for people to round up and extort; anyone who resisted was accused of being a rebel and shot or worse. After his father's murder, his family moved away from their town of Metapan and hid out in mountain villages to try to escape the violence. This childhood trauma had lasting effects on him, and he spent much of his twenties drinking away the pain.

## A.    Life in the United States.

He was lucky enough to come to the United States in the mid-1990s along with his mother and siblings; today, they mostly live in Florida with good jobs and visas or residence cards. Juan Carlos moved to Boston, where he briefly had the makings of a good life for himself. During his years in Boston, Mr. Cabrera worked several jobs. First, he worked at recycling plant, sorting plastic bottles. Next, he worked for a company located in Dedham, Massachusetts, called Tent For Rent. At the company, he set up and took down large tents for outdoor events. Mr. Cabrera also worked at Logan Airport in housecleaning. He helped clean airplanes between flights. He also worked as a musician – he can play guitar, bass, basso sexto, and almost any other stringed instrument.

Mr. Cabrera met Luz Benitez in 1994 in Boston through his aunt. Ms. Benitez was born in Puerto Rico and is a United States citizen. They fell in love and got married on March 1, 1997. Their daughter Chantay Cabrera was born on October 19, 1995, at Beth Israel Hospital in Boston. In 1997, Luz Cabrera filed an I-130 Petition for Alien Relative on behalf of Mr. Cabrera. The Petition was approved in May of 1997, paving the way for Mr. Cabrera to file a petition to adjust his status to that of a lawful permanent resident. Mr. Cabrera filed an I-485 petition to adjust his status in December of 1997.

Unfortunately, by that point Mr. Cabrera had begun a slow spiral into alcoholism and bad behavior. Between 1996 and 2001 he racked up several convictions based on drinking and drug use; the longest sentence he received was for six months. His marriage crumbled and he couldn't hold onto his jobs after being in and out of county jail. This troubling and sad five-year run of alcoholism and petty crime caught up with him, and he was deported from the United States for the first time in 2000.

*UNITED STATES V. CABRERA*, 20CR-0435-LAB – DEF. SENTENCING MEMORANDUM - 3

ER-159

**B. Life in El Salvador.**

Mr. Cabrera has tried to make a life for himself in El Salvador. He has lived in his hometown of Metapan as well as in the capital city of San Salvador. But the neighborhoods there are utterly dominated by two powerful gangs originating in the United States. As he gets older, Mr. Cabrera increasingly tries to avoid interacting with them at all – he's almost 50, and an easy-going musician with no desire to get caught up in politics. But the gangs inescapably dominate life there. Recently, he had to cross a gang territory line in order to get from his tiny apartment to his factory job. Every day that he crossed, he would be harassed, stopped, searched, robbed, threatened, and humiliated – the gangs thought (or claimed to think) that he was a spy for the other side.

Mr. Cabrera also carries the trauma of his violent childhood. In his asylum application in 2018 (following his 2017 case), he described being shot at and having people come to his sister's house to look for him. El Salvador remains a terribly dangerous place for those whose past stretches back into the civil war, and many of the country's wounds have yet to heal. Mr. Cabrera feels impossibly unsafe there, and has tried many times to leave, including by moving to Mexico.

**C. The future.**

Mr. Cabrera intends to apply again for asylum, withholding of removal, and any other relief for which he may be eligible. His prospects of success are unclear; his sincere fear for his life and safety may well be offset by his criminal record from the 1990s and by his repeated attempts to return to this country. As he enters his sixth decade, though, he'll have to find a solution to his situation that doesn't involve his returning to the United States, even to seek refuge. Each subsequent conviction for returning only brings with it the likelihood of more prison time and the dimming of his hopes of returning legally.

# III.

## Objections to the Presentence Report

**A.   Alleged facts underlying criminal convictions.**

The Presentence Report in this case details Mr. Cabrera's criminal history. *See* PSR at 7-12. He does not deny his criminal convictions. However, the Report adds to the records of the convictions several long factual allegations, taken from police reports reflecting the hearsay of alleged witnesses and police officers. Many of the factual allegations derive from double or triple hearsay.

Mr. Cabrera disputes the characterizations of each factual allegation appended to the descriptions of his convictions. He admits the convictions themselves, as well as whatever facts the government can prove that he admitted in connection with those convictions. But he denies the rest of the factual allegations, as well as all of the conduct imputed to him in the "Other Criminal Conduct" section of the PSR (¶¶ 34-39), and asks the Court not to rely on them at sentencing.

**B.   Mr. Cabrera's 2015 conviction scores as a +2, not a +3.**

Probation has incorrectly scored Mr. Cabrera's 2015 conviction as a three-point prior conviction under § 4A1.1(a), as a "prior sentence of imprisonment exceeding one year and one month." This is a mistake; the conviction only scores as a two-point conviction under § 4A1.1(b), as a "prior sentence of imprisonment of at least sixty days not counted [as a three-point conviction]."

In 2015, Mr. Cabrera pleaded guilty to a re-entry charge and was initially sentenced to twelve months in custody, to be followed by two years of supervised release. *See* PSR at ¶ 29. He was thereafter arrested on August 10, 2017, and charged with another immigration crime. *See generally* 17cr-2645-JMA. From August 10, 2017, until his sentencing date, he was in custody on the re-entry charge.

On January 25, 2018, Mr. Cabrera pleaded guilty a misdemeanor violation of 8 U.S.C. § 1325, and was sentenced to time served. PSR at ¶ 30. The Bureau of Prisons

# ER-161

will only count time served against one sentence at a time; *all* of the time he had been in custody following his arrest in August of 2017 therefore counted *only* toward the § 1325 sentence in 17cr-2645-JMA. *See* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of any term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . that has not been credited against another term."). However, he was not released from custody; rather, he was held on the supervised release warrant, and his time in custody for that violation began counting. Four days later on January 29, 2018, his supervised release in 15cr-0353-LAB was revoked, and Mr. Cabrera was sentenced to time served, followed again by two years of supervised release. PSR at ¶ 29. The "time" he had "served" on the OSC case at that point was four days. Accordingly, the twelve months from the original sentence, plus the four days for the revocation sentence, fall below the thirteen-month requirement to qualify for a three-point sentence under § 4A1.1(a).

However, the PSR has mistakenly attributed the months between his arrest in August of 2017 and the subsequent sentencings in January of 2018 to two cases, allocating *both* 172 days of time served to the misdemeanor case in 17cr-2645 *and* 134 days of that same time served to the OSC case in 15cr-0353. This was a mistake; federal authorities only give credit for time served to a single case. 18 U.S.C. § 3585(b). The "sentence imposed" for the revocation sentence in 2018 therefore was the time served that had not been counted toward another sentence: four days.

The difference matters. Under Probation's calculation, Mr. Cabrera has ten criminal history points and is in Criminal History Category V. The correct calculations, though, leave him with nine points and in Criminal History Category IV.

# III.

## The Guidelines

**A. Guidelines calculations: § 1325 & § 1326 charges.**

| | | |
|---|---|---|
| Base offense level: | 8 | U.S.S.G § 2L1.2(a) |
| Prior immigration offense: | +4 | § 2L1.2(b)(1)(A) |
| Pre-deport conviction: | 0 | § 2L1.2(b)(2) |
| Post-deport conviction: | 0 | § 2L1.2(b)(3) |
| Final adjusted offense level: | 12 | |
| Criminal History Score: | 9 | |
| Criminal History Category: | IV | |
| Resulting Guidelines range: | 21-27 months[1] | |

**C. Guidelines calculations: supervised release case.**

| | |
|---|---|
| Grade of violation: | B |
| Criminal history category (2015): | II |
| Resulting Guidelines range: | 6-12 |

# IV.

## The Court Should Sentence Mr. Cabrera to a Total of 27 Months

Mr. Cabrera respectfully asks the Court to sentence him to a total of 27 months in custody, consisting of 21 months on the new case and six months consecutive on the supervised release case. He submits that this sentence is warranted in light of:

- His desire to come to this country to seek asylum or withholding of removal, which was corroborated by the trial testimony that he climbed the hill from the

---

[1] The Guidelines are identical for the two charges; Count One is limited by a statutory maximum of 24 months in custody. *See* 8 U.S.C. § 1325.

*UNITED STATES V. CABRERA*, 20CR-0435-LAB – DEF. SENTENCING MEMORANDUM - 7

# ER-163

primary fence, calmly walked to the secondary fence, and sat down to await the arrival of arresting officers some minutes later;

- His strong and deep ties to this country, which include his mother, sisters, brother, ex-wife, and daughter;

- His exceptionally difficult time in custody. Mr. Cabrera was arrested in November of 2019, well before the advent of the global pandemic in March of 2020, and he had no inkling that his case could stretch on for so long or that he could face such dire straits in custody. Over the past two years, he has endured lockdowns, isolation, fear and anxiety, and deprivation of ordinary jail amenities. Worst of all, he contracted a severe case of Covid-19 in April of 2021 and was hospitalized, on a respirator, for several days. This frightening and harrowing experience has rendered his time in custody much more punitive than the ordinary pretrial detention.

### V.

### <u>Conclusion</u>

In light of Mr. Cabrera's history and characteristics  and the statutory sentencing factors listed in 18 U.S.C. § 3553(a), he respectfully asks this Court to impose 21 months in the new case plus six months in the supervised release case, for a **total sentence of 27 months in prison.**

Respectfully submitted,

<u>Dated</u>: November 9, 2021

*s/ Benjamin P. Davis*
**Benjamin P. Davis**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Cabrera

SENTENCING SUMMARY CHART
Sentencing Date: 20CR435-LAB

USPO [ ]
AUSA [☒]
DEF [ ]

Defendant's Name: <u>Juan Carlos Cabrera</u>
Attorney's Name: <u>Amanda T. Muskat</u>

Docket No.: <u>20-CR-0435-LAB</u>
Phone No.: <u>619-546-6495</u>

Guideline Manual Used: <u>November 1, 2018</u>          Agree with USPO Calc.: ☒

| | |
|---|---:|
| Base Offense Level: [USSG § 2L1.2(a)] | 8 |
| Specific Offense Characteristics: | |
| Prior Illegal Reentry Offense [USSG § 2L1.2(b)(1)]: | +4 |
| Adjusted Offense Level: | 12 |
| Adjustment for Acceptance of Responsibility | 0 |
| Total Offense Level: | 12 |
| | |
| Criminal History Score: | 10 |
| Criminal History Category: | V |

____ Career Offender     ____ Armed Career Criminal

Guideline Range:                                              from <u>27</u> mths
(Range limited by: ____ minimum mand.   x statutory maximum **as to Count 1**)   to <u>33</u> mths

Departures:
<u>N/A</u>                                                                ____

**Government Recommendation:** _33 months' custody; 3 years S/R; no fine; $100 S/A_

As to the 1326 count, 33 months' custody is reasonable in light of Defendant's history and characteristics. Defendant, a 49-year-old citizen of El Salvador, has extensive criminal history, including history of violent crime, crimes while on S/R, law enforcement contacts while in the U.S. without status, and multiple prior immigration convictions (this being his fourth). *See generally* PSR paras. 21-39. Given that history, the 3553(a) factors—including the need to protect the public, promote just punishment, and achieve specific deterrence—support a 33-month sentence. As to the 1325F count, the United States concurs with the PSR's recommendation of 24 months' custody and one year of S/R, both to run concurrent with the 1326 sentence.

Separately, the United States recommends 12 months' consecutive for Defendant's violation of supervised release in 15-cr-00353-LAB, with no supervision to follow (given the request for supervised release in this new matter).

ER-165



FILED

JUN 0 9 2021

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20CR00435-LAB |
| Plaintiff(s), | COURT'S INSTRUCTIONS |
| vs. | |
| JUAN CARLOS CABRERA, | |
| Defendant(s). | |

20CR00435-LAB

COURT'S INSTRUCTION NO. 11

The defendant is charged in Count Two of the indictment with being an alien who, after exclusion, deportation or removal, attempted reentry into the United States in violation of Section 1326(a) and (b) of Title 8 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant was excluded, deported or removed from the United States;

Second, the defendant had the specific intent to reenter the United States; free from official restraint. A person has the intent to enter the United States free from official restraint only if he has the intent to enter the United States without being detected, apprehended, or prevented from going at large within the United States and mixing with the population. The government need not prove that entry free from official restraint was the defendant's sole intent. However, the government must prove that at the point the defendant *first* entered the United States he had a specific intent to enter free from official restraint, not that this was his only purpose;

Third, the defendant was an alien at the time of the defendant's attempted reentry into the United States. An alien is a person who is not a natural-born or naturalized citizen of the United States.

Fourth, the defendant had not obtained the consent of the Attorney General of

the United States or the Secretary of the Department of Homeland Security to reapply for admission into the United States; and

Fifth, the defendant did something that was a substantial step toward committing the crime.

Mere preparation is not a substantial step toward committing the crime. To constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances.

COURT'S INSTRUCTION NO. 10

The defendant is charged Count One of the indictment with being an alien who attempted entry into the United States at a time or place other than as designated by immigration officers, in violation of Section 1325(a)(1) of Title 8 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant was an alien on November 4, 2019;

Second, the defendant had the specific intent to enter the United States free from official restraint. A person has the intent to enter the United States free from official restraint only if he has the intent to enter the United States without being detected, apprehended, or prevented from going at large within the United States and mixing with the population. The government need not prove that entry free from official restraint was the defendant's sole intent. However, the government must prove that at the point the defendant *first* entered the United States he had a specific intent to enter free from official restraint, not that this was his only purpose;

Third, the defendant attempted to enter the United States at a time or place other than as designated by immigration officers;

Fourth, the defendant did something that was a substantial step toward committing the crime and that strongly corroborated Defendant's intent to commit the crime; and

ER-169

Fifth, the defendant committed the offense after being convicted of a prior offense under Title 8, United States, Section 1325.

Mere preparation is not a substantial step toward committing the crime. To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.

An alien is a person who is not a natural-born or naturalized citizen of the United States.

A "place . . . other than as designated by immigration officers" refers to any place other than immigration facilities at designated ports of entry.



FILED
JUN 0 9 2021
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 20CR00435-LAB |
| | ) | |
| vs | ) | |
| | ) | **V E R D I C T** |
| JUAN CARLOS CABRERA, | ) | |
| | ) | |
| Defendant, | ) | |

We the jury in the above entitled cause find the defendant,

JUAN CARLOS CABRERA,

_guilty_ of Attempted Unlawful Entry by an Alien as charged in Count 1 of the Indictment.

_guilty_ of Attempted Reentry of Removed Alien as charged in Count 2 of the Indictment.

If you find the defendant guilty on Count 2, do you further find the defendant was removed from the United States subsequent to December 18, 2015?

_X_                     _____

YES                     NO

_____
FOREPERSON

Date: _6/9/21_
San Diego, California

# ER-171

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5        Plaintiff,                    ) No. 20-CR-435-LAB
                                        )
 6            v.                        )
                                        ) June 8, 2021
 7   JUAN CARLOS CABRERA,               )
                                        ) 11:29 a.m.
 8        Defendant.                    )
     _____  ) San Diego, California
 9

10        TRANSCRIPT OF JURY TRIAL - DAY 1 (No Voir Dire)
               BEFORE THE HONORABLE LARRY ALAN BURNS
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  COLIN MCDONALD, ESQ.
14                                AMANDA MUSKAT, ESQ.
                             880 Front Street
15                           San Diego, California  92101

16   For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
                             By:  BENJAMIN P. DAVIS, ESQ.
17                                SALIL DUDANI, ESQ.
                             225 Broadway
18                           San Diego, California  92101

19

20   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
21                           West Broadway, Suite 420
                             San Diego, California, 92101
22                           cynthia_ott@casd.uscourts.gov

23

24
     Reported by Stenotype, Transcribed by Computer
25
```

ER-172

1                          I N D E X

2   EXAMINATIONS                                      PAGE

3   OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT
    MS. MUSKAT:.........................................  21
4   OPENING STATEMENT BY COUNSEL FOR THE DEFENDANT
    MR. DUDANI..........................................  25
5   DANIEL CABRAL ALEXANDER.............................
    DIRECT EXAMINATION BY MR. MCDONALD..................  43
6   *****Amanda Legore Reported Cross of Daniel Cabral
    Alexander and Direct of Joseph Cisneros*****
7   JOSEPH CISNEROS.....................................
    CROSS EXAMINATION BY MR. DUDANI.....................  64
8   REDIRECT EXAMINATION BY MR. MCDONALD................ 102
    LEAH HOGUE..........................................
9   DIRECT EXAMINATION BY MS. MUSKAT.................... 104

10

11                      E X H I B I T S

12                                                    PAGE

13

    Government's Exhibits 11, 12, 12A, 13, 15, 15A and    49
14  19 were received in evidence........................
    Government Exhibits 20, 21 and 22 were received in    56
15  evidence............................................
    Government's Exhibit 25 was received in evidence.... 113
16  Government's Exhibit 10A was received in evidence... 122

17

    Defendant's Exhibits C, D, E, F, G, J and K were
18  received in evidence................................  74
    Defendant's Exhibit S was received in evidence......  78
19  Defendant's Exhibits O, P, and Q were received in
    evidence............................................  79
20  Defendant's Exhibit F was received in evidence......  85
    Defendant's Exhibit E was received in evidence......  86
21  Defendant's Exhibit X was received in evidence......  95

22

23

24

25

1      And at that point, the case will be to you for

2   deliberation.

3      Again, I anticipate that's going to happen sometime

4   before noon tomorrow.  I expect we'll have the case to you

5   sometime tomorrow morning, if not before then.

6      So, those are the preliminary instructions on what I

7   give you.  If you'll give respectful attention now to the

8   lawyers.  After they have made their opening statements, we'll

9   send you to the lawyer room for lunch.

10      Who speaks for the government?

11      MS. MUSKAT:  Amanda Muskat for the United States, Your

12   Honor.

13      THE COURT:  All right, Ms. Muskat, you may make your

14   opening statement.  You can use the well.  I think there's a

15   green line there.  Is it still there?

16      MS. MUSKAT:  Yes.

17      THE COURT:  Okay.  So keep your voice up and stay

18   behind the green line.

19      (Discussion off the record.)

20      OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT

21      MS. MUSKAT:  Members of the Jury, on November 4th,

22   2019, the defendant tried to come back into the United States

23   again.  But he didn't do this by going to a port of entry and

24   presenting documents showing that he had a legal right to be in

25   the United States because no such documents exist.

ER-174

1        Rather, the defendant tried to enter the United States

2   by climbing over a very tall fence along the U.S.-Mexico

3   border, and you can see the approximate location of that fence

4   where the blue circle is on the screen.

5        The defendant climbed over this fence and this fence,

6   Members of the Jury, is located miles away from the nearest

7   port of entry.

8        The approximate location of the port of entry is

9   indicated by the blue -- the second blue circle on the map that

10  you see there.  Now, this is a picture of the United

11  States-Mexico border near Imperial Beach, California.  The

12  black line you see running down the middle of the screen is the

13  border fence.  And now the area near Imperial Beach is an area

14  that United States Border Patrol watches because it is

15  frequently used by individuals trying to cross illegally into

16  the United States.

17       Now, this fence might look like just one fence but it

18  is in actuality two fences.  This fence runs from the Pacific

19  Ocean, all the way to the San Ysidro port of entry, which is

20  about five miles away.  You can see in this photograph that

21  there are actually two fences in this location.  There's a

22  primary border fence and a secondary border fence.

23       The primary border fence is the fence on the right

24  side of the photograph that's darker in color.  The secondary

25  border fence is the one to the left that's taller.

ER-175

1    Now in this case, the defendant climbed over that
2   first border fence, the primary fence.  Then he climbed up the
3   hill right up to the secondary fence and, at that point, he
4   crouched down at a specific place in the border fence where the
5   fence juts out about 18 inches providing some cover from the
6   east side.
7    And that is where the defendant was found and that is
8   why we're here today.
9    The defendant has been charged in two counts for
10   today's trial.  First, he's been charged with attempted entry
11   of an alien after previously being convicted of illegal entry.
12   He's also been charged with attempted reentry of a removed
13   alien.
14    Now, the evidence in today's trial will prove to you
15   beyond a reasonable doubt that the defendant is guilty of both
16   counts.
17    You're going to hear about the defendant's A-file and
18   you're going to get to see documents from that A-file, which
19   contains his immigration history.  Now, you're going to hear
20   that he has been removed to El Salvador previously.
21    For instance, you'll see documents that show that he
22   has been deported multiple times.  These documents also contain
23   Mr. Cabrera's photograph, his name, and for most of them, his
24   fingerprints.
25    You're also going to get to hear or rather watch a

ER-176

1   video of the defendant admitting that he is a citizen of El

2   Salvador without documents to enter the United States legally

3   and that he has been deported previously.

4          You're also going to hear, because it's an element

5   that we must prove to you, that the defendant has previously

6   been convicted of a prior illegal entry offense.

7          Now, Members of the Jury, you are also going to hear

8   today from the arresting agent in this case, so you're going to

9   hear from the agent who encountered the defendant on November

10  4th, 2019.  You're going to hear exactly what happened on that

11  date.

12         And the arresting agent is going to testify about

13  where he found the defendant.  He's going to tell you that he

14  introduced himself as border patrol and he conducted a standard

15  immigration inspection, asking the standard questions.

16         You're going to hear that the defendant admitted to

17  being a citizen of El Salvador, stated that he didn't have

18  documents permitting him to legally enter the United States,

19  and you're also going to hear that he said his purpose for

20  coming to the United States was to find work.

21         So Members of the Jury, this is a simple case and

22  that's why at the end of this case, after seeing the evidence

23  presented by the United States, you will know beyond a

24  reasonable doubt that the defendant is guilty as to both

25  counts.

1          Thank you.

2          THE COURT:  All right.  Thank you, Ms. Muskat.

3          Do you wish to make an opening statement?

4          MR. DUDANI:  Yes, Your Honor.  Thank you.

5          THE COURT:  Mr. Dudani, you may make your opening

6   statement at this time.

7          OPENING STATEMENT BY COUNSEL FOR THE DEFENDANT

8          MR. DUDANI:  Mr. Cabrera is accused today of trying to

9   sneak into the United States undetected, but Mr. Cabrera is not

10  guilty because he was trying to get caught.

11         Mr. Cabrera walked up to the border just north of

12  urban Tijuana with the sun up.  He climbed over that first

13  primary border fence and he walked directly to the border

14  patrol access road that was just inside it and what he does

15  next is just this.

16         He sits down on the border patrol access road.  Now he

17  doesn't run.  He doesn't hide.  He doesn't take any steps to

18  get past that secondary fence that you saw a moment ago.  He's

19  sitting.  He's sitting with his back against the secondary

20  fence right next to the border patrol access road.

21         And he sits there not for one minute, not for two

22  minutes, he sits there with the sun up on the border patrol

23  access road sitting with his back against the secondary fence

24  for seven minutes.

25         He sits there for seven minutes until he sees border

1    patrol driving on the border patrol access road and, at that

2    point, you will see today that he does not run, he does not

3    hide and he does not take any steps to enter the United States

4    past that secondary fence.

5         And you will get to see for yourself what happened in

6    this case because it was captured on surveillance footage and

7    I'm going to show you a clip of that.  What we're looking at

8    here is Mr. Cabrera walking up the slope just inside the

9    primary fence.  He's walking out of the slope on to the highest

10   point of the border patrol access road.

11        He's walking.  He walks directly to the road and we're

12   now seeing him about to sit down.  We're not seeing him run.

13   We're not seeing him hide.  We don't see a ladder to get over

14   that fence.  We don't see a rope to scale that fence.  What

15   we're seeing is Mr. Cabrera sitting down with his back against

16   that secondary fence.

17        And what you'll see today is that he stays right there

18   until he sees border patrol come and apprehend him.

19        Now, to understand why Mr. Cabrera was sitting on the

20   border patrol access road for minutes just waiting to get

21   arrested you need some background about him.

22        Mr. Cabrera in 2018, the year before this happened,

23   you'll hear today he applied for protection from being returned

24   to El Salvador which is his home country.

25        And you'll hear today that when a person applies for

ER-179

1    protection from being returned, that means they're in some

2    danger in their home country and they're asking for permission

3    to stay here in the United States, to live here and, yes, to

4    work here rather than being returned to where they're in

5    danger.  And you'll hear today that, after you replied in 2018,

6    he was unsuccessful.  And you'll also hear that when your

7    request for protection is denied, you're allowed to request it

8    again.

9            You'll further hear today that you cannot apply for

10   protection from abroad.  You have to be in the United States.

11           You can't, for example, apply from your home country

12   or anywhere else.  And you will hear today that one way you can

13   apply for protection is if you are in custody in the United

14   States.  If you're in the United States, you're arrested,

15   you're detained, you can apply for protection.

16           The government and Judge Burns is going to instruct

17   you on all the elements in this case, all the parts of these

18   two alleged crimes.

19           This case is going to come down to one element from

20   both of those counts, whether Mr. Cabrera was trying to sneak

21   into the country undetected or not.

22           And you will see today that he was trying to get

23   caught.  You will see today that he walks up to a border patrol

24   access road in daylight, sits down, and waits.  Waits to get

25   arrested.

```
 1          He was sitting down.  He wasn't sneaking in.  And
 2   that's why, at the end of this trial, I'm going to come back
 3   before you and I'm going to ask you to find him not guilty.
 4          THE COURT:  All right.  Thank you, Mr. Dudani.
 5          Folks, at this time, we'll call it 12:05, we'll break
 6   for lunch.  Please be back in your seats at 1:05.  You'll be
 7   escorted to the La Jolla conference room.
 8          And the lunches are ready, Tish?
 9          THE CLERK:  Yes, Your Honor.
10          THE COURT:  Remember the Court's admonitions.  Don't
11   form or express an opinion about the case.  Don't discuss it,
12   enjoy your lunch.  We'll begin testimony at 1:05.  Have a nice
13   lunch.  A nice recess.
14          You're free to leave anything that you feel
15   comfortable leaving in the chair, on one is going to disturb
16   it.  We lock the court up and have people here during the
17   break.  So if you want to leave things there, you don't have to
18   take them with you.
19      (At 12:06 p.m., the jury was excused, and the following
20   proceedings were held:)
21          THE COURT:  Is there anything we need to discuss
22   before we take the noon recess?
23          MR. DAVIS:  The only thing, Your Honor, is I just
24   wanted to complete my record from the argument yesterday, if
25   the Court will indulge it, the argument about our witness.  I'm
```

ER-181

1  not seeking to revisit the ruling, I just want to make sure the
2  record was complete.
3          THE COURT:  Of course, Mr. Davis.
4          MR. DAVIS:  The only thing I want to do is make sure
5  that my proffer was complete about what the testimony would
6  have been so the record is complete on it.
7          THE COURT:  Okay.  This is the lawyer from Mexico, the
8  U.S. lawyer who lives in Mexico and has interaction with people
9  trying to get asylum?
10         MR. DAVIS:  Yes.  Our proffer, Your Honor, would be
11 that had she been called to testify, Ms. Pinheiro would have
12 testified that she is intimately familiar with the process of
13 applying for asylum from Mexico in the United States or other
14 forms of relief, that she has specific firsthand knowledge of
15 the facts on the ground at the San Ysidro port of entry and the
16 situation in Tijuana, Mexico generally in November of 2019 and
17 that her specific, personal firsthand experience, she was aware
18 that there was a backlog of several thousand -- I think between
19 8- and 10,000 -- migrants who were waiting in Tijuana for their
20 opportunity to present their claims for asylum or other forms
21 of humanitarian relief in the United States.
22         And as a result of two policies, one called metering
23 and the other called the Migrant Protection Protocols, commonly
24 known as the Remain in Mexico Policy, that backlog was growing
25 and that there was increasing -- drastically increasing wait

1   times for migrants, especially from Central America, to be able

2   to come into the ports of entry and press their claims in the

3   United States.

4           THE COURT:  Okay.  You acknowledged in response to a

5   question that I had that she has no knowledge of Mr. Cabrera.

6   She doesn't know him.  She never spoke to him.  She has no idea

7   of what his specific motives were when he came across, true?

8           MR. DAVIS:  Correct.

9           THE COURT:  And you did say the word -- the word on

10  the street that she had picked up on was, what, that people

11  were jumping the fence to try to get a shot at asylum?

12          MR. DAVIS:  I disclaimed reliance on that testimony.

13  I think we said that if the Court objected to that, that we

14  would withdraw that.

15          THE COURT:  All right.

16          MR. DAVIS:  But we intended to present her for those

17  other specific facts.

18          THE COURT:  Do you have any objection, Mr. McDonald,

19  now that the defense has pared down their proffer regarding --

20  I'm sorry, what's the witness' name, Mr. Davis?

21          MR. DAVIS:  Erika Pinheiro.

22          THE COURT:  -- Ms. Pinheiro's testimony?

23          MR. MCDONALD:  Your Honor, I do for the same reasons

24  as stated yesterday but also to reiterate this type of

25  testimony enlarges the scope of this case from the specifics

1   pertaining to Mr. Cabrera to bring in categories of evidence

2   that are highly controversial and are highly inflammable and

3   prejudicial under Rule 403.

4           Without a link specifically to Mr. Cabrera's

5   situation, without him, for instance, testifying that I was

6   coming to seek, you know, some sort of protection or asylum,

7   without that link to his particular circumstances, this witness

8   would solely be talking about the experiences of unknown,

9   unnamed, unnumbered individuals and their plight at the border

10  in some, you know, date range.

11          That is evidence that is highly prejudicial.  We're

12  already carrying, as we heard in the opening statement, the

13  baggage of the El Salvador situation and his prior request for

14  protection in that.  And I think that in and of itself is -- is

15  unduly prejudicial under 403 --

16          THE COURT:  All right.

17          MR. MCDONALD:  -- but certainly this further proposed

18  testimony is --

19          THE COURT:  Here's the problem I'm having, Mr. Davis,

20  with the testimony.  I just think it's very attenuated.  The

21  government has to prove that this defendant, not people in

22  general, but this defendant had the state of mind that he

23  wanted to come in in order to go free among the populace.

24          In other words, that he did not want to be arrested,

25  that his purpose was to get in olly olly oxen free.  The

1  witness, Ms. Pinheiro can't offer any testimony about that.

2  She has no idea.  Until -- I dare say until you or Mr. Dudani

3  told her what was at stake here, she didn't have any context

4  for understanding anything about this case.

5       And I'm a little concerned here because if the

6  defendant testifies, that's one thing, he can testify to his

7  state of mind and what his purposes were, but if he doesn't, I

8  think it's very, very tricky for you to say, here's what he was

9  thinking in the absence of his testimony and I expect the

10  government will object if you cross that line, and it's

11  a -- it's a difficult thing to press this.

12       I have no problem with you suggesting, as you've said,

13  that, you know, a possible motive for somebody coming over is

14  to reapply for asylum, but I don't think it can go any farther

15  than that absent his testimony, I really don't.

16       There's no other evidence that that was his purpose

17  that you've proffered, none.  And so I -- the fear I have and

18  the concern I have is that without subjecting him to cross

19  examination, someone is going to say, here's what he was

20  thinking, here's what was on his state of mind and I won't

21  permit that.

22       And that's why I think the testimony of --

23  Ms. Quintera?

24       MR. DAVIS:  Pinheiro.

25       THE COURT:  That's why I think Ms. Pinheiro's

1   testimony is not particularly relevant here and it raises all

2   kinds of probative dangers.  It raises the danger that I'm

3   going to have to instruct the jury that, look, the decision

4   here you have to make is what the defendant's subjective intent

5   was.  Attempt crimes or specific intent crimes, you know, his

6   intent had to be to turn himself in for the purpose of applying

7   for asylum, if that's what you say, but that has to come from

8   him or some other form of competent evidence that shows that

9   and I just find Ms. Pinheiro doesn't -- can't do that.  She has

10  no competent evidence of that.

11          The fact that other people were held up at the border

12  doesn't inform what his frame of mind was on the day and time

13  that he crossed the first fence.  Doesn't do that at all.

14          MR. DAVIS:  I disagree with that last point, Your

15  Honor.  Obviously she would never have testified about his

16  mental state.  She's not competent to do that.  We frankly --

17  she doesn't know Mr. Cabrera and we haven't talked to her about

18  the facts of his case.

19          THE COURT:  Right.

20          MR. DAVIS:  What she would testify to are facts from

21  which the jury can infer that a person who crosses in this

22  situation --

23          THE COURT:  Are they facts or are they hearsay

24  accounts that she's gotten from other people?  I mean, that's

25  one of the problems too.  You've disclaimed that the word was,

ER-186

1    but how does she know?  Was she there interviewing people?

2            MR. DAVIS:  Yes.

3            THE COURT:  Was she looking at documentation saying

4    this is this person's purpose in jumping over the fence at a

5    particular time?

6            MR. DAVIS:  Your Honor, I want to be clear about this.

7    The facts that we were going to proffer her for are about the

8    long wait, the reasons for the wait and the fact that there

9    were thousands of people waiting.

10           THE COURT:  Why can't you establish that, as you

11   indicated you're going to be able to establish, that a person

12   can seek asylum again through the government's witness?

13           MR. DAVIS:  Well, I may be able to, Your Honor, but

14   these facts are going to be specific to November 2019 at the

15   San Ysidro port of entry.

16           THE COURT:  Well, again, I'm not even sure she's

17   competent to state facts.  Does she have some kind of empirical

18   basis for knowing what the numbers were?

19           MR. DAVIS:  Yes, Your Honor.

20           THE COURT:  How does she have access to government

21   records as to what the numbers were?

22           MR. DAVIS:  She doesn't have access to government

23   records.  She works in Tijuana and works with the populations.

24           THE COURT:  Really, so she can give us a definitive

25   number of how many people were waiting?

# ER-187

1          MR. DAVIS:  A range.

2          THE COURT:  Yeah, again, I think it's trying to prove,

3    well this is what the phenomena was and so this guy, he must

4    have had, you know, a similar motive, similar subjective

5    intent.

6          And I just -- I don't think that's competent evidence.

7    So the Court -- the Court finds first that there's very little

8    relevance to this, if any; and second, that the probative

9    danger of getting into things that are going to delay the trial

10   or cause the government to have to, you know, call counter

11   witnesses to say, well, no, actually we were processing, you

12   know, at a steady pace just fine.

13         The case isn't about that.  The case is about what was

14   on Mr. Cabrera's mind when he came over, whether he had the

15   intent to go at large in the population without being

16   apprehended or whether he intended to turn himself in for the

17   purpose of seeking asylum for a second time.

18         He can answer that question.  Maybe there's other

19   competent evidence, but I find Ms. Pinheiro can't offer

20   competent evidence on that so the objection is sustained, both

21   under 402 and 403.

22         I have weighed the evidence.  I find that it does not

23   substantially -- that it is substantially outweighed by the

24   probative dangers of consumption of time, distracting the jury

25   from what the important issue is on the case and the likelihood

1   of -- of prejudice, that is, the suggestion that, well, because

2   other people were doing it, that that must have been the

3   defendant's motive too.

4           So for all those reasons, you've got your record but I

5   reiterate that the objection is sustained.

6           MR. DAVIS:  Thank you, Your Honor.

7           THE COURT:  Mr. Dudani, you mentioned something that I

8   was not aware of.  I just want to check with you.  I thought

9   people could -- could apply for asylum from outside the United

10  States, that they did not have to be in the United States to

11  apply for it.

12          I don't know what the status of the law is now, but I

13  thought that that was the whole purpose of the so-called Remain

14  in Mexico Policy, is make your application for asylum.  We'll

15  consider it.

16          I have a vague recollection of people saying you could

17  go to a U.S. embassy in these countries.  Now, again, I'm

18  unsure of that so I heard you say, no, you have to be in the

19  United States to apply for asylum, physically present in the

20  United States.

21          Is that your understanding of what the situation was

22  and what the law was in 2019?

23          MR. DUDANI:  Yes, Your Honor, and even in the -- the

24  Remain in Mexico program, the application is made inside the

25  United States.

ER-189

1       THE COURT:  But does the person have to be physically

2   present?  I thought somebody else could make the application

3   for the person.

4       MR. DUDANI:  My best understanding is that to make the

5   application, the person needs to be physically present and

6   these are facts that the witnesses will hopefully be able to

7   speak to.

8       THE COURT:  Okay.  Okay.  Again, I'm only inquiring

9   because I don't know and my understanding was different from

10  what you said.  Is that your understanding also, Mr. McDonald?

11  You have to be physically present in the United States to

12  pursue an asylum application?

13      MR. MCDONALD:  I'm not a hundred percent sure.

14      THE COURT:  Okay.  Yeah, I'm not either.

15      MR. MCDONALD:  It hasn't come up in a case previously.

16  I was a little bit surprised by it as well.

17      MR. DAVIS:  I believe that's the case, Your Honor.  In

18  the Remain in Mexico Policy, they would come in, put their

19  application in, and while it was pending, normally you're

20  allowed to stay in the United States while it's pending.

21      In Remain in Mexico, they would have them go back to

22  Mexico, wait there while it was pending.  But they have to be

23  in the United States.

24      THE COURT:  So where would they present it?  At the

25  port of entry and then go back?

ER-190

1              MR. DAVIS:  Yes, but basically -- any situation where
2      they were -- made an asylum application --
3              THE COURT:  But you're going to offer some testimony
4      on that?
5              MR. DAVIS:  We're going try -- elicit it.
6              THE COURT:  Okay.  All right.  And it's a question
7      because I was unsure about that.
8              MR. DAVIS:  Can I spell the witness' -- the
9      prospective witness' name for the court reporter to make sure
10     the record is clear?
11             THE COURT:  Ms. Pinheiro?
12             MR. DAVIS:  Her first name is Erika with a K, and the
13     last name is Pinheiro, P-I-N-H-E-I-R-O.
14             THE COURT:  All right.  Will you -- the last thing
15     before I let you go for lunch, both of you do me a favor.  I've
16     had problems and I tried to contact Ms. Nestor and
17     Mr. Grossman, before that, Mr. Brewer about this.
18             It's not uncommon for people from both respective
19     offices to come and watch the closing arguments, and then
20     there's this mass exodus right in-between jury instructions,
21     and I've had to tell people, sit down, please sit down, let me
22     finish the instructions, don't get up because it 's
23     distracting, right?  I'm trying to finish the concluding
24     instructions and there's this mass exodus.
25             So please remind those who want to come and watch the

ER-191

1  arguments that they have to stay until the jury has been sent

2  to begin its deliberations or we recess so that they can do so.

3         In other words, they have to sit through the last five

4  instructions on deliberations.

5         MR. DAVIS: We'll tell them, Your Honor.

6         THE COURT: Same thing with the government, of course,

7  Mr. McDonald.

8         MR. MCDONALD: Yes, Your Honor.

9         THE COURT: Both sides have done that before. I want

10  everybody seated until all the instructions are given and we

11  recess to allow the jury to begin deliberations.

12         Have a nice lunch. See you back a little bit before

13  1:05.

14    (A recess was taken from 12:19 p.m. to 1:06 p.m.)

15         THE COURT: Counsel's present. The defendant is

16  present. The jury is not present. I looked at this, thought

17  about the proffer a little bit more.

18         I wanted to, from my perspective, complete the record

19  of my thoughts. It may not be clear.

20         Ordinarily, propensity evidence is not admissible, in

21  other words, showing that somebody did something on this

22  occasion because they'd done it many times on other occasions.

23         The problem I'm having with the proffer with respect

24  to Erika Pinheiro is that I view this as a form of propensity

25  evidence. It's even more attenuated. It's not because the

ER-192

1  defendant had done this several times before, necessarily he

2  did it this time.  The suggestion is that, because other people

3  are doing this, the defendant must have done it.  So it's even

4  another step away and I find that that really erodes the

5  relevancy of the evidence.

6          The other thing is, I've also sustained the objection

7  under 403 after considering it.  To the extent it has some

8  relevancy at all, I find it grossly outweighed by the probative

9  dangers under 403, particularly the danger that we'll have a

10  trial within a trial.

11          For example, counsel has conceded that Ms. Pinheiro

12  doesn't have any kind of empirical figures on how many people

13  were trying to come over illegally in order to press an asylum

14  claim.

15          And even if she did, to what extent have those people

16  who are trying to press an asylum claim had one denied already?

17  Those are all relevant things.  What sample can she give us?

18  How many people are actually over there?

19          I don't think she has any basis for saying any of that

20  and logical follow-up questions of a witness who had offered

21  the testimony that's been proffered would lead to those

22  questions and then we're off on a chase about, you know -- a

23  chase of white rabbits that have nothing do with the issues in

24  this case.  So I find under 403 that there's a significant

25  danger of diverting the jury's attention from the important

1    issue in this case.

2          This is an attempt case.  The government has to prove

3    that the defendant had the intent not to go at large but rather

4    to turn himself in.  They must prove beyond a reasonable

5    doubt -- actually, just the opposite, that he had the specific

6    intent to go at large, not some other intent.

7          All of that focuses on the defendant.  And it's not

8    focused on the motives of other people or how many other people

9    were trying to come over to press an asylum claim.  I'm not

10   foreclosing that theory of defense, not at all.  I'm just

11   saying that this witness, number one, I don't think offers

12   anything relevant on that issue and to the extent there's

13   marginal relevance to what she would say, it's greatly

14   outweighed by the risk of a trial within a trial having to do

15   with the motives of other unknown people and whether the sample

16   of people she spoke to is representative and many other

17   differences that exist.

18         The motives of other people don't inform what the

19   defendant's motives were on that day.  Again, not trying to

20   foreclose and will not foreclose you from arguing inferences.

21         For example, Mr. Dudani mentioned in opening statement

22   the defendant came in and sat down and one can logically argue

23   from that, no, he didn't have any intent to go any farther in

24   the United States.  Look what he did.  He sat there for seven

25   minutes and waited for Border Patrol to get there.  Fine.

ER-194

1    You want to argue the circumstantial evidence from
2    that, that that shows that he had no motive to go at large
3    within the United States, that's fine.  That's an inference
4    that directly derives from the defendant's conduct.
5        But I think when we get away from that and we start
6    talking about somebody who doesn't know the defendant, had no
7    contact with him, has no idea what his motives are, but is
8    going to testify to the motives of other people, that we,
9    number one, run into a relevancy problem, but more than that,
10   run into a 403 problem with the evidence outweighing whatever
11   marginal relevancy they may be.
12       So those are my concluding remarks on that.
13       Tish, you can call the jury.  You can call the jury
14   in.
15     (The following proceedings were held in open court in the
16   presence of the jury:)
17       THE COURT:  Your witnesses are here.  Go ahead and
18   summon your first witness and have him ready to go,
19   Mr. McDonald.
20       (Jury entered the courtroom.)
21       THE COURT:  All right.  All jurors are present.
22   Counsel and the defendant are present.
23       Welcome back.  How was the filet mignon?  Oh, it
24   wasn't filet mignon, huh?
25     DANIEL CABRAL ALEXANDER, GOVERNMENT'S WITNESS, SWORN

```
 1              THE COURT:  Have a seat.  Remove your mask.  Speak
 2   into the mike.  State and spell your full name.
 3              THE WITNESS:  Daniel Cabral Alexander, D-A-N-I-E-L,
 4   C-A-B-R-A-L, A-L-E-X-A-N-D-E-R.
 5              THE COURT:  Go ahead, Mr. McDonald.
 6              MR. MCDONALD:  Thank you, Your Honor.
 7                        DIRECT EXAMINATION
 8   BY MR. MCDONALD:
 9   Q.   Good afternoon, sir.
10   A.   Good afternoon.
11   Q.   How are you employed, sir?
12   A.   With the U.S. Border Patrol.
13   Q.   And is that as a border patrol agent?
14   A.   It is.
15   Q.   How long have you been with the border patrol?
16   A.   For over 12 years.
17   Q.   Did you have to receive some training in order to become a
18   border patrol agent?
19   A.   I did.
20   Q.   What generally did that training consist of?
21   A.   The training at the Border Patrol Academy includes driver's
22   training, firearms training, physical techniques, immigration
23   law, and nationality law.
24   Q.   And how long did that training last?
25   A.   It's roughly, say, three to five months.  I forget exact ly
```

ER-196

1    how long.
2    Q.   Now, after you completed that training, were you assigned
3    to a border patrol station?
4    A.   I was.
5    Q.   And where was that?
6    A.   That is at the Brown Field Border Patrol Station.
7    Q.   And what generally were your duties there?
8    A.   At the Brown Field Border Patrol Station, I do numerous
9    things.  I've done what we call line watch, which is
10   essentially just driving along the border.  And responding to
11   sensors.
12        I've done processing, which would be processing of aliens.
13   And then I've worked checkpoints.  I've done this duty here
14   where I'm assigned to the U.S. Attorney's Office as a liaison
15   and I've done a little bit of intel work as well.
16   Q.   Let's talk about your work as a liaison to the U.S.
17   Attorney's Office.  What does that job entail?
18   A.   As a liaison, I order A-files, I maintain A-files, and I
19   provide the U.S. Attorney's Office with whatever they need
20   discovery-wise for their cases.
21   Q.   Okay.  Now, you mentioned that you work with A-files.  What
22   is an A-file?
23   A.   An A-file is a folder that holds -- that contains the
24   immigration history of an individual.
25   Q.   And is this an actual physical file?

ER-197

1   A.   It is, yes.

2   Q.   And when is an A-file for an individual created?

3   A.   It can be created in a few different ways.  It can be

4   created upon an arrest.  It can be created upon an application

5   for some kind of immigration benefit as well.

6   Q.   And are A-files distinguished from other A-files in any

7   way?

8   A.   They are.

9   Q.   And how is that?

10  A.   There's a nine digit number that's on the outside of the

11  file that distinguishes the files between each other.

12  Q.   Is that something like a Social Security number?

13  A.   It's similar in the respect that it is identified to a

14  person and that it's nine digits.

15  Q.   Can more than one person share the same A-file number?

16  A.   No.

17  Q.   And does an A-file and an A-file number stay connected with

18  an individual forever?

19  A.   Yes.

20  Q.   In your capacity as a border patrol agent and an A-file

21  custodian, have you reviewed A-files before?

22  A.   Yes.

23  Q.   Approximately how many would you say?

24  A.   I would say hundreds to a thousand.

25  Q.   Now, sir, are you the A-file custodian for the A-file

ER-198

1  number 076490689?

2  A.  I am.

3  Q.  And is the leading zero of that number sometimes left off

4  in documents that appear in that A-file?

5  A.  Yes, it can be.

6  Q.  And what name is that A number assigned to?

7  A.  Juan Carlos Cabrera.

8  Q.  And how did your office come to have custody of Juan Carlos

9  Cabrera's A-file?

10  A.  We ordered the A-file from the national records center that

11  holds it.

12  Q.  And when it's in your custody, how is the A-file

13  maintained?

14  A.  It is maintained in our office, which is a locked, secure

15  office that only have -- only certain individuals have access

16  to.

17  Q.  And are those individuals A-file custodians?

18  A.  Yes, and other border patrol agents.

19  Q.  Now, ahead of your testimony today, did you review all of

20  the documents in the defendant's A-file?

21  A.  Yes.

22  Q.  If you could look at the binder that's in front of you at

23  Exhibits 11, 12, 12A, 13, 15, 15A, and 19.  And if you need

24  those again, I can provide those again.

25      And when you've finished reviewing those exhibits, just

ER-199

1  look back up at me and I'll continue the questioning.

2  A.  After 15A, it was 18?

3  Q.  19.

4  A.  Thank you.

5  Q.  15A and then the last one, 19.

6  A.  Okay.

7  Q.  Do you recognize each of those exhibits?

8  A.  I do.

9  Q.  Did each of these documents come from the defendant's

10 A-file ending in 689?

11 A.  They did.

12 Q.  Was each of these documents prepared by a Department of

13 Homeland Security or Department of Justice employee?

14 A.  Yes.

15 Q.  Was each document prepared by someone at the Department of

16 Homeland Security or Department of Justice with personal

17 knowledge of the information contained inside of it?

18 A.  Yes.

19 Q.  Was each document prepared in the regular course of

20 business?

21 A.  They were, yes.

22 Q.  Was each made at or near the time of the events recorded

23 within it?

24 A.  Yes.

25 Q.  Now, is the Department of Homeland Security under a duty to

1    keep each document in an alien's A-file?

2    A.   They are, yes.

3    Q.   With regard to Exhibits 11, 12, 13, 15, and 19, were each

4    of those documents certified by a proper official with the

5    Department of Homeland Security who created a certification

6    that each document is a true and accurate copy from the

7    defendant's A-file?

8    A.   They were, yes.

9    Q.   And with regard to Exhibits 12A and 15A, are those simply

10   better photocopies of the second pages of Exhibits 12 and 15?

11   A.   Yes.

12   Q.   Is there any other difference between the 12A and 15A and

13   12 and 15?

14   A.   Both of them, right above the fingerprint, there's a

15   marking which is the marking of the fingerprint expert that

16   reviewed them.

17   Q.   Otherwise, the documents are the same?

18   A.   Yes.

19        MR. MCDONALD:  At this time, Your Honor, the United

20   States would move to admit these exhibits, 11, 12, 12A, 13, 15,

21   15A and 19.

22        THE COURT:  Any objection?

23        MR. DAVIS:  Renew motions in limine, Your Honor, as

24   well as connection to this defendant.

25        THE COURT:  All right.  The Court renews the ruling it

ER-201

1   made in limine, the exhibits are admitted 11, 12, 12A, 13, 15,

2   15A and 19, all admitted.

3     (Government's Exhibits 11, 12, 12A, 13, 15, 15A and 19 were

4                         received in evidence.)

5         MR. MCDONALD:  Thank you, Your Honor.

6   BY MR. MCDONALD:

7   Q.  Now, sir, as part of your duties as a border patrol agent,

8   have you personally been involved in the process of deporting

9   and removing illegal aliens from the United States?

10  A.  I have, yes.

11  Q.  Have you personally prepared documents related to the

12  deportation process?

13  A.  I have.

14  Q.  Have you personally attended deportation proceedings before

15  an immigration judge?

16  A.  I have, yes.

17  Q.  Through each of these experiences and your training, have

18  you become familiar with the deportation process?

19  A.  I have.

20  Q.  And did you search through the defendant's A-file to see

21  whether there were documents showing he had been deported

22  previously from the United States?

23  A.  I did.

24  Q.  And has he been?

25  A.  He has, yes.

1  Q.  Referring you now to Exhibit 11, which should now be on the
2  screen displayed to the jurors, what is Exhibit 11, sir?
3  A.  Exhibit 11 is the order of the immigration judge for Juan
4  Carlos Cabrera who's listed as the respondent.
5  Q.  And is that towards the upper top left corner of this
6  document?
7  A.  It is, right here where I've circled.
8  Q.  Thank you, sir.  And is Juan Carlos Cabrera's A-file number
9  also on this document?
10  A.  It is.  On the other side, top of the page, it states
11  A76490689.
12  Q.  All right.  And what is the date of this order?
13  A.  It is dated at the bottom -- I just crossed it out,
14  actually.  It also has a date at the top, January 29th, 2002.
15  Q.  Okay.  And what is the conclusion of this immigration
16  judge's order?
17  A.  It states that the respondent was ordered removed from the
18  United States to El Salvador.
19  Q.  Now, once an immigration judge issues a deportation order,
20  do immigration officials then physically remove that person
21  from the United States?
22  A.  They do, yes.
23  Q.  Directing your attention now to Exhibit 12.
24      Now, as part of your job, have you received training in how
25  someone is physically removed from the United States after a

ER-203

1  deportation order is in place?

2  A.  Yes.

3  Q.  So are you familiar with that process?

4  A.  I am, yes.

5  Q.  And earlier in your career, did you personally participate

6  in the process of physically removing aliens from the United

7  States?

8  A.  I have, yes.

9  Q.  Looking at Government's Exhibit 12, what is this document?

10  A.  This is a warrant of removal/deportation for Juan Carlos

11  Cabrera.

12  Q.  And does this exhibit contain the defendant's A number

13  again?

14  A.  It does in the top right corner.  It states A076 -- well it

15  doesn't have the zero, but A76490689.

16          MR. DAVIS:  Your Honor, I'm just going to object to

17  the foundation of this being the defendant's A number.

18          THE COURT:  I'm sorry, I didn't hear the last part.

19          MR. DAVIS:  Foundation for this being the defendant's

20  A number.

21          THE COURT:  Okay.  Overruled.  Go ahead.

22  BY MR. MCDONALD:

23  Q.  Sir, does this document show that the defendant was

24  deported from the United States?

25  A.  It does on the second page.

ER-204

```
 1   Q.  Are we looking at the second page of this exhibit now, sir?
 2   A.  We are, yes.
 3   Q.  And how does this show that he was deported from the United
 4   States previously?
 5   A.  On the top, there's a line that states port, date, and
 6   manner of removal.  And then beyond that, it states Boston
 7   Logan Airport, and there is what appears to be a flight number,
 8   AA number 1711.  And then date of March 11th of 2002.
 9   Q.  And does that date refer to the date that the defendant was
10   removed from the United States?
11   A.  It does, yes.
12   Q.  Now, is there a signature of alien being fingerprinted that
13   appears on this page?
14   A.  There is, yes.
15   Q.  And where is that?
16   A.  That is in the middle area, in which I've just circled
17   here.
18   Q.  Now, sir, did anyone personally witness the defendant's
19   deportation?
20   A.  Yes.
21   Q.  And how do you know that?
22   A.  There's a section at the middle of the bottom area that
23   says "departure witnessed by" and there's a signature next to
24   it.
25   Q.  Okay.  And based on your experience participating in the
```

ER-205

1  removal process, when does the immigration official sign that

2  form to indicate the person was deported?

3  A.   That form is signed after the individual has been removed

4  from the United States, physically removed.

5  Q.   And then looking at the bottom of this form which is not

6  filled out, is that common that it would not be filled out?

7  A.   That is, yes.

8  Q.   And why is that?

9  A.   That section is for a separate type of removal in which the

10 individual is able to leave on his own and show proof that he's

11 left.

12 Q.   So for those who are removed by the United States by

13 immigration officials, that bottom half is not filled out?

14 A.   Correct.

15 Q.   Now, directing your attention to Exhibit 13, if someone

16 returns to the United States after being removed pursuant to an

17 immigration judge order, can that individual be removed again

18 from the United States based on that original immigration judge

19 order?

20 A.   Yes, they can.

21 Q.   And what is Government's Exhibit 13?

22 A.   Exhibit 13 is a separate warrant of removal/deportation for

23 Juan Carlos Cabrera.

24 Q.   Okay.  And does the second page of this document show that

25 this individual was removed from the United States?

ER-206

1   A.   It does.

2   Q.   Does it provide a date?

3   A.   It does.

4   Q.   And what is that?

5   A.   On the top section, it shows a date of November 4th, 2011.

6   Q.   And what is the manner of removal, is that reflected?

7   A.   The manner of removal is reflected by ICE FLT, which I'm

8   assuming stands for flight, FLT.

9   Q.   Now, sir, are you familiar with when individuals would be

10  removed by flight versus being removed just on foot?

11  A.   Yes.

12  Q.   And when is that?

13  A.   When an individual is not from one of our contiguous

14  borders of Canada or Mexico.

15  Q.   Okay.  So -- and El Salvador is not one of those?

16  A.   Correct.

17  Q.   Okay.  How far away approximately is El Salvador?

18  A.   From San Diego, approximately 2500 miles away.

19  Q.   Directing your attention to Exhibit 15, what is this

20  document?

21  A.   This is another warrant of removal/deportation for Juan

22  Carlos Cabrera.

23  Q.   So this is a third warrant of removal and deportation for

24  him?

25  A.   Correct.

ER-207

1  Q.  And does this contain his name and his A-file number?

2  A.  It does.

3  Q.  And on the second page, does it show, again, that he was

4  removed from the United States?

5  A.  It does.

6  Q.  And what was the port date and manner of removal in this

7  instance?

8  A.  On the top right corner, there's a stamp that shows

9  Phoenix-Mesa Gateway Airport, Mesa, Arizona and the date of

10  April 4th, 2018 via an ICE air charter flight.

11  Q.  And was this departure also witnessed by a deportation

12  officer?

13  A.  It was, yes.

14  Q.  Now, before the defendant was deported from the United

15  States on April 4th, 2018, did he make a claim that he feared

16  being returned to El Salvador?

17  A.  He did.

18  Q.  And was that claim reviewed by an immigration officer?

19  A.  It was, yes.

20  Q.  And after it was reviewed by an immigration officer, was it

21  then reviewed by an immigration judge?

22  A.  It was.

23  Q.  And what was the result of those proceedings?

24  A.  The judge found that the individual did not have a credible

25  fear of returning to his country.

ER-208

1   Q.  And then following that decision, was he then deported as

2   shown by this exhibit?

3   A.  Correct, yes.

4           MR. MCDONALD:  Your Honor, at this time, the United

5   States, separate from the testimony of this individual, would

6   move into evidence Exhibits 20, 21, and 22.

7           Exhibit 20 is the certified docket sheet of the case

8   of the United States versus Juan Carlos Cabrera, number

9   17-mj-2817-JMA.

10          Exhibit 21 is a certified copy of the plea agreement

11  from the same case.

12          And Exhibit 22 is a certified copy of the judgment in

13  that case.

14          THE COURT:  Do you have any objection beyond those

15  that have already been raised and ruled upon?

16          MR. DAVIS:  No additional objection.  We just re-raise

17  them, Your Honor.

18          THE COURT:  20, 21 and 22 are admitted.

19          MR. MCDONALD:  Thank you, Your Honor.

20  (Government Exhibits 20, 21 and 22 were received in evidence.)

21  BY MR. MCDONALD:

22  Q.  Now, sir, when an individual is encountered by border

23  patrol, does border patrol frequently record that interaction

24  by taking the individual's fingerprints?

25  A.  Yes.

ER-209

1   Q.   Showing you now Government's Exhibit 19, what is
2   Government's Exhibit 19?
3   A.   19 is a fingerprint card for Juan Carlos Cabrera.
4   Q.   Is there also a photograph on this card?
5   A.   There is.
6   Q.   And is the defendant's A-file number on this document?
7   A.   On the other side of the card, the second page I guess you
8   could call it, there is an A number, yes.
9   Q.   Okay.  And is there a date associated with this fingerprint
10  card?
11  A.   There is.  On this same side, there is a date at the top.
12  Q.   And is that August 10th of 2017?
13  A.   It is.
14  Q.   Now, directing your attention to Government's Exhibit 20,
15  which was just admitted, is this a docket sheet for the case
16  United States versus Juan Carlos Cabrera?
17  A.   It is, yes.
18  Q.   And is that case number 17-CR-2645?
19  A.   It is.
20  Q.   And on page three of this docket sheet -- if we could
21  scroll down to page three.
22       Page three of this document, does it show an arrest date
23  for Juan Carlos Cabrera?
24  A.   It does.
25  Q.   And what is that date?

ER-210

1   A.  8/10/2017.

2   Q.  And was that the same date as the fingerprint card we just

3   looked at?

4   A.  It is.

5   Q.  And directing your attention to Government's Exhibit 22

6   previously admitted, is this a judgment in the case

7   17-CR-2645-JMA?

8   A.  It is.

9   Q.  And who is the individual at issue in this document?

10  A.  It shows in the top left corner, United States versus Juan

11  Carlos Cabrera.

12  Q.  And does this document show the offense that the defendant

13  was found guilty of?

14  A.  Yes, in the middle section, it states title and section,

15  8-USC-1325.  And the nature of the offense was listed as

16  improper entry by an alien, misdemeanor.

17  Q.  Thank you.  Now, I'd like to talk to you about permission

18  to reenter the United States and what that process looks like.

19      After the defendant was deported from the United States,

20  did he need to get consent from the Attorney General or the

21  Secretary of Homeland Security before he could reapply for

22  admission into the United States?

23  A.  Yes.

24  Q.  Now, how does someone begin the process of getting

25  permission to enter the United States?

ER-211

```
1    A.   In the case in which they've been removed or deported, they

2    would have to file an application, it's called the Application

3    For Permission to Reapply For Admission to the United States

4    After Deportation.  It's an I1 -- or I212, that is.

5         They would have to file -- fill that out and then send it

6    out to either the Department of Homeland Security or the

7    Attorney General.

8    Q.   And is there a filing fee associated with filing a form

9    I212?

10   A.   There is, yes.

11   Q.   What approximately is that filing fee, if you know?

12   A.   I think it's approximately $900.

13   Q.   Now, if an individual were to file a form I212, would that

14   form be kept in that person's A-file?

15   A.   It would, yes.

16   Q.   Did you look in the defendant's A-file to find such a

17   document?

18   A.   I did.

19   Q.   Did you find one?

20   A.   No.

21   Q.   Now, if an I212 request was granted and the individual was

22   given permission from the United States Government to enter the

23   United States, would that permission appear in the individual's

24   A-file as well?

25   A.   It would, yes.
```

ER-212

1   Q.  And in reviewing the defendant's A-file, did you see any

2   document establishing that the defendant had been granted such

3   permission?

4   A.  No, there was nothing in there.

5   Q.  Now, are there also computer databases that reflect when a

6   form I212 is received?

7   A.  Yes.

8   Q.  And what database is that?

9   A.  The claims database.

10  Q.  And have you received training in -- to the claims

11  database?

12  A.  I have, yes.

13  Q.  And is information in that database maintained in the

14  regular course of business for the Department of Homeland

15  Security?

16  A.  It is.

17  Q.  Are you also familiar with the database called CIS?

18  A.  I am, yes.

19  Q.  And what is the CIS database?

20  A.  The CIS database will give us the current immigration

21  status of an individual.

22  Q.  And do you use and access the claims in CIS databases as

23  part of your regular duties?

24  A.  I do.

25  Q.  How frequently do you use them?

ER-213

 1   A.   I'd say very often, usually at least once a week, sometimes

 2   numerous times a week.

 3   Q.   And is the data entered into these databases by individuals

 4   with personal knowledge of the information they're entering?

 5   A.   Yes.

 6   Q.   And is the data entered at or near the time of the events

 7   recorded within it?

 8   A.   They are.

 9   Q.   Is the Department of Homeland Security under a duty to

10   maintain these databases and to do so accurately?

11   A.   They are, yes.

12   Q.   Now, based on your training and experiences, do all I212

13   applications either get entered into claims or appear in the

14   A-file?

15   A.   Yes.

16   Q.   And did you personally search the claims database to see

17   whether an I212 request had been filed?

18   A.   I did.

19   Q.   And when did you perform that search?

20   A.   This morning.

21   Q.   And what did you search -- what names did you search under?

22   A.   I searched under numerous names, Juan Carlos Cabrera, Juan

23   Carlos Cabrera with Carlos Cabrera being the last name, Juan

24   Carlos Cabrera Martinez, Juan Carlos Martinez Cabrera and a few

25   other iterations and misspellings.

ER-214

1  Q.  And what was the result of your search?

2  A.  It showed no results as far as the I212 being submitted.

3  Q.  Now, with regard to the CIS database, is that an

4  immigration service database that indicates the current status

5  of an individual?

6  A.  Yes.

7  Q.  Did you personally search CIS for information relating to

8  the defendant?

9  A.  I did.

10  Q.  And when did you perform that search?

11  A.  This morning.

12  Q.  What was the result of that search?

13  A.  That search showed that the individual was or is an El

14  Salvadorian citizen and that he does not have permission to

15  enter the United States.

16  Q. Does that mean that the defendant's prior deportation order

17  is still in effect?

18  A. Yes.

19  Q. Thank you.

20        MR. McDONALD:  Your Honor, I have no further questions

21  at this time

22                         * * * * *

23     (Amanda Legore reported from 1:37 p.m. to 3:01 p.m.)

24                         * * * * *

25        (At 3:01 p.m., the jury was excused, and the following

ER-215

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   UNITED STATES OF AMERICA,      )
                                   )  No. 3:20-CR-00435-LAB
4              Plaintiff,          )
                                   )
5   v.                             )  June 8, 2021
                                   )
6   JUAN CARLOS CABRERA,           )
                                   )  Courtroom 14A
7              Defendant.          )
    _____)  San Diego, California

8

9              TRANSCRIPT OF PROCEEDINGS

10    (Jury Trial - Day 1 - Part 1 of Afternoon Session)

11   BEFORE THE HONORABLE LARRY ALAN BURNS, SENIOR DISTRICT JUDGE

12
     APPEARANCES:
13   FOR THE PLAINTIFF:      COLIN McDONALD
                             AMANDA MUSKAT
14                           Assistant U.S. Attorneys
                             U.S. Attorney's Office
15                           Southern District of California
                             880 Front Street, Room 6293
16                           San Diego, CA  92101-8893
                             (619)557-5610
17
     FOR THE DEFENDANT:      BENJAMIN DAVIS
18                           SALIL DUDANI
                             Assistant Federal Defender
19                           Federal Defenders of San Diego
                             225 Broadway, Suite 900
20                           San Diego, CA  92101-5008
                             (619)234-8467
21
     ALSO PRESENT:           ANA REYNA
22                           PAULA NAVARRO-GOMEZ

23   COURT REPORTER:         AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
24                           U.S. District Court
                             333 West Broadway, Suite 420
25                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
```

ER-216

2

INDEX


Witness Index

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Daniel Cabral-Alexander | | 3 | 26 | 28 |
| Victor Montoya | 30 | 40 | 45 | 46 |
| Joseph Cisneros | 48 | | | |

Exhibit Index

| EXHIBIT | DESCRIPTION | RECEIVED |
|---|---|---|
| DD | Record of Determination | 18 |
| 1 | Photograph | 52 |
| 1A | Photograph | 52 |
| 2 | Photograph | 52 |
| 3 | Photograph | 52 |
| 4 | Photograph | 53 |
| 5 | Photograph | 53 |
| 6 | Photograph | 53 |
| 7 | Photograph | 53 |
| 8 | Photograph | 53 |
| 9 | Disk | 72 |
| 10C | Transcript of Clips of Interview | 39 |
| 40 | Immigration Order | 28 |

-oOo-


ER-217

3

Alexander - X - By Mr. Davis

1  (For earlier proceedings, please see jury trial,

2  Day 1, reported by Court Reporter Cynthia Ott.)

3  (Tuesday, June 8, 2021; 1:37 p.m.)

4

5  P R O C E E D I N G S

6

7  THE COURT:  Cross-examination.

8  MR. DAVIS:  Thank you, your Honor.

9  <u>CROSS-EXAMINATION</u>

10  BY MR. DAVIS:

11  Q.  Good afternoon, Agent.  How are you?

12  A.  I'm good.

13  Q.  Can you hear me okay?

14  A.  I can.  Yes.

15  Q.  Sometimes I lean back a little bit too far.

16  Agent, I would like to start just by asking you a

17  couple of questions about your role as the A-file custodian.

18  Now, you testified that you -- you're the custodian

19  of the physical A-file.  Right?

20  A.  That is correct.

21  Q.  And the physical A-file is kind of a compendium of an

22  individual's immigration documents.  Right?

23  A.  I don't understand what "compendium" means.

24  Q.  Fair enough.  It's a compilation.  It's a folder that

25  holds all of the immigration documents of a person who's not a

ER-218

Alexander - X - By Mr. Davis                    4

1   citizen.

2   A.   Yes.

3   Q.   Okay.  And those are the documents -- the reason that

4   they're collected together in one A-file is so that they can be

5   relied on and kept in this particular place.  Right?

6   A.   Correct.

7   Q.   Okay.  And so you, as the A-file custodian, you've been

8   relying on the content of those documents to explain what

9   happened to Mr. Cabrera in the past.  Right?

10  A.   The content of the file and then also the databases, yes.

11  Q.   Fair enough.  I'm just talking about the documents

12  themselves.  You rely on those documents.  Right?

13  A.   Yes.

14  Q.   And those documents were created by other people.  Right?

15  A.   They are, yes.

16  Q.   And you're relying on them -- what they say happened in

17  the documents is how you understand what actually took place.

18  Right?

19  A.   Correct.

20  Q.   And so good record keeping is really important to find out

21  what happened in a person's immigration past?  Correct?

22  A.   Correct.

23  Q.   And you -- as I said, you rely on documents such as the

24  warrants of removal that we've already looked at.  Right?

25  A.   Correct.

ER-219

5

Alexander - X - By Mr. Davis

1   Q.   There are other documents that might be in a person's

2   A-file, such as I-213s.  Correct?

3   A.   That is correct, yes.

4   Q.   And when I say an I-213, just for the jury's benefit,

5   that's a document that's created every time that a noncitizen

6   encounters a -- a -- an immigration officer.  Right?

7   A.   It's not created every time.  No.

8   Q.   All right.  Fair enough.

9        But many encounters are -- there's an I-213 that

10  documents those encounters.  Right?

11  A.   Correct.

12  Q.   And you might rely on the contents of an I-213 to come to

13  court and testify about what happened to a person in the past,

14  for example?

15  A.   I could, yes.

16  Q.   Okay.  And another document might be a record of sworn

17  statement.  Right?

18  A.   Correct.

19  Q.   And those are paper documents that keep a record of a

20  sworn statement that an alien or a noncitizen gave in a prior

21  proceeding.  Right?

22  A.   Correct.

23  Q.   And you would rely on what's in the record of sworn

24  statement to come and testify about what happened at that

25  interview.  Right?

ER-220

Alexander - X - By Mr. Davis 6

1  A.   Yes.

2  Q.   Okay.

3        MR. DAVIS:  And so just to illustrate this, if the

4  Government -- or, Mr. McDonald, if you could pull up

5  Government's Exhibit 12A.

6  BY MR. DAVIS:

7  Q.   Now, we're looking here at Government's Exhibit 12A.

8  Correct?

9  A.   Correct.

10 Q.   This is the cleaner page of the second page of a warrant

11 of removal that's dated from -- of March 11th of 2002.

12 Correct?

13 A.   Yes.

14 Q.   Okay.  And this is the page that you testified documents

15 that Mr. Cabrera was physically removed from the United States

16 on that date?

17 A.   Yes.

18 Q.   Okay.  And you -- and the reason that we know that is

19 because it was signed by a deportation officer.  Right?

20 A.   That's what it looks like, yes.

21 Q.   Okay.  And then -- if you look at the top left-hand part

22 of the page, there's a photograph there.  Correct?

23 A.   That is correct.

24 Q.   And below that photograph there's a line that says

25 "Signature of the alien being deported."  Right?

ER-221

7

Alexander - X - By Mr. Davis

1  A.   Correct.

2  Q.   And it appears that that signature says "Juan C. Cabrera."

3  Right?

4  A.   Yeah.  Sorry.  I misspoke before.  You asked whether it

5  said signature of alien being arrested, or something like that.

6  It says fingerprinting.

7  Q.   Correct.  I apologize for that.

8  A.   Yes, to answer your question, it does appear to be Juan

9  Carlos.

10 Q.   Okay.  And then if you go down to the next paragraph, it

11 says "Departure witnessed by."  Correct?

12 A.   Correct.

13 Q.   And then there's a signature there?

14 A.   There is, yes.

15 Q.   And you testified that that was the signature of the

16 deporting officer?

17 A.   Yes.

18 Q.   And that signature also says Juan C. Cabrera.  Correct?

19 A.   It does appear to say Juan C. Cabrera.

20 Q.   And in fact it appears identical to the signature on the

21 line above, of the alien being fingerprinted.  Correct?

22 A.   It is very similar, yes.

23 Q.   Okay.  So -- so that leaves us unsure about who actually

24 witnessed the departure, doesn't it?

25 A.   It shows Juan C. Carlos or Juan C. Cabrera did, or

ER-222

8

Alexander - X - By Mr. Davis

1  something similar to that.

2  Q.    Yeah, but the signatures are the same.  Right?  That's

3  what you testified to?

4  A.    They look similar.

5  Q.    Okay.  Very similar, would you say?

6  A.    Yes.

7  Q.    Okay.  They appear to be the same signature of the same

8  person, don't they?

9  A.    They do.

10  Q.    Okay.  So what I'm getting at is that we don't really know

11  who -- who was the person who witnessed the deportation for

12  this warrant of removal.  I'm not talking about the other ones.

13  I'm just talking about this one.

14  A.    No, we don't.

15  Q.    Okay.  And so that's an example of how a mistake in an

16  A-file document can leave us now, you know, these -- almost 20

17  years later -- unsure of what happened and what -- what took

18  place on that date.  Correct?

19  A.    Correct.

20  Q.    Okay.  Now, I would like to talk to you a little bit about

21  your background training as a Border Patrol agent.

22         You testified that you've been a Border Patrol agent

23  for 12 years.  Right?

24  A.    For over 12 years, yes.

25  Q.    More than 12 years.

ER-223

9

Alexander - X - By Mr. Davis

```
1   A.    Yes.
2   Q.    And at first you were -- you had been assigned to the
3   Brown -- Brownfield station?
4   A.    Correct.
5   Q.    And you -- were you in the field for a large portion of
6   those 12 years?
7   A.    I would say I've been out of the field more than in.  Yes.
8   Q.    Okay.  When you were border -- and you testified -- excuse
9   me.  You testified that you have witnessed removal proceedings.
10  Right?
11  A.    Yes.
12  Q.    Have you conducted expedited removals yourself?
13  A.    I have, yes.
14  Q.    So you have been the deciding officer that ordered a
15  person removed from the United States before?
16  A.    No.  As an agent, I'm not the deciding officer.
17  Q.    All right.  Fair enough.
18            But you've conducted the expedited removal
19  proceeding?  The first stage of that.  Correct?
20  A.    Yes.
21  Q.    Okay.  And you said that you've had background training in
22  immigration law?
23  A.    I have, yes.
24  Q.    And nationality law?
25  A.    Correct.
```

ER-224

10

Alexander - X - By Mr. Davis

1  Q.   And so as someone who conducts expedited removal

2  proceedings, you're charged with knowing the content of those

3  laws.  Right?

4  A.   A small version of it.  Not completely.  The laws are --

5  are very long and --

6  Q.   Fair enough.  The laws are extremely complicated.  Right?

7  A.   They can be, yes.

8  Q.   Yeah.  But I guess I'm talking about the laws that relate

9  to ordering a person removed from the United States.  Right?

10  A.   Correct.

11  Q.   Okay.  And as part of that, you're trained about relief

12  from removal?

13  A.   As a part, yes.

14  Q.   Okay.  And so you're aware of the forms of relief from

15  removal by -- and from relief of removal, I mean when someone

16  who might be subject to removal is actually not removed and

17  stays in the United States?

18  A.   I really don't encounter that very much in my job, besides

19  one specific aspect of it.  But I'm aware that there are ways

20  to request relief, yes.

21  Q.   Okay.  And you're aware that if someone, for example,

22  makes a request for relief to a Border Patrol agent or to an

23  immigration officer, that that triggers certain

24  responsibilities from the Border Patrol agent or immigration

25  officer.  Correct?

ER-225

Alexander - X - By Mr. Davis                    11

1   A.    Correct.

2   Q.    Okay.  And so one form of relief is called asylum.

3   Correct?

4   A.    Correct.

5   Q.    There's another form of relief that's called withholding

6   of removal.  Correct?

7   A.    Correct.

8   Q.    Okay.  And those -- those are similar, in that people who

9   are claiming those forms of relief are saying that they are

10  afraid of returning to their home country.  Correct?

11  A.    I'm not so certain that both of them are based on their

12  fear of returning to the country.

13  Q.    Okay.  Are you not familiar with withholding of removal?

14  A.    I am, like, vaguely familiar with it.  I don't deal with

15  that very much, so I wouldn't say I'm too familiar with it.

16  Q.    Okay.  And is -- in your immigration training to be a

17  Border Patrol agent, you weren't trained on withholding of

18  removal?

19  A.    No, we don't deal with that.  That's outside of our realm

20  as a Border Patrol agent.

21  Q.    Okay.  But people -- if someone says to you that they have

22  a fear of returning to their home country, that triggers a

23  responsibility on your part.  Correct?

24  A.    Correct.

25  Q.    And one of the things you would do is refer them to an

ER-226

Alexander - X - By Mr. Davis    12

1  asylum officer, who would make an evaluation of that claim.

2  Correct?

3  A.    Correct.

4  Q.    And you're aware that there are different standards for

5  different forms of relief?

6  A.    Yes.

7  Q.    And one standard is called the credible fear standard.

8  Right?

9  A.    That is correct.

10  Q.    And that's whether a person has a credible fear of being

11  returned to their home country.  Right?

12  A.    I don't know the specifics of it.  Like I said, I don't

13  really deal with this very much.

14          We -- when we get a claim for credible fear, we refer

15  it to ICE, and then it goes beyond us and we don't -- we don't

16  deal with it outside of that.

17  Q.    But you testified on direct examination that one of the

18  standards is whether the person has a credible fear.  Correct?

19  A.    I don't believe I stated --

20          MR. McDONALD:  Objection, your Honor.  Misstates the

21  testimony.

22          THE COURT:  All right.  Put the question to him again

23  affirmatively.

24  BY MR. DAVIS:

25  Q.    Are you aware of the standard known as a reasonable fear?

ER-227

Alexander - X - By Mr. Davis                    13

1   A.   I have heard of it, I could say.

2            MR. McDONALD:  Okay.  Your Honor, I'm going to object

3   to the questions based on asking for legal opinions and

4   conclusions.

5            THE COURT:  Overruled at this point.

6            Ask the next question.

7   BY MR. DAVIS:

8   Q.   You're aware of that standard?

9   A.   I -- I said that I've heard of it.  I'm not -- I don't

10  know exactly what is within that standard, no.

11  Q.   Okay.  And then in terms of the process, a person who says

12  that they fear return to their home country, they'll be

13  referred to ICE is what you said.  Correct?

14  A.   Correct.

15  Q.   And then they'll be examined by an asylum officer to make

16  an evaluation about that fear.  Correct?

17  A.   That is my understanding, yes.

18  Q.   And then the person can be found credible or not credible.

19  Correct?

20  A.   Correct.

21  Q.   And then the officer will make an ultimate determination

22  about whether the person qualifies for that form of relief or

23  doesn't.  Correct?

24  A.   They can, yes.

25  Q.   And then if they are not found to qualify, then they'll be

ER-228

Alexander - X - By Mr. Davis     14

1  typically removed.  Correct?

2  A.   Typically.

3  Q.   Okay.  But -- but if they -- but a person who applies, for

4  example, for asylum or withholding can nonetheless obtain a

5  work permit to work in the United States?

6           MR. McDONALD:  Objection.  Lacks foundation.

7           THE COURT:  Do you know the answer to that, based on

8  your training and experience?

9           THE WITNESS:  Can you ask the question again.

10 BY MR. DAVIS:

11 Q.   Sure.  A person who has applied for asylum or withholding

12 of removal -- right? -- relief to be able to stay in the United

13 States --

14 A.   Um-hmm.

15 Q.   -- those people can apply for a work permit to enable them

16 to work in the United States?

17 A.   I'm not sure.  I -- I don't know if that is true or not.

18 Q.   Okay.  In your training about immigration law, you didn't

19 learn that fact?

20          MR. McDONALD:  Your Honor, asked and answered.

21          THE COURT:  No.  This is different.  It's a

22 variation.

23          Did you learn about that in training?

24          THE WITNESS:  No.

25 BY MR. DAVIS:

ER-229

15

Alexander - X - By Mr. Davis

1   Q.   Okay.  What I would like to -- I just want to clarify a

2   little bit to what happened to Mr. Cabrera when he applied for

3   relief in 2018.

4        You testified on direct that he did claim a fear of

5   return to his home country.  Correct?

6   A.   Correct.

7   Q.   And he was interviewed by an asylum officer.  Right?

8   A.   Correct.

9   Q.   And what happened when the interview -- when he was

10  interviewed with an asylum officer, was that he was found

11  credible.  Correct?

12  A.   I'm not sure.

13  Q.   Okay.  I'm going to ask you to turn -- there's a binder up

14  there of defense exhibits.

15       Do you see that binder?

16  A.   Yes.

17  Q.   I'm going to ask -- turn -- ask you to turn to what's been

18  marked for identification as Defendant's Exhibit DD.  It's

19  towards the back of the binder.

20       Do you have that exhibit in front of you?

21  A.   I do.

22  Q.   And that exhibit is titled, at the top right-hand corner

23  of the page, Record of determination, reasonable fear

24  worksheet.  Right?

25  A.   Yes.

ER-230

Alexander - X - By Mr. Davis                    16

1   Q.    And the A number on it is -- at the top is A076490689.

2   Correct?

3   A.    Correct.

4   Q.    And the name that's on it is Juan Cabrera.  Correct?

5   A.    Correct.

6   Q.    And this is a document from Mr. Cabrera's A-file.

7   Correct?

8   A.    It appears to be, yes.

9   Q.    And it's one of the documents that you reviewed before

10  today's testimony.  Right?

11  A.    Correct.

12  Q.    Okay.  Turning to -- this document documents what --

13  excuse me -- the determination that the asylum officer made

14  about Mr. Cabrera's claim for relief.  Correct?

15  A.    It does.

16  Q.    Okay.  I'm going to ask you to turn to page 3 of that

17  document.  At the bottom right-hand corner it will say

18  "DD-003."

19          MR. McDONALD:  Your Honor, I don't believe this

20  exhibit has been introduced in evidence.  I don't believe it's

21  appropriate for the witness to be testifying directly from it

22  at this stage.

23          THE COURT:  He hasn't been asked to do that yet.

24          Go ahead.

25          MR. DAVIS:  Thank you.

ER-231

17

Alexander - X - By Mr. Davis

```
 1              THE WITNESS:  Can you go ahead and repeat the
 2   question.
 3   BY MR. DAVIS:
 4   Q.   Yes.  I'm asking you to turn to page DD003.
 5   A.   Okay.
 6   Q.   You testified that -- I think -- did you say that he was
 7   not found credible on direct examination?  I believe that's
 8   what you said.  Right?
 9   A.   I'm not exactly sure what I stated.
10   Q.   Okay.  On the top part of the page there's a line that
11   says credibility determination.  Right?
12   A.   There is.
13   Q.   And then there's a box that's checked, that says "The
14   applicant's testimony was sufficiently detailed, consistent,
15   and plausible in material respects" --
16              MR. McDONALD:  Objection, your Honor.  Reading
17   from -- reading from an exhibit --
18              THE COURT:  Sustained.
19              At this point, if you want to offer the document, you
20   may.  But it's hearsay otherwise.
21              MR. DAVIS:  Very well, your Honor.
22              I was impeaching him with it.  But at this point I'll
23   just ask to move Defendant's DD into evidence.
24              THE COURT:  Any objection to this?
25              MR. McDONALD:  No, your Honor.
```

ER-232

Alexander - X - By Mr. Davis                    18

1         THE COURT:  Received.

2               (Exhibit DD received.)

3    BY MR. DAVIS:

4    Q.   The credibility determination is that the defendant's

5    testimony was sufficiently detailed, consistent, and plausible

6    in material respects and is therefore found credible.  Correct?

7    A.   I'm sorry.  Could you ask the question again.

8    Q.   Yes.

9               The box that's checked 3.1 --

10   A.   Okay.

11   Q.   -- says:

12              "The applicant's testimony was sufficiently

13              detailed, consistent, and plausible in material

14              respects and is therefore found credible."

15   A.   Correct.

16   Q.   Okay.  And then at the bottom, 3.6, do you see that last

17   box at the bottom?

18   A.   I do.

19   Q.   And that says that no reasonable fear of persecution was

20   established.  Correct?

21   A.   That is correct.

22   Q.   Okay.  So what this document indicates was that

23   Mr. Cabrera was found to be credible but that his -- that his

24   application did not amount to the reasonable fear standard.

25   Correct?

ER-233

Alexander - X - By Mr. Davis                    19

1   A.    Correct.

2   Q.    Okay.  I would like to ask you a couple more questions

3   about asylum and withholding of removal.

4         You had -- a person has to be inside the United

5   States to apply for those forms of relief.  Correct?

6               MR. McDONALD:  Objection.  Lacks foundation.

7               THE COURT:  If you know the answer based on training

8   and experience, you may answer.  Don't guess or speculate.

9               THE WITNESS:  I don't know.

10  BY MR. DAVIS:

11  Q.    Okay.  Again, not something you were trained on?

12  A.    No.

13  Q.    Now you're also aware, based on your training, that a

14  person that has been denied protection in the United States can

15  apply again.  Correct?

16              MR. McDONALD:  Objection.  Lacks foundation.

17              THE COURT:  Same ruling.

18              If you know the answer to that, based on experience,

19  training, you may answer.  Otherwise, don't guess or speculate.

20              THE WITNESS:  Can you ask the question again.

21  BY MR. DAVIS:

22  Q.    Yes.

23        You're aware from your training and experience that a

24  person who has been denied protection in the United States in

25  the past is not barred from applying again?

ER-234

Alexander - X - By Mr. Davis

1  A.   Yeah, based on my experience, yes.

2  Q.   Right.  It doesn't mean that they'll get it, obviously,

3  the second time.  But they're not prohibited from trying again.

4  Correct?

5  A.   Correct.

6  Q.   For example, the situation in their home country may have

7  changed for the worse, for example.  And that might lead them

8  to apply again?

9  A.   For example, yes.

10  Q.   Okay.  Now, I want to turn back to your role as a Border

11  Patrol agent.

12        You mentioned you had done some intel for a while.

13  Correct?

14  A.   That is correct.

15  Q.   And the Border Patrol is responsible for patrolling the

16  border between the -- between the ports of entry.  Right?

17  A.   That is correct.

18  Q.   So distinct from the officers who work at the ports of

19  entry.  Right?

20  A.   That is correct.

21  Q.   And the Border Patrol has an intelligence unit.  Right?

22  A.   Yes.

23  Q.   And intelligence is often shared among the agents about

24  situations and conditions that might change at the border.

25  Right?

Alexander - X - By Mr. Davis

1       MR. McDONALD:  Objection.  Relevance, your Honor.

2       THE COURT:  I'll allow you to answer that question.

3  But, yes, we're getting far afield.

4       You may answer that.

5       Is information shared among intelligence agents?

6       THE WITNESS:  Yes.

7  BY MR. DAVIS:

8  Q.   Okay.  Are you aware of -- in the course of your duties as

9  a Border Patrol agent, were you aware of the conditions around

10 the San Ysidro port of entry and the border between the ports

11 of entry November of 2019?

12 A.   Can you repeat the question again.

13 Q.   Yeah.  Sure.

14      In your role as a Border Patrol agent, were you aware

15 of the conditions at the border in the fall of 2019 in --

16 around the San Ysidro Port of Entry?

17 A.   My only real awareness was based on the news.  I've been

18 assigned to the U.S. Attorney's Office for quite some time, and

19 I haven't been in the field.

20 Q.   Okay.  So through the news, you --

21      MR. McDONALD:  Objection, your Honor.

22      THE COURT:  Let's hear the question.  Go ahead.

23 BY MR. DAVIS:

24 Q.   Through the news, you were aware that in 2018 and 2019

25 there was a large --

# ER-236

Alexander - X - By Mr. Davis

1    MR. McDONALD:  Your Honor, objection.  Objection.

2    THE COURT:  Let him finish the question,

3  Mr. McDonald.  Put the question to him again.

4    MR. DAVIS:  Thank you.

5    THE COURT:  Hold off before you answer so I can rule

6  on the objection.

7  BY MR. DAVIS:

8  Q.   In your role as -- I'm sorry.  Through the news, then, you

9  were aware that in 2018 and 2019 there was a large surge of

10  migrants to the San Ysidro port of entry.  Correct?

11    MR. McDONALD:  Objection, your Honor.  Hearsay.

12  Relevance.

13    THE COURT:  Sustained.

14  BY MR. DAVIS:

15  Q.   Are you aware of the United States' policy known as the

16  migrant protection protocols?

17    MR. McDONALD:  Objection.  Relevance.

18    THE COURT:  Overruled.

19    You may answer if you're aware of it.

20    THE WITNESS:  Vaguely, yes.

21  BY MR. DAVIS:

22  Q.   Have you been -- received any intelligence or briefings

23  about the migrant protection protocols?

24  A.   No.

25  Q.   Are you aware that it was also known as the

Alexander - X - By Mr. Davis          23

1   remain-in-Mexico policy?

2   A.    No.

3   Q.    You've never heard of the remain-in-Mexico policy?

4   A.    No.

5   Q.    Okay.  The migrant protection protocols was a Government

6   policy relating to applications for --

7            MR. McDONALD:  Objection, your Honor.  Test --

8   counsel appears to be testifying --

9            THE COURT:  Hold on.

10           Sustained.  That's not a question.  Put a question to

11   him.

12           MR. DAVIS:  I was asking -- correct.  I was asking --

13           THE COURT:  He's not aware of it.  He's answered

14   that.

15           Next question.

16           MR. DAVIS:  He said he was aware of the migrant

17   protection protocols, not of the remain-in-Mexico policy, your

18   Honor?

19           THE COURT:  Is that your answer?

20           THE WITNESS:  I said "vaguely" for awareness of the

21   migrant protection protocol, yes.

22           THE COURT:  Okay.  Go ahead.

23           MR. DAVIS:  Thank you.

24   BY MR. DAVIS:

25   Q.    So I just want to find out what's contained in your

ER-238

1  awareness of it.  You were aware that it was a policy relating

2  to applications for asylum from people outside the United

3  States?

4  A.   Honestly, I -- I don't know that much about the MPP

5  program.

6  Q.   Okay.  Were you aware that it was a policy related to

7  applications for asylum into the United States?

8  A.   Yes.

9  Q.   Okay.  And were you aware that the -- what the policy was,

10  was that people who had made their applications for asylum were

11  asked to wait in Mexico while their asylum applications were

12  pending?

13  A.   Yes.

14  Q.   And are you aware that, because of that, there were large

15  numbers of people in Tijuana, Mexico, waiting for their

16  application asylum -- excuse me, their asylum applications in

17  the United States to be adjudicated?

18       MR. McDONALD:  Objection.  Lacks foundation.

19       THE COURT:  Sustained at this point.  The source of

20  his information, I think, needs to be elicited for him to be

21  able to answer this competently.

22       Sustained.

23       In other words, Mr. Davis, I've already sustained an

24  objection to what he may have heard on the news.  So if you

25  want to lay a foundation for his personal knowledge or the

Alexander - X - By Mr. Davis                    25

1   basis of his personal knowledge, you may.

2          MR. DAVIS:  Your Honor, I asked him if he is aware of

3   it.

4          THE COURT:  I know.  But you also asked if he was

5   aware from the news, and I sustained the objection to that.

6          So you will need to be more specific about what the

7   basis for his knowledge is.  I don't want him just to repeat

8   things he saw on the news.

9          MR. DAVIS:  Very well.

10  BY MR. DAVIS:

11  Q.   You said that you had a vague understanding of the migrant

12  protection protocols.  Correct?

13  A.   Correct.

14  Q.   Did you receive any information about the migrant

15  protection protocols in your role as a Border Patrol agent?

16  A.   Can you ask the question again.

17  Q.   Yes.

18          Did you receive any information about the migrant

19  protection protocols in your role as a Border Patrol agent?

20  A.   Yes.

21  Q.   Okay.  Was -- did some of that information lead you to be

22  aware that in November of 2019 there were a large number of

23  migrants in Tijuana, Mexico, awaiting the adjudication of their

24  asylum petitions in the United States?

25          MR. McDONALD:  Objection.  Hearsay.

ER-240

Alexander - ReD - By Mr. McDonald

1        THE COURT:  Overruled.  You may answer that.

2        Again, it's framed this way.  Based on your official

3   duties and things that you heard in the course of your official

4   duties, were you aware of what he just asked you?  That there

5   were a large number of migrants waiting for adjudication of

6   asylum petitions?

7        That's the question.  That's the one you may answer.

8        THE WITNESS:  No.

9        MR. DAVIS:  One moment, your Honor.

10       Thank you, your Honor.  I have no further questions.

11       THE COURT:  Anything else for this gentleman?

12       MR. McDONALD:  Just briefly, your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. McDONALD:

15  Q.   If you could turn to Defendant's Exhibit DD, previously

16  admitted.

17  A.   Okay.

18  Q.   At the top of this document, sir, does this have the

19  defendant's A-file number, 076490689?

20  A.   It does, yes.

21  Q.   And that's the same A-file that we've been talking about

22  previously?

23  A.   Yes.

24  Q.   And does this document specify the alien's nationality at

25  the top of the document?

Alexander - ReD - By Mr. McDonald                    27

1   A.    It does.

2   Q.    And what does it say?

3   A.    It says, "El Salvador."

4   Q.    And does it give the alien's first name as Juan and last

5   name as Cabrera?

6   A.    It does.

7   Q.    Directing your attention to Government's Exhibit 40, in

8   the binder in front of you.

9         If you could please look at Exhibit 40, and then look

10  back up once you're finished doing that.

11  A.    Okay.

12  Q.    Do you recognize Government's Exhibit 40?

13  A.    I do.

14  Q.    And what is it?

15  A.    40 is an order of the immigration judge for Juan Carlos

16  Cabrera.

17  Q.    And is this document -- was this from the defendant's

18  A-file?

19  A.    It is.

20  Q.    And was this document kept in the ordinary course of

21  business as you described previously as pertains to A-file

22  documents in your possession and control?

23  A.    Yes.

24  Q.    At this time, the United States would move to admit

25  Government's Exhibit 40.

28

Alexander - ReX - by Mr. Davis

1    THE COURT:  Any objection to 40?

2    MR. DAVIS:  No, your Honor.

3    THE COURT:  40 is received.

4    (Exhibit 40 received.)

5  BY MR. McDONALD:

6  Q.   Sir, what does this document show?

7  A.   This document shows -- if you read the second paragraph --

8  that after the consideration of the evidence, the Court finds

9  that the alien has not -- there's a checkmark -- has not

10  established a reasonable possibility that he or she would be

11  persecuted on the basis of his or her race, religion,

12  nationality, membership in a particular social group, or his or

13  her political opinion, or a reasonable possibility that he/she

14  would be tortured in the country of removal.

15  Q.   Okay.  And is this signed and dated the 16th of March,

16  2018?

17  A.   It is, yes.

18  Q.   And who signed this document?

19  A.   It is signed by an immigration judge, Anna Partida.

20    MR. McDONALD:  Okay.  I have no further questions,

21  your Honor.

22    THE COURT:  Anything else, based on that?

23    MR. DAVIS:  Brief follow-up on this exhibit, your

24  Honor.

25    RECROSS-EXAMINATION

ER-243

29

Alexander - ReX - by Mr. Davis

1  BY MR. DAVIS:

2  Q.   Agent, in the middle of the page, that has the -- contains

3  the Court's reasoning for its concurring in the reasonable fear

4  determination.  Correct?

5  A.   Yes.

6  Q.   And it says the reasons are -- it's a little bit faint and

7  hard it read.  It says:

8            "For the reasons established by the immigration

9            officer in the reasonable fear determination."

10           Correct?

11  A.   Correct.

12  Q.   Okay.  So this document does not contain any finding about

13  Mr. Cabrera's credibility as to whether he had the fear.

14  Right?

15  A.   It does not.

16  Q.   Right.  That -- that finding was contained in the

17  reasonable fear determination that we already looked at,

18  Defendant's Exhibit EE?

19  A.   Correct.

20           MR. DAVIS:  Okay.  Nothing further.  Thank you.

21           THE COURT:  Thank you.  You may stand down.

22           THE WITNESS:  Thank you.

23           THE COURT:  Next witness.

24           MR. McDONALD:  The United States calls Border Patrol

25  Agent Victor Montoya.

ER-244

Montoya - D - By Ms. Muskat                           30

1          THE COURT:  Agent Montoya, raise your right hand.

2          (Witness sworn.)

3          THE WITNESS:  Yes, sir.  I will.

4          THE COURT:  Have a seat.  Remove your mask.  State

5     and spell your full name.

6          THE WITNESS:  Victor Montoya.  V-I-C-T-O-R,

7     M-O-N-T-O-Y-A.

8                      DIRECT EXAMINATION

9     BY MS. MUSKAT:

10    Q.   Good afternoon, Agent Montoya.  Can you please tell us

11    what your current occupation is.

12    A.   Border Patrol agent.

13    Q.   And how long have you been a Border Patrol agent?

14    A.   12 years.

15    Q.   And what are your current duties as a Border Patrol agent?

16    A.   Patrolling the border.

17    Q.   And what -- what does that entail, just for the jury?

18    A.   Line-watch duties, which is patrolling the border.  Also

19    processing.

20    Q.   And where are you currently assigned?

21    A.   Yuma Border Patrol Station.

22    Q.   Have you always been assigned to the Yuma Border Patrol

23    Station?

24    A.   No.

25    Q.   Where else have you been as signed?

ER-245

Montoya - D - By Ms. Muskat                31

1   A.    The Brownfield Border Patrol Station in San Diego.

2   Q.    Were you assigned to Brownfield Border Patrol Station on

3   August 10th, 2017?

4   A.    Yes.

5   Q.    So what were your duties when you were working at

6   Brownfield Border Patrol Station at -- at that 2017 date?

7   A.    I was assigned to a unit called ASID, Alien Smuggling

8   Identification and Deterrence.

9   Q.    And what were some of your duties with ASID?

10  A.    Interviewing all arrestees, or close to all arrestees.

11  Q.    Did you ever interview anybody in Spanish?

12  A.    Yes.

13  Q.    How frequently did you do that?

14  A.    I would say close to 95 percent of the time.

15  Q.    And so how -- just as a ballpark range, how many

16  interviews in Spanish have you done?

17  A.    Say close to a thousand.

18  Q.    And how is your Spanish?

19  A.    Very good.

20  Q.    Are you a fluent speaker?

21  A.    Yes.

22  Q.    And how did you become fluent in Spanish?

23  A.    It was my first language.

24  Q.    So just a little bit background, where exactly is the

25  Brownfield Border Patrol Station located?

ER-246

Montoya - D - By Ms. Muskat                    32

1   A.    Otay Mesa part of San Diego, south San Diego.

2   Q.    At approximately 10:33 p.m. on August 10th, 2017, did you

3   conduct an interview with an individual by the name of Juan

4   Carlos Cabrera?

5   A.    Yes.

6   Q.    And where did you interview this individual?

7   A.    Processing area, in one of the interview rooms.

8   Q.    Is that standard practice for the interviews you conduct

9   with arrestees?

10  A.    Yes.

11  Q.    And was there another Border Patrol agent during this

12  interview?

13  A.    Yes.

14  Q.    Is that standard practice?

15  A.    Yes, it is.

16  Q.    How were you both dressed when this interview went on?

17  A.    Plain clothes.

18  Q.    Were there any weapons visible on your person while you

19  conducted this interview?

20  A.    No.

21  Q.    Did either you or the other Border Patrol agent have

22  weapons visible?

23  A.    No.

24  Q.    Were there any weapons in the room that would have been

25  visible?

ER-247

Montoya - D - By Ms. Muskat                    33

1   A.   No.

2   Q.   Did you at any point yell at Juan Cabrera?

3   A.   No.

4   Q.   Did you threaten Juan Cabrera?

5   A.   No.

6   Q.   Now, was this particular interview conducted in English or

7   in Spanish?

8   A.   Spanish.

9   Q.   And as you recall, did Mr. Cabrera have any -- appear to

10  have any trouble understanding your questions?

11  A.   No.

12  Q.   And were his responses appropriate to the questions you

13  asked?

14  A.   Yes.

15  Q.   Now, was this interview recorded?

16  A.   It was.

17  Q.   Is that standard practice as well?

18  A.   Yes, it is.

19  Q.   Are you familiar with what's known as *Miranda* rights?

20  A.   Yes.

21  Q.   Did you read the defendant his *Miranda* rights?

22  A.   I did.

23          MR. DAVIS:  Relevance, your Honor.

24          THE COURT:  Yes.  Sustained.

25          Go ahead.  Next question

ER-248

Montoya - D - By Ms. Muskat                    34

1   BY MS. MUSKAT:

2   Q.   Okay.  Drawing your attention to -- did Mr. Cabrera agree

3   to speak with you without an attorney present?

4   A.   Yes, he did.

5   Q.   Drawing your attention to Government's Exhibit 10, in that

6   binder in front of you.

7          Okay.  Mr. Cabrera, just hold that thought for a

8   second.  Just -- I want to talk to you about the interview a

9   little bit more.

10         To your knowledge, did the agent who witnessed the

11  interview write a report of the interview?

12  A.   Yes.

13  Q.   Is that report called the record of sworn statement?

14  A.   Yes.

15  Q.   Okay.  Did you have a chance to review that record before

16  your testimony today?

17  A.   I did.

18  Q.   Drawing your attention to Government's Exhibit 17 in that

19  same binder, do you recognize this?

20  A.   Yes.

21  Q.   What is it?

22  A.   It's a report, which we call a 215.

23  Q.   Is that the record of sworn statement?

24  A.   Yes.

25  Q.   Okay.  Are there any corrections that you thought needed

ER-249

Montoya - D - By Ms. Muskat                          35

1   to be made to this record?

2   A.    Yes.

3   Q.    And what is that correction?

4   A.    Second-to-last question:  Have you had any fear of

5   persecution or torture?

6   Q.    Okay.  And what is the correction that -- that needs to be

7   made to it?

8   A.    After reviewing the -- it should be yes.

9   Q.    Okay.  Other than that, are there any corrections you

10  would like to make to that at this time?

11  A.    No.

12  Q.    And just to be clear, did you -- you did not draft that

13  report.  Right?

14  A.    No.

15  Q.    Okay.  Did you sign it?

16  A.    Yes, I did.

17  Q.    Now, back to Government's Exhibit 10.  Do you recognize

18  this?

19  A.    Yes.

20  Q.    What is it?

21  A.    It is a transcript of the DVD.

22  Q.    I just want to make sure we're looking at the same thing.

23        Are you looking at Government's Exhibit 10?

24        There's 10 and 10A.

25  A.    I'm looking at 10A.  Sorry.

ER-250

Montoya - D - By Ms. Muskat

1        Yes.

2   Q.   And what is this?

3   A.   The DVD of the post-arrest interview.

4   Q.   And was this the interview that occurred on August 10th,

5   2017?

6   A.   Yes.

7   Q.   Okay.  Did you review this DVD prior to your testimony

8   today?

9   A.   I did.

10  Q.   How do you know that this DVD is the same one you

11  reviewed?

12  A.   After reviewing, I put my signature on it.

13  Q.   Does Government's Exhibit 10 fairly and accurately reflect

14  the interview that you had with Mr. Cabrera on August 10th,

15  2017?

16  A.   Yes.

17  Q.   Were clips of your interview with the defendant prepared

18  for your testimony today?

19  A.   Yes.

20  Q.   Turning your attention to Government's Exhibit 10C, do you

21  recognize this?

22  A.   Yes.

23  Q.   What is it?

24  A.   Clips of the -- of the interview with translation.

25  Q.   And just to be clear, is that -- that's the same

Montoya - D - By Ms. Muskat

1   interview?  The August 10th, 2017, interview?

2   A.    Yes.

3   Q.    Okay.  After reviewing them, were they altered in any way

4   from the original interview video in Exhibit 10?

5   A.    Yes.  Subtitles were added in English, of the interview.

6   Q.    Otherwise, were there -- were there any changes to the

7   video?

8   A.    No.

9   Q.    Drawing your attention to Government's Exhibit 10A.

10          Have you reviewed Government's Exhibit 10A in this

11  matter?

12  A.    Yes.

13  Q.    What is Government's Exhibit 10A?

14  A.    The transcript and translation of the interview.

15  Q.    In reviewing the transcript and comparing it to the video

16  interview of -- in Government's Exhibit 10, does the transcript

17  appear to accurately transcribe from Spanish into English the

18  interview that you conducted?

19  A.    Yes.

20          MS. MUSKAT:  Your Honor, I would like to read a

21  stipulation into the record.

22          THE COURT:  All right.  We don't need the preamble,

23  just whatever facts are agreed to.

24          MS. MUSKAT:  Yes, your Honor.

25          The Spanish-to-English translation contained in

Montoya - D - By Ms. Muskat

1   Government's Exhibit 10A was prepared by a certified and

2   qualified Spanish-English interpreter, and is an accurate

3   translation of the statements the defendant made on August

4   10th, 2017.

5               THE COURT:  Do you agree with that on behalf of

6   Mr. Cabrera?

7               MR. DAVIS:  I do.

8               THE COURT:  Okay.  Folks, as I mentioned, the

9   stipulations are agreements between lawyers that certain things

10  are undisputed.

11              They do not contest that this transcript is an

12  accurate Spanish-to-English transcription of what was said.

13              Go ahead.

14  BY MS. MUSKAT:

15  Q.   Agent Montoya, did you review the clips that you mentioned

16  alongside the transcript in Government's Exhibit 10A?

17  A.   Yes.

18  Q.   And based on that, were the translations from Government's

19  Exhibit 10A added as subtitles to the video clips of your

20  interview with the defendant?

21  A.   Yes.

22  Q.   Did the text of the transcript and the text of the

23  subtitles match?

24  A.   They did.

25              MS. MUSKAT:  Your Honor, at this time, the United

ER-253

Montoya - D - By Ms. Muskat                    39

1   States moves to admit Government Exhibit 10C, which also

2   reflects the -- the ruling and the motion --

3            THE COURT:  All right.  We're belaboring something

4   that is agreed to.  This is the transcript.  This is the thing.

5            10C is admitted.

6            Go ahead.

7                    (Exhibit 10C received.)

8   BY MS. MUSKAT:

9   Q.   Agent Montoya, let's talk a little bit about the questions

10  you asked the defendant when you took his statement.

11           Were you making up questions as you went along?

12  A.   No.

13  Q.   Is there a standard set of questions that you asked the

14  defendant?

15  A.   Yes.

16  Q.   For instance, did you ask him if he's ever been deported?

17  A.   I did.

18  Q.   Did you ask him if he had any documents permitting him to

19  enter the United States legally?

20  A.   Yes.

21  Q.   Did you ask him what his citizenship was?

22  A.   Yes.

23  Q.   And did you ask the standard interview questions during

24  the August 10th, 2017, interview?

25  A.   I did.

Montoya - X - By Mr. Davis

40

1      THE COURT:  Ms. Muskat, are you planning to play the

2  tape?

3      MS. MUSKAT:  I'm about to, your Honor.

4      THE COURT:  Okay.  Instead of going through it, then,

5  play the tape.

6      MS. MUSKAT:  Yes, your Honor.

7      Directing your attention to the screen, I'll play

8  Government's Exhibit 10C, beginning with clip 2.

9      (Videotape playing with audio.)

10     THE CLERK:  Can you turn it down just a little bit on

11 your end.

12     MS. MUSKAT:  And now I'll play Government's Exhibit

13 10C, clip 4.

14     (Video playing with audio.)

15 BY MS. MUSKAT:

16 Q.   Agent Montoya, after concluding this interview, did you

17 have any further involvement in this case?

18 A.   No.

19     MS. MUSKAT:  Thank you.  No further questions at this

20 time.

21     THE COURT:  Cross-examination.

22     MR. DAVIS:  Thank you.

23                   CROSS-EXAMINATION

24 BY MR. DAVIS:

25 Q.   Hello, Agent Montoya.  How are you doing?

ER-255

Montoya - X - By Mr. Davis                    41

1   A.   Good.   Thank you.

2   Q.   I want to start by asking about the -- this -- the

3   interviews that you gave as part of -- a Border Patrol agent.

4        You testified that you don't make up the questions as

5   you go along.   Right?

6   A.   No.

7   Q.   You have a list of questions that you're supposed to ask.

8   Correct?

9   A.   Yes.

10  Q.   And those questions are prescribed for you.   Right?

11  A.   Yes.

12  Q.   You didn't write them yourself?

13  A.   No.

14  Q.   Okay.   And some of those -- the questions that you asked,

15  the answers might trigger responses from you.   Correct?

16  A.   Yes.

17  Q.   Okay.   So, for example, one of the questions that you ask

18  somebody is if they have a fear of returning to their home

19  country?

20  A.   Correct.

21  Q.   And the fear is if they fear persecution or torture in

22  their home country.   Right?

23  A.   Yes.

24  Q.   And if someone says yes to that question, you don't just

25  ignore that.   Right?

Montoya - X - By Mr. Davis

1   A.   No.

2   Q.   That's a serious -- that's something you have to take

3   seriously.  Correct?

4   A.   Yes.

5   Q.   All right.  And you would then, you know, document that.

6   Right?

7   A.   Yes.

8   Q.   And then refer that person eventually to someone who would

9   make an evaluation of that claim.  Right?

10  A.   Not during the interview.  That would be more once he gets

11  processed.

12  Q.   Okay.  So when he gets processed, someone would look to

13  see whether --

14  A.   Yes.

15  Q.   -- he had answered yes to that question?

16  A.   He would be asked again by the processer.

17  Q.   Okay.  And they would also look to see whether he answered

18  yes to that question in your interview.  Right?

19  A.   I can't say if they did.

20  Q.   Okay.  But let's talk about the record keeping that you

21  keep of these interviews.

22         There's a form called the record of sworn statement.

23  Right?

24  A.   Yes.

25  Q.   And that documents what was -- what the questions and

ER-257

Montoya - X - By Mr. Davis                        43

1   answers were --

2   A.    Yes.

3   Q.    -- in the interview.  Right?

4   A.    Yes.

5   Q.    And that record of sworn statement ends up in an

6   individual's A-file.  Correct?

7   A.    Correct.

8   Q.    And it becomes part of the official record of their

9   immigration history in the United States?

10  A.    Yes.

11  Q.    And it can be relied on later by people like us, here in a

12  court of law.  Correct?

13  A.    Yes.

14  Q.    Okay.  In this case you asked Mr. Cabrera, in this same

15  interview, if he feared being returned to his home country.

16  Right?

17  A.    Correct.

18  Q.    And he answered that question "yes"?

19  A.    Yes.

20  Q.    Okay.  And you've testified before that there was a record

21  of sworn statement produced in this -- in this interview.

22  Right?

23  A.    Yes.

24  Q.    And you said that you didn't take that -- make that

25  record?

ER-258

Montoya - X - By Mr. Davis                    44

1   A.   My witness -- I was the one asking the questions.  The

2   witness was typing it up.

3   Q.   Okay.  Do you know who that witness was?

4   A.   Michael Disento (phonetic).

5   Q.   Okay.  And so he's the one who made the -- created that

6   record?

7   A.   Yes.

8   Q.   Okay.  But then you reviewed the record.  Right?

9   A.   Correct.

10  Q.   And you checked to make sure every answer was correct?

11  A.   As I stated, I missed it.

12  Q.   Okay.  And then you signed on the bottom of the page?

13  A.   Yes.

14  Q.   Okay.  And as you've said today, you missed it.  Right?

15  A.   Yes.

16  Q.   And, in fact, the record of sworn statement, the official

17  record of this interview says that he claimed that he did not

18  have a fear of being returned?

19  A.   Correct.

20  Q.   And that's the record that ended up in his A-file.

21  Correct?

22  A.   Yes.

23  Q.   Okay.  And that's the record that we looked at here today.

24  Right?

25  A.   Yes.

ER-259

Montoya - ReD - By Ms. Muskat

1   Q.   And sometimes, as part -- when you were a Border Patrol

2   agent, do you ever pull someone's documents from their A-files

3   to look at them?

4   A.   No.

5   Q.   All right.  That's not something you do at the station?

6        All right.  But you are aware that these documents

7   are relied upon by people downstream from you in the removal

8   process.  Correct?

9   A.   Yes.

10       MR. DAVIS:  Okay.  No further questions.

11       THE COURT:  All right.  Thank you.  You may stand

12  down.

13       MS. MUSKAT:  Your Honor, brief redirect, if possible.

14       THE COURT:  Yeah.  Go ahead.

15       MS. MUSKAT:  Very brief.

16                    REDIRECT EXAMINATION

17  BY MS. MUSKAT:

18  Q.   Agent Montoya, defense counsel brought up the sworn

19  statement on your cross-examination.

20       Were you trying to hide that the defendant said he

21  had a fear of return when you signed a report written by your

22  colleague that inaccurately stated that he said no to that

23  question?

24  A.   No, I wasn't.

25  Q.   And this interview was recorded, as we just saw.  Right?

Montoya - ReX - By Mr. Davis                46

1  A.   Yes.

2  Q.   And why is it the standard practice that interviews are

3  recorded at the Border Patrol station?

4  A.   To keep an accurate record.

5  Q.   Have you ever encountered a mistake before in a record, in

6  your -- your years with Border Patrol?

7  A.   Yes.

8  Q.   And when there is a question, do people refer back to the

9  videotaped interviews?

10  A.   Yes.

11          MS. MUSKAT:   Okay.  Nothing further.

12          THE COURT:   Thank you.

13          You can stand down.

14          MR. DAVIS:   Your Honor, may I ask two questions?

15  Just two.

16          THE COURT:   All right.

17          MR. DAVIS:   Real short.

18                  RECROSS-EXAMINATION

19  BY MR. DAVIS:

20  Q.   First, does the videotape -- the recording, does that go

21  in a person's A-file?

22  A.   I don't think so.

23  Q.   Right.  It's the record of sworn statement.  Right?

24  A.   Correct.

25  Q.   And the second one is, have you gone back and physically

Montoya - ReX - By Mr. Davis

1  amended this record of sworn statement to correct it?

2  A.    No.

3  Q.    So as it sits now, in the A-file, it still records the

4  incorrect answer that Mr. -- Mr. Cabrera did not claim fear.

5  Correct?

6  A.    Correct.  After reviewing, that's when I noticed there was

7  an error there.

8  Q.    Okay.  This is -- this is from four years ago.  Correct?

9  A.    Correct.

10            MR. DAVIS:  All right.  No further questions.

11            Thank you.

12            THE COURT:  Now you may stand down.

13            Next witness.

14            MR. McDONALD:  The United States calls Border Patrol

15  Agent Joseph Cisneros.

16            (Pause.)

17            THE COURT:  Raise your right hand.

18            (Witness sworn.)

19            THE WITNESS:  Yes, I do.

20            THE COURT:  All right.  Have a seat.  Speak directly

21  into the mic.  Take your mask off.  And state and spell your

22  full name, please.

23            THE WITNESS:  Joseph Cisneros.

24            THE COURT:  Spell your name.

25            THE WITNESS:  J-O-S-E-P-H.  Last name,

48

Cisneros - D - By Mr. McDonald

1    C-I-S-N-E-R-O-S.

2         THE COURT:  You may move the mic a little closer,

3    Mr. Cisneros, if that is more convenient.

4         Go ahead.

5         THE WITNESS:  That's good.  Thank you.

6                   <u>DIRECT EXAMINATION</u>

7    BY MR. McDONALD:

8    Q.   Sir, are you recently retired from the United States

9    Border Patrol?

10   A.   Yes, as of March.

11   Q.   Were you a Border Patrol agent?

12   A.   Yes, I was.

13   Q.   How long were you a Border Patrol agent?

14   A.   More than 20 years.

15   Q.   Did you receive training in order to become an agent?

16   A.   Yes, I did.

17   Q.   What generally did that training consist of?

18   A.   Studied immigration law, conducting line-watch operations.

19   We also went over criminal law and basic felonies, recognizing

20   felonies and misdemeanors.

21   Q.   During the course of that training, did you receive any

22   training in the Spanish language?

23   A.   Yes, I did.

24   Q.   And what, generally, was that training?

25   A.   The training was -- covers the Spanish language concerning

49

Cisneros - D - By Mr. McDonald

1  immigration matters.

2  Q.   And when did you first start speaking Spanish?

3  A.   Well, I started speaking Spanish when I was a young -- a

4  young child.  My -- my mother spoke Spanish and, therefore, I

5  picked up the second language, speaking Spanish at home.

6  Q.   And during your time as a Border Patrol agent, did you

7  regularly communicate with individuals in the Spanish language?

8  A.   Yes, most of the time.

9  Q.   Now, in your Border Patrol training, did you learn how to

10  conduct what's known as an immigration inspection?

11  A.   Yes.

12  Q.   And what is the purpose of an immigration inspection?

13  A.   When we encounter someone, immigration inspection is to

14  determine their status, meaning what citizenship is the person.

15  Q.   And are there common questions that are asked?

16  A.   Yes.

17  Q.   What would those be generally?

18  A.   Generally we would ask the person what country are they a

19  citizen of, what -- what was their purpose for entering the

20  United States.  And if they have documents that would allow

21  them to enter or remain or work in the United States.

22  Q.   Now, after your Border Patrol training, were you assigned

23  to a Border Patrol station?

24  A.   Yes, I was.

25  Q.   What station was that?

Cisneros - D - By Mr. McDonald                    50

1   A.    Initially?  It was the Calexico station in the Imperial

2   Valley.

3   Q.    Okay.

4   A.    And I worked there for ten years and subsequently got a

5   transfer, luckily, to San Diego sector.  And I did my last

6   ten -- ten years there.

7   Q.    And was that at the Imperial Beach station?

8   A.    Yes.

9   Q.    And is that within the Southern District of California?

10  A.    Yes, it is.

11  Q.    And what portion of San Diego County does Imperial

12  Beach -- does the Imperial Beach station cover?

13  A.    Can you repeat the question?

14  Q.    Yes.  What -- what portion of San Diego County does the

15  Imperial Beach Border Patrol station cover?

16  A.    Oh, it extends from the Pacific Ocean, the southern --

17  southwesternmost part of the United States that butts up to

18  Mexico, and it runs east to the -- currently the San Ysidro

19  port of entry.

20  Q.    And does it extend some distance north, as well, into the

21  United States?

22  A.    Yeah, several miles north.  I believe -- the last I had

23  knowledge of the area, it extended up to Oceanside, I believe.

24  Q.    Now, did your duties at the Imperial Beach station include

25  line-watch duties?

ER-265

1   A.    Yes.  Most of the time, I was assigned line-watch duties.

2   Q.    And what is line watch?

3   A.    Line watch is basically what it says.  It's watching the

4   southern border, the actual borderline between the two

5   countries, meaning Mexico and the United States.

6   Q.    I would like to talk to you about a location known as

7   Yogurt Canyon.  Are you familiar with an area known to Border

8   Patrol as Yogurt Canyon?

9   A.    Yes, I am very familiar with Yogurt Canyon.

10  Q.    And is that part of the Imperial Beach area of

11  responsibility?

12  A.    Yes, it is.

13  Q.    Have you patrolled the Yogurt Canyon area before?

14  A.    Yes, many times.

15  Q.    And why is it that border patrol patrols the Yogurt Canyon

16  area?

17  A.    Well, the Yogurt Canyon area is -- it's what it is, it is

18  a canyon.  And as you all know, a canyon is a depression that's

19  not visible at the very bottom of the canyon.

20          So if a person is -- or anything that crosses the

21  canyon is below, they're below the usual line of sight.  Line

22  watch mainly consists of watching a certain area that's flat,

23  which makes it easier.  If it's a canyon, then it's a little

24  bit more difficult to -- to watch into the bottom of the canyon

25  because it's like a basin.

52

Cisneros - D - By Mr. McDonald

1   Q.    Directing your attention to the exhibit -- or to the white

2   binder that should be there in front of you.

3           If you could look at Exhibits 1, 1A, and then 2

4   through 8.  So, actually, just Exhibits 1 through 8.

5           And once you're finished looking at each of those

6   exhibits, just look back up at me, and I'll continue the

7   questioning.

8   A.    Okay.

9   Q.    All right.  Do you recognize those exhibits?

10  A.    Yes, I do.

11  Q.    What are they?

12  A.    They're the photographs of Yogurt Canyon area.

13  Q.    And of the broader Imperial Beach area?

14  A.    Also, yes, included.

15  Q.    And do these fairly and accurately depict those areas?

16  A.    Yes.

17          MR. McDONALD:  At this time, the United States would

18  move to admit 1, 1A, and 2 through 8, your Honor.

19          THE COURT:  Any objection to those?

20          MR. DUDANI:  No objection, your Honor.

21          THE COURT:  All right.  They're received.

22                  (Exhibit 1 received.)

23                  (Exhibit 1A received.)

24                  (Exhibit 2 received.)

25                  (Exhibit 3 received.)

ER-267

Cisneros - D - By Mr. McDonald                    53

1              (Exhibit 4 received.)

2              (Exhibit 5 received.)

3              (Exhibit 6 received.)

4              (Exhibit 7 received.)

5              (Exhibit 8 received.)

6    BY MR. McDONALD:

7    Q.    Displaying Exhibit 1 for the jury.  What does Exhibit 1

8    show?

9    A.    It's a view of the southern border that encompasses the

10   Imperial Beach area of responsibility.

11              As I had indicated before, you can see the Pacific

12   Ocean on the left side, and it extends the border -- the yellow

13   line, that runs horizontal, is our -- our border.

14   Q.    That's the United States/Mexico border?

15   A.    Yes, it is.

16   Q.    And so the United States is above the yellow line, Mexico

17   is below the yellow line?

18   A.    Yes, correct.  There's -- on this photograph.

19   Q.    And is there a port of entry that -- that appears on

20   Government's Exhibit 1?

21   A.    Yes.

22   Q.    Could you please, on the screen in front of you, just

23   circle where that port of entry is, approximately.

24   A.    Okay.  It should be right here (indicating).

25   Q.    Okay.  And is Yogurt Canyon on Exhibit 1?  The approximate

ER-268

Cisneros - D - By Mr. McDonald

54

1  location?

2  A.   Yes, it is.

3  Q.   And if you could just circle that as well.

4  A.   Okay.  (Witness complies.)

5  Q.   And how far, approximately, away are those two red circles

6  that you have just written?

7  A.   I was told it's about five miles.

8  Q.   And are you familiar with Border Field State Park?

9  A.   Yes, I am.

10  Q.   What is Border Field State Park?

11  A.   Border Field State Park is just west of goat -- Yogurt

12  Canyon.

13       It's a -- it's a state park that allows visitors.

14  And, basically, people have fun at the park, barbecuing.  It's

15  there, closest to the -- to the beach.

16  Q.   Okay.  And could you just circle the approximate area

17  there.

18  A.   It's going to overlap a little bit.

19  Q.   And does the Border Field State Park pose any difficulties

20  fore Border Patrol?

21  A.   Yes, it does.

22  Q.   And why is that?

23  A.   Well, there's a -- a -- again, uneven terrain.  There's a

24  sheer cliff, to go -- to the -- to have access to the beach

25  area.  Also, there is more uneven and brushy -- extremely

ER-269

Cisneros - D - By Mr. McDonald

1  brushy terrain.

2  Q.   And why is brushy terrain of interest to Border Patrol?

3  A.   Well, because that's -- it offers concealment to anybody

4  who crosses in that area.  When -- there's a brushy terrain

5  that extends from Border Field State Park throughout that area.

6  It's very easy for someone to evade Border Patrol.

7          MR. DUDANI:  Excuse me.  Objection as to that last

8  statement, as to personal knowledge.

9          THE COURT:  Overruled.

10          Next question.

11  BY MR. McDONALD:

12  Q.   Turning your attention to Exhibit 1A.  What does 1A show?

13  A.   1A shows the actual border between the United States and

14  Mexico.

15          It begins at the Pacific Ocean, or Whiskey 15, and

16  extends all the way to -- in this picture it looks like it's

17  bunkers, another landmark.

18  Q.   That's to the top of the screen?

19  A.   I'm sorry?

20  Q.   I'm sorry, sir.  Bunkers is towards the top of the screen?

21  Is that --

22  A.   Yes.  Bunkers is the top of the screen.  The little hill

23  there.  The hill there.

24  Q.   And is the United States/Mexico border visible in this

25  photograph?

ER-270

56

Cisneros - D - By Mr. McDonald

1   A.   Yes, it is.

2   Q.   And where is it?

3   A.   It's right down the center, and it's bordered by the brown

4   fence, the brown line.

5   Q.   Now, how far does that fence extend to the east?

6   A.   That -- that fence -- it now goes all the way to this --

7   to the San Ysidro port of entry.

8   Q.   And was that true, also, of -- of -- in November of 2019?

9   A.   Yes.  There always was a primary fence there.

10  Q.   Okay.  And where, approximately, on this exhibit is Yogurt

11  Canyon?

12  A.   Yogurt Canyon would be the depression area that is -- gee.

13  It's the next -- okay.  You have visibility of Whiskey 15,

14  Border Field State Park.  That's level ground.  And you can see

15  the little dip.  That is a little bit east, and I would say

16  maybe 300, 400 yards east.

17  Q.   Okay.  And if you could just place a circle around where

18  the Yogurt Canyon meets that -- that border fence.

19  A.   Okay.  Right -- this is all Yogurt Canyon.  (Indicating.)

20  Q.   Okay.  Thank you, sir.

21       And, for the record, that's just approximately left

22  center.  Approximately two-thirds of the -- two-thirds up this

23  page, Government's Exhibit 1A.

24       And, sir, is there also a second fence depicted in

25  this photograph?

ER-271

57

Cisneros - D - By Mr. McDonald

1  A.    Yes, there is.

2  Q.    And where is the second fence?

3  A.    It's just north of the primary fence.

4  Q.    Okay.  Could you just draw a line on that second fence.

5  A.    Of the entire second fence?

6  Q.    Yes.

7  A.    (Complies.)

8  Q.    Okay.  So your -- your drawing has encircled that second

9  fence?

10  A.    Yes.

11  Q.    And why is there a second fence in this area?

12  A.    The secondary fence is primarily there as a tactical

13  infrastructure unit.  It inhibits further illegal entries

14  from -- from the southern border.

15  Q.    Exhibit 2, moving along, what does Exhibit 2 show?

16  A.    This shows, also, the Whiskey 15 area, the camera pole,

17  the Tijuana slough, or -- or the San Diego/Tijuana River

18  slough.  And it shows the primary fence and the secondary

19  fence.

20  Q.    And, in this shot, is -- is the secondary fence closest to

21  the center of the photo?

22  A.    Yes.

23  Q.    And this is looking west towards the Pacific Ocean?

24  A.    Yes, it is.  Facing --

25  Q.    And is Border Field State Park to the right?

ER-272

58

Cisneros - D - By Mr. McDonald

1   A.   Yes, on the little mesa there.

2   Q.   And does this give a good example of the bushy terrain

3   that you described previously?

4   A.   Yes, because it extends beyond the Border Field State

5   Park.  You'll see a puddle there.  And adjacent to that,

6   further north, is the slough.  It looks like a grassy, flat

7   area, which it's not.  It's a grassy, bushy area that's --

8   that's very high.  Almost, I would say, thigh high.

9   Q.   Okay.  So just to be sure that we're clear, you're

10  referring to what section of Government's Exhibit 2, when you

11  talk about the thigh-high bushes?

12  A.   Oh, that's -- would be all this.  (Drawing.)

13  Q.   So that is not a flat lawn?

14  A.   No, it's not a flat lawn.

15  Q.   Okay.  Exhibit 3, what direction are we looking in Exhibit

16  3?

17  A.   We're looking east, from just the western side of Yogurt

18  Canyon.

19  Q.   Okay.  And so the Pacific Ocean is behind us, in this

20  photograph?

21  A.   Correct.  Yes.

22  Q.   And -- and do we see the two fences here?

23  A.   Yes, we do.

24  Q.   Is the primary fence on the right?

25  A.   Yes, it is.

Cisneros - D - By Mr. McDonald

1  Q.   And the secondary fence is on the left?

2  A.   Yes.

3  Q.   Now, there appears to be a road directly to the right of

4  the secondary fence.  Who has access to that road?

5  A.   We do, the Border Patrol.

6  Q.   Okay.  Does the general public have access to that road?

7  A.   No.

8  Q.   Exhibit 4, what does Exhibit 4 show?

9  A.   It shows the -- the bottom portion, the depression area of

10  goat -- of Yogurt Canyon.  And it also shows the primary fence

11  that actually borders the -- the United States and Mexico.

12  Q.   And is there any way to enter the United States in this

13  area without climbing this fence?

14  A.   Absolutely not.

15  Q.   And does the low point of Yogurt Canyon, depicted in

16  Government's Exhibit 4, pose any difficulties for Border

17  Patrol's line-watch responsibilities?

18  A.   Yes, it does.

19  Q.   In what way?

20  A.   As I stated before, the -- it's -- it's a depression.

21  It's not level ground where agents who are normally stationed

22  can have visibility in this area.

23        We've -- we've placed, as you can see, the

24  constantine [sic] wire due to the -- the fact that this area

25  is -- is highly used for illegal -- illegal crossings.

Cisneros - D - By Mr. McDonald

1  Q.   Exhibit 5 --

2        MR. DUDANI:  As to that last statement, 401, 403

3  propensity.

4        THE COURT:  Overruled.

5  BY MR. McDONALD:

6  Q.   What does Exhibit 5 show?

7  A.   This shows the bottom portion of Yogurt Canyon.

8  Q.   Is this just to the left of that concertina wire that you

9  spoke about in that prior exhibit?

10 A.   Yes.  I'm sorry.  What's -- what side --

11 Q.   I can rephrase that.  Is this at the bottom of Yogurt

12 Canyon, just next to the primary border fence?

13 A.   Yes, it is.

14 Q.   And it's looking at the secondary fence?

15 A.   Yes, it is.

16 Q.   So in order to get from the primary fence to the secondary

17 fence, do you have to climb this hill?

18 A.   Yes, you do.

19 Q.   And how would you describe this hill?

20 A.   It's very rocky, brushy, as you can see.  Steep incline.

21 It's not a very safe, good place to be.  Also because of the

22 contaminants at the bottom of Yogurt Canyon, as you can see by

23 the -- the storm drains at the bottom.

24 Q.   And directing your attention to the secondary fence, it

25 appears as though the fence styles change from one to another.

Cisneros - D - By Mr. McDonald                    61

1   Is that right?

2   A.   Yes, they do.

3   Q.   And had that change occurred already in November of 2019?

4   A.   Has a change occurred?

5   Q.   This photograph, does it show the status of what the fence

6   looked like in November of 2019?

7   A.   Oh, yes.  Yes, it was.  Yes, it is.

8   Q.   Exhibit 6, please.  Displaying that now to the jury.

9        Does Exhibit 6 show where those two fence styles come

10  together?

11  A.   Yes, it does.

12  Q.   Okay.  And where the fences come together, does the taller

13  fence jut back towards the road some distance?

14  A.   Yes, it does.

15  Q.   Now, have you observed individuals climb over this

16  secondary fence?

17  A.   Yes, I have.

18        MR. DUDANI:  Objection.  401, 403 propensity.

19        THE COURT:  Overruled.  Go ahead.

20  BY MR. McDONALD:

21  Q.   And how is it that individuals are able to climb over this

22  fence?

23  A.   There's several ways.  It looks difficult, but what the --

24  what I've seen, contraptions such as rope ladders are often

25  used.  Ropes themselves.  Even makeshift ladders are -- are

ER-276

Cisneros - D - By Mr. McDonald

1  used to hook to the top of the fence.  And a person can climb

2  those fences very easily.

3  Q.   What about people who don't have any of those things?

4  A.   I have actually seen -- yeah, there's actually people who

5  are -- are adapted, I guess, in climbing.  And they -- they can

6  climb these fences, even without any assistance.

7  Q.   Are there horizontal bars --

8         THE COURT REPORTER:  I couldn't hear you, sir.

9         MR. DUDANI:  Objection as to foundation.  The witness

10 testified as to the previous ones --

11        THE COURT:  Overruled.  Overruled.

12        Next question.

13 BY MR. McDONALD:

14 Q.   Are there horizontal bars on the nearer secondary fence

15 that individuals used to help climb over this fence?

16 A.   Yes, there are.

17 Q.   And can you see those in Government's Exhibit 6?

18 A.   Yes.

19 Q.   If you could please just draw a line on the bottom

20 horizontal bar that you see.

21 A.   This one here.  (Drawing.)

22 Q.   Okay.  And the -- okay.  So you've encircled that bottom

23 horizontal bar.  Thank you.

24        And how quickly, if you know, does it take someone to

25 traverse this fence?

ER-277

Cisneros - D - By Mr. McDonald                    63

1   A.   I would say less than a minute.  I've seen them, very

2   fast, climb this fence.

3   Q.   Exhibit 7.  Is this a closer perspective of where the

4   taller fence juts out?

5   A.   Yes, it is.

6   Q.   And how far, approximately, does it jut out?

7   A.   Approximately two feet.

8   Q.   And does that have an impact on the visibility of agents

9   looking from the east to the west in this area?

10  A.   Yes, it does.

11  Q.   Why is that?

12  A.   Well, because the -- the fence is not on a straight plane.

13  It's not -- it's not even where you can actually see somebody,

14  I guess, coming over the fence.  More obvious if it was -- if

15  it was straight.  When it's like that, it -- it provides a

16  niche for concealment against the -- the -- the angle there.

17  The 90-degree angle

18  Q.   Exhibit 8, what does Exhibit 8 show?

19  A.   It shows the buttress of -- of both -- both fences, both

20  style of fences.

21  Q.   And the horizontal bars that we talked about, are those

22  clearly visible in this photograph?

23  A.   Yes, they are.

24  Q.   Beyond the secondary fence, it appears that there's some

25  shrubbery and open terrain.  What is that area?

ER-278

Cisneros - D - By Mr. McDonald                    64

1   A.    That's the Tijuana estuary.  The slough is beyond that,

2   beyond the canyon.

3   Q.    And then beyond that, it appears as though there are some

4   structures in the distance.  Do you see that?

5   A.    Yes.

6   Q.    And what is that?

7   A.    That would be -- that would be Imperial Beach.  The City

8   of Imperial Beach.

9   Q.    Now, when an individual reaches Imperial Beach, is it

10  difficult for Border Patrol to apprehend them at that point?

11  A.    Yeah, extremely.

12  Q.    And why is that?

13  A.    Because persons can blend into the population.  And since

14  there's more -- more population, more infrastructure, it makes

15  it easier for concealment, for people to hide.  And it makes it

16  difficult for apprehension, based on -- on the -- the hundreds

17  and thousands of places where a person can hide.

18  Q.    Now, I would like to direct your attention, now, to

19  November 4th of 2019.

20  A.    Yes.

21  Q.    Were you on duty on that day?

22  A.    Yes, I was.

23  Q.    What was your shift that day?

24  A.    The day shift that begins at 6:00 a.m.

25  Q.    And what were you wearing at the time?

ER-279

Cisneros - D - By Mr. McDonald                    65

1   A.   I was fully dressed in my Border Patrol uniform, which is

2   a familiar green uniform.

3   Q.   And what was your specific duty -- duty responsibility

4   that day?

5   A.   I was assigned the Whiskey 15 area, which is essentially

6   the Border Field State Park area.

7            I'm supposed to conduct -- conduct line watch as far

8   as I could see.

9   Q.   And just to be clear on this, Whiskey 15, is that a larger

10  area that encompasses Yogurt Canyon?

11  A.   Yes.

12  Q.   And directing your attention to Government's Exhibit 1A,

13  where approximately were you located on that date?

14  A.   I was located here, on the Border Field State Park area.

15  Q.   And if you could just circle where you were, on the

16  screen.

17  A.   I believe I was somewhere here, in this area (indicating).

18  Q.   Okay.  And were you on foot or in a Border Patrol vehicle?

19  A.   I was in the fully marked government -- government-marked

20  vehicle.

21  Q.   And at around 6:48 or so that morning, did you hear

22  something that caught your attention?

23  A.   Yes, I did.

24  Q.   What did you hear?

25  A.   Over our service radio, which is in our government service

Cisneros - D - By Mr. McDonald          66

1   vehicle, I heard the radio -- the remote video surveillance

2   operator indicate they had movement and somebody that was --

3   had crossed the primary fence and was now on his way to the

4   secondary fence.

5          MR. DUDANI:  Objection, hearsay.

6          THE COURT:  Overruled.

7   BY MR. McDONALD:

8   Q.   And was that in the Yogurt Canyon area?

9   A.   Yes.  Yes, it was.

10  Q.   And what did you do in response to hearing this?

11  A.   I -- I responded by driving my vehicle around the

12  secondary fence.  Well, I headed out towards the secondary

13  fence, on the paved road, and went to the beach where the fence

14  ends in the sandy area; and proceeded to go, drive through

15  Yogurt Canyon.

16  Q.   So you were driving just to the right of the secondary

17  border fence?

18  A.   Yes.

19  Q.   And is that shown on Government's Exhibit 3, that's on the

20  screen now?

21  A.   Yes.

22  Q.   Now, did you see -- looking at Government Exhibit 3, did

23  you see an individual somewhere on this exhibit?

24  A.   Yes, I did.

25  Q.   Where did you see this individual?

ER-281

67

Cisneros - D - By Mr. McDonald

1  A.   I saw the person there, where the -- the two different

2  fences buttress or meet.   The gray portion, where it meets the

3  brown-colored portion.

4  Q.   So right at that 90-degree corner that you talked about

5  previously?

6  A.   Yes, that's where he was.

7  Q.   Now, as you were driving towards that location, did the

8  individual that was there try to get your attention in any way?

9  A.   No, he did not.

10  Q.   Did the individual wave his arms at you?

11  A.   No, he did not.

12  Q.   Did the individual start yelling for help?

13  A.   No, he did not.

14  Q.   What did the individual do?

15  A.   The person was crouched down.   He didn't do any type of

16  movement.   He was crouched down, where the two fences meet.

17  Q.   And if you could describe what you mean by "crouched."

18  A.   Well, he was either sitting down or he was -- or on his

19  knees, with his back against the fence, towards the gray fence.

20         He was facing south, but I recall that he was back

21  against the fence, down.

22  Q.   In the niche?

23  A.   In the niche there.

24  Q.   Did you approach that individual and conduct an

25  immigration inspection?

ER-282

68

Cisneros - D - By Mr. McDonald

1   A.   Yes, I did.

2   Q.   Now, if you could look around the courtroom, do you see

3   that individual that you encountered in the niche in the court

4   here today?

5   A.   I --

6            MR. DUDANI:  Can I ask the Court to --

7            THE COURT:  Hold on a second.

8            Mr. Davis, have Mr. Cabrera remove his mask

9   temporarily, please.

10           Mr. Cabrera, take your mask off for a minute.

11           THE WITNESS:  Yes, I do see him.  He's seated right

12  there in the -- in the light gray shirt.

13           THE COURT:  Referring to the gentleman who just

14  removed his mask?

15           THE WITNESS:  Yes, the person who just removed his

16  mask.

17           THE COURT:  All right.  The record will reflect that

18  the agent has identified Mr. Cabrera.

19  BY MR. McDONALD:

20  Q.   When you conducted your immigration inspection of the

21  defendant, did you threaten him at all?

22  A.   No, I did not.

23  Q.   Did you take out a weapon?

24  A.   No, I didn't.

25  Q.   Did you yell at him?

ER-283

1   A.   No, I did not.

2   Q.   What was your tone of voice at the time?

3   A.   Similar to what it is right now.

4   Q.   Did you handcuff him at all?

5   A.   No, I did not.

6   Q.   Now, did you learn the defendant's name?

7   A.   Yes, I did.

8   Q.   And what was that?

9   A.   He told me his name was Juan Cabrera.

10  Q.   Now, what questions did you ask the defendant?

11  A.   We -- we typically ask the person immigration questions.

12  We ask them of what country he's a citizen of.  And the person

13  responded that he was from El Salvador.

14       The next question --

15  Q.   Let me take this one at a time.

16  A.   Okay.

17  Q.   So you said you asked him his citizenship?

18  A.   Yes.

19  Q.   And he said El Salvador?

20  A.   Yes.

21  Q.   What did you ask him next?

22  A.   I asked him if he had any immigration documents that would

23  allow him to come to the United States.  He replied to me that

24  he did not.

25  Q.   Did you ask him how he entered the United States?

ER-284

1  A.    I also asked him how and when he entered the United

2  States.  And he told me just now, by crossing over the fence a

3  few minutes ago.

4  Q.    Did you also ask him his purpose for coming to the United

5  States?

6  A.    Yes, I did.  I asked the defendant what was his purpose

7  for crossing into the United States and coming?  He informed me

8  that he was looking for work, just for work.

9  Q.    Did he say anything about asylum?

10  A.    No, he did not.

11  Q.    Did he say anything about reasonable fear?

12  A.    No, he did not.

13  Q.    Now, was your conversation with the defendant in English

14  or Spanish?

15  A.    It was in Spanish.

16  Q.    And did the defendant appear to have any trouble

17  understanding the questions you were asking him?

18  A.    No, he did not.

19  Q.    And did you have any trouble understanding the answers

20  that he was giving back to you?

21  A.    No, I -- I -- I understood what he was saying.

22  Q.    And how far apart were you, approximately, when you were

23  having this conversation?

24  A.    Approximately three feet.

25  Q.    Now, after the defendant said his purpose for crossing was

Cisneros - D - By Mr. McDonald                    71

1    to find work, what happened next?

2    A.    Well, I determined what his status was.  I determined that

3    he was here illegally; present in the United States, without

4    any visas or documents.  So I then arrested him.

5              MR. DUDANI:  Objection as to the legal

6    characterization.

7              THE COURT:  Overruled.

8    BY MR. McDONALD:

9    Q.    Now, sir, is there a video recording device that's

10   positioned in the area?

11   A.    Yes, there is.

12   Q.    And was this event that you've just described captured on

13   video?

14   A.    Yes, it was.

15   Q.    If you could please look at the binder in front of you,

16   again.  This time at Exhibit 9.

17              Do you recognize Exhibit 9?

18   A.    Yes, I do.

19   Q.    And what is Exhibit 9?

20   A.    These are the -- the disks that recorded the incident on

21   November 4th.

22   Q.    Okay.  So Exhibit 9 is a disk?

23   A.    Yes.

24   Q.    And did you watch the contents of that disk?

25   A.    Yes, I did.

ER-286

Cisneros - D - By Mr. McDonald                72

1  Q.   Okay.  Did you place your initials on the disk after you

2  watched it?

3  A.   Yes, I did.

4  Q.   And is Government's Exhibit 9 a fair and accurate

5  depiction of the events that you've just described in Yogurt

6  Canyon, involving the defendant, on November 4th of 2019?

7  A.   Yes.

8           MR. McDONALD:  The United States would move to admit

9  Government's Exhibit 9 at this time, your Honor.

10          THE COURT:  Any objection to 9?

11          MR. DUDANI:  No objection.  Thank you.

12          THE COURT:  9 is received.

13               (Exhibit 9 received.)

14 BY MR. McDONALD:

15 Q.   Okay.  If we -- we'll pull up Exhibit 9.  And if we could

16 just pause it, just for a brief moment.

17          And, sir, what I would like for you to do is orient

18 the jurors to the direction that we're looking here and the

19 general terrain and the area that they see depicted here in

20 Government's Exhibit 9.

21 A.   Okay.  This is a view from the -- the tall -- extremely

22 tall camera pole that's facing east.

23          You can see the primary border fence.  It's in a -- I

24 guess on the top portion.  It's in a lighter -- lighter --

25 lighter shade.  It extends down to a -- a darker shade.  The --

ER-287

73

Cisneros - D - By Mr. McDonald

1  those are landscaped areas of Yogurt Canyon.

2          And -- and the person who's walking there,

3  Mr. Cabrera, is headed towards -- I guess it's a drainage ditch

4  that's on the eastern side of the canyon.

5  Q.   When you talked previously, sir, about the hill that's

6  next to the primary fence, looking up towards the secondary

7  fence, is that where this individual is in this video?

8  A.   Yes, it is.

9  Q.   Coming up the hill?

10  A.   Going up the hill, yes.

11  Q.   All right.  Let's play this for the jury.

12          (Video playing.)

13  BY MR. McDONALD:

14  Q.   Does it appear that the individual, here, is using his

15  hands?

16  A.   Yes.

17  Q.   In what way is he using them?

18  A.   To -- like I said, the terrain is rocky.  It's not stable.

19  It's also slippery.  I believe -- of course, this was the

20  morning, so there's going to be morning mist.  There's also

21  ocean -- ocean mist in the area, which makes it slippery.

22  Q.   We saw a little blip in the video.  What was that?

23  A.   I -- I wouldn't know.

24          (Pause, video continues to play.)

25  BY MR. McDONALD:

74

Cisneros - D - By Mr. McDonald

1  Q.   The video, here, is -- shows white and dark objects.  Is
2  that right?
3  A.   Yes.  Yes.
4  Q.   And is that infrared?
5  A.   Yes, it is.
6  Q.   And how does that work?
7  A.   The infrared, it detects body heat.  So if you're using
8  white -- white hot, it's going to show or eliminate anything
9  that's with any thermal color white.
10  Q.   Now, the individual, the defendant appears to be reaching
11  the road just next to the secondary fence.  Is that right?
12  A.   Yes.
13  Q.   And where is he located right now?
14  A.   He's on the -- what we call the secondary road or
15  all-weather road.  And he's on the eastern part of -- eastern
16  part of Yogurt Canyon, heading towards the secondary fence
17  right now.
18  Q.   What direction is he walking now?
19  A.   East, away from me.
20  Q.   And where is he proceeding?
21  A.   He's -- he's proceeding to the -- that -- that angle in
22  the fence, where the gray, shorter fence meets -- meets up with
23  the brown, taller fence.
24  Q.   Towards the center of the screen, sir, there appears to be
25  a black bar that runs just to the right of this road.  What is

ER-289

Cisneros - D - By Mr. McDonald                    75

1  that?

2  A.    That's the guardrail that is on the edge of the

3  all-weather road.

4  Q.    Are you able to sit on that guardrail?

5  A.    Yes, you can.

6              (Pause.  Video continuing.)

7  BY MR. McDONALD:

8  Q.    Sir, throughout this video, do you ever see the defendant

9  wave towards the camera?

10  A.    No, you -- you don't.

11              (Pause.  Video continuing.)

12              THE COURT:  Mr. McDonald, do you have any other

13  questions?  We're not going to wait through seven minutes of

14  him just sitting there, are we?

15              MR. McDONALD:  Your Honor, we can -- I anticipated

16  that the defense, perhaps, wanted the jury to see this entire

17  time.  But I'm happy to fast-forward it to --

18              THE COURT:  You don't have to do their work for them.

19              MR. McDONALD:  That's true.

20              THE COURT:  We'll see it when we get to that.

21              MR. McDONALD:  No problem.

22              If we could fast-forward to the moment where the

23  vehicle appears in Government's Exhibit 9.

24              (Pause.  Video continuing.)

25  BY MR. McDONALD:

ER-290

76

Cisneros - D - By Mr. McDonald

1  Q.   All right.  Sir, what do we see now on the screen?

2  A.   Okay.  In the video, it depicts myself.  And I have

3  already exited my government -- government vehicle.  And I have

4  approached Mr. Juan Cabrera.

5  Q.   And are you conducting the immigration inspection that we

6  talked about, now?

7  A.   Yes, I am.

8  Q.   And was it during this time frame where Mr. Cabrera said

9  that he was coming to the United States for work?

10  A.   Yes, it is.

11          (Pause.  Video continuing.)

12  BY MR. McDONALD:

13  Q.   Did you also conduct a search to see whether he had any

14  documents on him?

15  A.   Yes, I did.

16  Q.   Did you find any documents permitting him to be in the

17  United States?

18  A.   No, I did not.

19  Q.   After conducting your immigration inspection, you said

20  that you -- you put Mr. Cabrera under arrest?

21  A.   Yes, I did.

22  Q.   Did you then have him enter your Border Patrol vehicle

23  that's depicted here?

24  A.   Yes, I did.

25  Q.   And then what happened next?

77

Cisneros - D - By Mr. McDonald

1   A.   I began to make sure that his personal property is

2   secured, away from himself.

3   Q.   Okay.  And was he then transported back to the Imperial

4   Beach Border Patrol station?

5   A.   Yes.  I made arrangements to have him transported back,

6   with our transport unit.

7           MR. McDONALD:  Thank you.

8           Your Honor, I have no further questions at this time.

9           THE COURT:  Folks, it's three o'clock.  We'll take

10  our afternoon recess at this time.  We'll be in recess until

11  3:15.  Remember the Court's admonitions.  Please be ready to go

12  at 3:15.  We're in recess.

13          You may stand down for now, Mr. Cisneros.

14          THE WITNESS:  Thank you.

15          (Jury exits courtroom.)

16          (Conclusion of proceedings reported by

17          Amanda LeGore.)

18

19

20

21                          -0-

22

23

24

25

ER-292

78

Cisneros - D - By Mr. McDonald

1

2

3                                    --oOo--

4

5    I certify, by signing below, that the foregoing is a correct

6    stenographic transcript of the oral proceedings had in the

7    above-entitled matter this 5th day of January, 2022.  A

8    transcript without an original signature or conformed signature

9    is not certified.  I further certify that the transcript fees

10   and format comply with those prescribed by the Court and the

11   Judicial Conference of the United States.

12

             /S/ Amanda M. LeGore

13          _____

14          AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

15

16

17

18

19

20

21

22

23

24

25

1  proceedings were held:)

2       THE COURT:  Again, you're free to use this area here

3  if you'd like.  You don't have to, you can go outside or in

4  there, but please do one or the other so we can continue to

5  work on issues while you're on break.

6       The jurors are not present.  Counsel are present.

7  Anything we need to discuss before we take our afternoon

8  recess?

9       MR. DAVIS:  Not right now, Your Honor.  Can we come

10  back a couple minutes before?  We're going to discuss

11  something.  The government's asked us a question.  We're going

12  to discuss it a little bit.

13       THE COURT:  Yeah, sure, so I'll come back in a little

14  bit after 3:10.  I've worked up a preliminary draft of the

15  instructions so we'll have our instructions conference at the

16  end of the session today, okay?

17       MR. DAVIS:  That's good.

18       (A recess was taken from 3:03 p.m. to 3:13 p.m.)

19       THE COURT:  So Mr. Davis, was there something we

20  needed to discuss.

21       MR. DAVIS:  No, Your Honor, we've discussed it I think

22  we're all set.

23       THE COURT:  Okay.

24       MR. DAVIS:  And we'll do jury instructions some other

25  time?  The Court said already, I'm sorry.  We're going to do

ER-294

1    them later.

2          THE COURT:  Yeah, I have them here.  I just made some

3    final changes and we'll get those incorporated and get you a

4    copy of them.

5       (The following proceedings were held in open court in the

6    presence of the jury:)

7          THE COURT:  Go ahead and be seated, Mr. Cabrera.

8    We're waiting for one more juror.

9          All members of the jury are present.  Counsel and the

10   defendant are present.  You may cross-examine.

11         MR. DUDANI:  Thank you, Your Honor.

12                        CROSS EXAMINATION

13   BY MR. DUDANI:

14   Q.  Good afternoon, Mr. Cisneros.  How are you doing?

15   A.  Hungry.

16   Q.  Understandable.  Agent Cisneros, you just recently retired?

17   A.  Yes.

18   Q.  And before that you were in border patrol for 20 years?

19   A.  Yes.

20   Q.  You had a long career as a border patrol agent?

21   A.  Yes.

22   Q.  And your mission in border patrol was to, well, protect the

23   American border?

24   A.  Yes.

25   Q.  From several things, from smugglers.  Your mission was to

1  protect -- included protecting the border from smugglers?

2  A.   Yes.

3  Q.   From drugs crossing the border?

4  A.   Yes.

5  Q.   From terrorism?

6  A.   Yes.

7  Q.   And from unauthorized migration?

8  A.   Yes.

9  Q.   And you testified about the training you received?

10 A.   Yes.

11 Q.   You were trained in how to do line watch?

12 A.   Yes, correct.

13 Q.   And you were trained in how to conduct immigration

14 inspections?

15 A.   Yes.

16 Q.   And when you were working for border patrol you received

17 regular intelligence briefings?

18 A.   Yes.

19 Q.   And the purpose of those intelligence briefings is to

20 inform you and the rest of the agents about things they needed

21 to know to protect the border?

22 A.   Yes.

23 Q.   And those regular briefings, how often did they occur?

24 Daily?  Weekly?

25 A.   I believe daily.

ER-296

1  Q.  Okay.  So you believe daily intelligence briefings?

2  A.  Yes.

3  Q.  Let's talk a little bit about what that work entails when

4  you're a line watch border patrol agent.  So that means you're

5  a front line officer?

6  A.  Yes.

7  Q.  You're out in the field?

8  A.  Yes.

9  Q.  Like in this case.  And you're not at a desk, most of the

10  time?

11  A.  Right, no.

12  Q.  Most of the time you're not working at the Border Patrol

13  Station?

14  A.  Correct.

15  Q.  So the agents at the Border Patrol Station, they have

16  different jobs than a line watch officer, line watch agent?

17  A.  Yes.

18  Q.  And in the field your job, for example, is not to do full

19  interrogations of the detainees?

20  A.  Correct.

21  Q.  Right.  Because you just do the more limited, for example,

22  immigration inspections that you described?

23  A.  Yes.

24  Q.  And you wouldn't check their records out in the field?

25  A.  No.

ER-297

```
 1  Q.  You wouldn't take their fingerprints out in the field?

 2  A.  No.

 3  Q.  And out in the field you asked them certain questions?

 4  A.  Yes.

 5  Q.  And out in the field you wouldn't be asking whether they

 6  have a fear of return if they are deported?

 7            MR. MCDONALD:  Objection, relevance.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  No.

10  BY MR. DUDANI:

11  Q.  Because that's not your job out in the field?

12  A.  Correct.

13  Q.  Well, that's not part of the standard immigration

14  inspection --

15  A.  Yeah.

16  Q.  -- you were telling us about?

17  A.  Yes.

18  Q.  So now let's talk about the standard process when you make

19  an apprehension.

20      You -- well, the first thing you do after -- well, let me

21  ask you, would one of the first things you do after making an

22  apprehension be to write a field apprehension report?

23  A.  Yes.

24  Q.  Your -- this consists of your handwritten notes?

25  A.  Yes.
```

1   Q.   Handwritten notes about the encounter?

2   A.   Yes.

3   Q.   And you're trained to do that close in time to the

4   encounter?

5   A.   Yes.

6   Q.   That's the purpose?

7   A.   Yes.

8   Q.   It's to record what you saw and heard right then and there?

9   A.   Yes.

10  Q.   After that point, later, you might type up a report about,

11  for example, an encounter?

12  A.   Yes.

13  Q.   That would be a report you typed back at the Border Patrol

14  Station?

15  A.   Yes, typically, yes.

16  Q.   And typically that process of typing that up would include

17  relying on the handwritten notes you took out in the field?

18  A.   Yes.

19  Q.   Obviously you're aware that court cases can drag on in

20  time?

21  A.   Generally I know that, yeah.

22  Q.   Yeah.  What I mean is, it can take months, for example,

23  from an encounter until a case is heard in court?

24  A.   Yes.

25  Q.   It can even take years?

ER-299

```
 1   A.  I suppose, I don't know.
 2   Q.  Well, for example, in this case this is an encounter from
 3   November 2019?
 4   A.  Yes.
 5   Q.  And we're here in June 2021?
 6   A.  Yes, correct.
 7   Q.  And that's part of the point of writing these reports?
 8   A.  Correct.
 9   Q.  Because you do -- when you were working as a line watch
10   agent you were doing hundreds of apprehensions every month?
11          MR. MCDONALD:  Objection, lacks foundation.
12          THE COURT:  Overruled.  Were you apprehending hundreds
13   of people?
14          THE WITNESS:  I believe there were several, but I
15   wouldn't say hundreds, no.  It was almost seldom.
16   BY MR. DUDANI:
17   Q.  Fair enough.  That was probably bad math.
18       Generally speaking, in the course of your career, 20-year
19   career, how many people did you apprehend?
20   A.  In my 20-year career?
21   Q.  Yes.
22   A.  Thousands.
23   Q.  Thousands.  You're apprehending a lot of people?
24   A.  Yes.
25   Q.  Because you're a line watch officer?
```

ER-300

```
 1   A.   Yes.
 2   Q.   And so part of the point of the reports, is to help you
 3   remember particular encounters?
 4   A.   Correct.
 5   Q.   Okay.  You prepared for court today?
 6   A.   Yes.
 7   Q.   And you reviewed some materials?
 8   A.   Yes.
 9   Q.   What materials did you review for today?
10   A.   What was shown here, the -- the disks of the arrest to
11   refresh my memory.  It ideally portrays what happened on
12   that -- on that morning.
13   Q.   Okay.  So the videos -- the video.  Did you review any
14   reports?
15   A.   Yes.
16   Q.   What reports did you review?
17   A.   I reviewed my G166 arrest report.
18   Q.   Okay.  And other people also will rely on your report?
19   A.   Yes.
20   Q.   That's how you're trained?
21   A.   Yes.
22   Q.   And so, for example, if someone one month ago before you
23   prepared for this case were to ask you what happened in
24   November 2019 with Juan Carlos Cabrera, you would say I'd have
25   to check my report?
```

ER-301

```
1    A.   Yes.

2    Q.   Let's talk about where this encounter happened.

3         Now you're very familiar with the area?

4    A.   Yes, I am.

5    Q.   You patrolled there very frequently?

6    A.   Correct.

7    Q.   Mr. -- so let's start here, where this happened is just

8    immediately north of Tijuana?

9    A.   Yes.

10   Q.   The city of Tijuana?

11   A.   Yes, uh-huh.

12   Q.   Tijuana is in the state of Baja California?

13   A.   Yes.

14   Q.   It's the biggest city in Baja California?

15   A.   I think yes.  Maybe.  Perhaps.

16   Q.   It's a very large city?

17   A.   Yes.

18   Q.   It's a developed urban area?

19             THE COURT:  What's the relevance of this, Mr. Dudani?

20   It's not relevant.  Move on to something that's relevant.

21   BY MR. DUDANI:

22   Q.   Yes, Your Honor.

23        You testified about the San Ysidro port of entry.

24   A.   Yes.

25   Q.   That's located in Tijuana?
```

ER-302

1  A.  The San Ysidro port of entry?  No, it's on, on U.S. soil.

2  Q.  Fair enough.  Just north of Tijuana?

3  A.  Correct.

4  Q.  And it's five miles east of where you saw Mr. Cabrera?

5  A.  Correct.

6  Q.  And it's a very busy port of entry?

7  A.  Oh yeah.

8  Q.  It's actually the busiest land port of entry in the western

9  hemisphere?

10  A.  Absolutely.

11  Q.  And I'm guessing that's not the first time you've heard

12  that said.

13  A.  No.

14  Q.  Hundreds of thousands of people are crossing through that

15  port of entry every day?

16  A.  Yes.

17  Q.  And, again, this is five miles east --

18  A.  Yes.

19  Q.  -- of where this happened?

20  A.  Yes.

21  Q.  And when you saw Mr. Cabrera he was just yards north of the

22  city of Tijuana?

23  A.  Yes.

24  Q.  Let's talk about to the west of where this happened.  To

25  the west is the coast.

ER-303

1  A.  Correct.

2  Q.  This happened about one quarter of a mile from the

3  coast -- or to put it the way you put it, a few hundred yards?

4  A.  Yes.

5  Q.  2, 300 yards?

6  A.  Correct.

7  Q.  And to the east the secondary fence continues, the

8  secondary fence being the fence that Mr. Cabrera was sitting

9  against?

10  A.  Yes.

11  Q.  The fence continues to the east as far as the eye can see

12  from that location?

13  A.  Correct.

14  Q.  Okay.  I'd now like to show you some -- some photos.

15  They're marked for identification in the binder in front of you

16  as Defense Exhibit C through G, that's five photos.

17      And let me ask you -- take your time, but my question will

18  be are these a fair and accurate depiction of the arrest site

19  and the surrounding areas?

20  A.  I'm sorry, did you say Exhibit C?

21  Q.  Yes.  So C, D, E, F, G, those five.

22  A.  C through G?

23  Q.  Yes, exactly.

24  A.  Yes.

25  Q.  I'm going to give you two more while we're at it.  Exhibits

1    J and K, marked for identification, Defense Exhibits J and K.

2        Same question, are these fair and accurate depictions of

3    the arrest site and surrounding area?

4    A.   J through K, yes.

5    Q.   Okay.  I would move to admit Exhibit C through G and J

6    through K.

7            THE COURT:  Any objection?

8            MR. MCDONALD:  No, Your Honor.

9            MR. DUDANI:  And I would ask that we publish Exhibit

10   C.

11           (Defendant's Exhibits C, D, E, F, G, J and K were

12            received in evidence.)

13   BY MR. DUDANI:

14   Q.   Okay.  There we go.  So we're now looking at Defense

15   Exhibit C.

16   A.   Yes.

17   Q.   The yellow pin marks the arrest site.

18   A.   Yes.

19   Q.   And we have Tijuana just south of the yellow line?

20   A.   Yes.

21   Q.   And we have the coast 2 or 300 yards to the west?

22   A.   Correct.

23   Q.   And to the south and a little bit east we're looking at

24   several residences?

25   A.   Yes.

ER-305

1  Q.  And those residences are literally up against the primary

2  fence?

3  A.  Correct.

4  Q.  The edge of their backyard is the primary fence?

5  A.  Yes.

6  Q.  What we're looking at to the southwest, so this is kind of

7  the bottom left corner of the photo is the bull ring?

8  A.  Correct.

9  Q.  That's the large arena for bullfighting in Tijuana.

10  A.  Yes.

11  Q.  Okay.  And we're seeing several other buildings south of

12  the arrest site?

13  A.  Yes.

14  Q.  Let me point you to Exhibit G.  In -- and let me draw your

15  attention to the bottom right.

16       In this photo we can see a white high rise.  To the left of

17  Defendant's Exhibit G, there's a white high rise labeled Park

18  Towers.

19       Picture aside, let me just ask you, is there a white high

20  rise just south of Yogurt Canyon in Tijuana?

21              MR. MCDONALD:  Objection, relevance, Your Honor.

22              THE WITNESS:  I don't -- I'm not familiar with that.

23              THE COURT:  Hold on, hold on.  Sustained.  I don't

24  know what the relevance is to something located in Tijuana.

25              MR. DUDANI:  Your Honor, the relevance will become

ER-306

1   clear, the relevance is the nature of the arrest site, its

2   visibility and the relationship that has to --

3            THE COURT:  I don't see it here.  You're talking -- I

4   see the dot where the arrest site is and then I see something

5   in Tijuana.

6            MR. DUDANI:  Very well, Your Honor, I can move on.

7            THE COURT:  Okay.

8   BY MR. DUDANI:

9   Q.  Let's move on to Exhibit J.

10      Okay.  So now this photo is taken from the perspective of

11  the border patrol road where you saw Mr. Cabrera.

12  A.  Yes.

13  Q.  In other words, if you were at that spot looking south,

14  that's what you would see?

15  A.  Yes.

16  Q.  And we're seeing the bull ring?

17  A.  Correct.

18  Q.  And we're seeing immediately in front of that a series of

19  apartment buildings?

20  A.  Yes.

21  Q.  With windows facing -- with several windows facing north?

22  A.  To me it looks -- it appears east.

23  Q.  Okay.  Now let's go to Defense Exhibit K.

24      We're in the same location, the arrest site looking south

25  in this photo.

ER-307

1   A.   Yes.

2   Q.   Where it's kind of the other side of Yogurt Canyon?

3   A.   Yes.

4   Q.   There are more apartment buildings.  This is -- sorry,

5   there are more apartment buildings?

6   A.   Yes.

7   Q.   And this is just south of the primary fence?

8   A.   Correct.

9   Q.   Okay.  So we talked about south of the arrest site.  Let's

10  talk about west of the arrest site.

11       Returning to Defense Exhibit C.  So you testified earlier

12  and we can see here that the fence extends into the ocean.

13  A.   Yes.

14  Q.   And the point is to prevent people from crossing at the

15  coast?

16  A.   Yes.

17  Q.   Another way border patrol prevents people from crossing at

18  the coast is surveillance?

19  A.   That's how we detect it, yes.

20  Q.   Fair enough.  It's important to detect people in that area?

21  A.   Yes.

22  Q.   Because it's the coast?

23  A.   Correct.

24  Q.   And border patrol does engage in surveillance in that area?

25  A.   Correct.  Yes.

```
 1   Q.  Okay.  Let me point you to Defense Exhibit S in that black
 2   binder, what's been marked for identification as such.
 3       Is that a fair and accurate depiction of the arrest site
 4   with the coast in view?
 5   A.  Yes, it is.
 6            MR. DUDANI:  Move to admit.
 7            THE COURT:  Any objection to S?
 8            MR. MCDONALD:  No, Your Honor.
 9            THE COURT:  It's received.
10       (Defendant's Exhibit S was received in evidence.)
11   BY MR. DUDANI:
12   Q.  So we're now looking at Defense Exhibit S and we're looking
13   at the road where you saw Mr. Cabrera.
14   A.  Yes.
15   Q.  In fact, in the bottom right area is the exact spot?
16   A.  Correct.
17   Q.  And we're seeing a border patrol vehicle on that road?
18   A.  Yes.
19   Q.  And we're seeing a border patrol vehicle just on the other
20   side of the fence next to the coast?
21   A.  Correct.
22   Q.  And that's an example of surveillance near the coast?
23   A.  Yes.
24   Q.  I'm going to now direct your attention to what's been
25   marked for identification as Defense Exhibits O, P and Q.
```

```
1        Are these fair and accurate depictions of the towers and
2    lamp posts in the arrest area?
3    A.  Yes, they are.
4            MR. MCDONALD:  Vague as to arrest area.
5            THE COURT:  Overruled.
6            MR. DUDANI:  Move to admit.
7            MR. MCDONALD:  Objection as to relevance, Your Honor.
8            THE COURT:  I'm sorry, what was your question,
9    Mr. Dudani?  I didn't hear that.
10            MR. DUDANI:  I moved to admit.
11            THE COURT:  Oh, yeah, overruled.  The exhibits are
12    admitted, O, P and Q.
13     (Defendant's Exhibits O, P, and Q were received in evidence.)
14    BY MR. DUDANI:
15    Q.  So turning to Defense Exhibit O, we were talking just now
16    about surveillance in the area near the coast.  So this is in
17    the few hundred yards between the arrest site and the coast?
18    A.  Yes.
19    Q.  And we're seeing several lamp posts?
20    A.  Yes.
21    Q.  We're seeing a tower?
22    A.  A tower, yes.
23    Q.  And does that tower have a camera on it?
24    A.  Yes, they do.
25    Q.  That's the camera that recorded the footage we saw?
```

ER-310

1    A.   Yes.

2    Q.   Okay.  This is another example of surveillance by the

3    coast?

4    A.   Correct.

5    Q.   Let's move on to Defense Exhibit P.  Now we are looking at

6    that road where you saw Mr. Cabrera.

7    A.   Yes.

8    Q.   This time we're looking east, inland east rather than west.

9    A.   Yes.

10   Q.   And we see the lamp posts continue?

11   A.   Yes.

12   Q.   There are objects on the lamp posts?

13   A.   Yes.

14   Q.   Are there any cameras or recording devices on those lamp

15   posts?

16   A.   I'm unaware of any.

17   Q.   Okay.  Turning to Defense Exhibit Q, and now we're seeing a

18   lamp post just at the arrest site and I say that -- let me back

19   up.

20        In the top left of this photo you see the brown portion of

21   the fence end?

22   A.   Yes.

23   Q.   The arrest site is where the brown portion ends and meets

24   the silver portion?

25   A.   Correct.

1   Q.   There's a lamp post like that right at that location?

2   A.   I believe so, yes.

3   Q.   Okay.  We've talked about south and west, now let's talk

4   about north of the arrest site.

5        Now in contrast to the south, the north area is undeveloped

6   area?

7   A.   Yes.

8   Q.   Okay.  And you testified that there is some brush just

9   north of the secondary fence?

10  A.   Yes.

11  Q.   And you testified that further north there is Imperial

12  Beach?

13  A.   Yes, quite a ways north.

14  Q.   Quite a ways north?

15  A.   Yeah.

16  Q.   Now in-between the brush and Imperial Beach there's

17  grassland?

18  A.   It's looks like a slough.  It's never been termed a

19  grassland.  It's like the Tijuana River Valley slough area and

20  it's very muddy, brushy, thick brush and just not a good place

21  to be.

22  Q.   Okay.  Thank you for clarifying.

23       Now, there's surveillance in that area?

24  A.   Yes.

25  Q.   Border patrol surveillance?

1  A.  Correct.

2  Q.  In fact, that's the area you were in in your border patrol

3  vehicle when you got the call in this case?

4  A.  Yes.

5  Q.  And there is ground sensors there?

6  A.  Yes.

7  Q.  There is agents operating scopes which are high-powered

8  cameras?

9  A.  Yes.  I believe so.

10  Q.  There are agents on ATVs in that area?

11  A.  On that particular day, I'm not sure.  I don't think there

12  was.

13  Q.  Not on that particular day.

14  A.  I see.

15  Q.  My question is in general.

16  A.  In general, yes.

17  Q.  Right.  And in general there's aerial -- aerial

18  surveillance of that area as well?

19  A.  Yes.

20  Q.  For example, there are often helicopters visible in that

21  area?

22  A.  Yes.

23  Q.  So in short there's a heavy border patrol surveillance

24  north of the secondary fence?

25  A.  Yes.

ER-313

1  Q.  And there's heavy border patrol surveillance just west of

2  the arrest site at the coast?

3  A.  Yes.

4  Q.  Okay.  Now let's talk about east.

5     Can I ask the government to pull up what's been admitted

6  Government Exhibit 3.

7     From the Yogurt Canyon area which includes the arrest

8  site --

9  A.  Yes.

10 Q.  -- the secondary fence continues east as far as the eye can

11 see?

12 A.  Correct.

13 Q.  In particular the brown portion?

14 A.  Yes.

15 Q.  The very tall brown portion?

16 A.  Correct.

17 Q.  And that's visible from the Tijuana side as well?

18 A.  Yes.

19 Q.  Because it's elevated?

20 A.  Right.

21 Q.  And it goes as far as the eye can see?

22 A.  Yes.

23 Q.  Now -- so let's talk about if you're closer to the fence,

24 from an onlooker's perspective from the south, there is no way

25 through that fence that's visible.

ER-314

1    I can make it more specific, for example, there's no door

2  in that fence that's visible?

3  A.   No, there's no door there.

4  Q.   There's no hole there?

5  A.   I'm sorry?

6  Q.   There's no hole in the fence?

7  A.   Oh, hole.

8  Q.   That's visible?

9  A.   No.

10 Q.   In short there's no way through -- no visible way through

11 from the perspective of an onlooker to the south?

12 A.   Yes.  Correct.

13 Q.   That's the point of the fence?

14 A.   Yes.

15 Q.   Okay.  Now let's go to what's been marked for

16 identification as Defense Exhibit F.

17    Is this a fair and accurate depiction of the slope leading

18 up to the arrest site?

19         THE COURT:  Did you understand the question,

20 Mr. Cisneros?  He's asking if it's a fair and accurate picture

21 of the slope leading up to the arrest site.

22         THE WITNESS:  On which exhibit, sir?  I'm sorry.

23         THE COURT:  F.  F.

24         THE WITNESS:  Yes, it is.

25         MR. DUDANI:  Move to admit.

```
 1            MR. MCDONALD:  No objection.
 2            THE COURT:   F is received.
 3        (Defendant's Exhibit F was received in evidence.)
 4  BY MR. DUDANI:
 5  Q.  This photograph captures Mr. Cabrera's view from the bottom
 6  of the slope?
 7  A.  Yes.
 8  Q.  And you testified earlier that there's a visibility problem
 9  for border patrol in that area inside the canyon?
10  A.  Yes.
11  Q.  There's no visibility problem for border patrol out of that
12  slope on the road?
13  A.  It would depend if it's actually being looked at, but
14  there's no hindrance to it.
15  Q.  Right.
16  A.  Yeah.
17  Q.  When you said visibility problem, you meant it can be
18  harder to detect?
19  A.  Yes.
20  Q.  Regarding --
21  A.  Right.
22  Q.  There's no problem like that on the road?
23  A.  Correct, yes.
24  Q.  The road is out in the open?
25  A.  Yes.
```

ER-316

1   Q.  Let me point you to what's been marked as Defense Exhibit E

2   and let me ask you if that's a fair and accurate depiction of

3   the U.S.-Mexico border at the west most point with some ports

4   of entry marked.

5   A.  Yes.

6           MR. DUDANI:  Move to admit.

7           MR. MCDONALD:  No objection.

8           THE COURT:  It's received.

9       (Defendant's Exhibit E was received in evidence.)

10  BY MR. DUDANI:

11  Q.  We're now looking at a more zoomed out photo.  There are

12  three ports of entry marked.  The west most one is the one in

13  Tijuana you were telling us about, the San Ysidro port of

14  entry?

15  A.  Yes.

16  Q.  Five miles east of the arrest site?

17  A.  Yeah.

18  Q.  Moving east, there's the Otay Mesa port of entry?

19  A.  Yes.

20  Q.  That's also just north of Tijuana?

21  A.  Correct.

22  Q.  It's a smaller port of entry than San Ysidro?

23  A.  Yes.

24  Q.  More just commercial?

25  A.  Mostly for commercial traffic.

ER-317

```
 1   Q.   Okay.  About 20 minute drive to the east?
 2   A.   Yes.
 3   Q.   And to the east of that we can see mountains?
 4   A.   Yes.
 5   Q.   Wilderness?
 6   A.   Yes.
 7   Q.   Undeveloped, nonurban stretch?
 8   A.   Correct.
 9   Q.   Going to the city of Tecate?
10   A.   Yes.
11   Q.   And then there's the Tecate port of entry there?
12   A.   Correct.
13   Q.   And to the east of that we see more wilderness?
14   A.   Yes.
15   Q.   Mountains?
16   A.   Yes.
17   Q.   Undeveloped nonurban area?
18   A.   Correct.
19   Q.   And I know you have experience from different stations
20   here, so I'm sure you're aware border patrol commonly
21   apprehends people to the east of the Tecate port of entry in
22   that wilderness?
23           MR. MCDONALD:  Objection, Your Honor, relevance.
24           THE COURT:  Not relevant.  Sustained.  Next question.
25   BY MR. DUDANI:
```

ER-318

```
 1   Q.   Agent Cisneros, you saw Mr. Cabrera in the morning?

 2   A.   Yes, I did.

 3   Q.   It was close to 7 a.m.?

 4   A.   Yes.

 5   Q.   The sun had risen by this point?

 6   A.   I believe so, yes.

 7   Q.   The sun had risen --

 8   A.   Yes.

 9   Q.   -- close to an hour before --

10   A.   Correct.

11   Q.   -- that day at 6:08 a.m.?

12   A.   Okay.  Yes.

13   Q.   But in general --

14   A.   Yes.

15   Q.   -- sunrise is about 6 a.m. that time of year?

16   A.   Yes.

17   Q.   And in that video you don't have a flashlight?

18   A.   No.

19   Q.   Headlights aren't on?

20   A.   Correct.

21   Q.   Because the sun is out?

22   A.   Yes.

23   Q.   If I can ask the government to pull up what's been admitted

24   as Government Exhibit 9, the video.  I'll ask you some

25   questions, if we can just -- we can just start at the start.
```

ER-319

1        So the video starts here?

2   A.  Yes.

3   Q.  That's because -- well, let me start here, there's no

4   footage from before this point?

5   A.  I don't know.

6   Q.  As far as you know?

7   A.  I don't think so.  As far as I know, yeah.

8   Q.  In general border patrol doesn't have surveillance on

9   what's happening in Mexico?

10  A.  No, I don't think so.

11  Q.  Because your job is to surveil what's happening in the

12  United States near the border?

13  A.  Correct.

14  Q.  So for example, in this case, it's unknown what happened on

15  the Mexico side?

16  A.  Correct.

17  Q.  It's unknown how Mr. Cabrera got over the primary fence?

18  A.  Yes, I believe so.

19  Q.  Well, I mean it's unknown was there a ladder on the Mexico

20  side that border patrol doesn't surveil, for example is

21  unknown?

22  A.  We don't know that.

23  Q.  Now in this video Mr. Cabrera is climbing up the slope.

24  A.  Yes.

25  Q.  That's the slope you were describing as brushy?

ER-320

1   A.   Brushy.

2   Q.   Now this video is going to keep playing, at no point in

3   this video is Mr. Cabrera concealing himself in that brush?

4   A.   No.

5   Q.   He's not stopping?

6   A.   No, he's not.

7   Q.   He's not hiding?

8   A.   No.

9   Q.   He's just proceeding straight up?

10  A.   Correct.

11  Q.   And he's using his hands and legs?

12  A.   Yes.

13  Q.   You testified it's slippery?

14  A.   It can be slippery.

15  Q.   It can be slippery?

16  A.   Yes.

17  Q.   It's certainly rocky?

18  A.   Yes.

19  Q.   It's about a 45 degree angle?

20  A.   Yes.

21  Q.   And for all these reasons it can be a difficult slope to go

22  up?

23  A.   Yes.

24  Q.   And he started this with the view that we saw the photo of

25  a moment ago?

1  A.  Correct.

2  Q.  Soon he's going to step over the guardrail?

3  A.  Yes.

4  Q.  This is a -- essentially this camera picks up on heat and

5  shows it in a lighter color?

6  A.  Yes.

7  Q.  So he's in the light color for that reason?

8  A.  Right.

9  Q.  And we can see now he's entering, he's stepping into a

10  lighter area?

11  A.  Yes.

12  Q.  And what he's about to do, step on to the road, the road

13  has more light on it?

14  A.  Yes.

15  Q.  If we can pause.  Okay.

16      Now, so this is the area where you testified that the

17  secondary fence goes as far as the eye can see to the east?

18  A.  Yes.

19  Q.  The ocean is 2 to 300 yards to the west?

20  A.  Yes.

21  Q.  There's heavy border patrol surveillance to the north?

22          THE COURT:  That's been asked and answered.  Next

23  question.

24  BY MR. DUDANI:

25  Q.  We can -- if you can please press play that would be

1    helpful.  Thank you.

2        Okay, so now he's made it to the road.  He's proceeding to

3    where he's going to sit.

4    A.  Yes.

5    Q.  And his movements right now aren't furtive?

6            MR. MCDONALD:  Objection, lacks foundation.

7            THE COURT:  Sustained.

8    BY MR. DUDANI:

9    Q.  Now Mr. Cabrera has sat down.  You testified he's sitting

10   with his back against the secondary fence.

11   A.  Yes.

12   Q.  Okay.  So at all times in the video his back is up

13   against -- is up against that fence?

14   A.  Yes, it appears so.

15   Q.  Yeah.  And when you saw him his back was up against that

16   fence?

17   A.  Yes.

18   Q.  And when he sits down -- I guess we missed it by a minute,

19   but when he sat down, the timestamp read 6:50?

20   A.  Correct.

21   Q.  Okay.  And when you arrived -- well, why don't we -- why

22   don't we fast forward, if you can, Mr. McDonald, to 6:56, 6:57,

23   around there.

24       Now, through all this time, we're going to skip ahead, but

25   through all this time he's staying in that spot?

ER-323

```
 1   A.   Yes.
 2   Q.   In the video that you've reviewed?
 3   A.   Yes.
 4   Q.   At no point is he looking for a spot -- let me rephrase
 5   that.
 6        At no point is he scaling the fence to the west or east
 7   looking for anything?
 8   A.   Do you mean scaling as in climbing?
 9   Q.   I mean walking west or east, looking.
10   A.   No, he stayed there.
11   Q.   Right.  And at no point is he scaling going up?
12   A.   Yes.
13   Q.   And when you arrested him you searched him?
14   A.   Yes.
15   Q.   And he didn't have a rope?
16   A.   No.
17   Q.   He didn't have a ladder?
18   A.   No.
19   Q.   He didn't have a makeshift ladder?
20   A.   No, he didn't.
21   Q.   So we're now at the point where you reach him at the
22   secondary fence.  At this point based on the time stamp it's
23   6:57 a.m.?
24   A.   Yes.
25   Q.   And you drove from the west, from the coast?
```

ER-324

1  A.  Yes.

2  Q.  So Mr. Cabrera's head was directly at you as you

3  approached.  Let me put it this way, you were facing each

4  other?

5  A.  I don't recall him facing me.  I recall him just more or

6  less looking south with his back against the fence, but I don't

7  recall him actually looking at me.

8  Q.  Fair enough.

9  A.  I mean, when you see the -- the person there --

10 Q.  Right.

11 A.  -- that's mainly what you're looking at.  What's he doing

12 with his hands.  But I can't recall exactly where he was

13 looking.

14 Q.  Fair enough.  But as you were approaching he made no

15 movements?

16 A.  No.

17 Q.  No attempt to run, for example?

18 A.  No, he didn't.

19 Q.  Okay.  Let's talk about what Mr. Cabrera was wearing that

20 day.  Let me -- thank you, Mr. McDonald with the video.

21     Now I'll point you to what's been marked as Defense Exhibit

22 X for identification.

23 A.  Yes.

24 Q.  Is that a fair and accurate depiction of Mr. Cabrera on the

25 date of arrest?

```
 1   A.  I believe so.  I don't recall his exact color of his shirt
 2   right now.
 3   Q.  Fair enough.  Do you recognize that photo as the Imperial
 4   Beach Border Patrol Station?
 5   A.  Yes, it is.
 6   Q.  Do you recognize -- do you see the date and timestamp on
 7   the top right?
 8   A.  Yes, I do.
 9   Q.  In your experience, does this appear to be border patrol
10   footage?
11   A.  Yes.
12   Q.  Does the date and timestamp match the arrest date -- does
13   the date stamp match the arrest date?
14   A.  Yes, it does.
15   Q.  And is the timestamp consistent with when Mr. Cabrera was
16   at that station?
17   A.  Yes.
18   Q.  Okay.  So this appears to be a photo depicting what
19   Mr. Cabrera was wearing on the date of arrest?
20   A.  Yes.
21            MR. DUDANI:  I'd move to admit.
22            MR. MCDONALD:  No objection.
23            THE COURT:  X is received.
24        (Defendant's Exhibit X was received in evidence.)
25            MR. DUDANI:  Tisha, could we publish Defense Exhibit
```

ER-326

1   X.

2          Mr. Cabrera was wearing an orange tee-shirt on the

3   date of arrest?

4   A.  Yes.

5   Q.  Okay.  When you saw Mr. Cabrera, you spoke with him?

6   A.  Yes, I did.

7   Q.  And he said he did not need medical attention?

8   A.  Correct.

9   Q.  And part of your job is to get someone medical attention if

10  they need it?

11  A.  If they request it, yes.

12  Q.  If they request it or if you perceive the need for it

13  yourself?

14  A.  Yes.

15          MR. MCDONALD:  Objection, relevance, Your Honor.

16          THE COURT:  Sustained.  It's not relevant.  He didn't

17  ask for medical attention.  Next question.

18  BY MR. DUDANI:

19  Q.  Agent Cisneros, you're trained in immigration law?

20  A.  Yes.

21  Q.  And you were telling us earlier about the daily

22  intelligence briefings that you received?

23  A.  Yes.

24  Q.  Okay.  Now, part of your job was to stay on top of those

25  briefings?

1    A.  Yes.

2    Q.  Which you did?

3    A.  Yes.

4    Q.  Those briefings can talk about various developments that

5    affect your work as line watch officer, correct?

6    A.  Yes.

7    Q.  So they could cover new smuggling patterns, correct?

8           MR. MCDONALD:  Objection, Your Honor, relevance.

9           THE COURT:  Sustained.

10   BY MR. DUDANI:

11   Q.  The intelligence briefings that you testified you received

12   daily include information about new migration patterns,

13   correct?

14          MR. MCDONALD:  Objection, relevance.

15          THE COURT:  No, that's overruled.  You may answer

16   that.

17          THE WITNESS:  Yes, they do.

18   BY MR. DUDANI:

19   Q.  Okay.  And you were working for border patrol and receiving

20   these trainings in November 2019 -- these briefings in November

21   2019?

22   A.  Yes.

23   Q.  You're aware that at that time in Tijuana there were a

24   large number of people, unusually large number of people from

25   Central America?

1           MR. MCDONALD:  Objection, lacks foundation.

2           THE COURT:  Do you know the answer to that?  Were you

3  aware or were you briefed on that?  Don't guess or speculate.

4  If you remember or you were briefed on it, you may answer.

5           THE WITNESS:  I couldn't exactly remember the morning

6  briefs on that particular day.  If they did cover that -- that

7  topic.  I know that other times they do -- have addressed that.

8           But on that morning brief, I don't recall.

9  BY MR. DUDANI:

10  Q.  Fair enough.  At some point you received briefings

11  informing you of unusually large numbers of Central Americans

12  in Tijuana?

13           MR. MCDONALD:  Objection, hearsay.

14           THE COURT:  No, overruled.

15           THE WITNESS:  I don't recall.

16  BY MR. DUDANI:

17  Q.  Have you ever received intelligence briefings informing you

18  of surges in migration?

19  A.  Yes.

20  Q.  Did that ever happen, for example, in 2018?

21           MR. MCDONALD:  Objection, relevance.

22           THE COURT:  Sustained.  Hold on, hold on.  The

23  objection is sustained.  Next question.

24  BY MR. DUDANI:

25  Q.  If you recall, did that ever happen in the year of 2019?

ER-329

```
1              MR. MCDONALD:  Objection, relevance.
2              THE COURT:  Sustained.  If you want to ask him about
3    November '19 around the time of this, Mr. Dudani, you may, but
4    we don't care about other times.  Go ahead.
5    BY MR. DUDANI:
6    Q.  Okay.  Agent Cisneros, you're trained in immigration law?
7    A.  Yes.
8    Q.  And you were briefed on important developments relating to
9    the border?
10   A.  Yes.
11   Q.  And you're aware that there was a government policy in
12   effect in 2019 regarding people remaining in Mexico, called the
13   Remain in Mexico program?
14   A.  I believe so, yes.
15             MR. MCDONALD:  Objection, lacks foundation.
16             THE COURT:  Overruled.  He says he's familiar with it.
17   Go ahead.
18   BY MR. DUDANI:
19   Q.  And I'm not going to ask you if you know the ins and outs
20   of the program, but you're aware that there was a policy in
21   effect in 2019 relating to people having to Remain in Mexico
22   after making certain immigration applications?
23   A.  Yes.
24   Q.  Yes, okay.  And you're aware that that policy covered, for
25   example, asylum applications?
```

ER-330

```
 1  A.   I believe so, yes.
 2  Q.   That's what you believe based on your recollection?
 3  A.   Yes.
 4  Q.   And you're aware that under that policy after making
 5  applications like that people were to Remain in Mexico?
 6  A.   Yes.
 7  Q.   That was the new thing introduced by the policy?
 8  A.   Yes.
 9  Q.   That was in effect in 2019?
10  A.   I believe so, yes.
11  Q.   And do you believe that was in effect in November 2019?
12  A.   Yes, I believe so.
13  Q.   And so under that policy, under that policy, people were
14  waiting in Tijuana who would otherwise not have had to Remain
15  in Mexico?
16           MR. MCDONALD:  Objection, lacks foundation, relevance.
17           THE WITNESS:  I don't know how to answer that.
18           THE COURT:  Do you know the answer to that?
19           THE WITNESS:  No, I don't know the answer to that.
20           THE COURT:  Sustained.
21  BY MR. DUDANI:
22  Q.   You're aware of a government policy called metering?
23  A.   No.
24  Q.   You're aware that people whose asylum claims are successful
25  are permitted to work in the United States?
```

ER-331

```
 1            MR. MCDONALD:  Objection, relevance.
 2            THE WITNESS:  I'm unaware of that.
 3            THE COURT:  The answer will stand.
 4            THE WITNESS:  No, I don't know that.
 5   BY MR. DUDANI:
 6   Q.  And you have been trained in the basics of asylum law?
 7   A.  Yes.
 8   Q.  And you're aware that people can apply for asylum from
 9   inside the country?
10   A.  Yes.
11   Q.  That includes from -- if they're in custody inside the
12   United States they can apply for asylum?
13   A.  Yes.
14   Q.  If they're abroad not in the United States they cannot
15   request that protection?
16   A.  I'm -- I don't know asylum procedures.
17   Q.  Fair enough.
18   A.  I just know when they're arrested they can ask for an
19   asylum, declare asylum and their case is handled appropriately
20   for an asylum case.
21   Q.  And they can do that from in custody?
22   A.  Yes.
23   Q.  Okay.  You spoke to Mr. Cabrera on the date of arrest?
24   A.  Yes.
25   Q.  And we talked about the series of immigration questions
```

ER-332

1  that you asked him?

2  A.  Yes.

3  Q.  But in the field you didn't ask Mr. Cabrera whether he had

4  a fear of return?

5  A.  In the field, no.

6  Q.  It wasn't your job to do so?

7  A.  No.

8  Q.  So you never asked him that question?

9  A.  No, I didn't.

10        MR. DUDANI:  No further questions.

11        THE COURT:  Anything else?

12        MR. MCDONALD:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. MCDONALD:

15  Q.  Sir, you did ask Mr. Cabrera the reason for him coming to

16  the United States?

17  A.  Oh, yes, I did ask him the reason.

18  Q.  And what did he say?

19  A.  He said he came here to work.

20  Q.  Counsel has asked you about your memory of this event from

21  November of 2019, was Mr. Cabrera one of your last arrests?

22  A.  Yes, it was.

23  Q.  Before you retired?

24  A.  Yes, it was.  Or I went on detail.

25  Q.  Okay.

1  A.  And worked for the fence crew.

2  Q.  When did you go on detail?

3  A.  I believe it was September 20 -- September of 2020.

4  Q.  Okay.  So Mr. Cabrera is not one of the thousands of

5  arrests that you've done in the course of your career, it's one

6  of the last?

7  A.  One of the last, yes.

8  Q.  And this event has it been in your mind much closer to

9  November of 2019?

10  A.  Yes.

11  Q.  Okay.  With regard to asylum, I believe your testimony was

12  that someone inside the United States not in custody can apply

13  for asylum?

14        MR. DUDANI:  Objection, misstating the testimony.

15        THE COURT:  Yeah, sustained.

16        THE WITNESS:  I'm sorry.

17  BY MR. MCDONALD:

18  Q.  Is that your understanding, sir?

19  A.  I'm sorry, can you repeat the question.

20  Q.  That someone inside the United States can apply for asylum

21  without being in custody?

22        THE COURT:  Do you know the answer to that,

23  Mr. Cisneros, from training or experience?

24        THE WITNESS:  I know that they can apply any time for

25  asylum.

ER-334

```
 1            MR. MCDONALD:  Okay.  I have no further questions,
 2   Your Honor.
 3            THE COURT:  Thank you.  You may stand down.
 4            Next witness.
 5            MR. MCDONALD:  The United States calls Leah Hogue.
 6            THE COURT:  Ms. Hogue, if you'll stop and raise your
 7   right hand.
 8              LEAH HOGUE, GOVERNMENT'S WITNESS, SWORN
 9            THE COURT:  Have a seat.  Take your mask off.  Speak
10   directly into the mike, state and spell your name, your full
11   name, please.
12            THE WITNESS:  Leah, L-E-A-H, Hogue, H-O-G-U-E.
13                        DIRECT EXAMINATION
14   BY MS. MUSKAT:
15   Q.  Good afternoon, Ms. Hogue.
16   A.  Hi.
17   Q.  What do you do for a living?
18   A.  I'm a latent print examiner for the San Diego sheriff's
19   crime laboratory.
20   Q.  What is a latent print examiner?
21   A.  A latent print examiner basically analyzes friction ridge
22   detail.  In a nutshell, just fingerprints, palm prints and feet
23   impressions.
24   Q.  Did you have -- did you have experience examining
25   fingerprints prior to your current position?
```

ER-335

1   A.   Yes.

2   Q.   About how many years total experience do you have examining

3   fingerprints?

4   A.   I've been working for the San Diego sheriff's crime lab for

5   20 years as a latent print examiner.

6        Prior to that, I worked for Pomona Police Department as a

7   crime scene technician and, along with that job, I also

8   analyzed fingerprints in that capacity as well.

9   Q.   So about how many years total experience examining

10  fingerprints do you have with all that combined?

11  A.   Not including training, 22 years on the job.

12  Q.   Have you received any special education or training in

13  fingerprint analysis and comparison?

14  A.   Yes, I have my degree from San Diego State University in

15  criminal justice.  I also have an evidence technology degree

16  from Grossmont College.  And then just by working on the job

17  for the 22 years, I've had about 900 hours of training just by

18  traveling to different states and in-house training.

19  Q.   Do you do any continuing education?

20  A.   Yes, I do.

21  Q.   And what does that entail?

22  A.   Well, currently, right now, we've been doing webinars due

23  to COVID.  But we have conferences and different classes in

24  regards to friction ridge detail and just different things

25  pertaining to fingerprint evidence.

ER-336

```
 1    look at them.  They'll be there right where you left them
 2    tomorrow.
 3              THE CLERK:  And the lunch orders, please.
 4              THE COURT:  Oh yeah, did you get your lunch orders?
 5    You need not be unanimous on those.  You can have whatever you
 6    want that's on the menu.
 7         (At 4:25 p.m., the jury was excused, and the following
 8    proceedings were held:)
 9              THE COURT:  Please have a seat.  Jurors are not
10    present.  Counsel and the defendant are present.
11              The Court has before it a Rule 29 motion challenging
12    the sufficiency of the evidence.
13              In ruling on this motion, the Court must ask could a
14    reasonable juror looking at the evidence in the light most
15    favorable to the government -- any reasonable trier of fact,
16    find for the government.
17              I'm not to assess credibility and, as I said, I'm to
18    look at everything in light most favorable to the government.
19              The defense has conceded, mentions at least to me
20    outside the presence of the jury and in opening statement that
21    the only contested issue here is the defendant's intent and the
22    Court finds here that the government has proved that the
23    defendant entered the United States.  He entered without
24    permission.  I find the evidence supports that he was an alien
25    at the time.
```

ER-337

1          The salient question here is what was his intention.

2     Can the government prove beyond a reasonable doubt that he

3     entered with the specific intent to go at large in the United

4     States, not be caught or alternatively turn himself over and go

5     into custody?

6          That is a consummate jury question here.  There's

7     evidence that points both ways, but I'm, as I said, required to

8     look at the evidence in light most favorable to the government.

9          Here, the early morning entry by the defendant, the

10    fact that he sat in a recessed area, kind of back away,

11    supports an inference that his intention was to maybe come into

12    the United States.

13         Likewise, the evidence of his statements at the time

14    indicates that he told Officer Cisneros, retired Border Patrol

15    Agent Cisneros, that he had come in to work.

16         He mentioned nothing, according to the testimony,

17    about amnesty or applying for amnesty.  So the Court finds that

18    looking at that evidence in light most favorable to the

19    government, a reasonable trier of fact could find him guilty of

20    both counts, could find that he had the mens rea required in

21    both instances.  The Rule 29 motion is denied.

22         MR. DAVIS:  Your Honor, just to complete my record.  I

23    did make the motion as to all elements.  I just want to make

24    sure that was clear.  I know the Court addressed all elements.

25         THE COURT:  Yes, yes, it's clear.  Have I missed

ER-338

1    anything in the Rule 29?

2          MR. DAVIS:  No, just the Court indicated how we

3    referred outside of court that --

4          THE COURT:  And I think in opening statement, too,

5    right?  Didn't Mr. Dudani say in opening statement that it was

6    going to come down to the contest on a single issue whether the

7    defendant intended to go at large?

8          MR. DAVIS:  Yes, he did, but just --

9          THE COURT:  I know that's not evidence, but I'm --

10         MR. DAVIS:  Right.  But formally, I've raised the

11   motion as to all evidence.  I understand the Court's ruling.  I

12   won't argue it further.  Thank you.

13         THE COURT:  If you'd like a few minutes, I know you

14   were just handed these.  But I have some draft instructions if

15   you'd like five minutes or so.  Most of them are routine Ninth

16   Circuit instructions.

17         I know you want to look at the ones on the two crimes

18   and the elements of those crimes and any followup.

19         If you need time, I'll give it to you.  If you're

20   ready to go, we can go now.

21         MR. DAVIS:  I think I'm ready to go, Your Honor.

22         MR. MCDONALD:  We're ready to go, Your Honor.

23         THE COURT:  So I'll go through these and then just

24   sound off and let me know whether you have any objections.

25         The first one is just the preliminary instruction

ER-339

1    telling them that they have to follow all the instructions.

2            Next, the indictment is not evidence.  The change here

3    is that I took out "until."  You see it just says "unless."

4            MR. DAVIS:  Appreciate that.

5            THE COURT:  Okay.  I can leave the next instruction

6    which has to do with the defendant being on trial only for the

7    offenses or take it out.  It's up to you, Mr. Davis.  If you

8    want it, I'll give it.

9            MR. DAVIS:  I think we'd ask to take it out, Your

10   Honor.  I don't think there's any conduct that the jury would

11   likely confuse it with and this sort of might indicate to them

12   that there might be such conduct.

13           THE COURT:  Okay.

14           MR. DAVIS:  So we'd ask not to give it.

15           THE COURT:  I'll remove that then.

16           The Court will give the instruction that the defendant

17   hasn't testified.  I'll give a reprise of the next two which is

18   what is evidence and what's not.

19           The next instruction is the standard one on the

20   defendant making statements, whether he made them and so on.

21           The next one has to do with Ms. Hogue and the opinion

22   testimony offered.

23           MR. DAVIS:  Your Honor, I just ask that this

24   instruction identify Ms. Hogue as the only witness who

25   testified as to her opinion.

1      MR. MCDONALD:  We agree with that, Your Honor.

2      THE COURT:  Okay.  I will change the first line.  You

3  have heard testimony from a witness, Ms. Hogue -- I'll put that

4  in -- who testified to opinions.

5      Is that agreeable?

6      MR. DAVIS:  Yes, Your Honor.

7      THE COURT:  Okay.  So I'll make that change and we'll

8  get you a copy of that changed instruction.

9      Again, I'll -- we've got to indent the one on the

10  credibility instruction, so we'll fix that but, again, I'll

11  reprise this credibility instruction.  I've given it to them

12  already.  This is a little more elaborate.

13      I'll give them the Ninth Circuit pattern instruction

14  on reasonable doubt.  That brings us to the substantive

15  instructions.  Both of these I think have been updated to

16  indicate the latest pattern instruction and requirements of the

17  Ninth Circuit.

18      In particular, in attempt cases, that it's not so much

19  a question of physical being physically under surveillance.

20  It's the mental state and the Court is directed to concentrate

21  on that.  I know that well, at least I think I do, because, in

22  United States versus Castillo Mendez at 868 F.3d. 830, the

23  Ninth Circuit spoke to this exact situation, said the Court

24  should not try to instruct on the physical part of an attempt

25  case.  Only if the jury asks am I to give some instruction

ER-341

1    about what it means to be under official restraint.

2            Instead, the focus should be on the mental element

3    which is the defendant must have the specific intent to go at

4    large.

5            I think that's covered by element two.

6            MR. DAVIS:  The only additional sentence that I'd

7    raised, Your Honor, is that we'd ask the Court to -- in our

8    proposed instruction, we'd ask the Court to instruct the jury

9    that a person is not free from official restraint when he's in

10   an area that's subject to constant government surveillance.

11           I understand this is an attempt case but I think that

12   it's important.

13           You know, the video showed Mr. Cabrera entering an

14   area of constant government surveillance.  And so our position

15   is that the jury could find him not guilty if you believed that

16   he intended to enter into that area.  And that --

17           THE COURT:  See the problem, Mr. Davis, I'm having

18   with that is that's what I tried to do in Castillo Mendez and

19   the Court steered me away from that and let me read you what

20   they said, page 840.

21           They said, "Should the jury ask for a definition of

22   official restraint," first of all it said "the Court should

23   instruct on the specific intent to enter free from official

24   restraint."

25           But then they went on to say, "Should the jury ask for

1    definition of official restraint, the district court should
2    remind the jury that official restraint is relevant only as
3    part of the defendant's requisite mens rea, and the answer with
4    the definition drawn from attempted illegal reentry cases, such
5    as, you must find the defendant had the specific intent to
6    enter free from official restraint, which means intent to enter
7    without being detected, apprehended or prevented from going at
8    large within the United States and mixing with the population.
9          So I'm hesitant to put into the instruction some --
10   something that diverts them and says, well, it really matters
11   what area he's in.  That's the problem.
12         I did that in this Castillo Mendoza case and the Ninth
13   Circuit forgave me because they said this combination of cases
14   and the statute itself was confusing.  I still got reversed.
15         But now I'm admonished to stray away from that unless
16   they ask for official restraint and, even at that point, I'm
17   directed to go back to them and tell them, look, this really
18   has to do with mens rea.  It's not a physical location type
19   thing.
20         I'm hesitant to make the change you're asking me to
21   do.  It seems contrary to this case.
22         MR. DAVIS:  I understand, Your Honor.  My memory of
23   Castillo Mendez was that the Ninth Circuit believed that the
24   Court had instructed on official restraint sort of for a "found
25   in" case.  But the question is, are they actually under

```
1   official restraint versus what their intent to be.

2           THE COURT:  Right.  Right.

3           MR. DAVIS:  The line that I've proposed here, you

4   know, obviously the evidence in this case is that Mr. Cabrera

5   came over the fence into -- let me rephrase this.

6           I think the fear is that the jury could say, well, he

7   obviously intended to enter into this area where the road was.

8           THE COURT:  Right.

9           MR. DAVIS:  And our point is that, if he's intending

10  to enter a place that's under constant government surveillance,

11  then he's not intending to be in a place where he's free from

12  official restraint if that makes sense.

13          MR. MCDONALD:  Your Honor, Castillo Mendez speaks to

14  this exact scenario warning against injecting the "found in"

15  elements.  It's confusing.  If we add that element, it confuses

16  the jury thinking that somehow the official restraint doctrine

17  is wrapped up in --

18          THE COURT:  Where the person is and whether he's under

19  surveillance.

20          MR. MCDONALD:  Exactly.

21          THE COURT:  I agree.  I'll note your objection,

22  Mr. Davis, to the noninclusion of that.  I saw it's the last

23  sentence in your proposed instruction.

24          Other than that objection, are you satisfied with the

25  two elemental instructions.  Both contain the same language as
```

ER-344

1   far as the mens rea.

2           MR. DAVIS:  I'm satisfied with the 1325 and I'm just

3   reviewing the 1326 to make sure.

4           Yes, Your Honor, maintaining the objection, but other

5   than that, no other objections.

6           THE COURT:  So the Court notes as to both

7   instructions, the defense is asking me to give the last line

8   that they've proposed, which, as I pointed out, I think tends

9   to focus on the physical location rather than the mens rea.

10          For the reasons I've stated from Castillo Mendez, the

11  Court declines to do that.

12          The next and last is a separate crime as charged, I

13  assume you want that, right, that they should consider it

14  separately?

15          MR. DAVIS:  Yes, Your Honor, thank you.

16          MR. MCDONALD:  Your Honor, we have some -- we would

17  request that some additional language be included in the

18  instructions for the specific intent --

19          THE COURT:  Okay.

20          MR. MCDONALD:  -- element.

21          THE COURT:  Back to both instructions then?

22          MR. MCDONALD:  Yes.

23          THE COURT:  Which additional language?

24          MR. MCDONALD:  So we included this in our proposed

25  instructions for Your Honor and it is that -- and it is

ER-345

1   directly from Ninth Circuit case law, it's directly from the

2   Argueta Rosales case, and it is that the government does not

3   need to prove that entry free from official restraint was the

4   defendant's sole intent.  Rather, the United States must prove

5   only that the defendant had a specific intent to enter the

6   United States free from official restraint, not that that was

7   his only purpose.

8          That's directly from Argueta Rosales.  It's about the

9   only good case law in the Ninth Circuit on official restraint

10  and it directly engages with the facts of this case, which is

11  the jury needs to know that it's law that he's only not guilty

12  if his sole intent was to go into custody.

13         If he was okay, for instance, with possibly getting

14  through or possibly getting caught, he's guilty.  That element

15  is satisfied.  This is directly from Argueta Rosales.  I have a

16  copy of the case.

17         THE COURT:  If you'll hand it up for just a second,

18  please.

19         Do you have a copy of this too, Mr. Davis?

20         MR. DAVIS:  I don't have a copy of it, Your Honor.

21  I'm familiar with it.

22         MR. MCDONALD:  I've handed off a copy.

23         And this appears on page 1157 of this opinion, which

24  is page six of the Westlaw printout, Your Honor, on the left --

25  the left column, towards the bottom of that left column.

1      THE COURT:  So which line do you want me to use?  The
2  one that says the government must prove only that the defendant
3  had a specific intent to enter the United States free from
4  official restraint, not that this was his only purpose?

5      MR. MCDONALD:  What I would propose is starting midway
6  through the sentence before that, "the government or the United
7  States need not prove that entry free from official restraint
8  was the defendant's sole intent.  The government must prove
9  only that the defendant had a specific intent to enter the
10  United States free from official restraint, not that this was
11  his only purpose."

12      THE COURT:  Mr. Davis?

13      MR. DAVIS:  Your Honor, first of all, Your Honor,
14  Argueta came out in 2016.  The last time that the Ninth Circuit
15  model instruction on official restraint was updated was in
16  2019, several years later.

17      So the Ninth Circuit has had lots of opportunities to
18  update its model instruction and hasn't felt the need to do so.
19  So I don't think the Court should amend it when the Ninth
20  Circuit hasn't done so.

21      THE COURT:  Isn't this -- I mean -- I don't know if
22  it's really necessary here.  Do you, Mr. McDonald?  Because it
23  seems like a binary choice.  I mean, I understand the evidence
24  shows that this fellow, Mr. Cabrera, had applied for asylum
25  before.  It had been denied.

ER-347

1          I think the defense is going to argue, look, after he

2  got to the fence, he just sat there and was submissive and so,

3  you know, you can infer from that that really all he wanted to

4  do was get back to the United States and you heard testimony

5  that a person can reapply for asylum.

6          I mean, I think that those are fair inferences for

7  them to argue.  They can't stand in the shoes of Mr. Cabrera

8  and tell him what he was thinking.  Again, it's a fine line.

9          But it's either that or he was coming here to work and

10  he picked that little crooked spot in the fence because he was

11  hiding and waiting to get over.

12          Maybe he was fatigued from climbing up that hill.  I

13  don't know what the reasons were that there was a delay but it

14  seems like a binary choice here.

15          You're not going to say, well, he was coming to work

16  and to reapply for asylum, right?  You're not going to argue

17  that.

18          MR. MCDONALD:  Your Honor, that is exactly what

19  these -- this case law stands for, which is that if the

20  defendant had multiple intent, so, for instance, let's say he

21  crossed with the intent to go free, but then he changed his

22  mind after he came across, he changed his mind and said I'll

23  just go into custody, that would satisfy this element, because

24  he had the specific intent to enter free from official

25  restraint.

ER-348

1        He made a substantial step and then maybe he changed
2   his mind afterwards.
3        THE COURT:  Is that what you're going to say?  I mean,
4   is that what you think happened?  Or do you think he was coming
5   across to work?
6        MR. MCDONALD:  No, I think he certainly was coming
7   across to work, but the argument, the defense is going to, you
8   know, raise doubt as to whether he was coming to seek asylum.
9   The argument that I intend to make is that he was coming for
10  the purpose of being free from official restraint, period.
11       But it's even easier than that because the law only
12  requires that a purpose of his be to enter free from official
13  restraint.
14       So, for instance, if he had one purpose of trying to
15  come in for work and another was -- you know, he was okay with
16  going into custody.  If he has those dual purposes, Your Honor,
17  this element is satisfied based on this clear Ninth Circuit
18  law.  But I can't argue the law unless it's instructed to the
19  jury.
20       This -- and this case is very clear, there's also a
21  string cite there, Lombera-Valdovinos where it says noting the
22  defendant crossed the border with the intent only to be
23  imprisoned.  That's what negates guilt is if his only intent is
24  to go into custody.
25       If there's dual intent, then he's guilty of that

ER-349

1  element.

2  THE COURT:  Mr. Davis, you point out that the

3  instruction, notwithstanding the age of this case, which is

4  now, what, four years old, yeah, almost five years old,

5  notwithstanding the age of the case, I'm unaware this has been

6  overruled, right?

7  That principle appears to be an abiding principle that

8  string cite cases that go back to 612 -- 429 F.3d.  So it looks

9  like it's a legal principle that has been cited and withstood

10  the test of time so far.

11  MR. DAVIS:  I'm not aware of its being overruled, Your

12  Honor, but I agree with the Court and this is what I argued in

13  our briefing was that the proposition is binary.  He either had

14  the intent to enter free from official restraint or he didn't,

15  right?

16  So when he crosses the border, he intended with the

17  intent to enter -- I'm sorry, if he crosses the border --

18  THE COURT:  Right.

19  MR. DAVIS:  -- with intent to enter free from official

20  restraint --

21  THE COURT:  Right.

22  MR. DAVIS:  -- and then changes his mind and says I

23  want to go into custody, then he's guilty, because he entered,

24  he --

25  THE COURT:  So Mr. McDonald, what's wrong with that?

1    Why isn't it a binary proposition?  There's this principle in

2    the law that there has to be a unity between act and intent so

3    I think Mr. Davis is correct to say that the intent has to be

4    formed at the time of the crossing.

5           It can't be that he crossed and then changed his mind

6    and that somehow absolves you.  You have to show that the time

7    he crossed the first fence, his intention was to go at large

8    within the United States.  That's the element here.

9           Not that -- not that he crossed and then changed his

10   mind when he got in the midway point.

11          MR. MCDONALD:  Well, that's actually exactly

12   what -- that's actually exactly what the case law stands for,

13   Your Honor.  Not that it is his only intent to be free from

14   official restraint.  That flips it.

15          The requirement directly here from Argueta Rosales is

16   that the defendant need not prove that -- that the government

17   need not prove that entry free from official restraint was the

18   defendant's sole intent.

19          THE COURT:  We're begging the question, though.  The

20   question is:  At what point does the intent have to

21   crystallize, and I think it has to crystallize at the point

22   that he enters.

23          There has to be a union of act and intent at that

24   point seems to me.  So when he crosses the first fence and

25   comes into the United States, you have to be able to prove

ER-351

1    beyond a reasonable doubt that his intention was to go at

2    large, not to turn himself in.

3          So a concentration on what may have happened after he

4    got in seems -- seems to me to be beside the point.  I mean, if

5    he changes his mind after he's crossed, he's already entered,

6    physically he's entered.

7          MR. DAVIS:  Right.  It's like if I go to rob a bank

8    with the intent and I do the substantial step but then I see

9    the cop and I run away, as long as I've completed the

10   substantial step with the intent --

11         THE COURT:  I think that's right.  If you want to

12   concentrate at the point of entry, you know, and have me give

13   language similar to this by saying, when he first crossed over,

14   but I think it's wrong to say, well, he may have changed his

15   mind once he got over the first fence because he's in the

16   United States at that point.

17         The entry has occurred and if his intent, you know,

18   wasn't to go at large at that point, I don't think it does it

19   to say, well, he later formed the intent to go at large or he

20   later ascribed, you know, some other reason.

21         MR. MCDONALD:  Well, Your Honor, on Argueta Rosales,

22   it actually answers this exact question.

23         THE COURT:  All right.

24         MR. MCDONALD:  On the right hand column on that same

25   page we were on, page six, there's further analysis of this.

ER-352

1    At the end of that paragraph, it says exactly what may apply

2    here similarly if Argueta, "actually intended to sneak into the

3    country, and changed his plans only when he was spotted by the

4    border patrol, he again would be guilty."

5           MR. DAVIS:  And I said, Your Honor, I think that is a

6    correct statement of law, obviously, because the Ninth Circuit

7    said it, but I think that correctly identifies the union of

8    intent and action that the Court has described.

9           And I think the instruction, Your Honor, is correct

10   and has not been modified and if the government wants to say

11   that -- if they want to argue that that's what Mr. Cabrera did

12   and, therefore, he's still guilty, we won't object to the legal

13   point.

14          We'd say, yes, if he entered with his intent formed

15   and committed this actus reus at that time, then he would be

16   guilty and our contention, obviously, is that's -- you know,

17   that they can infer that that's not what he did, that he was

18   doing something else instead.

19          So, I think that the only question is when he

20   committed the action and substantial step, did he or did he not

21   have this intent to enter to go at large.

22          MR. MCDONALD:  Did he have an intent, an intent.

23          MR. DAVIS:  Yes, had, I think the intent does in this

24   not mean sole, it just means, it's a common way of describing

25   it, you had the intent to do something.

ER-353

1    MR. MCDONALD:  But, Your Honor, again, this case makes

2  that distinction and it's a legal distinction and that's why

3  the United States needs it to be in the instructions to the

4  jury that -- that the United States does not need to prove that

5  entry free from official restraint was the sole intent and then

6  also that final paragraph that if someone intends to sneak in

7  and then when they see that border patrol is coming up on them

8  and they think I'll just go into custody now.

9    THE COURT:  No, no, I think we're saying the same

10  thing.  We're concentrating on the point in time that he

11  entered and the burden of proof on the government is to prove

12  at that point in time, was his intent to go at large within the

13  United States.  Even if he had an alternative plan, you have to

14  establish that that was his intent at the point he crossed.

15    How about this, if I add to the second to last

16  sentence in the second paragraph this, starting with capital T,

17  and this would be the third sentence:  "The government need not

18  prove that entry free from official restraint was the

19  defendant's sole intent," and I won't italicize sole.

20    "However, the government must prove that at the point

21  the defendant first entered the United States, he had a

22  specific intent to enter free from official restraint, not that

23  that was his only purpose."

24    MR. DAVIS:  I maintain my objection to that, Your

25  Honor.  And part of the reason is that Mr. McDonald has been

1  repeatedly confusing the question about whether someone has the
2  intent when they enter versus after they enter.

3         THE COURT:  Doesn't this -- doesn't this instruction
4  that I've just proposed clarify that by saying --

5         MR. DAVIS:  No, I think the two sentences together are
6  confusing.  Right?  The only question is, did he have the
7  intent or not when he tried to enter.  It's binary.

8         So this question about other intents, you can't
9  simultaneously have the intent to go free but also have the
10  intent not to go free.

11        THE COURT:  Wait a minute.  Sure you can.  I mean,
12  he's hypothesized a situation where a guy says, okay, I'm going
13  to try to get in, but if something happens and I get caught,
14  then I'm going to give myself up and tell them I'm giving
15  myself up.

16        MR. DAVIS:  Right.  But you don't have the intent to
17  get caught.  You have the intent to not get caught and then if
18  you get caught you're okay with it.  And those are different
19  things.  That's not the intent to not get caught.

20        What I'm concerned about, Your Honor, is that
21  Mr. McDonald is going to conflate them again as he's been doing
22  in this argument in front of the jury and the jury is going to
23  be confused about it.

24        MR. MCDONALD:  Your Honor, I haven't been conflating
25  anything and I would just say that if this isn't a thing, these

ER-355

1    dual intents, then why would the Ninth Circuit in a published

2    opinion say that it is -- that it is, in fact, a thing, which

3    is that there's this -- that there's the possibility of dual

4    intents.

5           MR. DAVIS:  Your Honor, I think it goes to, for

6    example, the sufficiency of the evidence challenge, which

7    appears to be what they were ruling on.  The Ninth Circuit

8    instruction remains unchanged.

9           So how the Ninth Circuit wants district courts to

10   instruct juries on this issue has not changed at all.  If the

11   Ninth Circuit is going to review this case for sufficiency of

12   the evidence and I argue on appeal, it was insufficient because

13   they didn't prove it was his sole intent, that's how they're

14   going to rule.  They're going to follow Argueta.

15          But in terms of how the Ninth Circuit wants courts to

16   instruct juries, they haven't changed it, and I think that the

17   instruction that the Court has proffered -- the original

18   instruction without the added elements, is sufficient.

19          THE COURT:  If I were in the prosecutor's shoes, I

20   wouldn't want to get mouse trapped by saying, well, okay, I'll

21   give up on that only to have you say, oh, well, look, you know,

22   when he came over, you know, maybe he had that, but he had

23   obviously changed his mind.

24          Then I understand why he would want this in here.  If

25   you're going to proffer to me that your argument is going to be

ER-356

1    at the point he crossed the fence, the first fence, his purpose

2    was to give himself up and that's the only argument you're

3    going to make, maybe I'm swayed that this is unnecessary.

4          MR. DAVIS:  That's going to be our argument.  We're

5    going to argue it inferentially obviously because we don't have

6    direct evidence.  So we're going to argue that inference.

7    We're not going to argue that he had other intents or that the

8    government needs to prove other intents.

9          We're going to say -- need to say that they can infer

10   that he didn't have that intent, the government needs to prove

11   that he did have that intent.

12         MR. MCDONALD:  Your Honor, this is the most important

13   instruction in this case.

14         THE COURT:  Well, you'd think if that was the case,

15   Mr. McDonald, that the Ninth Circuit instructions committee

16   would have changed it between now and five years ago when

17   Argueta first said this.

18         It obviously doesn't come up that much, you know,

19   there's yearly revisions in those instructions and there's been

20   none here, right?

21         MR. MCDONALD:  Well, I think the issue, number one, is

22   that as Your Honor knows, these instructions based on a

23   case-by-case analysis of the particular facts, the importance

24   to tailor the instructions to the particular case that's at

25   hand, that's perfectly appropriate and common in all cases.

ER-357

1          And so the model instruction is just that it's a

2   model.  But the Court's instruction should be tailored to

3   engage with the actual facts of the case and so -- and in

4   official restraint cases, sometimes no definition of official

5   restraint is even given at all where it's not an issue.

6          In this case, we actually -- I think we are differing

7   already from the model instruction, the second sentence, a

8   person has the intent to enter the United States free from

9   official restraint only if he has the intent to enter, et

10  cetera.  That's not in the model instruction.

11         THE COURT:  Well, you're right.  That comes from

12  Castillo Mendez.  Okay.  Here's what I'm going to do.  Over the

13  defendant's objection, I'm going to add a third and fourth

14  sentence and I'll give you a copy of this so you can look at it

15  and -- look at it in context.

16         The sentence will read as follows, this will follow

17  the mixing with the population last sentence in the current

18  version.  "The government need not prove that entry free from

19  official restraint was the defendant's sole intent," no

20  italics.  "However, the government must prove," strike the word

21  only, "that at the point the defendant first entered the United

22  States, he had a specific intent to enter free from official

23  restraint, not that this was his only purpose."

24         So I will incorporate those two sentences and we'll

25  give you a copy of that first thing tomorrow morning.

# ER-358

```
1        And I note that the defendant objects to that, but in

2   the end, I don't think it's going to make a difference and I

3   agree with the government that I did modify the second

4   paragraph to capture this language.

5        I mean, the other problem is that this language that

6   we know to be the law of the case hasn't been picked up either

7   about concentrating on the mens rea rather than the physical

8   location where the defendant is apprehended.

9        MR. DAVIS:  Right, Your Honor, but that's because

10  Castillo Mendez is a case about jury instructions and Argueta

11  is about sufficiency of the evidence.

12       THE COURT:  I have your position on it.  It still

13  states what the black letter law is.  They have a concern about

14  it.  Frankly, I don't think it's going to come up.  I mean, I

15  honestly don't think it's going to be implicated if you do what

16  you say which is to say, look, his whole purpose from the

17  get-go was to come in to turn himself in and they have a

18  reasonable doubt about that, he's acquitted.

19       So whether it was his sole or an ancillary purpose,

20  if, you know, if that was his intent and they believe that,

21  then he'll be acquitted.

22       Okay.  So I'll make that change.  It'll be made to

23  both instructions to that element in both instructions.

24       MR. MCDONALD:  Your Honor, I see a stray quotation

25  mark.
```

ER-359

1          THE COURT:  Sure, tell me where.

2          MR. MCDONALD:  Yeah, 1325 elements, the second page,

3   the last sentence, a place other than as designated refers to,

4   and then I think we can just take out that quotation mark, any

5   place other than immigration facilities at designated ports of

6   entry."

7          THE COURT:  Okay.  All right.

8          MR. DAVIS:  Your Honor, I'm not going to reargue it

9   because I know the Court has ruled on it, but my concern is

10  that the government is going to argue in closing this confusion

11  between having the intent and being okay with being caught.

12  And so I'm going to object if the government does that.

13         THE COURT:  I'm sorry, I'm not following it.  You're

14  worried that they're going to say what?

15         MR. DAVIS:  The government is continually confusing

16  whether someone has the intent to enter free from specific --

17  excuse me, has a specific intent to enter free from official

18  restraint with after they come in being okay with being caught.

19  That's what Mr. McDonald is continually saying is that those

20  are really simultaneous intents where they're not in fact

21  simultaneous intents.  If the government argues that to the

22  jury, I'm going to object strenuously.

23         THE COURT:  And I'll sustain the objection.  I'm not

24  going to permit that.

25         The proof here, as I've said several times, there has

ER-360

1   to be a union of act and intent.  The government's
2   responsibility here is to prove at the point he crossed the
3   first fence, entered the United States from Mexico, he had the
4   intent to go at large.
5           If he had an alternative plan, that's one thing, but
6   they have to prove beyond a reasonable doubt that was his
7   intent.
8           Not his only intent.  Maybe they had a backup plan,
9   but they have to show that was his really his conscious purpose
10  at that point.  So don't argue contrary to that.  You can't
11  say, well, he got over and then he changed his mind and he used
12  this as some kind of subterfuge.
13          Your responsibility, Mr. McDonald, as I read the case
14  law, is to prove at the point of entry, he had the intent to go
15  at large in the United States.
16          MR. MCDONALD:  And I just want to clarify this, I plan
17  to hew my argument to what was said in Argueta Rosales
18  including the last sentence of page six on the right-hand
19  column, similarly if Argueta actually intended to sneak into
20  the country and changed his plans only when he was spotted by
21  the border patrol, he again would be guilty.
22          THE COURT:  I think that's fine.  But, again, the
23  concentration is on your burden of proving that at the point of
24  entry, his specific intent was to go at large.
25          So I'll listen carefully.  But don't suggest something

ER-361

 1   contrary to that.  That's what you have to prove here.

 2          Okay, let's see.  Separate crime as charged.  Oh, oh.

 3   I don't know, this was thrown in, this LIO.

 4          Does anybody want this, The lesser included offense?

 5          MR. DAVIS:  Yes, Your Honor, we'd ask for that for

 6   count one, the 1325 misdemeanor -- I'm sorry, felony, in the

 7   event the jury finds that they haven't proven the prior

 8   conviction.

 9          THE COURT:  Here's what I'll modify this and I'll give

10   it because you asked for it, Mr. Davis, but instead of the

11   crime of, I'll start it out, a lesser included offense of count

12   one is attempted improper entry by an alien and then go on from

13   there.

14          And I propose that we insert it right after count one

15   rather than leave it before we go -- give it before we go to

16   count two.

17          MR. DAVIS:  Agree with all of that.

18          THE COURT:  Okay.

19          I don't think I'm going to -- is there any reason for

20   me to repeat this three times, mere preparation is not a

21   substantial step?  And alien is a person designated and all

22   that stuff?

23          MR. DAVIS:  I think the Court could say that these

24   definitions apply to both counts in the lesser included and

25   state them once.